ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
        – and –
SCOTT H. SAHAM (188355)
ASHLEY M. KELLY (281597)
TING H. LIU (307747)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LAMARTINA, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Case No. 5:20-cv-02182-EJD |
| Plaintiff, ) ) | CLASS ACTION |
| vs. ) ) | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| VMWARE, INC., et al., ) ) | |
| Defendants. ) ) | |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................................3

        A.      Defendants Inflated Backlog to Conceal the True State of Affairs ........................3

        B.      On the Heels of Record-Breaking License Backlog, Insiders Sold Nearly
                $60 Million of VMware Stock at Inflated Prices.....................................................5

        C.      Defendants Disclose that Backlog Has Virtually Disappeared, and that
                VMware's Accounting for Backlog Is Being Investigated by the SEC...................6

III.    ARGUMENT.........................................................................................................................6

        A.      Plaintiff Pleads Actionable Misstatements and Material Omissions .......................7

                1.      Defendants Omitted Material Historical Facts Rendering Reported
                        Backlog Misleading to Investors ................................................................7

                2.      Defendants Violated GAAP by Inflating Reported Backlog and
                        Using It as a Slush Fund to Inflate FY 2020 Revenue...............................8

                3.      Defendants' Statements Are Not Protected by the Safe Harbor................10

                4.      VMware's Cautionary Language Was Not Meaningful ............................11

                5.      VMWare's False Statements Were Not "Puffery" ...................................13

        B.      The Complaint Alleges a Strong Inference of Scienter .........................................15

                1.      Defendants' Stock Sales Were Dramatically out of Line with Prior
                        Trading Practices and Maximized Personal Benefit.................................16

                2.      Defendants Gelsinger and Rowe Oversaw Core Financial
                        Operations Including the Reporting of Backlog .......................................19

                3.      GAAP Violations Support a Strong Inference of Scienter ........................19

                4.      The Resignation of the Chief Accounting Officer Is Further
                        Evidence of Scienter ................................................................................20

                5.      The Temporal Proximity of Defendants' Misrepresentations and
                        the Revelation of the Fraud Supports Scienter ........................................20

        C.      Plaintiff Has Adequately Alleged Loss Causation.................................................21

        D.      The Complaint Adequately Alleges a §20A Claim Against Defendant
                Gelsinger................................................................................................................23

IV.     CONCLUSION....................................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Azar v. Yelp, Inc.*,
   No. 18-cv-00400-EMC, 2018 WL 6182756
   (N.D. Cal. Nov. 27, 2018)................................................................................................18

*Backe v. Novatel Wireless, Inc.* (*In re Novatel Wireless Sec Litig.*),
   Case No. 08-CV-1689 H (RBB),
   2010 U.S. Dist. LEXIS 49543
   (S.D. Cal. May 12, 2010)................................................................................................24

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................ *passim*

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ...................................................................................14, 23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*
   *Waters Corp.*,
   632 F.3d 751 (1st Cir. 2011)..........................................................................................18

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................................21

*Eminence Cap., L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) .......................................................................................25

*Fouad v. Isilon Sys., Inc.*,
   No. C07-1764 MJP, 2008 WL 5412397
   (W.D. Wash. Dec. 29, 2008)......................................................................................19, 20

*Gebhardt v. ConAgra Foods, Inc.*,
   335 F.3d 824 (8th Cir. 2003) ...........................................................................................8

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008)............................................................................20

*In re CommVault Sys., Sec. Litig.*,
   No. 14-cv-5628 (PGS), 2016 WL 5745100
   (D.N.J. Sept. 30, 2016) ...............................................................................................8, 10

*In re Connetics Corp. Sec. Litig.*,
   No. C 07-02940 SI, 2008 WL 3842938
   (N.D. Cal. Aug. 14, 2008)...............................................................................................24

**Page**

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................................................14

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................................23

*In re Cypress Semiconductor Sec. Litig.*,
836 F. Supp. 711 (N.D. Cal. 1993) ......................................................................................24

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th. Cir. 2005) .............................................................................................19

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..............................................................................................21

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ..........................................................................13, 14

*In re Intrexon Corp. Sec. Litig.*,
No. 16-cv-02398-RS, 2017 WL 732952
(N.D. Cal Feb. 24, 2017)......................................................................................................14

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ....................................................................................13

*In re Intuitive Surgical Sec. Litig.*,
No. 5:13-cv-01920-EJD, 2017 WL 4355072
(N.D. Cal. Sept. 29, 2017) .....................................................................................................8

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................................19

*In re MRV Commc'ns Derivative Litig.*,
No. CV 08-03800 GAF, 2010 WL 5313442
(C.D. Cal. Dec. 27, 2010) .....................................................................................................20

*In re Network Assocs., Inc., Sec. Litig.*,
No. C 99-01729WHA, 2000 WL 33376577
(N.D. Cal. Sept. 5, 2000) ......................................................................................................15

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ................................................................................................13

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ....................................................................................11, 13, 15

**Page**

*In re Questcor Sec. Litig.*,
    No. SA CV 12-01623 DMG, 2013 WL 5486762
    (C.D. Cal. Oct. 1, 2013) ..............................................................................................................18

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 RWS, 2005 WL 225288
    (S.D.N.Y. Feb. 1, 2005) ..............................................................................................................12

*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000) .........................................................................................11

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ............................................................................................8

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ....................................................................................18, 20

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ...................................................................................................21

*Karinski v. Stamps.com, Inc.*,
    No. CV 19-1828-MWF, 2020 WL 281716
    (C.D. Cal. Jan. 17, 2020) ............................................................................................................19

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018), *cert. denied*
    *Hagan v. Khoja*, __ U.S. __, 139 S. Ct. 2615 (2019) ..................................................................7

*Kmiec v. Powerwave Techs., Inc.*,
    No. SACV 12-00222-CJC(JPRx), 2013 WL 10106769
    (C.D. Cal. Oct. 23, 2013) ............................................................................................................19

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) .......................................................................................................11

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .....................................................................................................21

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd sub nom.*
    *Fresno Cnty Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*,
    607 F. App'x 694 (9th Cir. 2015) ................................................................................................11

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)..........................................................................................20

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) .......................................................................................24

**Page**

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...............................................................................................7

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018),
    *cert. denied*, __U.S.__, 139 S. Ct. 2741 (2019)...............................................................3, 4, 21

*Mulderrig v. Amyris, Inc.*,
    No. 19-CV-1765 YGR, 2020 WL 5903844
    (N.D. Cal. Oct. 5, 2020)...............................................................................................9, 11, 12

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................................14

*Neubronner v. Milken*,
    6 F. 3d 666 (9th Cir. 1993) ..................................................................................................23

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..............................................................................................13

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v.*
    *Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................................................16

*Okla. Firefighters Pension & Ret. Sys. v IXIA*,
    50 F. Supp. 3d 1328 (C.D. Cal. 2014) ...................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................................8

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................................................21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..............................................................................................14

