1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WILLIAM LAMARTINA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> VMWARE, INC., PATRICK P. GELSINGER, and ZANE ROWE, <br><br> Defendants. | Case No.  5:20-cv-02182-EJD <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS WITH LEAVE TO AMEND** <br><br> Re: Dkt. No. 51 |

Northeast Carpenters Pension Fund ("Lead Plaintiff") brings this putative class action against Defendants VMware, Inc. ("VMware"), VMware Chief Executive Officer ("CEO") Patrick P. Gelsinger, and VMware Chief Financial Officer ("CFO") Zane Rowe, alleging violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 of the U.S. Securities and Exchange Commission ("SEC") promulgated thereunder.  *See* Am. Compl., Dkt. No. 50, ¶¶ 1, 13-15.  Lead Plaintiff brings this action individually and on behalf of all persons other than defendants who purchased or otherwise acquired VMware securities between August 24, 2018 and February 27, 2020, both dates inclusive ("the Class Period").  *Id.* ¶ 1.

Presently before the Court is Defendants' motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), and for failure to plead claims with the requisite level of particularity under Federal Rule of Civil

Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.

78u-4 et seq.  Defs.' Mot. to Dismiss ("Mot."), Dkt. No. 51, at v, 1.  The Court finds this matter

suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b).  Having

considered the parties' submissions, the Court GRANTS IN PART and DENIES IN PART

Defendants' motion to dismiss.

## I.      BACKGROUND

### A.      Factual Background[1]

#### 1.      Overview

Lead Plaintiff is "a defined benefit pension plan with assets of over $2.5 billion that

provides retirement benefits to over 25,000 participants."  Am. Compl. ¶ 12.  Lead Plaintiff was a

purchaser of VMware shares.  *Id.*

VMware is a company based in Palo Alto, California that provides software products and

services, including licenses, subscriptions, and software as a service ("SaaS").  *Id*. ¶¶ 16, 18.

VMware operates in three market segments: "Americas," "Asia Pacific & Japan," and "Europe

Middle East and Africa."  *Id.* ¶ 17.  During the Class Period, VMware experienced a customer

shift away from license-based revenue toward subscription- and SaaS-based revenue.  *See id*. ¶ 19.

Throughout the Class Period, VMware stocks were actively traded on the New York Stock

Exchange.  *Id*. ¶ 157.  VMware's publicly filed financial statements are subject to Generally

Accepted Accounting Principles ("GAAP").  *See id*. ¶ 33.

Lead Plaintiff alleges that Defendants made numerous misleading and/or false statements

in VMware's SEC filings and on quarterly earnings calls for investors and analysts between

September 2018 and December 2019, during VMware's Fiscal Years ("FY") 2019 and 2020.  *See

id*. ¶¶ 22-39, 63-125.  These statements generally indicated that VMware was meeting and would

continue to meet its expectations for revenue in FY 2019 and 2020, and Lead Plaintiff alleges

---

[1] On a motion to dismiss, the Court accepts as true all well-pled factual allegations and construes
them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d
681, 690 (9th Cir. 2011).

Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS

2

*United States District Court*
*Northern District of California*

these statements were misleading because VMware failed to disclose that it was improperly managing its backlog—a representation of sales already secured but not yet fulfilled—in order to manipulate revenue records and conceal potential risks regarding future revenue. *See id*. ¶ 22. Specifically, "[D]efendants engaged in a practice of materially and artificially inflating both license [revenue] and total backlog by pushing sales that were not required to meet current period revenue or earnings guidance . . . from the current quarter into the next quarter, by deliberately leaving them categorized as unfulfilled at quarter end." *Id.*

According to Lead Plaintiff, Defendants engaged in a practice of inflating VMware's backlog in order to "enhance[] [its] prospects of meeting guidance and analyst expectations in future periods, and [to lead] investors to believe that VMware's license and total revenue guidance would be met in FY 2020." *Id*. ¶ 27. Lead Plaintiff alleges that this practice also allowed VMware to manipulate records of its revenue growth in FY 2019 and, consequently, to shape analyst expectations of its revenue growth in FY 2020. *Id*. ¶ 28. Lead Plaintiff asserts that the backlog inflation at VMware allowed Defendants to "conceal[] from investors and the market several issues that would plague [VMware] in FY 2020: (i) a poorly performing Americas segment following a reorganization in that region; and, (ii) a failure to successfully weather the industry-wide shift away from license products in favor of subscription and SaaS products." *Id*. ¶ 29.

Lead Plaintiff alleges that VMware's practice of manipulating its revenue records by inflating its backlog culminated in FY 2020. In Q1 2020, VMware's stock price peaked, and VMware executives sold large quantities of their VMware stock. *Id*. ¶¶ 126-142. Throughout the rest of FY 2020, Lead Plaintiff says that a series of disclosures—particularly ones regarding VMware's declining backlog—coincided with a drop in VMware stock prices. *Id*. ¶¶ 143-153. On February 27, 2020, the last day of the Class Period, Defendants made several disclosures, including that VMware was the subject of an SEC investigation concerning its backlog practices. *Id*. ¶¶ 6-7. Lead Plaintiff alleges that these disclosures led to a dramatic drop in VMware stock prices. *Id*.

Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS
3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### 2.    Defendants' alleged misleading statements and failures to disclose

Lead Plaintiff alleges that Defendants made misleading statements in VMware's SEC filings. *Id.* ¶¶ 65-66, 75-77, 78, 83-86, 87-88, 91-101, 102-103, 108-111, 112-114, 122-125. For example, on September 11, 2018, VMware filed its quarterly Form 10-Q, stating in part that VMware's "total backlog was $320 million, generally consisting of licenses, maintenance, and services. Our backlog related to licenses was $141 million, which [it] generally expect[s] to deliver and recognize as revenue during the following quarter." *Id.* ¶¶ 65-66 (alterations original).

Lead Plaintiff also cites as misleading statements Defendants Gelsinger and Rowe's repeated positive statements during quarterly phone calls with shareholders and financial analysts. *Id.* ¶¶ 63-64, 69-74, 80-82, 89-96, 104-107, 115-121. For example, during VMware's August 23, 2018 Q2 2019 earnings call for investors and analysts, Rowe said, "[VMware] exited Q2 [2019] with $141 million of license backlog compared with $122 million at the end of Q1." *Id.* ¶ 63. Later during the same call, Rowe further stated:

> And I would just say, as I said in my formal comments, . . . that we believe we are in a strong cycle. Customers are resonating with the VMware strategy. Our execution is good and the market for technology is strong. And those are not this quarter statements. Those are long-term statements where we think that the business performance, our growth rates, the ability of customers to invest in the strategic product portfolio that we have. These are long-term trends and we believe that we're in a very good cycle for the business for not just this quarter, but well into the future.

*Id.* ¶ 64. Lead Plaintiff says that these statements and other similar ones were misleading because they failed to disclose that VMware was improperly managing its backlog in order to manipulate revenue records and to conceal potential risks regarding future revenue. *See, e.g.*, *id.* ¶ 67.

### 3.    VMware executives' stock sales

Lead Plaintiff asserts that Gelsinger, Rowe, and other VMware executives[2] sold VMware

---

[2] Lead Plaintiff lists six other VMware executives besides Gelsinger and Rowe: Executive Vice President, Worldwide Sales and Services Carli Maurizio; Chief Accounting Officer Patrick Kevan Krysler; Senior Vice President and General Counsel Olli Amy Fliegelman; Chief Operating Officer, Customer Operations Poonen Sanjay; Chief Operating Officer, Products & Cloud Rangarajan Raghuram; and Chief Operating Officer, Products & Cloud Rajiv Ramaswami. Am. Compl. ¶ 130.

