ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
        – and –
SCOTT H. SAHAM (188355)
ASHLEY M. KELLY (281597)
TING H. LIU (307747)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LAMARTINA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> VMWARE, INC., et al., <br><br> Defendants. | Case No. 5:20-cv-02182-EJD <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS <br><br> DATE: March 17, 2022 <br> TIME: 9:00 a.m. <br> JUDGE: Hon. Edward J. Davila <br> COURTROOM: 4 |

4871-3683-6100.v2-12/3/21

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF FACTS .......................................................................................3

        A.      Defendants Inflated Backlog to Smooth Reported Revenue Growth .....................3

        B.      On the Heels of Reporting Record-Breaking Backlog, Defendants Sold
                Nearly $41 Million of VMware Stock at Inflated Prices After Attending
                Key Meetings Where Sales and Backlog Were Discussed .....................................6

        C.      Defendants Disclose that Backlog Has Virtually Disappeared, and that
                VMware's Accounting for Backlog Is Being Investigated by the SEC ..................7

III.    ARGUMENT ...........................................................................................................7

        A.      Defendants Omitted Material Historical Facts Rendering Reported
                Backlog Misleading to Investors ..........................................................................7

        B.      The SAC Provides the Detail Required by the Court's Order ...............................9

        C.      The Complaint Adequately Alleges Additional False Statements........................10

        D.      The Statutory Safe Harbor Is Not Applicable...........................................................10

        E.      VMware's Cautionary Language Was Not Meaningful .......................................12

        F.      VMware's Statements Are Not Puffery.................................................................13

        G.      The SAC's Allegations Give Rise to a Strong Inference of Scienter ...................15

                1.      The Suspicious Timing and Amount of Defendants' Stock Sales
                        Give Rise to a Strong Inference of Scienter..............................................16

                2.      Gelsinger and Rowe Oversaw Core Financial Operations Including
                        the Reporting of Backlog...........................................................................20

        H.      Plaintiff Has Adequately Alleged Loss Causation................................................22

        I.      The Complaint Adequately Alleges a §20A Claim Against Gelsinger .................24

IV.     CONCLUSION......................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Azar v. Yelp, Inc.*,
No. 18-cv-00400-EMC, 2018 WL 6182756
(N.D. Cal. Nov. 27, 2018)...................................................................................................19

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................................1, 3, 8, 11

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..............................................................................................14

*Eminence Cap., L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ............................................................................................25

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................................18, 20

*In re CommVault Sys., Sec. Litig.*,
No. 14-cv-5628 (PGS), 2016 WL 5745100
(D.N.J. Sept. 30, 2016) .........................................................................................................9

*In re Connetics Corp. Sec. Litig.*,
No. C 07-02940 SI, 2008 WL 3842938
(N.D. Cal. Aug. 14, 2008)...................................................................................................24

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..............................................................................24

*In re Cypress Semiconductor Sec. Litig.*,
836 F. Supp. 711 (N.D. Cal. 1993) .....................................................................................24

*In re HI/FN, Inc. Sec. Litig.*,
No. C-99-4531 SI, 2000 WL 33775286
(N.D. Cal. Aug. 9, 2000)........................................................................................................9

*In re Intuitive Surgical Sec. Litig.*,
No. 5:13-cv-01920-EJD, 2017 WL 4355072
(N.D. Cal. Sept. 29, 2017) .....................................................................................................8

*In re Novatel Wireless Sec Litig.*,
No. 08-CV-1689 H (RBB), 2010 WL 11470156
(S.D. Cal. May 12, 2010).....................................................................................................24

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...................................................................................... *passim*

**Page**

*In re Questcor Sec. Litig.*,
    SA CV 12-01623 DMG (FMOx),
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)................................................................................19, 20

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 RWS, 2005 WL 225288
    (S.D.N.Y. Feb. 1, 2005)....................................................................................................................13

*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000)..............................................................................................12

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ................................................................................................8

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ..............................................................................................19

*Levy v. Gutierrez*,
    No. 14-cv-443-JL, 2017 WL 2191592
    (D.N.H. May 4, 2017)........................................................................................................................18

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..........................................................................................................20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ............................................................................................................13

*Loos v. Immerson Corp.*,
    762 F.3d 880 (9th Cir. 2014) ............................................................................................................23

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012),
    *aff'd sub nom. Fresno Cnty Emps.' Ret. Ass'n v.*
    *Alphatec Holdings, Inc.*,
    607 F. App'x 694 (9th Cir. 2015) .....................................................................................................12

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................................................24

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ..............................................................................................11

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014)...........................................................................................14, 15

**Page**

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v.*
     *Am. W. Holding Corp.*,
     320 F.3d 920 (9th Cir. 2003) ...............................................................................................16

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
     380 F.3d 1226 (9th Cir. 2004) .............................................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
     50 F. Supp. 3d 1328 (C.D. Cal. 2014) ...................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
     575 U.S. 175 (2015)...............................................................................................................8

*Reese v. Malone*,
     747 F.3d 557 (9th Cir. 2014) ...............................................................................................22

*Rodriguez v. Gigamon Inc.*,
     325 F. Supp. 3d 1041 (N.D. Cal. 2018) ...............................................................................14

*S. Ferry LP, No. 2 v. Killinger*,
     542 F.3d 776 (9th Cir. 2008) ...................................................................................15, 21, 22

*Schueneman v. Arena Pharms., Inc.*,
     840 F.3d 698 (9th Cir. 2016) ............................................................................................1, 8

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
     485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..........................................................................24, 25

*Shenwick v. Twitter, Inc.*,
     282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...............................................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
     551 U.S. 308 (2007)...................................................................................................15, 20, 22

*Va. Bankshares, Inc. v. Sandberg*,
     501 U.S. 1083 (1991)............................................................................................................13

*Washtenaw Cnty. Emps. Ret. v. Celera Corp.*,
     5:10-cv-02604 EJD, 2012 WL 3835078
     (N.D. Cal. Sept. 4, 2012) ............................................................................13, 15, 21, 22

**Page**

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 9(b) ...........................................................................................................................2
    Rule 12(b) ........................................................................................................................19

15 U.S.C.
    §78j(b)..............................................................................................................................19
    §78t(a) ..........................................................................................................................1, 24
    §78t-1 ...........................................................................................................................1, 24

17 C.F.R.`
    §240.10b-5 .......................................................................................................................19
    §240.10b5-1 ............................................................................................................16, 18, 19

## I.    INTRODUCTION

Lead Plaintiff Northeast Carpenters Pension Fund ("Plaintiff") brings this securities class action under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges that VMware, Inc. ("VMware" or the "Company") and its Chief Executive Officer ("CEO") Patrick Gelsinger ("Gelsinger") and Chief Financial Officer ("CFO") Zane Rowe ("Rowe") (collectively "Defendants") ***deliberately*** inflated publicly reported backlog (sales that were contractually secured but not yet fulfilled) by holding back the execution of secured contracts that were not needed to meet fiscal year ("FY") 2019 revenue guidance and reporting those sales as backlog. This scheme allowed VMware to start FY 2020 with a ***$450 million slush fund*** that was drawn upon in order to artificially enhance reported revenue growth during FY 2020. ¶¶2-3.[1] Backlog is an important leading metric for investors as stocks are valued, in large part, based upon future growth potential as opposed to past earnings. The inflated backlog was reported to investors and caused VMware's stock to trade at artificially inflated prices. ¶4. Given the importance of backlog to a company's stock price, the Ninth Circuit has held that "'once defendants cho[o]se to tout the company's backlog they [are] bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of.'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).[2]

The Court in its Motion to Dismiss Order recognized that the manipulation of backlog reporting is a viable theory of liability, which if plead with sufficient detail, would render Defendants' backlog reporting false and/or misleading under the federal securities laws. *See* Order Granting in Part and Denying in Part Motion to Dismiss with Leave to Amend, filed September 10, 2021 (ECF No. 60), at 12 (the "Order"). The Court also held that "the timing of the [defendants' stock] sales and Gelsinger's and Rowe's trading histories support an inference of scienter," (*id*. at

---

[1]    "¶_" and "¶¶_" refer to the Second Amended Complaint for Violations of the Federal Securities Law (the "SAC") (ECF No. 63).

