# EXHIBIT A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 11099 / September 12, 2022

**SECURITIES EXCHANGE ACT OF 1934**
Release No.  95744 / September 12, 2022

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No.  4333 / September 12, 2022

**ADMINISTRATIVE PROCEEDING**
File No.  3-21065

| | |
|---|---|
| **In the Matter of**<br><br>**VMWARE, INC.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against VMware, Inc. ("VMware" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order  ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

**Summary**

1.        This matter concerns VMware's omission of material information in its disclosures concerning its order "backlog" and revenue management, in quarterly and annual Exchange Act reports, on earnings calls, and in earnings releases, during its 2019 and 2020 fiscal years (the "relevant period").[2]  This information was necessary in order to make such statements, in light of the circumstances under which they were made, not misleading.  Beginning with the adoption of a new accounting standard for its FY2019, VMware began discretionarily holding back some sales orders, which were otherwise ready to be booked and recorded as revenue in the current quarter, in an effort to delay revenue and control the timing of revenue recognition, which was important to the company.  These discretionary holds, which VMware referred to internally as "managed pipeline" or "MPL," delayed the delivery of license keys to customers and thus, according to VMware's revenue recognition policy, delayed the recognition of license revenue to the next quarter or service revenue to future quarters as services were performed.  As a result, VMware shifted tens of millions of dollars in revenue into future quarters.

2.        VMware utilized discretionary holds if the company was on track to meet its financial guidance to securities analysts and investors.  The holds then would be released shortly after the end of the quarter.  This had the effect of increasing the amount of backlog that VMware reported in its Forms 10-Q and 10-K and delaying revenue recognition into future quarters.  Beginning with its Form 10-Q filed for Q1 FY19, VMware began disclosing in its filings that "[t]he amount and composition of [VMware's] backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography," but the disclosure omitted material information regarding the discretionary nature of VMware's backlog, the extent to which VMware controlled the amount of its backlog, and how backlog was used to manage the timing of the company's recognition of total and license revenue.  In actuality, VMware's backlog practices during the relevant period  were controlled for the purpose of determining in which quarters revenue would be recognized, and had the effect of obscuring the company's financial results and avoiding revenue shortfalls versus company financial guidance and analysts' estimates in at least three quarters during FY20, as well as full-year FY20.

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] VMware's fiscal-year numbering runs nearly a full year ahead of the calendar year.  The FY19-FY20 period at issue herein ran from February 3, 2018 through January 31, 2020.  As a result, the Forms 10-Q and 10-K at issue herein relate to the quarters Q1 FY19 (Form 10-Q filed on June 11, 2018) through Q4 FY20 (Form 10-K filed on March 26, 2020).

**Respondent**

3.      <u>VMware, Inc.</u> is a Delaware corporation based in Palo Alto, California.  Its common stock has been registered pursuant to Exchange Act Section 12(b) and listed on the New York Stock Exchange since 2007.  VMware primarily engages in the sale of cloud-storage software and services, in areas including hybrid cloud, multi-cloud, modern applications, networking and security, and digital workspaces.

**Facts**

*Background*

4.      During the relevant period, VMware's backlog at the end of each reporting period consisted of the company's unfulfilled orders for software, maintenance, and related professional services.  Under U.S. generally accepted accounting principles ("GAAP"), revenue is recognized upon transfer of control.  VMware recognizes revenue upon delivery to customers of license keys to access on-premises or cloud-based software, or through delivery of services – such as technology support and consulting work – as such services are performed.

5.      During FY19 and FY20, VMware controlled the timing of its revenue recognition by placing discretionary holds on selected sales orders, which delayed the delivery of license keys.  VMware employed discretionary holds when business objectives – including those for "bookings"[3] and revenue – had been achieved, in order not to exceed the company's revenue guidance by too much and as a way, in the words of VMware personnel, to start the next quarter with a buffer or more momentum than it might have had otherwise.

6.      Through the use of discretionary holds, MPL orders were entered into VMware's system, but order booking – and the coincident, automated email delivery of license keys – was suspended until just after quarter-end, at which point the hold was released, the order booked, and revenue subsequently recognized.

*VMware's Backlog Disclosures and Practices*

7.      During the relevant period, VMware disclosed a backlog metric in its quarterly and annual reports.  That backlog metric included orders withheld from booking for both nondiscretionary and discretionary reasons, but did not disclose this.  The largest category of nondiscretionary backlog consisted of orders held for regulatory export compliance reasons, but the great majority of backlog during the relevant period consisted of discretionarily held orders, or MPL.