*Reese v. BP Expl. (Ala.) Inc.*,
    643 F.3d 681 (9th Cir. 2011) .................................................................................................7

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014), *overruled on other grounds*
    *by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*
    *Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .....................................................................................15, 19, 21

*Ret. Tr. v. R.H., Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) .................................................................................7

**Page**

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) .................................................................................13

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ................................................................................................20

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................................................19

*S.E.C. v. Todd*,
642 F3d 1207 (9th Cir. 2011) ...............................................................................................10

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ...................................................................................1, 7, 8, 15

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
No. 18-CV-06720-LHK, 2020 WL 5408056
(N.D. Cal. Sept. 9, 2020) ......................................................................................................24

*Shaw v. Digit. Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996),
*abrogated on other grounds by* 15 U.S.C. 78u-4(b)(2) ........................................................18

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................................7, 11, 15

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ......................................................12

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .................................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).........................................................................................................6, 15

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991).............................................................................................................11

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) .....................................................................................................7

*Washtenaw Cnty. Emps. Ret. v. Celera Corp.*,
No. 5:10-cv-02604 EJD, 2012 WL 3835078
(N.D. Cal. Sept. 4, 2012) ......................................................................................................12

*Zaghian v. Farrell*,
675 F. App'x 718 (9th Cir. 2017) ..........................................................................................11

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)...........................................................................................................................1
    §78t(a) ..........................................................................................................................1
    §78t-1 .....................................................................................................................23, 24
    §78u-4(b)(1)(B)............................................................................................................7
    §78u-4(b)(2) ...............................................................................................................18

Federal Rules of Civil Procedure
    Rule 9(b) ......................................................................................................................7
    Rule 12(b)(6)................................................................................................................6

## I.    INTRODUCTION

Lead Plaintiff Northeast Carpenters Pension Fund ("Plaintiff") brings this securities class action under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"). ¶1.[1]  Plaintiff alleges that VMware, Inc. ("VMware" or the "Company"), and its Chief Executive Officer ("CEO") Patrick Gelsinger ("Gelsinger") and Chief Financial Officer ("CFO") Zane Rowe ("Rowe") (collectively "Defendants") deliberately inflated publicly reported backlog (sales that were contractually secured but not yet fulfilled) by ordering employees to *hold* from fulfillment secured contracts that were not needed to meet fiscal year ("FY") 2019 revenue guidance.  This scheme allowed VMware to start FY 2020 with a ***$450 million slush fund*** that was drawn upon in order to artificially enhance reported revenue growth during FY 2020.  ¶¶2-3.  Backlog is widely recognized as an important leading metric for investors as stocks are valued, in large part, based upon future growth potential as opposed to past earnings.  The inflated backlog was reported to investors and caused VMware's stock to trade at artificially inflated prices.  ¶4.  Given the importance of backlog to a company's stock price, the Ninth Circuit has held that "once defendants cho[o]se to tout the company's backlog they [are] bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of."  *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

VMware's backlog reported at year end FY 2019 was misleading to investors as the Company failed to disclose that but for defendants holding of secured contracts from fulfillment, much of the backlog would have organically been booked as revenue in FY 2019 and thus not been available to book during FY 2020.  ¶¶3, 32.  During FY 2020, Defendants drew down the artificial backlog slush fund they had created and reported misleadingly inflated revenues as a result.  ¶3. Defendants' conduct violated Generally Accepted Accounting Principles ("GAAP"), allowed VMware to misleadingly report ***double digit revenue growth*** during FY 2020, and allowed Defendants Gelsinger and Rowe and other insiders to sell over $118 million of their VMware stock

---

[1]    "¶_" and "¶¶_" refers to the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 50).

at highly inflated prices.  ¶¶3, 7.  Had Defendants recognized the backlog revenue when it was actually secured in FY 2019, VMware would have reported only *low single digit revenue growth* during FY 2020 and Defendants would not have been able to sell their stock at inflated prices.  ¶3.

VMware's boilerplate risk warning that it "'do[es] not believe the amount of backlog is indicative of future sales or revenue'" (Defs.' MTD at 2) does not immunize Defendants from liability, as it did not warn investors that VMware had *already* deferred revenue that was not needed to meet FY 2019 targets into backlog so that it would be available to inflate FY 2020 revenues.[2]  The Ninth Circuit, in *Berson*, rejected the same defense based upon a nearly identical warning that "'backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period.'"  527 F.3d at 986.  As in *Berson*, Defendants' failure to disclose what VMware's backlog "consisted of" is actionable as it created the "'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Id*. at 985-87.

Plaintiff has also alleged a strong inference of scienter as the inflation of backlog was deliberate and served no legitimate business purpose.  ¶¶2, 22-23.  Not only did *management direct that secured contracts be held to the next quarter*, but the Company's key executives, including the Defendants, took advantage of the Company's artificially inflated stock price, *unloading over $118 million of their own VMware stock*.  Defendants Gelsinger and Rowe alone accounted for over $41 million (or 34.7%) of these insider sales.  ¶¶2, 7, 62, 126-142.

Plaintiff has likewise adequately alleged loss causation – linking the fraud to Plaintiff's loss – as it purchased VMware stock at prices that were inflated as a result of Defendants' inflation of backlog and was harmed when VMware's stock price declined when Defendants disclosed the declines in backlog starting on May 30, 2019 that occurred as a result of the backlog draw down.  ¶¶143-153.  Defendants ultimately admitted on February 27, 2020, that VMware's total backlog had declined 96%; that VMware could not meet FY 2020 revenue guidance; and that the U.S. Securities and Exchange Commission ("SEC") had launched an investigation into the Company's accounting

---

[2]  "Defs.' MTD" refers to Defendants' Notice of Motion and Motion to Dismiss Amended Complaint; Memorandum of Points and Authorities in Support Thereof (ECF No. 51).

for backlog and related disclosures.  In total, the value of VMware shares declined $85 per share – over 41% from its Class Period high – following four quarterly disclosures of declining backlog. These allegations more than satisfy the standard recently articulated by the Ninth Circuit that "[t]o prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to the 'very facts about which the defendant lied.'"  *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, __U.S.__, 139 S. Ct. 2741 (2019).[3]

## II.  STATEMENT OF FACTS

### A.  Defendants Inflated Backlog to Conceal the True State of Affairs

Throughout FY 2019, Defendants engaged in a practice of materially and artificially inflating backlog by pushing sales that were not required to meet current period guidance into the next reporting period, by deliberately leaving them categorized as unfulfilled at quarter end.  ¶22.  Sales personnel would submit executed contracts for processing through the systems operations group at VMware's headquarters.  ¶23.  At the end of each quarter, and particularly at year end, ***VMware would deliberately leave executed contracts unprocessed, to be recognized in the subsequent quarter by funneling them into the Company's backlog***.  *Id*.  This practice served no legitimate purpose and had the effect of delaying and smoothing the recognition of revenue so that the revenue from those contracts would be recognized in the future rather than the quarter in which the contract execution was achieved.  *Id*.