United States District Court
Northern District of California

common stock without disclosing materially adverse nonpublic facts, despite their duty to refrain from doing so.  *Id*. ¶ 126.

In the 18 months preceding the Class Period, Gelsinger sold no VMware stock.  *Id*. ¶ 127. During the Class Period, he sold over 141,000 shares of VMware stock for $23.4 million.  *Id*. Gelsinger sold 20,000 shares of VMware stock two days before the close of Q1 2020.  *Id*. ¶ 133.

In the 18 months preceding the Class Period, Rowe made two sales of VMware stock, selling a total of 12,100 shares for $1.76 million.  *Id*. ¶ 129.  During the Class Period, Rowe sold 104,218 shares for more than $17.8 million.  *Id*.

During the 18 months directly preceding the Class Period, VMware executives collectively sold 251,867 shares of VMware stock, for approximately $31.8 million.  *Id*. ¶ 131.  During the Class Period, VMware executives sold over 702,000 shares of stock, for more than $118.6 million. *Id*. ¶ 130.  Lead Plaintiff alleges that between August 2018 and May 2019, as VMware stock prices were reaching all-time highs and as VMware backlog was increasing, VMware executives made approximately $84.1 million from VMware stock sales.  *Id*. ¶ 132.  Lead Plaintiff further alleges that:

- Between March 1, 2019, the day after VMware's FY 2019 earnings announcement, and May 2, 2019, the day before Q1 2020 ended, VMware executives sold $58.9 million of VMware stock, when the price of the stock was near its highest point (*id*. ¶ 133);

- Between June 4, 2019 and August 2, 2019 (the close of Q2 2020), VMware executives sold 84,053 shares for $14.6 million (*id*. ¶ 134);

- Between September 3, 2019, and November 1, 2019 (the close of Q3 2020), VMware executives sold 81,547 shares for $12.1 million (*id*. ¶ 135);

- Between the close of Q3 2020 and the announcement of Q4 2020 results, VMware executives sold 48,148 shares for $7.8 million (*id*. ¶ 136).

### 4. VMware disclosures and declines in stock prices

Lead Plaintiff alleges that, during the Class Period, a trend of VMware's disclosures—

Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS
5

particularly regarding backlog and company performance—coincided with a trend of declining VMware stock prices. *Id*. ¶¶ 139-153.

### a. May 30, 2019 disclosures

During the Q1 2020 earnings call on May 30, 2019, Defendants disclosed that VMware's license backlog had declined approximately 67% from Q4 2019. *Id.* ¶ 144. Gelsinger further said that VMware's Americas regional segments "trailed" other regional segments, resulting in "territory realignments" and "adjustments to the org[anization]" that led to lower revenue in the region. *Id*. The following day, VMware's stock price dropped approximately 7%. *Id*.

### b. August 22, 2019 disclosures

During the Q2 2020 earnings call on August 22, 2019, Defendants disclosed that VMware's total backlog had declined approximately 35% since Q1 2020 and approximately 74% in the past six months. *Id*. ¶ 146. Backlog at that time totaled $117 million, in contrast to the Class Period high point of $449 million at the end of FY 2019. *Id*. Defendants disclosed VMware's license backlog had declined 73% since Q1 2020. *Id*. The following day, VMware's stock price dropped approximately 10%. *Id*.

### c. November 26, 2019 disclosures

During the Q3 2020 earnings call on November 26, 2019, Defendants announced that VMware's total backlog had declined approximately 39% since Q2 2020. *Id*. ¶ 147. Backlog at that time totaled $71 million, an 84% drop from nine months prior. *Id*. In the two days following this disclosure, VMware's stock price dropped approximately 6%. *Id*.

### d. February 27, 2020 disclosures

During the Q4 2020 earnings call on February 27, 2020, Defendants disclosed that total backlog had dropped to $18 million, $5 million of which was license backlog. *Id*. ¶ 148. This represented a 96% and 97% drop, respectively, from VMware's backlog highs at the end of FY 2019. *Id*. Gelsinger stated that, partly due to an industry shift from licensing to subscription and SaaS models, VMware did not meet its license revenue growth targets for Q4 2020 or for FY 2020 and "missed the Q4 2020 license revenue guidance defendants issued . . . three months prior by

United States District Court
Northern District of California

1    5%." *Id*. ¶ 150.

2         That same day, Defendants filed with the SEC a Form 8-K that disclosed that VMware was

3    "subject to an ongoing SEC investigation into [VMware's] backlog of unfilled orders." *Id*. ¶ 149.

4    Specifically, the Form 8-K stated, "In December 2019, the staff of the Enforcement Division of

5    the [SEC] requested documents and information related to VMware's backlog and associated

6    accounting and disclosures." *Id*. The Form 8-K further stated, "VMware is fully cooperating with

7    the SEC's investigation, [and is] unable to predict the outcome of this matter at this time." *Id*.

8    This SEC investigation appears to have begun around the same time VMware's Chief Accounting

9    Officer resigned from VMware. *See id*. ¶ 6.

10         The following day, VMware's stock price dropped 11%, closing at a 52-week low of

11    $120.52 per share. *Id*. ¶ 151. A Deustche Bank analyst report issued on February 28, 2020,

12    described VMware's results "disappointing" and "a messy and uninspiring print." *Id*. ¶ 152.

13        **B.    Procedural Background**

14         On March 31, 2020, Plaintiff William Lamartina filed a putative class action federal

15    securities complaint with the Court. Dkt. No. 1. On July 20, 2020, the Court appointed Northeast

16    Carpenters Pension Fund as Lead Plaintiff and its counsel as lead counsel. Dkt. No. 45. On July

17    23, 2020, the parties stipulated to Lead Plaintiff filing an amended consolidated complaint (Dkt.

18    No. 48), which Lead Plaintiff filed on September 18, 2020. Am. Compl., Dkt. No. 50. On

19    November 17, 2020, Defendants moved to dismiss the operative amended complaint. Mot., Dkt.

20    No. 51.

21    **II.    LEGAL STANDARD**

22         Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

23    specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which

24    it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). A

25    complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim

26    upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule

27    12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts

United States District Court
Northern District of California

1   alleged under a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d

2   1097, 1104 (9th Cir. 2008); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

3   Moreover, the factual allegations "must be enough to raise a right to relief above the speculative

4   level" such that the claim "is plausible on its face." *Twombly*, 550 U.S. at 556–57.

5       At the motion to dismiss stage, the Court must read and construe the complaint in the light

6   most favorable to the non-moving party. *Reese*, 643 F.3d at 690.  The Court must accept as true

7   all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  However,

8   "courts are not bound to accept as true a legal conclusion couched as a factual allegation."