[2]    Unless otherwise noted, all emphasis is added and internal citations omitted.

23), and that "Lead Plaintiff ha[d] sufficiently pled facts alleging loss causation." *Id*. at 28. In dismissing the prior Consolidated Complaint with leave to amend, the Court required Plaintiff to plead additional factual detail supporting the backlog theory in order to meet the requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[3] *Id*. at 12.

The SAC provides the detail required by the Order and gives rise to a strong inference of scienter, as it alleges how Gelsinger and Rowe: (1) unlike lower level employees, possessed full real-time access and the authority to circumvent the Company's Salesforce booking system, in order to inflate backlog (¶¶23, 27, 163); (2) attended numerous Class Period meetings concerning sales, the Company's stock, and backlog, including a meeting specifically addressing the Company's "Backlog policy" in November 2018 (Q4 2019) (¶¶61-73); and (3) had a financial motive to inflate backlog so that they could sell over $41 million worth of VMware stock at inflated prices, whereas lower level sales employees had the opposite motivation, as the delay in booking contracts negatively impacted their compensation, causing several to leave the Company (¶¶25-26, 165).

VMware's inflation of backlog had no legitimate business purpose, but it allowed the Defendants to misleadingly report ***double digit revenue growth*** during FY 2020 as they drew down on the backlog slush fund they had created, and allowed them to sell over $41 million of their VMware stock at highly inflated prices, shortly after attending key meetings where sales and backlog were discussed. ¶¶3, 7, 149. Had Defendants recognized the backlog revenue when it was actually secured in FY 2019, VMware would have reported only ***low single digit revenue growth*** during FY 2020 and its stock would not have traded at the level it traded at during the Class Period. ¶3.

The boilerplate risk warning that "'[w]e do not believe the amount of backlog is indicative of future sales or revenue'" (Defs.' Memo at 9) does not immunize Defendants from liability, as it did not warn investors that VMware had ***already*** deferred revenue that was not needed to meet FY 2019

---

[3] "Consolidated Complaint" refers to the Consolidated Complaint for Violations of Federal Securities Laws (ECF No. 50).

targets into backlog so that it would be available to inflate FY 2020 revenues.[4] The Ninth Circuit, in *Berson*, rejected the same defense based upon a nearly identical warning that "'backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period.'" 527 F.3d at 986. As in *Berson*, Defendants' failure to disclose what VMware's backlog "consisted of" is actionable as it created the "'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Id.* at 985-87.

Finally, the Court correctly held that Plaintiff has adequately alleged loss causation (Order at 28) – as it purchased VMware stock at prices that were inflated as a result of Defendants' backlog scheme, and it was harmed when VMware's stock price declined on four separate occasions when Defendants disclosed the declines in backlog that occurred as a result of the backlog draw down. ¶¶171-181. In total, the value of VMware shares declined $85 per share – over 41% from its Class Period high – following four quarterly disclosures of declining backlog. ¶179.

## II.    STATEMENT OF FACTS

### A.    Defendants Inflated Backlog to Smooth Reported Revenue Growth

Throughout FY 2019, Defendants engaged in a practice of materially and artificially inflating backlog by pushing sales that were not required to meet current period guidance into the next reporting period, by deliberately leaving them categorized as unfulfilled at quarter end. ¶28. At the end of each quarter, and particularly at year end, Defendants deliberately left executed contracts unprocessed, to be recognized in the subsequent quarter by funneling them into the Company's backlog. ¶29. This practice served no legitimate purpose and had the effect of delaying and smoothing the recognition of revenue so that the revenue from those contracts would be recognized in the future rather than the quarter in which the contract execution was achieved. *Id.*

As CEO and CFO, unlike lower level employees, Gelsinger and Rowe had full access to the automatic booking system under which backlog was managed and the authority to hold back executed contracts as backlog in order to meet – and not exceed – Wall Street's expectations. ¶¶26,

---

[4]    "Defs.' Memo" refers to Defendants' Notice of Motion and Motion to Dismiss Second Amended Complaint; Memorandum of Points and Authorities in Support Thereof (ECF No. 64).

165.  The SAC details this process, including how sales personnel would submit executed contracts for processing directly to Rowe's Operations group at the Company's headquarters, through the Company's Salesforce automatic booking system.  ¶¶22, 24.  Once routed to Rowe's Operations group, executed contracts were typically cleared through the Salesforce "configure, price, and quote" program within 24 hours.  ¶22.  As quarter-end approached, however, salespeople experienced delays of several days in the processing of executed contracts by Rowe's Operations group, causing them to be pushed into the next quarter, and delaying the receipt of commissions earned on their executed contracts.  ¶¶22, 24.  These delays were discussed at regular sales meetings and Rowe's Operations group's practice of deliberately delaying executed contracts into subsequent quarters was so prevalent, that in some cases, it caused salespeople to depart the Company.  ¶26.

Through the process of pushing sales not required to meet FY 2019 guidance into backlog, VMware was able to report a head start – ***nearly half a billion dollars*** – toward meeting guidance for FY 2020.  The increased backlog created the perception of a state of affairs at VMware that was dramatically different from what actually existed and the later drawdowns continued to give analysts and investors a false impression of VMware's FY 2020 revenue growth.  This conduct was highly material, as by deferring revenue recognition to FY 2020, VMware was able to deliver ***double-digit*** revenue growth in FY 2020.  Had VMware recognized the revenue that was deferred into backlog during FY 2019 when it was in fact secured, VMware would have delivered only ***low single digit*** revenue growth for FY 2020.  ¶¶3, 30, 33.

During FY 2019, the Company reported a 58% increase in backlog, from $285 million at the beginning of the year, to $449 million at year end.  ¶31.  During the same period, license backlog likewise increased 48%.  *Id*.  The dramatic increases in backlog the Company experienced during FY 2019, and particularly at year end, indicated to investors that the Company had a solid head start for FY 2020.  As Defendants advanced a story of impressive backlog and growth, the Company's stock price soared reaching a Class Period high of $205.52 on May 16, 2019, just two weeks prior to the release of the Company's Q1 2020 results, the first quarter in which VMware began to draw down on its backlog slush fund.  ¶¶32, 52, 70.