---

[3] VMware's bookings are, essentially, non-cancellable customer orders that have been fully processed or "booked" within VMware's order management system.  When an order is fully processed, the order management system automatically generates and delivers license keys for the software components of the order.

8.    Beginning with Q1 FY19 (*i.e.*, the company's June 11, 2018 Form 10-Q), the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of VMware's quarterly and annual reports disclosed, *inter alia*, that "[t]he amount and composition of [VMware's] backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography." This disclosure (the "managed backlog disclosure") was formulated by VMware senior finance and accounting personnel with review and opportunity for input from others, including senior management, the audit committee, and VMware's independent auditor, shortly before the Q1 FY19 Form 10-Q was filed. An earlier, filed version of the MD&A backlog disclosure first appeared in the Business section of VMware's FY16 Form 10-K, although without the "managed" language. The FY19 and FY20 Forms 10-K included the managed backlog disclosure in both the Business and MD&A sections of each report, while the Forms 10-Q during that time, which did not have a Business section, included the disclosure in MD&A.

9.    Beginning in Q3 FY19 (*i.e.*, fall 2018), VMware formalized its internal MPL processes into a written "Bookings Finalization Process & Backlog" policy, which was drafted by VMware finance and accounting personnel. The written policy formally required the participation of VMware senior management in the managed pipeline process, through a regularly-scheduled meeting at or around Week 9 of each 13-week quarter. The policy further required that discretionary holds were to be discussed at the meeting and could be "value-based, product-based, geo[graphy]-based or any combination," and stated that such holds would be placed on or after Week 9. Decisions whether to release and book any discretionary holds for particular MPL orders were made in the final weeks, days, and hours of the quarter by VMware senior finance and accounting personnel. Preliminary quarterly-bookings and quarterly-MPL summaries were shared, essentially in real time, among VMware senior management.

10.    License orders that were still in MPL at quarter-end were typically booked, and the license revenue recognized, within the first few days of the next quarter. Non-license, quarter-end MPL orders were also typically booked in the first week of the next quarter, with associated revenue recognition occurring based on the product in accordance with VMware's revenue recognition policy, potentially over multiple quarters, as services were performed.

### *MPL Increases and Reductions: Fiscal Years 2019 and 2020*

11.    Over the course of FY19, VMware's quarter-end MPL increased by approximately 50%, from roughly $273 million at the beginning of Q1 to about $409 million at the end of Q4, with license-related MPL orders ("license MPL"), in particular, increasing by approximately 32%, from nearly $94 million at the beginning of Q1 to nearly $124 million at the end of Q4. VMware's license revenue, license bookings, and license backlog were a particular focus of securities analysts during the relevant period because software licenses had historically been seen as the key driver of VMware's entire business. At the end of FY19, approximately 91% of VMware's reported total backlog of $449 million consisted of MPL, *i.e.,* discretionarily held orders, and roughly 84% of reported license backlog consisted of license MPL. The approximately $409 million in MPL at the end of Q4 represented approximately 10% of all completed, ready-to-book VMware orders at the end of Q4 – the rest of which were in fact booked in Q4.

12.     During the course of FY20, however, VMware's business continually slowed versus the expectations quantified in the company's own guidance and in analysts' revenue estimates.  This occurred partially because of macro factors but also because VMware had accelerated its move to subscription-based software sales, which slowed the company's license revenue growth and shifted revenue from on-premises licenses with upfront revenue recognition upon delivery to cloud-based, subscription software requiring ratable revenue recognition over the term of the contract.  However, VMware's quarter-over-quarter net reductions in the large end-of-quarter backlog numbers that it had initially carried into FY20 from FY19 obscured this shift.  The existence and net (*i.e.*, quarter over quarter) reduction of that backlog throughout FY20 resulted in more revenue being recognized in each quarter than would otherwise have been recognized, allowing VMware to meet analyst estimates it would otherwise have missed.  Internal FY20 emails at VMware noted the company's ongoing "use" or "burn[ing]" of MPL.[4]

13.     Analysts who inquired about the continued trend in backlog reduction – with VMware's investor relations ("IR") staff or with VMware executives at organized IR events – were told that "[b]acklog only represents a small subset of our future revenues," without any disclosure regarding the largely discretionary nature of VMware's backlog and VMware's use of backlog to manage its quarterly total and license revenue.