By pushing sales not required to meet FY 2019 guidance into backlog, VMware was able to report a head start – ***nearly half a billion dollars*** – toward meeting guidance for FY 2020.  The increased backlog created the perception of a state of affairs at VMware that was dramatically different from what actually existed and the later drawdown continued to give analysts and investors a false impression of VMware's FY 2020 revenue growth.  This conduct was highly material, as by deferring revenue recognition to FY 2020, VMware was able to deliver ***double-digit*** revenue growth in FY 2020.  Had VMware recognized the revenue that was deferred into backlog during FY 2019

---

[3]    All emphasis is added and internal citations omitted unless otherwise noted.

when it was in fact secured, VMware would have delivered only *low single digit* revenue growth for FY 2020.  ¶¶24, 37.

During FY 2019, the Company reported a 58% increase in backlog, from $285 million at the beginning of the year, to $449 million at year end.  ¶25.  During the same period, license backlog likewise increased 48%.  *Id*.  The dramatic increases in backlog the Company experienced during FY 2019, and particularly at year-end, indicated to investors that the Company had a solid head start for FY 2020.  As Defendants advanced a story of impressive backlog and growth, the Company's stock price soared reaching a Class Period high of $205.52 on May 16, 2019, just two weeks prior to the release of the Company's Q1 2020 results, the first quarter in which VMware began to draw down on its backlog slush fund.  ¶¶25-26.

Defendants' motivation for racking up substantial backlog was two-fold. First, once guidance was met in FY 2019, VMware management directed that sales be deferred from the current period and recorded as backlog, so that the revenue would be available to book during the next fiscal year.  ¶27.  Second, pushing sales into backlog also *capped* the current period baseline upon which future revenue growth would be measured.  ¶28.  Fulfilling the contracts and recognizing the backlog sales organically in FY 2019 when they were secured rather than pushing them out into FY 2020 would have meant that analyst growth expectations in FY 2020 would have been significantly higher, and achieving the same percentage growth would have required nearly a *half a billion more* in total revenue.  *Id*.  Defendants' scheme enhanced the Company's prospects of meeting guidance and analyst expectations in FY 2020 and allowed VMware to continue to deliver double digit revenue growth in FY 2020.  ¶27.

Defendants' practice of deceptively pushing sales into backlog concealed from investors that VMware was facing several challenges that jeopardized the Company's ability to meet revenue guidance during FY 2020.  VMware's Americas segment was in a state of turmoil – just days after the close of FY 2019, VMware saw the departure of its head of Americas segment, leading to the reorganization of the Americas region and appointment of a new Americas leader.  This realignment resulted in deal execution problems and a subsequent slowdown following weakened performance in that region.  ¶30.  Separately, as customers' consumption of software evolved, the Company was

failing to address the industry-shift away from its license model, which was becoming obsolete, to subscription and SaaS products, which slowed the timing of revenue recognition and negatively impacted the Company's revenue growth.  ¶31.

In order to cushion the negative impact of these factors on the Company's financial performance in FY 2020, Defendants poured excess FY 2019 sales into VMware's backlog, thus artificially inflating backlog and misleading investors as to VMware's prospects for FY 2020 and creating a lower threshold to measure future growth.  As a result of their practice of deliberately pushing sales into backlog, Defendants were aware, but failed to disclose, that backlog was no longer an accurate barometer of the Company's expected performance as it was now being used to smooth reported results.  ¶32.

**B.  On the Heels of Record-Breaking License Backlog, Insiders Sold Nearly $60 Million of VMware Stock at Inflated Prices**

Knowing that the Company's massive license backlog reported at the close of FY 2019 would be drawn upon and not replenished and thus was no longer an accurate metric regarding the Company's financial health, Defendants Gelsinger and Rowe, and other insiders sold VMware shares at prices inflated to near all-time highs.  From March 1, 2019 – the day immediately following the Company's Q4 2019 announcement of record license backlog – until May 30, 2019 when defendants disclosed a 67% decline in license backlog during Q1 2020 – VMware executives, including the individual Defendants, unloaded ***$58.9 million*** in VMware stock at inflated prices, as high as $204.83 per share.  ¶¶7, 62 (Figure 2), 126-36.  Notably, during this period, Defendant Gelsinger sold over 41,000 shares of VMware stock at highly inflated prices, yielding almost $8 million in proceeds and Defendant Rowe sold over 48,000 shares yielding nearly $9 million.  ¶¶42-45, 130-33.  These sales maximized profits as they were made after VMware's share price had reached nearly full inflation to Class Period highs as a result of Defendants' inflation of backlog.  Notably, these shares would lose as much as $84 per share (40% of their value) when the truth about Defendants' backlog was belatedly disclosed to investors.

Moving forward, Defendants violated GAAP by failing to disclose that reported revenue included a drawdown of the backlog slush fund that had been stock piled with revenue secured in FY

2019. Unbeknownst to investors, without this deferred revenue, VMware would have reported significantly lower revenue growth for FY 2020 (low single digits as opposed to the double-digit growth reported). During this period, VMware's key executives responsible for managing the Company's day-to-day operations (including Defendants Gelsinger and Rowe) continued to sell millions of dollars of VMware stock prior to the additional disclosures of declining back log – a total of $118.6 million during the Class Period. ¶¶7, 126-36.

### C. Defendants Disclose that Backlog Has Virtually Disappeared, and that VMware's Accounting for Backlog Is Being Investigated by the SEC

Starting on May 30, 2019, Defendants disclosed the first of four large, quarterly declines in backlog for FY 2020. Financial analysts contemporaneously noted that the large decline in backlog appeared to be the result of the fact "that a good portion of 1QF20 product billings were actually 4QF19 deals that got invoiced in 1QF20." ¶48. Ultimately, on February 27, 2020, Defendants disclosed that total backlog had declined 96% and license backlog had declined 97% from Q4 2019, and that the Company was unable to meet license and total revenue guidance for Q4 2020 and FY 2020. ¶55. In addition, the Company also revealed that "the staff of the Enforcement Division of the [SEC] requested documents and information related to VMware's backlog and associated accounting and disclosures." ¶149. The Company's stock price declined substantially following each of the four FY 2020 quarterly disclosures of declining backlog shedding $85 per share, 41% of its value. ¶¶56-59.

## III. ARGUMENT

In assessing a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a court must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The Ninth Circuit has cautioned that:

> If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).

*Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). By specifically alleging the "'who, what, when, where, and how' of the fraud," Plaintiff's claims meet the heightened pleading requirements

of Rule 9(b) and the PSLRA. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018), *cert. denied Hagan v. Khoja*, __ U.S. __, 139 S. Ct. 2615 (2019).