9   *Twombly*, 550 U.S. at 555.  "In all cases, evaluating a complaint's plausibility is a context-specific

10  endeavor that requires courts to draw on . . . judicial experience and common sense." *Levitt v.*

11  *Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th

12  Cir. 2011)) (internal quotation marks omitted).

13      In addition to Rule 8's requirements, fraud cases are also governed by the heightened

14  pleading standard of Rule 9(b).  A plaintiff averring fraud or mistake must plead with particularity

15  the circumstances constituting fraud, but malice, intent, knowledge and other conditions of the

16  mind may be averred generally.  *See* Fed. R. Civ. P. 9(b).  Particularity under Rule 9(b) requires

17  the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged.  *Kearns v.*

18  *Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*,

19  317 F.3d 1097, 1106 (9th Cir. 2003)).  Securities fraud claims must also satisfy the pleading

20  requirements of the PSLRA, which states that the complaint "shall specify each statement alleged

21  to have been misleading, the reason or reasons why the statement is misleading, and, if an

22  allegation regarding the statement or omission is made on information and belief, the complaint

23  shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

24  The PSLRA also requires a plaintiff to state with particularity facts giving rise to a strong

25  inference of a defendant's scienter.  *See id.* § 78u-4(b)(2).

26      When deciding whether to grant a motion to dismiss, the Court generally "may not

27  consider material outside the pleadings." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998

28  Case No.: 5:20-cv-02182-EJD
    **ORDER GRANTING IN PART MOT. TO DISMISS**
    8

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (9th Cir. 2018).   However, the Court may consider material submitted as part of the complaint or

2  relied upon in the complaint, and it may also consider material subject to judicial notice.  *See id.*

3  In the event that a motion to dismiss is granted, "a district court should grant leave to amend even

4  if no request to amend the pleading was made, unless it determines that the pleading could not

5  possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.

6  2000) (internal quotation marks omitted).

7  **III.    DISCUSSION**

8          **A.    Request for Judicial Notice**

9          Defendants request the Court take judicial notice of the documents attached as exhibits to

10  the declaration of Elliot Greenfield filed in support of Defendants' motion to dismiss.  Mot. at 3,

11  n.1.  The documents in question consist of: VMware's Form 10-K, 10-Q, and 8-K reports filed

12  with the SEC; transcripts of VMware earnings calls; and Gelsinger and Rowe's Form 4 filings

13  submitted to the SEC.  Decl. of Elliot Greenfield in Supp. of Defs.' Mot. to Dismiss ("Greenfield

14  Decl."), Dkt. No. 51-1.  Federal Rule of Evidence 201 permits a court to judicially notice an

15  adjudicative fact if it is "'generally known,' or 'can be accurately and readily determined from

16  sources whose accuracy cannot reasonably be questioned.'"  *Khoja*, 899 F.3d at 999.

17  Accordingly, "[a] court may take judicial notice of matters of public record without converting a

18  motion to dismiss into a motion for summary judgment," but it may not take judicial notice of

19  disputed facts contained in such public records.  *Id.* (internal quotation marks omitted).

20          It is appropriate for the Court to take judicial notice of publicly available SEC filings

21  where, as here, such SEC filings form the basis of Lead Plaintiff's claim.  *See, e.g.*, *Metzler Inv.*

22  *GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("Defendants sought

23  judicial notice for Corinthian's reported stock price history and other publicly available financial

24  documents, including a number of Corinthian's SEC filings.  In its dismissal order, the Court

25  granted Defendants' unopposed requests for judicial notice.  Metzler does not contest the propriety

26  of the noticing of these documents on appeal, which in any event was proper.").  Because the

27  statements made in the VMware earnings calls are incorporated into the complaint and serve as the

28  Case No.: 5:20-cv-02182-EJD

1    basis for Lead Plaintiff's claims, judicial notice of the call transcripts is also appropriate. *Khoja*,

2    899 F.3d at 998.  Lead Plaintiff does not oppose Defendants' request for judicial notice.

3    Accordingly, the Court GRANTS Defendants' request for judicial notice.

4         **B.     Section 10(b) and 10b-5 Claim**

5         Lead Plaintiff alleges that all Defendants engaged in a scheme to defraud the market in

6    violation of § 10(b) and Rule 10b-5 when they disseminated materially false and misleading

7    statements in VMware's SEC filings and press releases and during VMware's earnings calls. *See*

8    Am. Compl. ¶¶ 44-45.  Section 10(b) of the Exchange Act provides that "[i]t shall be unlawful for

9    any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any

10   manipulative or deceptive device or contrivance in contravention of such rules and regulations . . .

11   ."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements this provision by making it unlawful for any

12   person

13             (a) [t]o employ any device, scheme, or artifice to defraud,
14             (b) [t]o make any untrue statement of a material fact or to omit to
             state a material fact necessary in order to make the statements made,
15             in the light of the circumstances under which they were made, not
             misleading, or
16             (c) to engage in any act, practice, or course of business which
             operates or would operate as a fraud or deceit upon any person, in
17             connection with the purchase or sale of any security.

18   17 C.F.R. § 240.10b–5(b).  To state a claim under § 10(b) and Rule 10b-5, Lead Plaintiff must

19   allege facts sufficient to establish: "(1) a material misrepresentation or omission by the defendant;

20   (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

21   of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

22   causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation

23   marks omitted).

24        Defendants argue Lead Plaintiff fails to state a claim under § 10(b) or Rule 10b–5 that

25   satisfies the PSLRA's heightened pleading standards. *See* Mot. at 6–16.  Defendants challenge the

26   adequacy of Lead Plaintiff's § 10(b) and Rule 10b-5 allegations, arguing that Lead Plaintiff has

27   failed to plead facts sufficient to establish (1) a material misstatement or omission, (2) a strong

28   Case No.: 5:20-cv-02182-EJD
     ORDER GRANTING IN PART MOT. TO DISMISS
     10

United States District Court
Northern District of California

inference of scienter, and (3) loss causation. *Id.* at 6.  The Court addresses each challenged element in turn.

### 1.    Material misstatement or omission

To sufficiently allege a material misstatement for a § 10(b) claim, a plaintiff must specify each statement alleged to have been misleading and the reason(s) why that statement is misleading.  If those allegations are made on information and belief, the plaintiff must also allege all facts on which that belief is formed.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005); *see also* 15 U.S.C. § 78u-4(b)(1).  For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A material omission is one that a reasonable investor would consider to significantly alter the total mix of information.  *Matrixx Initiatives*, 563 U.S. at 37.  "Silence, absent a duty to disclose is not misleading under Rule 10b-5."  *Basic v. Levinson,* 485 U.S. 224, 238, 239 & n.17 (1988).  A duty to disclose exists only "to . . . make statements in light of the circumstances under which they were made not misleading."  17 C.F.R. § 240.10b-5(b).

Defendants first argue that Lead Plaintiff has failed to satisfy the PSLRA's requirement to identify specific statements alleged to be misleading and to explain why they are misleading.  Mot. at 6–7.  In particular, Defendants contend that: (1) the complaint does not contain any facts from which it may be inferred that their statements about VMware's backlog or revenue recognition were misleading; (2) the PSLRA's safe harbor protects any forward-looking statements Defendants made; and (3) Defendants' statements of corporate optimism and puffery are nonactionable.

### a.    Defendants' statements concerning its backlog and revenue recognition

Defendants argue that Lead Plaintiff fails to allege facts from which the Court may infer that Defendants' statements concerning its backlog and revenue recognition were misleading.  Mot. at 7–9 (citing *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1471 (N.D. Cal. 1996) for the

United States District Court
Northern District of California

proposition that "[a]ccurate statements of historical fact . . . are not actionable").  Defendants assert that VMware's quarterly public statements and analyst calls often included clear explanations regarding the nature and size of its backlog and regarding revenue expectations, consistent with GAAP.  *Id*. at 7–8.  Defendants also contend that Lead Plaintiff's allegations mischaracterize the disputed statements.  *Id*. at 7.