Defendants' motivation for racking up substantial backlog was two-fold. First, once guidance was met in FY 2019, VMware management directed that sales be deferred from the current period and recorded as backlog, so that the revenue would be available to book during the next fiscal year. ¶33. Second, pushing sales into backlog also *capped* the current period baseline upon which future revenue growth would be measured. ¶34. Fulfilling the contracts and recognizing the backlog sales organically in FY 2019 when they were secured rather than pushing them out into FY 2020 would have meant that analyst growth expectations in FY 2020 would have been significantly higher, and achieving the same percentage growth would have required nearly a *half a billion more* in total revenue. *Id*. Defendants' scheme enhanced the Company's prospects of meeting guidance and analyst expectations in FY 2020 and allowed VMware to continue to deliver double digit revenue growth in FY 2020. ¶33. Unbeknownst to investors, without this deferred revenue, VMware would have reported significantly lower revenue growth for FY 2020 (low single digits as opposed to the double-digit growth reported).

Defendants' practice of deceptively pushing sales into backlog concealed from investors that VMware was facing several challenges that jeopardized the Company's ability to meet revenue guidance during FY 2020. VMware's Americas segment was in a state of turmoil – just days after the close of FY 2019, VMware saw the departure of its head of Americas segment, leading to the reorganization of the Americas region and appointment of a new Americas leader. This realignment resulted in deal execution problems and a subsequent slowdown following weakened performance in that region. ¶¶36, 52, 68. Separately, as customers' consumption of software evolved, the Company was failing to address the industry-shift away from its license model, which was becoming obsolete, to subscription and SaaS products, which slowed the timing of revenue recognition and negatively impacted the Company's revenue growth. ¶37.

In order to cushion the negative impact of these factors on the Company's financial performance in FY 2020, Defendants poured excess FY 2019 sales into VMware's backlog, thus artificially inflating backlog and misleading investors as to VMware's prospects for FY 2020 and creating a lower threshold to measure future growth. As a result of their practice of deliberately pushing sales into backlog, Defendants were aware, but failed to disclose, that backlog was no

longer an accurate barometer of the Company's expected performance as it was now being used to smooth reported results.  ¶38.

**B.     On the Heels of Reporting Record-Breaking Backlog, Defendants Sold Nearly $41 Million of VMware Stock at Inflated Prices After Attending Key Meetings Where Sales and Backlog Were Discussed**

Gelsinger and Rowe had direct access to backlog and executed sales information through the Company's Salesforce booking tool and through numerous Class Period meetings they attended. ¶¶27, 61-73, 163.  The SAC provides specific detail regarding Gelsinger's and Rowe's attendance at dozens of Class Period meetings where they had additional access to key backlog information.  ¶¶61-73.  Notably, Gelsinger and Rowe participated in a November 19, 2018 (Q4 2019) meeting where they were briefed regarding VMware's accounting for backlog.  ¶¶66, 73.  The "Backlog policy" meeting, organized by VMware's Vice President of Finance – Customer Operations & Revenue Accounting, Paula Delaney, included Gelsinger and Rowe, Chief Accounting Officer Kevan Krysler, and Executive Vice President ("EVP") of Worldwide Sales and Services, Maurizio Carli.  The Backlog policy meeting was held before Defendants announced record-breaking backlog at the end of FY 2019.  ¶73.  In addition, Gelsinger attended a February 14, 2019 Sales Quarterly Business Review ("QBR") meeting, which provided Gelsinger access to information concerning the Company's executed contracts, sales, backlog and financial forecast heading into FY 2020, directly from Rowe's Operations group.  ¶68.  Gelsinger also organized a February 22, 2019 Sales Activities Update meeting with the Company's Americas regions Vice President of Strategy, Planning & Operations, Magdeleine Bourgoin, along with the Company's Chief Operating Officer of Customer Operations, Sanjay Poonen, and EVP of Worldwide Sales and Services, Maurizio Carli.  ¶¶63-68.

After attending these meetings, during the period March 1, 2019 – the day immediately following the Company's Q4 2019 public announcement of record license backlog – until May 30, 2019 when Defendants disclosed a 67% decline in license backlog during Q1 2020 – Gelsinger and Rowe sold *$16.7 million* in VMware stock at inflated prices.  ¶149.  Notably, Gelsinger sold over 21,000 shares of stock for proceeds in excess of $3.7 million on March 1, 2019, the day after he and Rowe publicly reported VMware's record backlog.  ¶¶50, 149, 153, 213.  Gelsinger also sold an additional 20,000 on May 1, 2019, at prices as high as $204 per share, just weeks after attending an

April 10, 2019 "Discussion on Stock" meeting and an April 12, 2019 Sales Activity Update meeting he organized with Chief Operating Officer of Customer Operations Sanjay Poonen, and EVP of Worldwide Sales and Services Maurizio Carli. ¶¶149, 153-154. During the same time period, Rowe sold over 48,000 shares yielding nearly $9 million, just four days after the Company filed its 2019 Form 10-K on March 29, 2019, which highlighted record-breaking total and license backlog, at prices as high as $184 per share. ¶¶149, 153. Defendants' sales maximized profits as they were made after VMware's share price neared Class Period highs as a result of Defendants' inflation of backlog. Notably, the shares sold by Gelsinger and Rowe lost as much as $84 per share (40% of their value) when the truth about backlog was belatedly disclosed to investors.

### C.   Defendants Disclose that Backlog Has Virtually Disappeared, and that VMware's Accounting for Backlog Is Being Investigated by the SEC

Starting on May 30, 2019, Defendants disclosed the first of four large, quarterly declines in backlog during FY 2020. Financial analysts contemporaneously noted that the large decline in backlog and resulting stock price decline appeared to be the result of the fact "that a good portion of 1QF20 product billings were actually 4QF19 deals that got invoiced in 1QF20." ¶54. Gelsinger and Rowe continued to sell millions of dollars of VMware stock prior to the additional three disclosures of declining backlog, ultimately unloading over *$41 million* in stock at highly inflated prices. Finally, on February 27, 2020, Defendants disclosed that total backlog had declined 96% and license backlog had declined 97% from Q4 2019, and that the Company was unable to meet license and total revenue guidance for Q4 2020 and FY 2020. ¶¶74, 176. The Company also revealed that "the staff of the Enforcement Division of the [SEC] requested documents and information related to VMware's backlog and associated accounting and disclosures." ¶¶75, 177. The Company's stock price declined substantially following *each of the four* FY 2020 quarterly disclosures of declining backlog shedding $85 per share, 41% of its value. ¶¶78, 179.

## III.   ARGUMENT

### A.   Defendants Omitted Material Historical Facts Rendering Reported Backlog Misleading to Investors

As the Court correctly concluded in the Order at 12-13, when alleged with adequate particularity, the Company's statements concerning reported backlog are actionable under Ninth

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD                                                                - 7 -
4871-3683-6100.v2-12/3/21

Circuit precedent, which provides, "'once defendants cho[o]se to tout the Company's backlog, they [are] bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of.'" *Schueneman*, 840 F.3d at 707; *Berson*, 527 F.3d at 985.  Here, during FY 2019, Defendants failed to disclose that the reported backlog "consisted of" sales from contracts that were intentionally held, not for a legitimate business purpose, but for the express purpose of delaying the recognition of revenue so as to meet – but not exceed – analyst expectations and to give the Company a head start toward meeting FY 2020 revenue growth expectations.  Defendants' failure to disclose what VMware's backlog "***consisted of***" created the "'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson*, 527 F.3d at 985, 987.