***Revenue Impact of FY20 MPL Reductions***

14.     VMware's net reduction in quarter-end license MPL was material to reported license revenue in Q1 FY20, enabling VMware to boost reported license revenue by approximately 11%.  VMware's continual MPL reductions over the course of FY20 were likewise material, enabling the company to meet guidance and analyst estimates, or reducing the amount by which it missed guidance and/or estimates, during multiple quarters, for both total and license revenue.

15.     In all, the MPL or discretionary component of VMware's total backlog fell each quarter during FY20, by a total of nearly 99% over the course of the entire fiscal year, from roughly $409 million at the end of Q4 FY19 to only, approximately, $4 million at the end of Q4 FY20, as the company essentially "used" or "burned" the entirety of its MPL.  Moreover, VMware's license MPL fell in three of four quarters during FY20, by a total of nearly 100% over the course of the fiscal year, from nearly $124 million to approximately $0.1 million.  By FY20 year-end, VMware's business had slowed to such an extent versus expectations that it was essentially no longer generating any perceived excess sales to "hold" as MPL.  In parallel, VMware's stock price fell by approximately 37% from its closing price during trading on May 30, 2019, prior to the company's after-the-close announcement of Q1 FY20 results, to its closing price

---

[4] VMware effectively "used" discretionary backlog to increase revenue in a given quarter by choosing, at quarter's end, to carry over *less* MPL into the next quarter than it had carried into the current quarter, for a net reduction in quarterly MPL.  VMware's net reductions in quarterly MPL during FY20, and its prior net increases in MPL during FY19, were undertaken to manage revenue to meet company guidance and analysts' expectations.

on February 28, 2020, the day following VMware's after-the-close announcement of Q4 FY20 and full-year FY20 results.

*Quarterly Earnings Calls*

16.     VMware's earnings calls largely were scripted.  Call scripts, including sample question-and-answer ("Q&A") scripts, were drafted by the IR department and reviewed in advance by VMware executives and the legal department.

17.     VMware's Q1 FY20 earnings call cited the company's "consistency" and assured investors and analysts that the company was "seeing strong execution by our teams" and was "feeling quite good about the momentum that we see going into Q2 and for the second half."  In the second quarter, VMware continued the narrative of strong growth, stating on its earnings call, "[W]e demonstrated strong performance … in all 3 geographies."  All the while, VMware's internal Q&A preparation for the earnings calls anticipated analysts' concern with the "continued … decline" in total and license backlog numbers.  Reports from analysts indicated that some of them had calculated and understood the revenue impact of VMware's backlog declines, but when asked about these declines subsequent to the Q1 and Q2 earnings calls, VMware provided only scripted replies, such as "[w]e are pleased with the performance of the quarter," and "[b]acklog is only one part of our overall sales pipeline."

18.     On its Q3 FY20 earnings call, VMware dismissed questions from analysts regarding the apparent "gap" or "delta" between the "strong growth that VMware is seeing" and weak or mixed results seen from hardware vendors, citing "the ongoing strength of [VMware's] business" and affirming, "So yes, we feel good about the [Q4] guide.  We feel good about our pipeline heading into Q4 … and the solid guide for the [fiscal] year."  For its fourth quarter and full-year FY20 results, VMware changed the presentation of its financial results to account for a merger and to add a "subscription" revenue line item reflective of the increase in VMware's subscription-based software sales.  Reconciliation with the prior presentation, provided in VMware's slides for its fourth quarter earnings call, showed substantial misses to guidance and analyst estimates for quarterly and full-year revenue despite the company's nearly total net depletion of quarter-end MPL.  VMware acknowledged on the earnings call only that "for the quarter and year, revenue came in a bit short of expectations" and attributed the miss to "a higher mix of SaaS [*i.e.*, subscription] as well as … deal execution challenges … at the end of the quarter."

*VMware's Statements Were Misleading*

19.     In making public statements regarding its backlog, VMware omitted material information regarding the extent to which the company controlled its quarter-end total and license backlog numbers through its use of discretionary holds, and the extent to which it used backlog to control the timing of revenue recognition generally.  The managed backlog disclosure did not convey to investors the material information that backlog was used by VMware to manage the timing of revenue recognition based upon factors such as the company's financial guidance and

analysts' estimates.  This information was necessary in order to make VMware's statements regarding its backlog, in light of the circumstances under which they were made, not misleading.