### A.     Plaintiff Pleads Actionable Misstatements and Material Omissions

A statement is misleading """"if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.""""  *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. R.H., Inc.*, 302 F. Supp. 3d 1028, 1039 (N.D. Cal. 2018) (quoting *Reese v. BP Expl. (Ala.) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011)).  Statements that are "literally true" may be misleading due to """"their context and manner of presentation.""""  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (considering the "fair and reasonable implication an ordinary investor would derive" from the alleged misstatements in assessing falsity).  "'[O]nly if "reasonable minds" could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6).'"  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).  The Complaint properly alleges falsity by "'specify[ing] . . . each statement alleged to have been misleading, . . . the reason or reasons why the statement is misleading, and . . . stat[ing] with particularity all facts on which that belief is formed.'"  *Khoja*, 899 F.3d at 1008; 15 U.S.C. §78u-4(b)(1)(B).  Nothing more is required at this stage.

### 1.     Defendants Omitted Material Historical Facts Rendering Reported Backlog Misleading to Investors

The Ninth Circuit has held that "'once defendants chose to tout the company's backlog they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of.'"  *Schueneman*, 840 F.3d at 707; *Berson*, 527 F.3d at 985.  Here, Defendants, during FY 2019, reported backlog that was "misleading" because it "consisted of" sales from contracts that were ***intentionally held***, not for any legitimate business purpose, but because they were not needed to meet current quarter guidance.  These sales were then deferred into backlog in order to give the Company a head start for FY 2020.  Defendants' failure to disclose these material facts regarding what VMware's backlog "***consisted of***" rendered the reported backlog misleading by creating the

"'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson*, 527 F.3d at 985.

Plaintiff's allegations of the misleading nature of this activity are more than sufficient. In order to meet and not overly exceed market expectations, once quarterly sales goals were achieved, ***VMware management directed the Company's personnel to hold secured contracts*** until the next quarter, resulting in revenue smoothing into subsequent quarters, causing reported revenue to be far more consistent across reporting periods than it actually was. ¶¶2, 23. This undisclosed deliberate smoothing of revenue artificially inflated backlog reported to investors and created an impression of steady and continued growth that was not indicative of actual corporate performance. *Id.* Defendants' failure to disclose this practice rendered the backlog numbers it reported to investors misleading under binding Ninth Circuit precedent. *Schueneman*, 840 F.3d at 707; *Berson*, 527 F.3d at 985; *see also Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("Most investors would consider it significant, no matter what the mix of information available, that a company was not earning as much as it was claiming to earn" in a particular period.); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) (a company "must as well desist from misleading investors by saying one thing and holding back another"); *In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) (same); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 202 (E.D.N.Y. 2000) (fact that Defendant "was consistently 'robbing Peter to pay Paul' . . . is undoubtedly a fact that a reasonable investor would have considered important").

### 2. Defendants Violated GAAP by Inflating Reported Backlog and Using It as a Slush Fund to Inflate FY 2020 Revenue

"The practice of deferring the recognition of revenues to a later period in order to manipulate earnings is a GAAP violation." *In re CommVault Sys., Sec. Litig.*, No. 14-cv-5628 (PGS), 2016 WL 5745100, at *2 (D.N.J. Sept. 30, 2016). "[W]hen companies misleadingly shift revenue or earnings from one period to another for the purpose of making the latter period look better, it violates GAAP. This practice is known as 'cookie jar' accounting, 'earnings management' or 'smoothing,' and constitutes an improper manipulation of the subject financial statements." *Id.* Revenue

understatement theories provide the basis for an Exchange Act claim where plaintiff alleges defendant "shifted revenue from the present to the future . . . to create the false impression that [defendant] had significant future growth potential." *Okla. Firefighters Pension & Ret. Sys. v IXIA*, 50 F. Supp. 3d 1328, 1358 (C.D. Cal. 2014). That is exactly what is alleged here.

In this case, Defendants' practice of deliberately inflating backlog so that current period revenue could be recognized in future periods violated GAAP, Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, which requires "an entity to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers." ¶34. VMware violated ASC 606 as it failed to disclose the significant judgments, and changes to those judgments, related to the Company's accounting for and disclosure of backlog and how the delay in revenue recognition would impact future periods. *Id.*; ASC 606-10-50-17 (requiring the disclosure of the judgments, and changes in the judgments, made in applying the revenue recognition guidance "that significantly affect the determination of the amount and timing of revenue from contracts with customers"); *Mulderrig v. Amyris, Inc.*, No. 19-CV-1765 YGR, 2020 WL 5903844, at *9 (N.D. Cal. Oct. 5, 2020) (holding that "report[ing] revenues in a manner inconsistent with the GAAP standards stated in ASC 606 [is] misleading to investors").[4]

This omission was clearly material, as without the deferral of revenue intentionally held as backlog at the end of FY 2019, VMware would have been forced to disclose significantly lower revenue and growth rates during FY 2020. ¶37. The significant financial impact of the earnings manipulation on VMware's future financial results is precisely the type of information required to be

---

[4]    While Defendants claim the Company's revenue recognition policies were GAAP-compliant pursuant to ASC 606 (*see* Defs.' MTD at 3, 8-9), they do not dispute the Complaint's allegations that the Company failed to disclose the judgments, and changes to those judgments, used in accounting for and disclosing backlog, and how the Company's delay in recognizing prior-period revenue impacted future periods. ¶¶33-35. This violated GAAP.

disclosed under the SEC's Management's Discussion & Analysis ("MD&A") rules, which require the disclosure of "material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance." *See SEC Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350; 34-48960; FR-72 (Dec. 29, 2003). SEC Staff Accounting Bulletin ("SAB") 114 Topic 13.B. expressly provides that significant changes in backlog that reasonably might be expected to result in a revenue change the next period should be disclosed and discussed. During the Class Period, Defendants violated SAB 114 as they failed to disclose VMware's practice of intentionally deferring revenue into backlog in order to smooth earnings. ¶37. This conduct is actionable as "[t]he practice of deferring the recognition of revenues to a later period in order to manipulate earnings is a GAAP violation." *CommVault*, 2016 WL 5745100, at \*2-\*3 ("By deferring recognition of the software revenue put into its 'cookie jar' until the second and third quarters of fiscal 2014, and then falsely attributing its ability to meet software revenue targets to 'pure software license growth,' Defendants were able to create the illusion that CommVault was still a high growth Company . . . .").[5]

### 3.    Defendants' Statements Are Not Protected by the Safe Harbor

First, the Ninth Circuit in *Berson* rejected Defendants' argument that backlog is forward-looking and somehow subject to the PSLRA safe harbor (Defs.' MTD at 9-10), because "'backlog' isn't a 'projection' of earnings or a 'statement' about 'future economic performance' . . . backlog is, instead, a snapshot of how much work the company has under contract right now, and descriptions of the present aren't forward-looking." 527 F.3d at 990.

---

[5]    Even if Defendants assertion that they complied with GAAP (Defs.' MTD at 8) was correct, which it is not, "technical compliance with GAAP does not preclude a finding that an accounting treatment was a material misrepresentation" when like here, "there was evidence to support a finding that booking the transaction as revenue was nonetheless materially misleading to investors." *S.E.C. v. Todd*, 642 F3d 1207, 1217 (9th Cir. 2011).