In opposition, Lead Plaintiff argues that Defendants' backlog reporting was misleading under Ninth Circuit precedent, which holds that "once defendants [choose] to tout the company's backlog[,] they [are] bound to do so in a manner that [will not] mislead investors as to what the backlog consist[s] of."  Opp'n at 7–8 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).  Lead Plaintiff contends that "Defendants, during FY 2019, reported backlog that was 'misleading' because it 'consisted of' sales from contracts that were *intentionally held*, not for any legitimate business purpose, but because they were not needed to meet current quarter guidance."  *Id*. (emphasis original).  Lead Plaintiff refers to several paragraphs in the complaint that primarily consist of conclusory statements asserting that Defendants' backlog reporting and revenue recognition were misleading because Defendants were manipulating VMware's backlog in order to "smooth" revenue reports.  *See id.* at 7–10 (citing Am. Compl. ¶¶ 2, 23, 33-35, 37).  Beyond the paragraphs Lead Plaintiff cites in its opposition brief, the complaint identifies numerous other instances of what Lead Plaintiff asserts are misleading statements in Defendants' SEC filings and other public statements concerning VMware's revenue and backlog status.  Am. Compl. ¶¶ 63-125.  Lead Plaintiff relies primarily on its manipulated backlog theory as the basis for why Defendants' statements were misleading.  *See id.* ¶¶ 67, 77, 86, 101, 111, 125.

While such a theory may be viable, Lead Plaintiff has not pled facts with sufficient particularity to support it.  The only allegations in the nearly 50-page amended complaint concerning the genesis of the alleged deception—that VMware padded its backlog by deliberately delaying fulfillment of contracts—appear in two paragraphs.  Paragraph 2 states: "In order to meet and not overly exceed market expectations, once quarterly sales goals were achieved, management directed the Company's personnel to hold secured contracts until the next quarter, resulting in

revenue smoothing into subsequent quarters, causing reported revenue to be far more consistent across reporting periods than it actually was." *Id.* ¶ 2.  Paragraph 23 states: "Sales personnel would submit executed contracts for processing through the systems operations group at VMware's headquarters.  At the end of each quarter, and particularly at year end, VMware would deliberately leave executed contracts unprocessed, to be recognized in the subsequent quarter by funneling them into the Company's backlog." *Id.* ¶ 23.  There are no facts pled concerning, for example, exactly who in "management" made the decision and provided the direction to withhold secured contracts, and when, where, how, and whom they so directed.  *Compare Berson*, 527 F.3d at 985–87 (finding particularity requirement satisfied where plaintiff alleged misleading backlog figures and pled facts based on confidential witness testimony and admissions by defendants). Such general pleading does not satisfy Rule 9.  *Kearns*, 567 F.3d at 1124 (particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged).

### b.     PSLRA's safe harbor provision

Defendants further argue that, beyond their statements regarding backlog and revenue recognition, their statements in earnings calls and press releases were forward-looking and thus fall under the PSLRA's "safe harbor" provision.  Mot. at 9–10 (discussing statements made in Paragraphs 69, 70, 82, 88, 89, 91, 94, 95, 96, 103, 119, 120, 121).  Under the PSLRA safe harbor provision, "forward-looking statements" are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward[-]looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  "A forward-looking statement is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues."  *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 834 (N.D. Cal. 2019) (quoting *No. 84 Emp'r Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)) (internal quotation marks omitted).  "[I]f a forward-looking statement is identified as such and accompanied

United States District Court
Northern District of California

by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

Lead Plaintiff responds that statements regarding backlog are not forward-looking, and that the statements Defendants call out are intertwined with representations of current facts that are actionable. Opp'n at 10–11 (citing *Berson*, 527 F.3d at 990); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) ("We hold a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings.").

The Court finds that some of the statements Lead Plaintiff describes in the amended complaint fall within the PSLRA safe harbor, but others do not. First, Defendants concede that under the Ninth Circuit's holding in *Berson*, backlog reporting itself does not receive safe harbor protection. Reply at 4–5; *Berson*, 527 F.3d at 990 (observing that "'backlog' isn't a 'projection' of earnings or a 'statement' about 'future economic performance'" but rather "a snapshot of how much work the company has under contract right now, and descriptions of the present aren't forward-looking"). As discussed above, Lead Plaintiff has not alleged facts supporting its claim that VMware's backlog reporting is an actionable misstatement or omission. *See supra* Section III.B.1.a.

Second, the Court has reviewed the paragraphs Defendants contend are forward-looking and that Lead Plaintiff describes as containing a mixture of forward-looking statements and representations of current fact. Defendants specifically call out Paragraphs 69, 70, 82, 88, 89, 91, 94, 95, 96, 103, 119, 120, and 121 as forward-looking statements. Mot. 9–10. Lead Plaintiff addresses only Paragraphs 69, 70, 82, 88, 91, 94, 95, 103, 119, and 121. Opp'n at 11. The paragraphs cited contain numerous statements, and neither side specifies exactly which statements within each paragraph they are disputing. The Court here focuses primarily on the portions that Lead Plaintiff bolded and italicized in the complaint, presumably because Lead Plaintiff felt those

United States District Court
Northern District of California

portions were significant in some way or another:

- **Paragraph 69**: "We expect the strength we're seeing in the business to continue next year and are currently planning on total revenue growth of approximately 12% for FY '20, which includes accelerating our growth in hybrid cloud subscription and SaaS. . . . [VMware's increased guidance for FY 2020 and positive outlook for FY 2020] reflect the strength we continue to see in the business."

- **Paragraph 70**: "We're comfortable with the SaaS mix and the hybrid cloud mix that we're growing here at VMware.  It's obviously highlighted in the guide for Q4 as well as in the guide for FY '20.  So nothing there I would call out other than the fact that the business is performing well and we feel very confident heading into the next year."

- **Paragraph 82**: "When we look at that against our business, we've just positioned ourself, we believe, extremely well in many of these growth sectors.  And we're no longer dependent on any geo or any individual product, but the real breadth of our portfolio is nicely rewarding us across the broad landscape of, we believe a good tech market that's going to continue well into the future.  And there will be winners and losers inside of that because there is so much change going on in the marketplace with these powerful trends.  You might remember, I've talked about the 4 superpowers: cloud, mobility, AI and Edge and IoT, and all of those will have different effects of who's going to be the winners and losers inside of it.  But it's a good market and really happy with our performance."

- **Paragraph 88**: "Q1 was a good start to fiscal 2020 with strength across our comprehensive solutions portfolio."

- **Paragraph 89**: "[R]evenue for the quarter increased 13% year-over-year . . . [VMware is] very well positioned to execute on our plans for the full year."

- **Paragraph 91**:  "Q1 was a good start to FY '20, and we're maintaining our positive outlook for the year . . . . [VMware's performance during Q1 2020] has us well positioned to execute on our plans for the year."

- **Paragraph 94**: "But beyond [the volatility and uncertainty tied to the macroeconomic environment], we're comfortable with what we're seeing early and feel good about our forecast for the year."

- **Paragraph 95**: "And we're feeling quite good about the momentum that we see going into Q2 and for the second half."