Defendants were motivated to manipulate reported backlog in order to meet and not overly exceed market expectations.  Once quarterly sales goals were achieved, ***VMware management, including Gelsinger and Rowe, directed the Company's Operations personnel to hold secured contracts*** until the next quarter, resulting in revenue smoothing into subsequent quarters, causing reported revenue to be far more consistent across reporting periods than it actually was.  ¶¶2, 33. This undisclosed deliberate smoothing of revenue artificially inflated backlog reported to investors and created an impression of steady and continued growth that was not indicative of actual corporate performance, rendering the backlog numbers it reported to investors misleading under binding Ninth Circuit precedent.  *Schueneman*, 840 F.3d at 707; *Berson*, 527 F.3d at 985; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) (a company "must as well desist from misleading investors by saying one thing and holding back another"); *In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) (same); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 202 (E.D.N.Y. 2000) (fact that Defendant "was consistently 'robbing Peter to pay Paul' . . . is undoubtedly a fact that a reasonable investor would have considered important").

Not only is Defendants' failure to disclose what backlog "consisted of" misleading under Ninth Circuit precedent, Plaintiff has also alleged that Defendants' failure to disclose significant judgments and significant changes in backlog ran afoul of Generally Accepted Accounting Principles ("GAAP") and SEC disclosure rules (¶¶4, 39-42).  "The practice of deferring the

recognition of revenues to a later period in order to manipulate earnings is a GAAP violation." *In re CommVault Sys., Sec. Litig.*, No. 14-cv-5628 (PGS), 2016 WL 5745100, at *2 (D.N.J. Sept. 30, 2016). "[W]hen companies misleadingly shift revenue or earnings from one period to another for the purpose of making the latter period look better, it violates GAAP. This practice is known as 'cookie jar' accounting, 'earnings management' or 'smoothing,' and constitutes an improper manipulation of the subject financial statements." *Id*. Revenue understatement theories provide the basis for an Exchange Act claim where plaintiff alleges defendant "shifted revenue from the present to the future . . . to create the false impression that [defendant] had significant future growth potential." *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1358 (C.D. Cal. 2014). That is exactly what is alleged here.

### B.     The SAC Provides the Detail Required by the Court's Order

The Court held that the allegations in the Consolidated Complaint were not pled with sufficient particularity including "facts pled concerning, for example, exactly who in 'management' made the decision and provided the direction to withhold secured contracts, and when, where, how, and whom they so directed." Order at 13. The SAC meets this requirement by adding detail concerning Defendants unfettered access and real-time visibility into executed sales and backlog through the Company's Salesforce booking tool as well as their unique motivation to meet but not exceed Wall Street expectations – access and motive that was not shared by lower level employees or salespeople who possessed the opposite incentive – as the conduct at issue negatively impacted the timing of commissions that were due after the sales were booked. ¶¶25-26, 165. The SAC also describes how executed contracts were routed to Rowe's Operations group, and that Gelsinger and Rowe, as the CEO and CFO, had the ability to direct the bypassing of the automatic booking system to delay contracts at quarter end based on information they were seeing in real-time. ¶¶22, 27, 163. Plaintiff has also now alleged dozens of "specific meetings," regarding backlog and sales and "provide[d] the dates of the meetings, locations, [and] the particular defendants who attended." *See In re HI/FN, Inc. Sec. Litig.*, No. C-99-4531 SI, 2000 WL 33775286, at *8 (N.D. Cal. Aug. 9, 2000). The SAC's allegations concerning: (1) how Rowe's Operations group overrode the Salesforce booking system at quarter end; (2) how Rowe and Gelsinger unlike lower level employees,

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD                                                                                                      - 9 -
4871-3683-6100.v2-12/3/21

possessed full access to the Salesforce system; (3) how Gelsinger and Rowe were motivated to inflate backlog, whereas lower level employees had the opposite motivation; and (4) dozens of Class Period meetings organized and attended by Gelsinger and Rowe, including allegations as to the names of other senior level executives that attended, the dates, times, and locations of the meetings, and the topics of information conveyed at those meetings, including Backlog policy, Company stock, and sales and pipeline information, provide the detail required by the Court's Order. ¶¶22, 27, 61-73. Thus the SAC now describes the backlog scheme with sufficient particularity.

### C.    The Complaint Adequately Alleges Additional False Statements

Setting aside the misleading reporting of historical backlog numbers, Defendants' brief is remarkably devoid of *any* reference to Defendants' February 28, 2019, statements concerning the Company's "broad-based strength across our diverse product portfolio and in *all 3 geographies*." *See, e.g.*, ¶¶46, 97-98. Defendants' omission is glaring – while they conveyed to investors on February 28, 2019 that the Company was experiencing current strength in *all geographies*, in actuality, that month, VMware saw the abrupt departure of its Americas region leader, causing disruption and negatively impacting the Company's revenue. ¶¶36, 56, 63. These statements about the strength in the Company's Americas region came less than a week after Gelsinger organized a Sales Update Meeting with Americas regions Vice President of Strategy, Planning & Operations, Magdeleine Bourgoin, along with the Company's Chief Operating Officer of Customer Operations, Sanjay Poonen, and EVP of Worldwide Sales and Services, Maurizio Carli. ¶¶62-63. Despite the February 22, 2019 Sales Activities Update meeting and the February 14, 2019 Sales QBR meeting, both of which provided Gelsinger with access to information concerning the Company's executed contracts, sales, and backlog, the Company's February 28, 2019 Q4 2019 earnings announcement failed to disclose anything to investors concerning the Americas reorganization and the disruption it had caused – which was concealed by the drawdown of inflated backlog. ¶¶36, 56, 63.

### D.    The Statutory Safe Harbor Is Not Applicable

The PSLRA safe harbor does not protect the misleading reporting of backlog. Defendants concede that the Ninth Circuit has held that "backlog is 'a snapshot of how much work the company has under contract right now,' not a 'projection' of earnings or [a] statement about 'future economic

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD
4871-3683-6100.v2-12/3/21

- 10 -

performance.'"  *See* Defendants' Reply Memorandum of Points and Authorities in Support of Motion to Dismiss the Amended Complaint (ECF No. 56) at 4-5 (quoting *Berson*, 527 F.3d at 990). The misleading reporting of backlog is therefore not protected by the PSLRA safe harbor.  *See* Order at 14.

With respect to the other statements at issue,[5] the Court recognized, "the Ninth Circuit has held that where an otherwise forward-looking statement includes a non-forward-looking statement, that non-forward looking statement is not protected under the PSLRA safe harbor."  Order at 16; *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) ("We hold a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings.").[6]  Defendants claim Gelsinger's February 28, 2019 statement that, "'we do continue to see that it will be a good IT market into the future overall,'" is forward-looking.  Defs.' Memo at 13

---

[5]  Defendants pull out-of-context statements from three paragraphs of the SAC, and cite an additional 10 paragraphs as being forward-looking.  Defs.' Memo at 13.  Defendants do not contend that any other paragraphs in the SAC contain forward-looking statements.  *See, e.g.*, ¶¶82-88, 90-98, 100, 102-106, 109, 111, 116-121, 123-137, 141-143.