20.    In each quarter during FY20, VMware's practice of managing the timing of revenue recognition through its use of backlog enabled it to more closely match guidance and analyst estimates for its total and license revenue.  Without disclosure regarding all material aspects of the backlog, investors lacked necessary information to meaningfully evaluate VMware's reported financial results and the extent to which those results might be indicative of future results.  VMware thus made materially misleading disclosures regarding its backlog practices in its FY19 and FY20 periodic reports.

21.    Additionally, during FY20, VMware misleadingly reassured investors on quarterly earnings calls and in earnings-related press releases and other earnings materials furnished as Form 8-K attachments or made available on its website, that its revenue growth was meeting expectations, when revenue actually would not have met expectations or would have missed expectations by a larger amount without VMware's continual net reductions in its discretionary backlog.  These statements were misleading by virtue of VMware's omission of material information regarding the full extent of its backlog practices.

22.    Furthermore, FY20 year-over-year percentage increase figures provided by VMware on a quarterly basis for total and license revenue, on earnings calls and in the aforementioned materials, as well as in periodic filings, misleadingly portrayed the company's revenue growth.  This was the case not only because the FY20 results were almost always higher than they would have been without VMware's quarter-end backlog reductions but also because the prior fiscal year's results had been generally held back by VMware's quarter-end backlog *increases* during FY19 – meaning FY19 orders that otherwise could have been booked had instead been discretionarily held in order to more closely track revenue to VMware's FY19 quarterly guidance and analysts' estimates.

23.    The year-over-year percentage increase figures and disclosure omissions were material.  As the company was aware, VMware's ability to meet guidance and analysts' estimates was material to its stock price.  In fact, VMware specifically cited this as a "risk factor" in its Forms 10-K and 10-Q throughout the relevant period, as follows: "If our revenue or operating results fall below the expectations of investors or securities analysts or below any guidance we may provide to the market, the price of our Class A common stock would likely decline substantially."  License revenue, in particular, was a specific focus of securities analysts who

7

covered VMware's stock and was reported by VMware as a separate revenue line item in its financial statements. Without its FY20 quarter-end backlog reductions:

- VMware, in Q1, would have missed rather than met guidance and analyst consensus estimates for total revenue, and guidance for license revenue;
- VMware, in Q2, would have missed rather than met guidance for license revenue;
- VMware, in Q2 and Q3, may have missed guidance and analyst consensus estimates for total revenues, rather than meeting them; and
- VMware, in Q4 and full-year FY20, would have missed guidance and analyst consensus estimates for total revenue and guidance for license revenue, by substantially larger percentages than disclosed.

VMware's statements and omissions regarding its quarterly revenue and revenue growth, without disclosing the impact that the company's discretionary backlog practices and revenue management had on reported revenue, materially concealed a substantial FY20 slowing in the company's recognized revenue growth versus expectations.

24.    Reasonable investors would have considered the foregoing information to have been important in deciding whether to purchase VMware securities during the relevant period. In addition, this was important information to analysts, who began questioning VMware's backlog "drawdown" following the company's Q1 earnings call and continued to question the continual reductions in quarter-end backlog numbers throughout the remainder of the fiscal year. VMware recognized the materiality of the issue when preparing its Q&A scripts.

### *VMware Offered and Sold Securities During the Relevant Period*

25.    During the relevant period, VMware offered and sold securities, including selling shares under the company's employee stock purchase plan, issuing restricted stock as compensation to certain employees under its employee incentive plan, and selling notes.

### **Violations**

26.    As a result of the conduct described above, VMware violated Sections 17(a)(2) and (3) of the Securities Act, which prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities. A violation of these provisions does not require *scienter* and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

27.    Also as a result of the conduct described above, VMware violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13 and 12b-20 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and annual, current, and quarterly reports as the

Commission may require – including information required by Regulation S-K Item 101(c) to be contained in annual reports – and mandate that periodic reports contain such further material information as may be necessary to make the required statements not misleading.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent VMware's Offer.

Accordingly, it is hereby ORDERED that**:**

A.       Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and (a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder.

B.       Respondent shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $8,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)       Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)       Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)       Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying VMware as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Jeffrey P. Weiss, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

C.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.


Vanessa A. Countryman
Secretary

10