Next, VMware's statements in ¶¶69-70, 82, 88, 91, 94-95, 103, 119 and 121 also contain representations of current fact (*e.g.*, the current state of VMware's business). Accordingly, those representations are also not subject to safe harbor protection. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) ("We hold a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings."); *Mulderrig*, 2020 WL 5903844, at *14-*15 (finding the PSLRA safe harbor did not apply as the "financial forecasts were intertwined with its misstatements of current revenues and the revenue pipeline" and the defendants "failed to disclose the material facts undermining those projections").

Further, courts even find that mixed statements that contain projections are not forward looking if they are rendered misleading by misrepresentations of current conditions. *See In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (in analyzing statement that company was "on track to meet analysts' earnings expectations," the court "accepts [p]laintiffs' representation that they are alleging that [d]efendants misrepresented current business conditions" and concludes that the statement is not forward-looking); *see also Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (finding statement that revenues "'will continue to grow'" though "ostensibly couched in terms of the future, this statement also concerns historical and current facts"), *aff'd sub nom. Fresno Cnty Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).

### 4.    VMware's Cautionary Language Was Not Meaningful

The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the cautionary language prong of the safe-harbor provision. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). To constitute meaningful cautionary language, a disclaimer must "sufficiently address the harm that resulted." *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017). Indeed, risk warnings must be clear enough that "'"reasonable minds" could not disagree that the challenged statements were not misleading.'" *Twitter, Inc.*, 282 F. Supp. 3d at 1133; *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083,

1097 (1991) (to warrant protection, the cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil").

Defendants place much stock in their alleged risk warning that VMware "do[es] not believe the amount of backlog is indicative of future sales or revenue." Defs.' MTD at 2. This warning was wholly inadequate as it failed to reveal to investors that Defendants had *already* deceptively deferred revenue that was not needed to meet FY 2019 targets by placing it into backlog for future use. In *Berson*, the Ninth Circuit held that defendants' nearly identical backlog risk warning failed to "alert[] the reader that some of these risks may *already* have come to fruition." 527 F.3d at 986 (risk warning that "backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period" is not sufficient to avoid liability); *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (rejecting warning that product may be subject to product liability claims only "in the abstract, with no indication that the risk 'may already have come to fruition'"), *aff'd*, 563 U.S. 27 (2011); ¶¶2-6, 22-26. As this Court has recognized, the "safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized." *Washtenaw Cnty. Emps. Ret. v. Celera Corp.*, No. 5:10-cv-02604 EJD, 2012 WL 3835078, at \*4 (N.D. Cal. Sept. 4, 2012). Here, Defendants knew they had *already* artificially inflated backlog so that they could use FY 2019 sales as a head start to meet FY 2020 targets. Thus "[t]he statutory safe harbor does not apply because the [p]laintiff[] ha[s] adequately alleged that the [d]efendants *knew* of problems which they represented to be merely risks or uncertainties." *Id.* at \*4; *see also In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 RWS, 2005 WL 225288, at \*18-\*19 (S.D.N.Y. Feb. 1, 2005) ("discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized").

Finally, as discussed above, the statements regarding revenue and backlog were premised upon misleading representations of *current or historical* revenue and backlog and are thus not covered by the safe harbor. *Mulderrig*, 2020 WL 5903844, at \*1 ("[T]he statements defendants contend were forward-looking growth and revenue projections were accompanied by and premised upon false representations of current revenue, making them ineligible for the PSLRA's safe

harbor."); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (holding that financial guidance that lacks a reasonable basis at the time it is made is an actionable misleading statement).

### 5.      VMWare's False Statements Were Not "Puffery"

Taking two of Plaintiff's statements out of context, Defendants insist that their "optimistic statements on earnings calls, in press releases and public filings" are non-actionable puffery. Defs.' MTD at 11.  Defendants are wrong.  "'[G]eneral statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *Quality*, 865 F.3d at 1143; *see also In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 n.3 (N.D. Cal. 2014) (J. Davila). Only "forward-looking statements of optimism that are 'not capable of objective verification' and 'lack a standard against which a reasonable investor could expect them to be pegged'" are considered puffery.  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).  "'[T]he defining question is 'whether the statement is so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of information.'"  *Id.*

Here, Defendants' public statements concerning the Company's current period backlog, revenue, earnings guidance, and revenue forecasts went beyond the generalized cheerleading that courts have classified as puffery.  Instead, the statements contain factual representations concerning VMware's backlog and revenue specific and verifiable metrics.  *See, e.g.*, ¶¶3-4, 21, 24-26, 49, 139. It is highly plausible that investors would find these statements material, as these metrics were fundamental to VMware's business.  Accordingly, these representations are not so obviously unimportant to shareholders to warrant dismissal.  *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (noting that a statement is merely puffery when it is "extremely unlikely to induce consumer reliance"); *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018) (J. Davila) (declining to dismiss statements as non-actionable puffery as the "Defendants made factual statements regarding certain aspects of Gigamon's business, in particular Gigamon's backlog"); *Quality*, 865 F.3d at 1144 (finding the challenged statements actionable as the defendants "did not describe the pipeline in subjective or emotive terms," instead "they provided a concrete description of the past and present state of the pipeline").

Further, "the context in which the statements were made is key." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). Defendants claim that one part of a quotation "we believe we are in a strong cycle" is puffery (Defs.' MTD at 11), yet ignore the remainder of the statement: "These are long-term trends and we believe that we're in a very good cycle for the business *for not just this quarter*, but well into the future." ¶64. The "'fact-intensive assessment[]'" of determining materiality that is "'more properly left to the jury.'" *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Accordingly, Defendants' statement is not "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Id*. at 967.

Defendants also contend that the statement "[w]e're comfortable with the SaaS mix and the hybrid cloud mix that we're growing here at VMware" is not actionable. Defs.' MTD at 11.[6] But again, Defendants take the pleaded statement out of context. When viewed in its entirety, the statement created a misleading impression that the "business [was] performing well" and that Defendants were "confident heading into the next year," when in fact they knew that VMware had deceptively pushed nearly half a billion dollars of sales not required to meet FY 2019 guidance into FY 2020. ¶¶2-3, 22-26, 70. Thus, as the challenged statement is not so "'exaggerated' or 'vague'" that no reasonable investor would rely on it when considering the total mix of available information," *Impac Mortg.*, 554 F. Supp. 2d at 1096; *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (defendants' statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]").

---

[6] The generalized statements in the cases that Defendants have cited are distinguishable. Defs.' MTD at 11; *see In re Intrexon Corp. Sec. Litig.*, No. 16-cv-02398-RS, 2017 WL 732952, at *3 (N.D. Cal Feb. 24, 2017) ("'extensive knowledge and experience,'" "'complementary technologies,'" and "'first-mover advantage in synthetic biology'"); *see also In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) ("'continuing improvements'" and "'accomplishments we have achieved'").