- **Paragraph 96**: "[Defendants are] comfortable with how [VMware is] positioned for the year [despite] some of our competitors seeing a little bit of weakness and some volatility and variability quarter-to-quarter."

Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS
15

- **Paragraph 103**: "[VMware is b]uilding on another solid quarter . . . We are pleased with our strong financial performance in Q2, which reflected broad-based strength in all three geographies."

- **Paragraph 119**: "I talked about RPO, which, for the third quarter, was $8.5 billion, which has also grown nicely year-over-year, reflecting the ongoing strength of the business.  So yes, <u>we feel good about the guide.  We feel good about our pipeline heading into Q4</u>."

- **Paragraph 120**: "<u>But again, if you recall, the guide also highlighted some of the growth that we're anticipating for the second half of the year based on what we said last quarter.  So we feel really good about the pipeline heading into the fourth quarter and the solid guide for the year</u>."

- **Paragraph 121**: "But in aggregate, you're right, there's always that balance when you're considering a perpetual model versus the SaaS model, but we're comfortable with that balance.  We've maintained the annual guide.  <u>We feel good about the trajectory heading into next year</u>."

Am. Compl. ¶¶ 69, 70, 82, 88, 89, 91, 94, 95, 96, 103, 119, 120, 121.  These statements all fall at least partly within the definition for forward-looking statements because they pertain to VMware's financial projections, Defendants' plans and objectives for future operations, VMware's future economic performance, or the assumptions underlying or related to these issues.  *See In re Facebook*, 405 F. Supp. at 834.  However, the Ninth Circuit has held that where an otherwise forward-looking statement includes a non-forward-looking statement, that non-forward-looking statement is not protected under the PSLRA safe harbor.  *See In re Quality Sys.*, 865 F.3d at 1141.  The Court finds that the portions of the statements underlined above are forward-looking.

Defendants further argue that the above listed statements were accompanied by meaningful cautionary language.  Mot. at 10.  Lead Plaintiff asserts Defendants' cautionary statements were "wholly inadequate as it failed to reveal to investors that Defendants had *already* deceptively deferred revenue."  Opp'n at 12 (emphasis original).  "The safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized."  *Washtenaw Cty. Emps. Ret. v. Celera Corp.*, No. 5:10-cv-02604 EJD, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012) (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991); *see also Berson*, 527 F.3d at 986 (holding that a company's warning language

1   was misleading because it did not indicate that the warned-of risk may have already come to

2   fruition).  However, as discussed above, Lead Plaintiff has not alleged facts necessary to

3   substantiate its theory of backlog manipulation.  *See supra* Section III.B.1.a.

### c.   VMware's statements of corporate optimism and puffery

5       Defendants argue that their statements of optimism and "non-specific celebrations of

6   [VMware's] success" are nonactionable puffery.  Mot. at 11 & n.10 (discussing statements

7   described in Paragraphs 64, 70, 73, 82, 84, 87-89, 91, 93-96, 99, 103-104, 106-107, 112-116, 118-

8   121).  Puffery is an expression of opinion, while a misrepresentation is a knowingly false

9   statement of fact.  *Or. Public Emps. Retirement Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th

10  Cir. 2014).  Generalized statements of corporate optimism, such as business is "healthy," may be

11  considered puffery.  *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051,

12  1060 (9th Cir. 2014) (statement that "opportunity for system placement at hospitals 'is still very,

13  very large'" not actionable); *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8

14  (N.D. Cal. 2017) ("[A]lleged optimistic statements indicating that a company is 'on track' to

15  meet a certain goal are, without more, inactionable puffery."); *Fadia v. FireEye, Inc.*, No. 14-5204

16  EJD, 2016 WL 6679806, at *9 (N.D. Cal. Nov. 14, 2016) (statements about business being "very

17  healthy" and sales cycles being "consistent" were nonactionable puffery); *In re Rackable Sys., Inc.*

18  *Sec. Litig.*, No. 09-0222 CW, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (statements that

19  relationship with customers was "pretty strong" and "solid" not actionable) (citation omitted).

20  However, "even general statements of optimism, when taken in context, may form a basis for a

21  securities fraud claim when those statements address specific aspects of a company's operation

22  that the speaker knows to be performing poorly."  *In re Quality Sys.*, 865 F.3d at 1143 (internal

23  quotation marks omitted); *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D.

24  Cal. 2018) (declining to dismiss factual statements regarding certain aspects of defendant's

25  business as nonactionable puffery).

26      Lead Plaintiff argues that "Defendants' public statements concerning [VMware's] current

27  period backlog, revenue, earnings guidance, and revenue forecasts went beyond the generalized

United States District Court
Northern District of California

1    cheerleading that courts have classified as puffery," but none of the paragraphs Lead Plaintiff cites

2    for that proposition are the ones Defendants contend contain puffery.  Opp'n at 13–14 (citing Am.

3    Compl. ¶¶ 3-4, 21, 24-26, 49, 139).  Out of the numerous paragraphs Defendants suggest contain

4    puffery, Lead Plaintiff directly addresses only one: Paragraph 64.  The statement from Gelsinger

5    described in Paragraph 64 reads:

6             And I would just say, as I said in my formal comments, Mark, that
          we believe we are in a strong cycle.  Customers are resonating with
7             the VMware strategy.  Our execution is good and the market for
          technology is strong.  And those are not this quarter statements.
8             Those are long-term statements where we think that the business
          performance, our growth rates, the ability of customers to invest in
9             the strategic product portfolio that we have.  These are long-term
          trends and we believe that we're in a very good cycle for the
10            business for not just this quarter, but well into the future.

11   Am. Compl. ¶ 64 (original emphasis omitted).  Nothing in Paragraph 64 constitutes a factual

12   statement regarding any specific aspect of VMware's business; rather, it consists solely of

13   generalized statements of optimism about VMware's current performance and its future outlook.

14           The same can be said for the other paragraphs that Defendants cite as puffery, except for

15   factual statements concerning specific revenue and backlog amounts in Paragraphs 87, 89, 91,

16   104, 112, 113, 115, and 116.  *See, e.g.*, *id.* ¶ 89 ("[R]evenue for the quarter increased 13% year-

17   over-year.").  Furthermore, certain statements in Paragraphs 106, 118, 119, and 121 are likewise

18   not generalized statements of optimism but rather either forward-looking statements about

19   projected revenue or concrete descriptions of the past and present state of revenue recognized over

20   a period of time.  *Id.* ¶¶ 106 ("We're forecasting growth in total revenue plus the sequential

21   change in total unearned revenue to be approximately 13% year-over-year in the quarter and up

22   about 2 percentage points versus Q3 FY '19."), 118 ("For the full year, we are projecting an

23   increase in total revenue to $10,100,000,000, up 12.5% year-over-year.  This includes the addition

24   of Carbon Black's financials post close, which accounts for the largest portion of the revenue

25   increase.  We expect license revenue of $4,245,000,000 for FY '20, up 12% year-over-year. . . .