[6]  It is unclear which portion of ¶99 (Consolidated Complaint, ¶80) Defendants claim to be forward-looking.  Defs.' Memo at 13.  That statement was one made by Defendant Rowe on February 28, 2019, that VMware "exited Q4 with $147 million of license backlog compared to $144 million at the end of Q3."  As described above, backlog is not forward-looking, and therefore not protected by the statutory safe harbor as a matter of law.  *Berson*, 527 F.3d at 990; *see also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1005-06 (N.D. Cal. 2020) ("[T]he statements defendants contend were forward-looking growth and revenue projections were accompanied by and premised upon false representations of current revenue, making them ineligible for the PSLRA's safe harbor.").

(quoting ¶101 (Consolidated Complaint, ¶82)).  But Defendants have conveniently omitted other portions of that statement that the Court *has already considered* and concluded are not forward-looking, namely that "'we've just positioned ourself [*sic*], we believe, extremely well,'" in the then-existing turbulent market, and that currently, "'we're *no longer* dependent on any geo or any individual product.'"  *See* Order at 15-16 (describing only that the underlined portion of the disputed statement was forward-looking).  Defendants' challenge of ¶113 (Consolidated Complaint, ¶94) fares no better – as defendant Rowe informed investors and analysts that the Company was "'comfortable with what we're seeing early,'" that is, the Company's *current* performance at the end of Q1 2020 (Defs.' Memo at 13).  The Court previously considered that statement, finding only that the last part of the statement, "'feel good about our forecast for the year,'" was forward-looking.  *See* Order at 15-16.  These disputed statements contain mixed statements of current or historical fact and therefore are not protected by the safe harbor.  Order at 16 (citing *Quality Sys.*, 865 F.3d at 1141).[7]

### E.    VMware's Cautionary Language Was Not Meaningful

VMware's cautionary language was not meaningful.  The Ninth Circuit has held that "[b]ecause Defendants made materially false or misleading non-forward-looking statements about the state of [it's] sales pipeline, *virtually no cautionary language short of an outright admission*

---

[7]    Mixed statements that contain projections are not forward looking if they are rendered misleading by misrepresentations of current conditions.  *See In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (in analyzing statement that company was "on track to meet analysts' earnings expectations," the court "accepts [p]laintiffs' representation that they are alleging that [d]efendants misrepresented current business conditions" and concludes that the statement is not forward-looking); *see also Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (finding statement that revenues "'*will continue to grow*'" though "ostensibly couched in terms of the future, this statement also concerns historical and current facts") (emphasis in original), *aff'd sub nom.  Fresno Cnty Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).

*that the non-forward-looking statements were materially false or misleading would have been adequate*." *Quality Sys.*, 865 F.3d at 1148.  The same is true here.

As to other statements, "[t]he safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized."  Order at 16 (quoting *Washtenaw Cnty. Emps. Ret. v. Celera Corp.*, 5:10-cv-02604 EJD, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012)).  The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the cautionary language prong of the safe-harbor provision.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005).  Risk warnings must be clear enough that ""reasonable minds" could not disagree that the challenged statements were not misleading.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133 (N.D. Cal. 2017); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (to warrant protection, the cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil").

Here, Defendants knew they had *already* artificially inflated backlog so that they could use FY 2019 sales as a head start to meet FY 2020 targets, rendering any future projections based on current and historical operations misleading – including that the Company was currently well-positioned (¶101) and that VMware's operations early in Q1 2020 provided "comfort[]" toward the rest of the year (¶113).  Accordingly, "[t]he statutory safe harbor does not apply because the [p]laintiff[] ha[s] adequately alleged that the [d]efendants *knew* of problems which they represented to be merely risks or uncertainties."  *Celera*, 2012 WL 3835078, at *4; *see also In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 RWS, 2005 WL 225288, at *18-*19 (S.D.N.Y. Feb. 1, 2005) ("discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized").

### F.    VMware's Statements Are Not Puffery

The Court has already held Defendants' "factual statements concerning specific revenue and backlog amounts" are not puffery.  Order at 18 (citing ¶¶106, 108, 110, 123, 131-132, 134-135 (Consolidated Complaint, ¶¶87, 89, 91, 104, 112-113, 115-116)).  The Court has already addressed Defendants' arguments that other statements were puffery, because they were "likewise not

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD
4871-3683-6100.v2-12/3/21

- 13 -

generalized statements of optimism but rather either forward-looking statements about projected revenue or concrete descriptions of the past and present state of revenue recognized over a period of time." *Id.* (citing ¶¶125, 137-138, 140 (Consolidated Complaint, ¶¶106, 118-119, 121)). Defendants concede this point. Defs.' Memo at 14 ("statements of historic fact about backlog and predictions of future performance" are not puffery). Instead, Defendants challenge the remaining portions of those statements, without providing any specificity for the portion they contend to be mere corporate optimism. Defs.' Memo at 14.[8]

In the Ninth Circuit, "'even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly.'" Order at 17 (quoting *Quality Sys.*, 865 F.3d at 1143). "Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1054-55 (N.D. Cal. 2018) (Davila, J.) (declining to dismiss factual statements regarding certain aspects of defendant's business as nonactionable puffery). A court should "only grant Defendants' motion to dismiss on the ground that the statements are 'puffery' only if it concludes that the statement is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).

When viewed in context, the remaining portions of the Defendants' statements about the state of VMware's operations "went beyond 'feel good' optimistic statements." *Quality Sys.*, 865 F.3d at 1144 (finding statements concerning growing pipeline were material). Defendants affirmatively created the misleading impression that VMware was poised for continued success when in fact they knew – based on their actual access to backlog information – that VMware had deceptively pushed nearly half a billion dollars of sales not required to meet FY 2019 guidance into FY 2020, "creat[ing] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Those

---

[8] Defendants do not challenge any of the alleged false statements concerning the Company's strength in "all three geographies," including the Americas region. *See*, *e.g.*, ¶¶46, 97, 98.

statements are not "'so obviously unimportant'" as to warrant dismissal. *Mulligan*, 36 F. Supp. 3d at 966-67 (noting the determination of "whether a given statement is material 'entails fact-intensive assessments that are more properly left to the jury'").

### G.    The SAC's Allegations Give Rise to a Strong Inference of Scienter

"In ruling on a motion to dismiss, the inquiry is 'whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets th[e] standard.'"  Order at 19-20 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007) (emphasis in original); *see also Celera*, 2012 WL 3835078, at *3 ("The court must consider the complaint holistically rather than parsing and analyzing each allegation in isolation.")).  "Allegations regarding management's role in a corporate structure may be considered as part of the *Tellabs* holistic analysis, and such allegations can independently satisfy the PSLRA where they are 'particular and suggest that defendants had actual access to the disputed information.'"  Order at 24 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008); *see also Quality*, 865 F.3d at 1145 ("'particularized allegations that defendants had "actual access to the disputed information," . . . raise a strong inference of scienter'").  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.