**B.    The Complaint Alleges a Strong Inference of Scienter**

The Complaint pleads facts collectively giving rise to a "strong inference" of scienter. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A "'strong inference'" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* "'The PSLRA calls for a "strong inference," not an outright confession or an airtight case.'" *In re Network Assocs., Inc., Sec. Litig.*, No. C 99-01729WHA, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000). The question is "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("*Reese II*") (emphasis in original), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Schueneman*, 840 F.3d at 705. "'An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *Twitter, Inc.*, 282 F. Supp. 3d at 1134 (citing *Reese II*, 747 F.3d at 569); *see also Quality*, 865 F.3d at 1145 ("'particularized allegations that defendants had "actual access to the disputed information," . . . raise a strong inference of scienter'").

Plaintiff has pled a strong inference of scienter as the Complaint alleges that the backlog numbers were deliberately *inflated at the direction of management* as employees were instructed to push sales orders into future quarters once the Company had recorded enough revenue in order to meet current period guidance. ¶¶2, 27. The Complaint further alleges that there was *no legitimate business purpose* for this conduct and that it was done in order to obtain a head start toward FY 2020, as contrary to Defendants' assertion (Defs.' MTD at 12) they knew that the shift away from *license to subscription and SaaS* and the *turmoil in the Americas segment* including the departure of its leader would slow revenue growth during FY 2020. ¶¶2, 23-24, 27, 30-31, 42-45, 62, 126-136.

The Complaint further alleges motive as Defendants profited as a result by selling their VMware shares at suspicious times at highly inflated prices.  *Id*.

### 1.    Defendants' Stock Sales Were Dramatically out of Line with Prior Trading Practices and Maximized Personal Benefit

""'"[U]nusual" or "suspicious" stock sales by corporate insiders"'"" support a strong inference of scienter "'"when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed information."'""  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003).  "'Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insiders prior trading history.'"  *Id*.  When each of those factors are considered here, the Defendants and key executives sales are highly unusual and suspicious in time and amount and, therefore, support a strong inference of scienter.

During the Class Period, Defendant *Gelsinger sold $23.4 million* of VMware stock (over 141,000 shares) at inflated prices while in the possession of material non-public information.  In contrast to his large Class Period, stock sales, Defendant Gelsinger sold *no* VMware stock in the five years directly preceding the Class Period, thus, his sales were highly inconsistent with his prior trading history.  In addition, Defendant Gelsinger sold shares at suspicious times at highly inflated prices.  For example, on March 1, 2019, the day after the Company disclosed record-breaking license backlog, he sold 21,086 shares of his VMware stock at prices as high as $181.61 per share for proceeds of $3.77 million.  ¶¶127-128.  Defendant Gelsinger also sold approximately $4 million in additional stock on May 1, 2019 after the Company's share price reached record levels of over $204 per share shortly before the first disclosure of declining license backlog that sent VMware's share price plummeting.  ¶¶43, 132-133.

Similarly, Defendant Rowe's Class Period sales were likewise inconsistent with his prior trading history.  During the Class Period, Defendant *Rowe sold 104,218 shares of VMware stock* at inflated prices while in the possession of material non-public information to yield proceeds of *$17.8 million*.  ¶129.  Defendant This included the sale of almost $9 million on April 2, 2019 just three

days after VMware reported record backlog at year end FY 2019. ¶130. Notably, in the 18 months preceding the Class Period, Defendant Rowe made only two transactions, selling a total of only 13,100 shares for $1.76 million in proceeds. ¶129. Defendant Rowe's Class Period transactions thus represent an increase of ***915%*** from his pre-Class Period sales. *Id.*

In total, VMware executives sold over 702,000 shares of stock during the Class Period at inflated prices for proceeds in excess of $118.6 million. ¶¶7, 45, 130. The executives' Class Period sales were dramatically out of line with the executives' prior trading practices. During the 18 months prior to the Class Period, VMware executives collectively sold only 251,867 shares of VMware stock, for proceeds of under $31.8 million. ¶131. Thus the total number of shares sold, and proceeds received during the Class Period, by VMware's executives increased by 179% and 272%, respectively. *Id.* The insider sales were also suspicious in timing as they occurred at times calculated to maximize personal benefit from undisclosed inside information. VMware executives sold $84.1 million in VMware stock at inflated prices prior to the first disclosure of declining backlog on May 30, 2019. ¶132.

From March 1, 2019 – the day immediately following the Company's FY 2019 announcement of record-breaking backlog numbers – through May 2, 2019 – just ***one day*** prior to the close of Q1 2020 – VMware executives, including Defendants Gelsinger and Rowe, unloaded $58.9 ***million*** in VMware stock at inflated prices, as high as $204.83 per share. This included sales by Defendant Gelsinger of $3.8 million (21,086 shares) on March 1, 2019, the day after the Company's 4Q 2019 announcement of record backlog, and over $4 million (20,000 shares) on May 1, 2019 at prices near the Company's all-time high, less than one month before the disclosure of the 67% decline in license backlog and the resulting share price decline. ¶¶44, 62 (Figure 2), 128, 130-133. All told ***50%*** of the executives' sales during the Class Period were made in the ***three-month period*** between the Company's announcement of all-time high license backlog on February 28, 2019, and the time the Company announced the drastic decline in license backlog on May 30, 2019. ¶133. By selling their stock at inflated prices, Defendants Gelsinger and Rowe and the other executives were able to maximize profits prior to the disclosure of adverse information.

Defendants assert that the existence of 10b5-1 trading plans somehow rebut a strong inference of scienter. Defs.' MTD at 14. As an initial matter, courts routinely reject this affirmative defense as premature at the pleading stage. *See In re UTStarcom, Inc. Sec. Litig*., 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales [pursuant to a 10b5-1 plan] may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) ("'[A] 10b5-1 plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith,' which a court cannot make when considering a motion to dismiss."); *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("the fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales").

Next, Defendants admit that a number of Gelsinger's and Rowe's sales (including Rowe's most egregious sales) were not even made pursuant to 10b5-1 plans. Defs.' MTD at 14-15. This is confirmed by the limited documentation Defendants improperly reference from beyond the pleadings which conspicuously fails to include the 10b5-1 plans themselves. *See* Defs.' MTD, Exs. R, W (identifying ***non*** 10b5-1 plan sales by both Gelsinger and Rowe including 18,000 shares sold by Rowe at highly inflated prices for $3.3 million in proceeds on April 2, 2019, just three days after VMware reported record backlog). Accordingly, Defendants' improper submissions do not rebut a strong inference of scienter and at most raise factual issues that cannot be resolved at the pleadings stage, as not only were the plans utilized to sell stock at inflated prices, but Gelsinger and Rowe both sold stock in addition to that which was sold pursuant to their 10b5-1 plans.