26   Moving to our Q4 guidance.  License revenue is expected to be $1,390,000,000, an increase of

27   13% year-over-year, and total revenue is expected to be $2,950,000,000, up 13.8% year-over-

28

year."), 119 ("I talked about RPO, which, for the third quarter, was $8.5 billion . . . ."), 121 ("[A]s we called out in the third quarter, [the headwind on revenue growth] was more pronounced on the license revenue side, and what we've generally done is steered you more towards total revenue and with the strength we've seen in the third quarter, candidly, in both categories.  I mean as you know, hybrid cloud subscription and SaaS, while we get the bookings now, we recognize the revenue over an extended period of time. . . . That's the sort of the balance that we were contemplating in the third quarter. And we mentioned, with that strength, we saw the guide continue through the year.  So there's always a little bit of headwind, especially as you're growing that just because you essentially recognize the revenue slightly differently.").

To the extent Lead Plaintiff argues that certain statements are not puffery because they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," *In re Quality Sys.*, 865 F.3d at 1144 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002)) (internal quotation marks omitted), that argument relies on Lead Plaintiff's theory of a manipulated backlog which the Court has already found insufficiently pled.  *See supra* Section III.B.1.a.

### 2.    Scienter

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required statement of mind."  15 U.S.C. § 78u-4(b)(2).  "A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'"  *City of Dearborn Heights Act Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)).  "Deliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'"  *Schueneman*, 840 F.3d at 705 (emphases original).  In ruling on a motion to dismiss, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) (emphasis original).  "A securities fraud complaint will survive a motion to dismiss under Rule 12(b)(6) 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting *Tellabs*, 551 U.S. at 324).

Defendants argue that Lead Plaintiff has failed to satisfy the PSLRA's requirement that a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Mot. at 11–15 (citing 15 U.S.C. § 78u-4(b)(2)(A)).  Lead Plaintiff responds that it pleads facts alleging a strong inference of scienter, including that Defendants made unusual or suspicious stock sales, that Defendants controlled backlog reporting, that Defendants' GAAP violations were indicative of scienter, that VMware's Chief Accounting Officer resigned around the time of the SEC investigation, and that only three months passed between the Q4 2019 report concerning record backlog and the first backlog draw down.  Opp'n at 15–21.

### a.    Stock sales

First, with respect to the stock sales, only "unusual" or "suspicious" stock sales by corporate insiders that are dramatically out of line with prior trading practices at times calculated to maximize personal benefit may support a strong inference of scienter in the Ninth Circuit.  *See In re Quality Sys.*, 865 F.3d at 1146; *Metzler*, 540 F.3d at 1066–67.  "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history."  *Metzler*, 540 F.3d at 1067.  Here, Defendants point out that many of Gelsinger's and Rowe's alleged stock sales made in the Class Period were made pursuant to a 10b5-1 trading plan.  Mot. at 14–15 (citing Greenfield Decl., Exs. R, S, T, U, V, W, X, Y, Z).  "[T]he weight of authority in the Ninth Circuit" holds that courts can consider 10b5-1 trading plans when evaluating allegations concerning scienter.  *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018).  "In

United States District Court
Northern District of California

general, automatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter." *Rodriguez*, 325 F. Supp. 3d at 1056.

The Form 4 filings for Gelsinger and Rowe of which the Court has taken judicial notice show that at least some of Gelsinger's sales on November 7, 2018, January 11, 2019, March 1, 2019, May 1, 2019, and June 19, 2019 and Rowe's sales on March 31, 2019, April 2, 2019, June 13, 2019, September 5, 2019, and December 6, 2019 were effected pursuant to 10b5-1 plans. Greenfield Decl., Exs. R, S, T, U, V, W, X, Y, Z.  Of the 142,355 shares Rowe sold on March 31 and April 2, 2019, only 30,630 were sold pursuant to a 10b5-1 plan.  *See id.*, Ex. W.  Additionally, the complaint alleges at least one additional sale each by Gelsinger and Rowe during the Class Period for which Defendants did not provide a Form 4, and thus it is not clear whether those sales were conducted pursuant to 10b5-1 plans.  Am. Compl. ¶ 130 (describing sales by Gelsinger on September 4, 2018 and by Rowe on December 12, 2018).

Furthermore, while stock sales made "according to pre-determined plans *may* rebut an inference of scienter," *Metzler*, 540 F.3d at 1067 n.11 (emphasis added), SEC regulations recognize "a written plan for trading securities" as an affirmative defense to insider trading allegations only if the insider adopted the plan "[b]efore becoming aware of the [material nonpublic] information."  17 C.F.R. § 240.10b5-1(c)(1)(i); *Azar*, 2018 WL 6182756, at *18. There is nothing before the Court that indicates when Gelsinger and Rowe executed their 10b5-1 plans, and thus the Court cannot say that those plans preceded Gelsinger's and Rowe's awareness of the alleged plan to manipulate VMware's backlog and revenue records.  On this record, the Court cannot conclude that the 10b5-1 plans negate any inference of scienter.  *Azar*, 2018 WL 6182756 at *19; *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales [pursuant to a 10b5-1 plan] may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales.").

10b5-1 trading plans aside, Lead Plaintiff alleges that during the Class Period, Gelsinger

United States District Court
Northern District of California

1  sold $23.4 million of VMware stock and Rowe sold $17.8 million of VMware stock "at inflated

2  prices." Am. Compl. ¶¶ 126-142.  According to Lead Plaintiff, Gelsinger sold no VMware stock

3  before the Class Period began, even though his exercisable shares vested as early as 2014—

4  followed by 17 sales within a year during the Class Period.  *Id.* ¶¶ 128, 130.  Lead Plaintiff further

5  alleges that in the 18 months preceding the Class Period, Rowe sold VMware stocks on only two

6  occasions for total proceeds of $1.76 million, and then made 12 sales within a year during the

7  Class Period.  *Id.* ¶¶ 129, 130.

8        Defendants argue that "the alleged sales are neither 'dramatically out of line with prior

9  trading practices' nor 'calculated to maximize the personal benefit from undisclosed insider

10  information."  Mot. at 13–15 (citing *Police Ret. Sys.*, 2012 WL 1868874, at *22).  In particular,

11  Defendants point out that the complaint does not provide sufficient information about Gelsinger's

12  or Rowe's portfolios.  *Id.* at 14.  "[I]nsider trading becomes suspicious only when considered in

13  comparison to the defendant's overall portfolio and trading practices."  *Police Ret. Sys.*, 2012 WL

14  1868874, at *22; *see also Wozniak v. Align Techs., Inc.*, No. 09-3671 MMC, 2011 WL 2269418,

15  at *14 (N.D. Cal. June 8, 2011) ("The Ninth Circuit has held that typically 'larger sales amounts'

16  than 37% of a defendant's holdings are necessary to support scienter.") (citing *Metzler*, 540 F.3d

17  at 1067).  Because there are no allegations concerning what percentage of Gelsinger's or Rowe's

18  portfolios their respective sales comprised, *see* Am. Compl. ¶¶ 126-142, the Court considers the

19  timing of the sales.  Comparing Gelsinger's and Rowe's trading before the Class Period to their

20  trading during the Class Period, the Court finds that there was a notable increase in the amount

21  and frequency of sales.  In the absence of any rebuttal information from the 10b5-1 plans, this

22  finding provides some support for an inference of scienter.

23        Moreover, Lead Plaintiff alleges that, of Rowe's total $17.8 million sales proceeds

24  received during the Class Period, Rowe made $8.9 million on April 2, 2019, directly prior to the

25  May 2019 disclosures after which VMware's stock price dropped approximately 7%.  *Id.* ¶ 130.

26  Of Gelsinger's total $23.4 million sales proceeds received during the Class Period, Gelsinger

27  made $4.1 million on May 1, 2019, directly before the May 2019 disclosures.  *Id.*  These

28  Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS
22

United States District Court
Northern District of California

1    allegations further support a finding of scienter, in particular with respect to Rowe.  Overall, the

2    timing of the sales and Gelsinger's and Rowe's trading histories support an inference of scienter.