The SAC alleges that Defendants were motivated to deliberately hold back executed sales contracts as backlog once current period guidance had been met in order to meet Wall Street's expectations. ¶¶26, 165.  As backlog increased, so did VMware's share price. ¶¶4, 32.  Defendants then sold $41 million of their own VMware stock at inflated prices while in possession of material information gleaned from their participation in dozens of key meetings – some of which were within days, or even the same day, as their stock sales.  ¶¶149, 153-154.

As the Company's most senior leaders, Gelsinger and Rowe had access to real-time booking information and were able to observe contract activity as it occurred.  ¶164.  In contrast, salespeople, who entered each executed contract into the Company's automatic booking tool, Salesforce, lacked authority and visibility into the Salesforce system to delay the processing of contracts once they were

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD
4871-3683-6100.v2-12/3/21

- 15 -

routed to Rowe's Operations group. ¶163. Unlike Gelsinger and Rowe, salespeople and lower-level managers were disadvantaged by the holding back of contracts as the practice caused a delay in their commissions and ultimately led certain salespeople to depart the Company due to the practice. ¶26. The SAC further alleges that there was **no legitimate business purpose** for this conduct and that it was done solely to obtain a head start toward FY 2020, as Defendants knew that the shift away from license to subscription and SaaS and the turmoil in the Americas segment including the departure of its leader would slow revenue growth during FY 2020. ¶¶2, 30, 33, 36-37, 48-51, 145-161.

### 1.    The Suspicious Timing and Amount of Defendants' Stock Sales Give Rise to a Strong Inference of Scienter

The Court already concluded "the timing of the [stock] sales and Gelsinger's and Rowe's trading histories support an inference of scienter." Order at 23. The SAC supplements the prior allegations by adding additional, particularized detail concerning these stock sales and their proximity to key meetings concerning sales, VMware's stock, backlog, and the Company's struggling Americas region. ¶¶63, 68, 149, 154. Approximately 50,000 of these shares worth nearly $8 million, were sold by Defendants outside of their Rule 10b5-1 trading plans. *See, e.g.*, ¶149. Defendants' Class Period stock sales give rise to a strong inference of scienter.

Defendants' stock sales were dramatically out of line with prior trading practices and were suspiciously timed to maximize personal benefit. *See, e.g.*, Order at 22 ("Comparing Gelsinger's and Rowe's trading before the Class Period to their trading during the Class Period the Court finds that there was a notable increase in the amount and frequency of sales."). Suspiciously-timed stock sales support a strong inference of scienter "when they are "'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.""" *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). "'Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insiders prior trading history.'" *Id*. The Ninth Circuit has held that the percentage of total stock is not necessarily dispositive as to whether stock sales are indicative of scienter, especially in light of sales that were "'dramatically out of line with prior trading practices,'"

including where, like here, the defendant sold no stock in the 5 years preceding the class period. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

Defendants argue that Plaintiff did not allege facts concerning Defendants' "'overall portfolio[s],'" (Defs.' Memo at 17) but Defendants ignore that, in contrast to his large Class Period stock sales, Plaintiff alleges that Gelsinger sold *no* VMware stock in the five years directly preceding the Class Period. ¶146. During the Class Period, *Gelsinger sold $23.4 million* of VMware stock (over 141,000 shares) at inflated prices while in the possession of material non-public information at suspicious times at highly inflated prices, often times within days of key meetings regarding sales and backlog. *See, e.g.*, ¶149.

In addition, the stock sales were suspiciously timed. For example, on March 1, 2019, Gelsinger sold 21,086 shares of his VMware stock at prices as high as $181.61 per share for proceeds of $3.77 million, the day immediately following Defendants' disclosure of record-breaking license backlog. ¶¶147, 153, 213. The sale came just days after Gelsinger's February 22, 2019 Sales Update Meeting with the Americas Region Vice President of Strategy, Planning & Operations, Magdeleine Bourgoin, the Company's Chief Operating Officer of Customer Operations Sanjay Poonen and EVP of Worldwide Sales and Services, Maurizio Carli. ¶63. The February 22, 2019 meeting was contemporaneous with the departure of the Americas region leader, which caused disruption in that region. ¶¶62-63. Gelsinger had also organized, just a week prior to that, a February 14, 2019 Sales QBR meeting, which provided Gelsinger an opportunity to meet with senior leaders of Rowe's Operations group to obtain information related to the Company's executed contracts, sales, and backlog. ¶¶63, 68.

Gelsinger also sold approximately $4 million in additional stock on May 1, 2019, just weeks after he organized key meetings, including his April 2019 "Discussion on Stock" with Corporate Vice Presidents and a Sales Activities Update meeting with the Company's Chief Operating Officer and EVP of Worldwide Sales. Gelsinger's May 1, 2019 sales were made as the Company's share price reached record levels of over $204 per share, just two days prior to the close of Q1 2020, and shortly *before* the first disclosure of declining license backlog caused the share price to decline. ¶¶149, 151, 153-154.

Rowe's Class Period sales were likewise both suspiciously timed and inconsistent with his prior trading history.  During the Class Period, Defendant **Rowe sold 104,218 shares of VMware stock** at inflated prices while in the possession of material non-public information to yield proceeds of **$17.8 million**.  ¶149.  This included the sale of almost $9 million on April 2, 2019, just days after the Company filed its 2019 Form 10-K on March 29, 2019, which highlighted record-breaking backlog (*see* ¶¶102-104).  Notably, on April 2, 2019, Rowe sold $3 million in VMware stock **outside** of his Rule 10b5-1 plan.  Rowe also netted over $1 million from his sale of stock just weeks after the Q4 2019 "Backlog policy" meeting.  ¶¶149, 166.  Notably, in the 18 months preceding the Class Period, Defendant Rowe made only two transactions, selling a total of only 13,100 shares for $1.76 million in proceeds.  ¶148.  Defendant Rowe's Class Period transactions thus represent an increase of **915%** from his pre-Class Period sales.  *Id.*

Defendants claim that the increase in Gelsinger's and Rowe's VMware stock holdings is evidence of "'good faith.'"  Defs.' Memo at 17.  Defendants are wrong, as although stock purchases may in some cases raise issues of fact that cut against a scienter inference, Gelsinger's and Rowe's increased holdings in this case were not due to stock purchases, but instead were the result of compensation awards for their employment.  In fact, **none** of Defendants' Forms 4 indicate a transaction code of "P" for "purchase."  *See, e.g.*, Declaration of Elliot Greenfield in Support of Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 64-1) Exs., R-DD.  Defendants' contention from outside the pleadings thus not only improperly raises issues of fact that are premature at the pleading stage, but also completely **ignores** that **compensation for employment** – unlike an affirmative decision to purchase more stock – does not undermine the scienter inference.  *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("[defendant] acquired shares at no cost to him, which does not demonstrate lack of scienter"); *Levy v. Gutierrez*, No. 14-cv-443-JL, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017) ("Defendants also argue that the inference of scienter is defeated because they actually increased their holdings during the class period, via vesting stock options.  Defendants are correct that the Court of Appeals has ruled that 'it is appropriate to consider not only the shares of stock that [defendants] held prior to their sales, but also the shares that they could have sold through the exercise of options.'

*Nevertheless, the stark contrast between their pre-class dormancy and their class period activity remains grist for the scienter mill at the Rule 12(b) stage*.").