Finally, contrary to Defendants' assertion (Defs.' MTD at 15) courts do consider "stock sales by non-defendant insiders when evaluating the sufficiency of a pleading of scienter." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 762 n.5 (1st Cir. 2011); *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) (insider sales by non-defendants, "inasmuch as they are at least consistent with [plaintiffs'] theory of fraud, provide some support against the defendants' motion to dismiss"), *abrogated on other grounds by* 15 U.S.C. 78u-

4(b)(2); *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 281716, at *15-*16 (C.D. Cal. Jan. 17, 2020) ("[w]hile Defendants' arguments might appeal to a trier of fact, the Court cannot determine as a matter of law that the sales do not support scienter, even if the sales would alone be insufficient").  In any event, here Plaintiff has alleged suspicious sales by the Defendants as well as other insiders.

### 2. Defendants Gelsinger and Rowe Oversaw Core Financial Operations Including the Reporting of Backlog

The Court can infer Defendants' scienter, "based on the inference that [they] have knowledge of the 'core operations' of the company."  *Reese II*, 747 F.3d at 575.  When "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred just on the basis of the core operations doctrine.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).  Throughout the Class Period, VMware's financial operations (including the reporting of backlog) were overseen by Gelsinger and Rowe.  Gelsinger and Rowe had in place extensive processes to track VMware's financial performance, including backlog, on a daily, quarterly, and yearly basis.  ¶138.

Given their roles as CEO and CFO of the Company, Gelsinger and Rowe had access to material adverse non-public information about Company performance and the improper, unsustainable business practice of VMware deferring revenue not required to meet current period guidance into backlog so that it could be recognized in subsequent periods.  ¶142.

### 3. GAAP Violations Support a Strong Inference of Scienter

"Violations of GAAP standards can also provide evidence of scienter."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th. Cir. 2005) (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves."); *see also Kmiec v. Powerwave Techs., Inc.*, No. SACV 12-00222-CJC(JPRx), 2013 WL 10106769, at *3-*4 (C.D. Cal. Oct. 23, 2013) (strong inference of scienter created through evidence that defendants violated GAAP by shifting sales from one period to another); *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *10-*11 (W.D. Wash. Dec. 29, 2008)

("the Court is unconvinced by Defendants' argument that [the CEO and CFO] might not have known how and when the revenue on these transactions was being recognized"); *In re MRV Commc'ns Derivative Litig.*, No. CV 08-03800 GAF (RCx), 2010 WL 5313442, at *4 (C.D. Cal. Dec. 27, 2010) (refusing to find more plausible defendants' suggestion that "inference of misconduct" is negated because these "experienced, well-educated, high ranking, corporate decision-makers" were somehow "ignorant of basic accounting principles and financial reporting requirements").

### 4.    The Resignation of the Chief Accounting Officer Is Further Evidence of Scienter

The resignation of the Company's Chief Accounting Officer is further evidence of scienter, in this case, which involves allegations of accounting fraud. *See, e.g.*, *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) ("[CEO's] forced resignation and Deloitte's resignation 'add to the overall pleading of circumstantial evidence of fraud.'"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 127 (S.D.N.Y. 2013) (holding that the resignations of the company's CFO and independent auditor supported a finding of scienter).

Here, VMware's Chief Accounting Officer, who had signed each quarterly and annual report filed with the SEC from August 2018 through December 2019, abruptly resigned from VMware after six years of service, the same month the SEC began its investigation into the Company's accounting for backlog and related disclosures. ¶141. His resignation supports a strong inference of scienter. *See, e.g.*, *UTStarcom,* 617 F. Supp. 2d at 976 ("At the very least, the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances."); *Isilon Sys.*, 2008 WL 5412397, at *11-*12 (allegations of fraud supported by the fact that the former CEO and CFO "left their positions . . . two weeks before the Audit Committee announced that it would be conducting an internal investigation" of revenue recognition practices).

### 5.    The Temporal Proximity of Defendants' Misrepresentations and the Revelation of the Fraud Supports Scienter

That only three months had passed between Defendants' 4Q19 report of record backlog and the first backlog draw down "'bolster[s]' the inference that defendants knew about [the problem] when they made the [misleading] statement." *Berson*, 527 F.3d at 988 n.5 (quoting *Ronconi v.*

*Larkin*, 253 F.3d 423, 437 (9th Cir. 2001)) (first alteration in original); *see also Reese II*, 747 F.3d at 574-75 (finding a temporal proximity of "three to six months" between a misrepresentation and a disclosure to be evidence of scienter).

### C.      Plaintiff Has Adequately Alleged Loss Causation

Defendants' argument that the Complaint fails to adequately allege loss causation is without merit.  Defs.' MTD at 15.  As the Ninth Circuit recently held, pleading loss causation "requires no more than the familiar test for proximate cause." *First Solar Inc.*, 881 F.3d at 753 ("To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to the 'very facts about which the defendant lied.'").  "We start from the premise that loss causation is a 'context-dependent' inquiry, as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id*.  Loss causation requires Plaintiff to "demonstrate a causal connection between the deceptive acts . . . and the injury suffered." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605, 608 (9th Cir. 2014).  However, "[t]he misrepresentation need not be the sole reason for the decline in value of the securities" but rather must be a """"substantial"""" one.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A complaint must allege "particular facts indicating that 'but for the circumstances that the fraud concealed' . . . [plaintiffs'] investment . . . would not have lost its value." *Berson*, 527 F.3d at 989; *see also Lloyd*, 811 F.3d at 1210 (citing *In re Williams Sec. Litig.-WCG Subclass,* 558 F.3d 1130, 1140 (10th Cir. 2009) ("'To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company.'")).  "[I]t should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the . . . causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

The Complaint exceeds this standard as it alleges that Plaintiff purchased VMware stock at inflated prices after Defendants deceptively deferred FY 2019 sales into backlog and that when the Company later drew down its backlog VMware's stock price plummeted causing injury to the

Plaintiff and the Class.  These allegations are sufficient to tie Defendants' conduct to the loss suffered.  In addition to the material omission of fact regarding backlog, the Complaint details four subsequent corporate disclosures of declining backlog (as a result of the draw down) each of which was followed by a significant stock price decline.  First, on May 30, 2019, after the market closed, VMware held an earnings call and *disclosed a significant decline in the Company's license backlog of over 67% from Q4 2019*.  VMware's stock price immediately dropped over 7%.  ¶144.  The Complaint further connects the loss to the omitted facts regarding backlog by citing a Deutsche Bank contemporary analyst report attributing the Company's practice of deferring historical sales to subsequent quarters for the sharp decline in license backlog during Q1 2020:

> The unbilled license backlog fell sharply to $48m from $147m in 4QF19, implying that a good portion of 1QF20 product billings were actually 4QF19 deals that got invoiced in 1QF20.

¶48.  These allegations sufficiently connect Defendants' fraud to Plaintiff's loss.