3        As to the stock sales of other VMware executives, Defendants contend that those sales are

4    irrelevant.  Mot. at 15.  In response, Lead Plaintiff cites *City of Dearborn Heights Act 345 Police*

5    *& Fire Retirement System v. Waters Corps.*, 632 F.3d 751, 762 n.5 (1st Cir. 2011) for the

6    proposition that courts can consider "stock sales by non-defendant insiders when evaluating the

7    sufficiency of a pleading of scienter." Opp'n at 18–19.  Courts in this District have held that stock

8    sales by non-defendant executives are immaterial in the absence of allegations explaining why

9    those non-defendants' sales are related to defendants' scienter.  *See, e.g.*, *Rodriguez*, 325 F. Supp.

10   3d at 1057 (finding no scienter where plaintiff failed to allege facts showing non-defendant

11   executives engaged in unusual or suspicious stock sales); *Browning v. Amyris, Inc.*, No. 13-cv-

12   02209-WHO, 2014 WL 1285175, at *17 n.5 (N.D. Cal. Mar. 24, 2014) ("Because the plaintiffs do

13   not explain how stock sales by non-defendants relate to the issue of whether the defendants acted

14   with scienter, there is no need to consider such stock sales."); *In re Lexar Media, Inc. Sec. Litig.*,

15   No. C-04-2013 SC, 2005 WL 1566534, at *6 n.1 (N.D. Cal. July 5, 2005) ("[S]tock sales by non-

16   defendants cannot be a basis for establishing scienter unless the non-defendant intended to assist

17   defendants.").  Here, Lead Plaintiff alleges that VMware executives' sales of stock (including

18   sales by Gelsinger and Rowe)  rose from 251,867 shares in the 18 months preceding the Class

19   Period (for a total proceeds of under $31.8 million) to 702,270 shares during the Class Period (for

20   a total proceeds of $118.6 million).  Am. Compl. ¶¶ 130-137.  Lead Plaintiff further alleges that

21   $58.9 million of executive sales proceeds made during the Class Period occurred in the three

22   months between VMware's announcement of an all-time high license backlog and VMware's May

23   2019 disclosures, after which the stock price dropped approximately 7 percent.  *Id*. ¶ 133.  While

24   these allegations hint at unusual trading patterns and timing, the allegations of the complaint

25   combine Gelsinger's and Rowe's sales with those of other executives, rendering it difficult to

26   evaluate non-defendant executive sales on their own merits.  *See, e.g.*, *id.* ¶ 131.  Without more

27   information, the Court cannot say that such trading patterns are "dramatically out of line" with

28   Case No.: 5:20-cv-02182-EJD
     ORDER GRANTING IN PART MOT. TO DISMISS

United States District Court
Northern District of California

1    previous sales—particularly where the complaint lacks allegations linking non-defendants' sales to

2    Defendants' scienter.  *Cf. Junge v. Geron Corp.*, No. C 20-00547 WHA, 2021 WL 1375960, at *7

3    (N.D. Cal. Apr. 12, 2021) (non-defendant executives' sales supported inference of scienter where

4    the company had less than 20 employees, complaint plausibly alleged that the executives knew of

5    the insider information, and sold 100% of their stocks at inflated prices, having never before sold

6    any).  Non-defendant executives' stock sales, as currently pled, do not support an inference of

7    scienter.

8                    b.      **Backlog reporting oversight and GAAP violations**

9           Beyond stock sales, Lead Plaintiff argues that Gelsinger and Rowe's oversight of backlog

10   reporting and Defendants' alleged GAAP violations indicate scienter.  *See* Opp'n at 19–20.  Lead

11   Plaintiff argues that the Court can infer scienter from Gelsinger and Rowe's knowledge of

12   VMWare's "core operations."  *Id.* at 19.  The Ninth Circuit has stated that as a general matter,

13   corporate management's general awareness of the day-to-day workings of the business does not

14   establish scienter, at least absent additional allegation of specific information conveyed to

15   management and related to the fraud or other allegations supporting scienter.  *S. Ferry LP, No. 2 v.*

16   *Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (citation omitted).  However, allegations regarding

17   management's role in a corporate structure may be considered as part of the *Tellabs* holistic

18   analysis, and such allegations can independently satisfy the PSLRA where they are "particular and

19   suggest that defendants had actual access to the disputed information."  *Id.* at 785–86.

20   Management's role and the importance of the corporate information in question may create a

21   strong inference of scienter when made in conjunction with "detailed and specific allegations

22   about management's exposure to factual information within the company."  *Id.* at 785; *Zucco*

23   *Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009).  In "rare circumstances,"

24   particularized allegations are not needed where the nature of the relevant fact is of such

25   prominence that it would be "absurd" to suggest that management did not have knowledge of it.

26   *S. Ferry*, 542 F.3d at 786.

27          Here, Lead Plaintiff alleges generally that Gelsinger and Rowe oversaw VMware's

28   Case No.: 5:20-cv-02182-EJD
     ORDER GRANTING IN PART MOT. TO DISMISS
                                      24

United States District Court
Northern District of California

1   financial operations, that they spoke repeatedly on investor calls with analysts concerning

2   VMware's financial results, and that they "had in place extensive processes to track VMware's

3   financial performance, including backlog, on a daily, quarterly, and yearly basis." Am. Compl. ¶

4   138. Lead Plaintiff further alleges that as the VMware CEO and CFO, respectively, Gelsinger and

5   Rowe "had access to material adverse non-public information about Company performance and

6   the improper, unsustainable business practice of VMware deferring revenue not required to meet

7   current period guidance into backlog so that it could be recognized in subsequent periods." *Id.* ¶

8   142. These allegations lean more general than detailed and specific, and they do not rise to the

9   level of allegations the Ninth Circuit found sufficient on their own for scienter. *See S. Ferry*, 542

10  F.3d at 785 (describing allegations made in *In re Daou Sys.*, 411 F.3d at 1022–23 and *Nursing*

11  *Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004)).

12          As for the alleged GAAP violations, a mere failure to follow GAAP—without more—does

13  not establish scienter. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th

14  Cir. 2002). At any rate, as discussed above, Lead Plaintiff's arguments fail to allege particular

15  facts indicating that Defendants' backlog reporting was improper or that Defendants violated

16  GAAP. *See supra* Section III.B.1.a. The Court therefore finds these arguments unavailing on

17  their own as they pertain to scienter.

18                  **c.      VMware's Chief Accounting Officer's resignation**

19          Lead Plaintiff further contends that the Court may infer scienter from the resignation of

20  VMware's CAO coinciding with the beginning of the SEC's investigation of VMware's backlog

21  practices. Opp'n at 20. Lead Plaintiff alleges that the CAO, "who had signed each quarterly and

22  annual report filed with the SEC from August 2018 through December 2019, abruptly resigned

23  from VMware after six years of service, the same month the SEC began its investigation into

24  [VMware's] accounting for backlog and related disclosures." Am. Compl. ¶ 141.