Defendants' argument (Defs.' Memo at 17-18) regarding 10b5-1 plan sales also lacks merit, as the Court previously recognized, the existence of a Rule 10b5-1 plan is an affirmative defense that cannot form the basis for dismissal at the pleading stage. Order at 21; *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales [pursuant to a 10b5-1 plan] may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) ("'[A] 10b5-1 plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith,' which a court cannot make when considering a motion to dismiss."); *In re Questcor Sec. Litig.*, SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("the fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales"). This is because, whether the Rule 10b5-1 plans were initiated and entered into in good faith is a question of fact that cannot be resolved on a 12(b)(6) motion. *See* Order at 21; Defs.' Memo at 18 (noting the "Forms 4 do not indicate *when* Mr. Gelsinger and Mr. Rowe executed their Rule 10b5-1 plans") (emphasis in original); *see also Yelp, Inc.*, 2018 WL 6182756, at *4 (noting "the relevant SEC regulation recognizes the existence of a ***prior*** 'contract, instruction, or plan' to sell stocks as an affirmative defense, to a suit under §10(b) and Rule 10b-5, ***but only where 'the plan was "entered in good faith"***'"). Issues of fact abound, and the Court still "cannot conclude that the 10b5-1 plans negate any inference of scienter." *See* Order at 21.

Finally, as the Court recognized in its Order, three of Defendants' Class Period stock sales (totaling nearly 50,000 shares for proceeds of nearly $8 million) were ***not*** made pursuant to 10b5-1 plans. This includes some of Defendants' most nefariously-timed sales. *See* Order at 21 and Defs.' Memo at 17, n.14. In fact, Rowe admittedly sold $4.3 million worth of stock outside of his Rule 10b5-1 plan, and Gelsinger admittedly sold $3.8 million outside of his Rule 10b5-1 plan. ¶149. Rowe's ***non***-10b5-1 plan trades included the sale of 6,500 shares on December 12, 2018, for

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD
4871-3683-6100.v2-12/3/21

- 19 -

proceeds in excess of $1 million, just two days after (1) the Company reported inflated backlog of $324 million (¶95); and, (2) Rowe met with the Company's "Core Team," consisting of Gelsinger and at least three Chief Operating Officers. ¶¶72, 149, 152. The December 12, 2018 sale also came just weeks after the Q4 2019 "Backlog policy" meeting. ¶149. Rowe's other *non* 10b5-1 sales included 18,000 shares sold on April 2, 2019 at highly inflated prices for nearly $3.3 million in proceeds, just days after VMware reported record-breaking backlog. *See* ¶¶102-104, 149, 153.[9] Likewise, Gelsinger's September 4, 2018, non-10b5-1 plan sale contributes to the scienter inference as it was made after the Company's stock price had already been inflated by the commencement of the backlog scheme. That VMware's stock price continued to climb does not negate that inference. *See, e.g.*, *Questcor*, 2013 WL 5486762, at *17-*18.

**2.    Gelsinger and Rowe Oversaw Core Financial Operations Including the Reporting of Backlog**

As the Court acknowledged, "allegations regarding management's role in a corporate structure may be considered as part of the *Tellabs* holistic analysis, and such allegations can independently satisfy the PSLRA where they are 'particular and suggest that defendants had actual

---

[9]    Relying on *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002), Defendants contend that Rowe's April 2, 2019 sale of $8.9 million in VMware stock (48,630 shares) is not suspicious because "'[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings.'" Defs.' Memo at 18. But *Lipton* is easily distinguishable—there, only one insider sold any stock during the class period, and it was in a single transaction constituting an "extremely small" sale. *Lipton*, 284 F.3d at 1037. In contrast, Rowe's April 2, 2019 sale was his largest Class Period sale by a wide margin – he sold over 115% more shares, and netted $5 million more in proceeds, than his next largest sale. ¶149. This adds to the suspicious nature of the April 2, 2019 sale. Moreover, "'[t]he fact that there might be an innocent explanation for the timing of [defendant's] sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations – which, as defendants keep forgetting, I must accept as true for purposes of this motion to dismiss.'" *Freudenberg*, 712 F. Supp. 2d at 201.

access to the disputed information.'" Order at 24. When "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred the basis of the core operations doctrine. *S. Ferry LP*, 542 F.3d at 786; *Celera*, 2012 WL 3835078, at *3 (finding inference of scienter where it was "unlikely" the "magnitude of the declining collections . . . could have gone unnoticed by the CFO and CEO").

The Consolidated Complaint alleged that Gelsinger and Rowe "oversaw VMware's operations, that they spoke repeatedly on investor calls with analysts concerning VMware's financial results, and that they 'had in place extensive processes to track VMware's financial performance including backlog, on a daily, quarterly, and yearly basis.'" Order at 24-25 (quoting Consolidated Complaint, ¶138). The SAC adds detailed allegations concerning the sales booking system used (Salesforce), the steps needed to clear sales from that booking system, and the real-time access Gelsinger and Rowe had – that other employees lacked – as the Company's CEO and CFO ultimately responsible for overseeing the Company's operations. ¶¶22-27, 163. These allegations, when considered holistically with the SAC's other allegations, give rise to a strong inference of scienter.

The SAC also details that Gelsinger and Rowe were uniquely motivated to, and did, direct the inflation of backlog to smooth revenue to appease Wall Street (¶¶26, 165) – a motivation that was not shared by lower level salespeople and managers who were penalized by the practice in the form of delayed commissions. ¶¶25-26, 165. The SAC also alleges dozens of Class Period meetings providing Gelsinger and Rowe with "'actual access to disputed information,'" including a pivotally-timed Backlog policy meeting on November 19, 2018, as the Company's backlog neared record highs at the end of Q4 2019. Order at 24; ¶¶63, 68, 166. Other key meetings include Sales QBR and Sales Activities Update meetings with senior sales and Operations leaders for the Company, including at least two in February 2019 after the close of Q4 2019, during the time when Defendants would have been closing VMware's quarterly/yearly financials by recording VMware's closing entries and making adjustments and updating forecasts and while the Americas region was facing disruption, just days prior to the Company's official FY 2019 earnings announcement. ¶¶63, 68. These new allegations support a strong inference of scienter. Order at 24 ("Management's role and

the importance of the corporate information in question may create a strong inference of scienter when made in conjunction with 'detailed and specific allegations about management's exposure to factual information within the company.'") (quoting *S. Ferry LP*, 542 F.3d at 785).

Furthermore, as this Court has recognized, the sheer magnitude of the Company's drawdowns on backlog also supports a strong inference of scienter. *See, e.g., Celera*, 2012 WL 3835078 at *3. At the end of FY 2019, the Company's total backlog and license backlog were $449 million and $147 million, respectively. ¶167. In just one year, VMware reported just $18 million in total backlog, and $5 million in license backlog representing staggering declines of 96% and 97%. ¶¶74, 176. The SAC's new allegations strengthen the scienter inference. *See S. Ferry LP*, 542 F.3d at 786 (concluding "'core operations'" allegations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information").[10] When read together with the other allegations, including the meetings' proximities to the sufficiently-pled suspicious stock sales, the allegations "collectively create an inference of scienter" "'at least as compelling as any opposing inference.'" Order at 26-27 (quoting *Tellabs*, 551 U.S. at 324).