VMware's stock price continued to fall in tandem with the Company's disclosures of declining backlog that Plaintiff alleges was the result of the drawdown of the slush fund created in FY 2019.  On August 22, 2019, Defendants again disclosed a substantial decrease in backlog – this time revealing that the Company's total backlog plummeted from a Class Period high of $449 million at the end of FY 2019 to $117 million at the close of Q2 2020 – a decline of 35% from the prior quarter and a 74% drop from just six months prior.  ¶146.  Immediately following this news, the Company's stock price fell over $12 per share – a decline of 10%.  *Id*.  On November 26, 2019, Defendants held the Q3 2020 earnings conference call and disclosed another 39% decline in backlog.  ¶147.  Following this announcement, VMware's stock price fell nearly 6%.  *Id*.

On February 27, 2020, one year after VMware posted record-breaking backlog, VMware's backlog scheme finally completely unraveled.  Defendants admitted that the Company was unable to meet license and total revenue guidance *despite* the substantial backlog it had entering FY 2020.  Defendants announced a dismal $18 million in total backlog and just $5 million in license backlog – a staggering decline of 96% and 97% to total backlog and license backlog, respectively, from the inflated backlog reported at the end of FY 2019.  ¶148.  Rowe admitted the connection between backlog and the Company's poor results noting that unlike "in Q4 last year" we no longer had a

"strong backlog that we were able to utilize." *Id*. The Company also revealed "the staff of the Enforcement Division of the [SEC] requested documents and information related to VMware's backlog and associated accounting and disclosures." ¶149. The Company's stock price immediately declined 11% following the above disclosure, closing at a 52-week low of $120.52 per share a decline of $85 per share or 41% – from the Class Period high reached prior to the first disclosure of declining backlog in Q1 2020. ¶151. The above allegations are more than sufficient to tie Defendants' fraudulent inflation of backlog and the subsequent drawdown thereof to the Plaintiff's loss.[7]

### D. The Complaint Adequately Alleges a §20A Claim Against Defendant Gelsinger

Defendant Gelsinger urges the court to dismiss Plaintiff's §20A claim because Plaintiff's stock purchase just four days after Defendant Gelsinger sold $3.8 million worth of VMware shares is not "'contemporaneous'" as a matter of law. Defs.' MTD at 16. The Ninth Circuit has **not** endorsed the standard Defendant Gelsinger seeks here – *i.e.*, that Plaintiff must have traded "'on the same day,'" or "'the day after'" the insider's sale. *Id*. at 16-17.[8] In fact, the "'contemporaneous'" requirement is not strictly interpreted in the Ninth Circuit. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1074–75 (C.D. Cal. 2008) ("The duration of the period in which an insider defendant's trade can be considered 'contemporaneous' with the plaintiff's is 'not fixed,' and

---

[7]    Defendants' argument that Plaintiff's §20(a) control person claim should be dismissed because there is not a predicate violation of §10(b) (Defs.' MTD at 17) lacks merit because the §10(b) claim should be upheld for all of the reasons addressed above.

[8]    Neither of the Ninth Circuit cases cited by defendants involved a violation of §20A of the Exchange Act, and otherwise involved significantly wider gaps between the transactions. Defs.' MTD at 16-17. *See Neubronner v. Milken*, 6 F. 3d 666, 669-70 (9th Cir. 1993) (rejecting plaintiff's "**three-year span**" for contemporaneity and acknowledging that courts have found "trades within a four day period were contemporaneous"); *Brody*, 280 F.3d at 1005 (two-month gap too long).

the Ninth Circuit [has] . . . expressly declined to elaborate on its 'exact contours.'").  Courts in this Circuit have routinely found trades to be "contemporaneous" where they were made several days to even weeks after the insider's sale, in line with the four-day period here.  *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *14-*15 (N.D. Cal. Aug. 14, 2008) (five days); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (five days); *Backe v. Novatel Wireless, Inc.* (*In re Novatel Wireless Sec Litig*.), Case No. 08-CV-1689 H (RBB), 2010 U.S. Dist. LEXIS 49543, at *26 (S.D. Cal. May 12, 2010) ("Plaintiffs' trades occurring within four business days after Defendants' sales are sufficiently contemporaneous.").  As one court has explained, without a clear definition of "'contemporaneous'" from the Ninth Circuit, the "'better rule with respect to standing [for §20A claims] seems to be that a class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information.'"  *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007).

The fact that Plaintiff purchased shares at a price lower than that which Defendant Gelsinger sold his shares is likewise not dispositive.  Defs.' MTD at 17.  While courts have looked to the price a plaintiff paid for the security in relation to the price the insider sold as one consideration in the contemporaneity inquiry, Defendants have cited no case where that fact alone was determinative.[9] In *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, No. 18-CV-06720-LHK, 2020 WL 5408056 (N.D. Cal. Sept. 9, 2020) the primary case upon which Defendant Gelsinger relies, the court noted that a six-day gap between defendant's sale and plaintiff's purchase may be considered contemporaneous, but that there was no indication that the "trades occurred with defendant at an unfair advantage."  *Id*. at *15. Here, Plaintiff has alleged that it was at an informational disadvantage because it was unaware that the record-breaking backlog disclosed to the market the day before Defendant Gelsinger's March 1, 2019 sale, and just days before Plaintiff's purchase, was deliberately inflated, causing VMware's stock price to trade at inflated prices.  Defendant Gelsinger, through the inflation of backlog, deliberately concealed declining license revenue and the struggling Americas region and traded on

_____

[9]    The language of the statute contains no such limitation on the purchase price.

the basis of his knowledge contemporaneously with Plaintiff, who was harmed as the truth later emerged.

## IV.    CONCLUSION

For the above stated reasons, Defendants' motion should be denied.  Should the Court disagree, Plaintiff requests leave to amend as in this Circuit such a request should be granted "'with extreme liberality.'"  *See Eminence Cap., L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003).

DATED:  January 15, 2021                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SCOTT H. SAHAM
ASHLEY M. KELLY
TING H. LIU

                                            SCOTT H. SAHAM

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Lead Counsel for Lead Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 15, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ SCOTT H. SAHAM
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  scotts@rgrdlaw.com

4847-9297-5318.v1

## Mailing Information for a Case 5:20-cv-02182-EJD Lamartina v. VMware, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Asim M. Bhansali**
  abhansali@kblfirm.com,asim-bhansali-6238@ecf.pacerpro.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Elliot Greenfield**
  egreenfi@debevoise.com,mao-ecf@debevoise.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Ashley Michelle Kelly**
  akelly@rgrdlaw.com,AKellyRGRD@ecf.courtdrive.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Maeve O'Connor**
  mloconnor@debevoise.com,mao-ecf@debevoise.com,mjsorensen@debevoise.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomla

- **Nicholas Alan Roethlisberger**
  nroethlisberger@kblfirm.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_SD@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **Brian Jared Schall**
  brian@schallfirm.com

- **Matthew John Sorensen**
  mjsorensen@debevoise.com,mao-ecf@debevoise.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,cbarrett@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)