25          A plaintiff citing a resignation as evidence of scienter must allege "sufficient information

26  to differentiate between a suspicious change in personnel and a benign one. Mere conclusory

27  allegations that a financial manager resigns or retires during the class period or shortly before [a

28  Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS
25

1    significant event], without more, cannot support a strong inference of scienter."  *Zucco Partners*,

2    552 F.3d at 1002.  Here, Lead Plaintiff pleads only that the CAO's resignation came during the

3    same month as the investigation.  It is not clear whether the resignation occurred *before* the

4    investigation was announced (in which case, the resignation might have had a benign reason), or

5    *after* (when such a resignation after the announcement of an investigation would not be surprising,

6    since the CAO was a figure of responsibility who had signed VMware's SEC reports).  Because of

7    the lack of additional detail, the Court finds that the CAO resignation "add[s] [a] piece to the

8    scienter puzzle" but cannot support scienter by itself.  *In re UTStarcom*, 617 F. Supp. 2d at 975–

9    76.

10                              d.      **Temporal proximity of alleged misrepresentations and revelation of the alleged fraud**

11

12          Finally, Lead Plaintiff argues that the fact that only three months passed between

13   Defendants' Q4 2019 report of "record backlog and the first backlog draw down" is also evidence

14   of scienter.  Opp'n at 20–21 (citing *Berson*, 527 F. 3d at 988 n.5; *Reese v. Malone*, 747 F.3d 557,

15   574–75 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d 605.

16   Defendants do not respond to this argument.  *See* Reply.

17          "Temporal proximity of an allegedly fraudulent statement or omission and a later

18   disclosure can be circumstantial evidence of scienter."  *Malone*, 747 F.3d at 574.  Lead Plaintiff's

19   argument here relies on the premise that Defendants' statements during the Q4 2019 conference

20   call reporting a record high backlog constitute or contain an allegedly misleading statement or

21   omission.  However, for the reasons stated above, Lead Plaintiff has not adequately pled that any

22   statements made during that call were misleading.  *See supra* Section III.B.1.  "Because the

23   complaint's remaining allegations do not comport with the requirements of the PLSRA, the

24   temporal proximity of the statements, in and of itself, is insufficient [to establish scienter]."

25   *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

26          Each of Lead Plaintiff's allegations concerning scienter are, by themselves, subject to

27   competing inferences.  While they may collectively create an inference of scienter, the Court

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  cannot say at this time that that inference is a sufficiently strong one or it is "at least as compelling

2  as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324.

3          **3.      Loss causation**

4          Defendants argue that Lead Plaintiff has failed to plead facts alleging loss causation.  Mot.

5  at 15–16.  An inquiry into loss causation "requires no more than the familiar test for proximate

6  cause."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  "To

7  prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the

8  loss by tracing the loss back to the very facts about which the defendant lied."  *Id.* (internal

9  quotation marks and citations omitted).  "A plaintiff is not required to show that a

10  misrepresentation was the *sole* reason for the investment's decline in value," but it must set forth

11  facts that "if assumed true, are sufficient to provide [the defendant] with some indication that the

12  drop in [defendant's] stock price was causally related to [the defendant's] financial

13  misstatement[s]."  *In re Daou Sys.*, 411 F.3d at 1025–26 (internal quotation marks omitted,

14  emphasis original).  "So long as the complaint alleges facts that, if taken as true, plausibly

15  establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."  *In re Gilead Scis. Sec. Litig.*,

16  536 F.3d 1049, 1057 (9th Cir. 2008).

17          Here, Lead Plaintiff alleges that, "[b]ecause [D]efendants failed to disclose the true state of

18  [VMware's] backlog and revenue, investors were not aware of the true state of [VMware's]

19  operations."  Am. Compl. ¶ 143.  Lead Plaintiff alleges that this lack of awareness in turn led Lead

20  Plaintiff and other members of the putative class to purchase or otherwise acquire VMware

21  common stock, "relying upon the integrity of the market price for VMware's common stock and

22  market information relating to VMware."  *Id.*  Lead Plaintiff alleges that as Defendants made a

23  series of disclosures regarding VMware's backlog and revenue and the SEC investigation,

24  VMware's stock price dropped, and Lead Plaintiff and other members of the putative Class

25  suffered economic loss.  *Id.* ¶¶ 143-153.  For example, Lead Plaintiff alleges that the day after

26  VMware's May 30, 2019 earnings call in which Defendants announced a decline in license

27  backlog of over 67%, VMware's stock price dropped over 7%.  *Id.* ¶ 144.  Lead Plaintiffs allege

28  Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS

similar stock price drops following announcements of shrinking backlog.  *See, e.g.*, *id.* ¶¶ 146, 147, 151.

These allegations are enough to give rise to a plausible inference that Defendants' disclosures were at least partially responsible for Lead Plaintiff's and other putative class members' economic losses. The Court finds that Lead Plaintiff has sufficiently pled facts alleging loss causation.

In sum, the Court finds that Lead Plaintiff has adequately pled facts sufficient concerning loss causation, but not concerning scienter or a material misstatement or omission.  The Court therefore dismisses the § 10(b) and Rule 10b-5 claim with leave to amend.

### C.       Section 20(a) Claim

Lead Plaintiff's second cause of action asserts a § 20(a) claim against the individual defendants, Gelsinger and Rowe.  Am. Compl. ¶¶ 173-180.  Section 20(a) of the Exchange Act provides that certain "controlling" individuals may be held liable for violations of § 10(b) and its underlying regulations.  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 711 (9th Cir. 2012); *Zucco Partners*, 552 F.3d at 990.  In relevant part, § 20(a) states that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To prevail on its claim under § 20(a), a plaintiff must demonstrate "a primary violation of federal securities law" and that "the defendant exercised actual power over the primary violator."  *In re VeriFone*, 704 F.3d at 711 (quoting *Zucco Partners*, 552 F.3d at 990). "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)."  *Id.*

Having found that Lead Plaintiff has not adequately alleged a predicate violation under § 10(b), the Court finds that Lead Plaintiff does not state a controlling person liability claim against Gelsinger or Rowe under § 20(a).

Case No.: 5:20-cv-02182-EJD
ORDER GRANTING IN PART MOT. TO DISMISS
28

United States District Court
Northern District of California

### D.     Section 20A Claim

Lead Plaintiff's third cause of action asserts a § 20A claim against Gelsinger.  *See* Am. Compl. ¶¶ 181-190.  "Section 20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading."  *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020).  "To satisfy § 20A, a plaintiff must plead [(1)] a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur contemporaneously."  *Id*. (internal quotations removed).

Having found that Lead Plaintiff has not adequately alleged a predicate violation under § 10(b) or otherwise, the Court finds that Lead Plaintiff does not state a § 20A claim against Gelsinger.

### E.     Leave to Amend

In the event that a motion to dismiss is granted, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez*, 203 F.3d at 1127 (internal citations omitted).  Because the Court cannot say that the defects described above cannot possibly be cured by the allegation of other facts, it grants Lead Plaintiff leave to amend to add facts that would support its claims under §§ 10(b), 20(a), and 20A of the Exchange Act and Rule 10b-5.

## IV.     CONCLUSION

For the reasons given above, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss with leave to amend.  Lead Plaintiff shall file a second amended consolidated complaint by **September 24, 2021**.

**IT IS SO ORDERED.**

Dated: September 10, 2021

_____
EDWARD J. DAVILA
United States District Judge