### H.    Plaintiff Has Adequately Alleged Loss Causation

The Court has already concluded Plaintiff "sufficiently pled facts alleging loss causation," concluding that there was a "plausible inference that Defendants' disclosures were at least partially responsible for Lead Plaintiff's and other putative class members' economic losses." Order at 28. The Court's ruling was correct as Plaintiff purchased VMware stock at inflated prices after Defendants deceptively deferred FY 2019 sales into backlog and when the Company later drew down its backlog, VMware's stock price declined. As the Court recognized, Plaintiff has adequately

---

[10]    "'Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.'" Order at 26 (quoting *Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014)) (finding a temporal proximity of "three to six months" between a misrepresentation and a disclosure to be evidence of scienter). The Court also found "that the [Chief Accounting Officer's] resignation 'add[s] [a] piece to the scienter puzzle.'" Order at 26.

alleged *four* subsequent corporate disclosures of declining backlog (as a result of the draw down) each of which was followed by a significant stock price decline. Order at 6, 27-28; ¶¶172-179. The SAC further connects the loss to the omitted facts regarding backlog by citing a Deutsche Bank contemporary analyst report attributing the Company's practice of deferring historical sales to subsequent quarters for the sharp decline in license backlog during Q1 2020 noting "[t]he unbilled license backlog fell sharply to $48m from $147m in 4QF19, implying that a good portion of 1QF20 product billings were actually 4QF19 deals that got invoiced in 1QF20." ¶54. These allegations sufficiently connect Defendants' conduct to Plaintiff's loss.

VMware's stock price continued to fall in tandem with the Company's FY 2020 quarterly disclosures of declining backlog. One year after VMware posted record-breaking backlog, Defendants admitted that the Company was unable to meet license and total revenue guidance *despite* the substantial backlog it had entering FY 2020. ¶74. Defendants announced a dismal $18 million in total backlog and just $5 million in license backlog – a staggering decline of 96% and 97% to total backlog and license backlog, respectively, from the inflated backlog reported at the end of FY 2019. *Id*. Rowe admitted the connection between backlog and the Company's poor results noting that unlike "in Q4 last year" we no longer had a "strong backlog that we were able to utilize." *Id*. The Company also revealed "the staff of the Enforcement Division of the [SEC] requested documents and information related to VMware's backlog and associated accounting and disclosures." ¶177. The Company's stock price immediately declined 11% following the above disclosure, closing at a 52-week low of $120.52 per share a decline of $85 per share or 41% – from the Class Period high reached prior to the first disclosure of declining backlog. ¶179. The above allegations are sufficient to tie Defendants' backlog scheme to the Plaintiff's loss.

Defendants' citation to *Loos v. Immerson Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) is inapposite, as the first three alleged corrective disclosures did not contain any disclosure of an investigation, but rather were disclosures of the backlog decline itself. *See* Defs.' Memo at 20. Likewise, the fourth corrective disclosure was not merely a disclosure of an investigation, but also a revelation of the virtual disappearance of backlog – a decline of approximately 96% from the start of

the Class Period.  Thus, the Court correctly concluded in the Order that loss causation has been adequately alleged.  Order at 27-28.[11]

## I.    The Complaint Adequately Alleges a §20A Claim Against Gelsinger

Defendant Gelsinger urges the court to dismiss Plaintiff's §20A claim because Plaintiff's stock purchase just four days after Gelsinger sold $3.8 million worth of VMware shares is not "'contemporaneous'" as a matter of law.  Defs.' Memo at 21.  The Ninth Circuit has **not** endorsed the standard Gelsinger seeks here – *i.e.*, that Plaintiff must have traded "'on the same day,'" or "'the day after'" the insider's sale.  *Id.  See In re Countrywide Fin. Corp. Derivative Litig.,* 554 F. Supp. 2d 1044, 1074-75 (C.D. Cal. 2008) ("The duration of the period in which an insider defendant's trade can be considered 'contemporaneous' with the plaintiff's is 'not fixed,' and the Ninth Circuit [has] . . . expressly declined to elaborate on its 'exact contours.'").  Courts in this Circuit have routinely found trades to be "contemporaneous" where they were made several days to even weeks after the insider's sale, in line with the four-day period here.  *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *14-*15 (N.D. Cal. Aug. 14, 2008) (five days); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (five days); *In re Novatel Wireless Sec Litig.*, No. 08-CV-1689 H (RBB), 2010 WL 11470156, at *6 (S.D. Cal. May 12, 2010) ("Plaintiffs' trades occurring within four business days after Defendants' sales are sufficiently contemporaneous.").  The "'better rule with respect to standing [for §20A claims] seems to be that a class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information.'"  *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007).

The fact that Plaintiff purchased shares at a price lower than that which Gelsinger sold his shares is likewise not dispositive, and Defendants have cited no case where that fact alone was determinative.  In *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020) the primary case upon which Gelsinger relies, the court noted that a six-day gap between

---

[11]    Plaintiff's §20(a) control person claim should be upheld for all of the reasons addressed above.

defendant's sale and plaintiff's purchase may be considered contemporaneous, but that there was no indication that the "trades occurred with defendant at an unfair advantage." *Id*. Here, Plaintiff has alleged that it was at an informational disadvantage because it was unaware that the record-breaking backlog disclosed to the market the day before Gelsinger's March 1, 2019 sale, and just days before Plaintiff's purchase, was deliberately inflated, causing VMware's stock price to trade at inflated prices. Gelsinger, through the inflation of backlog, deliberately concealed declining license revenue and the concurrent disruption in the Americas region, and traded on the basis of his knowledge contemporaneously with Plaintiff, who was harmed as the truth later emerged.

## IV.   CONCLUSION

For the above stated reasons, Defendants' motion should be denied. Should the Court disagree, Plaintiff requests leave to amend as in this Circuit such a request should be granted "'with extreme liberality.'" *See Eminence Cap., L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003).

DATED: December 3, 2021                                  Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SCOTT H. SAHAM
ASHLEY M. KELLY
TING H. LIU


                                                              s/ SCOTT H. SAHAM
                                                           SCOTT H. SAHAM

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Lead Counsel for Lead Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD
4871-3683-6100.v2-12/3/21

- 26 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 3, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ SCOTT H. SAHAM
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  scotts@rgrdlaw.com

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
5:20-cv-02182-EJD
4871-3683-6100.v2-12/3/21

## Mailing Information for a Case 5:20-cv-02182-EJD Lamartina v. VMware, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Asim M. Bhansali**
  abhansali@kblfirm.com,asim-bhansali-6238@ecf.pacerpro.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Elliot Greenfield**
  egreenfi@debevoise.com,mao-ecf@debevoise.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Ashley Michelle Kelly**
  akelly@rgrdlaw.com,e_file_sd@rgrdlaw.com,AKellyRGRD@ecf.courtdrive.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,asoto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Maeve O'Connor**
  mloconnor@debevoise.com,mao-ecf@debevoise.com,mjsorensen@debevoise.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,asoto@pomlaw.com,abarbosa@pomlaw.com

- **Nicholas Alan Roethlisberger**
  nroethlisberger@kblfirm.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_SD@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **Brian Jared Schall**
  brian@schallfirm.com

- **Matthew John Sorensen**
  mjsorensen@debevoise.com,mao-ecf@debevoise.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)