1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6                                SAN JOSE DIVISION

7

8        WILLIAM LAMARTINA,                     Case No.   20-cv-02182-EJD

9                       Plaintiff,              **ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'
10              v.                              MOTION TO DISMISS SECOND
                                                AMENDED CONSOLIDATED
11       VMWARE, INC., et al.,                  COMPLAINT**

12                      Defendants.             Re: ECF No. 64

13

14          Presently before the Court is Defendants VMware, Inc., Patrick P. Gelsinger, and Zane

15    Rowe's Motion to Dismiss the Second Amended Consolidated Complaint ("Motion") for failure

16    to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure

17    12(b)(6), and for failure to plead claims with the requisite level of particularity under Federal Rule

18    of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15

19    U.S.C. 78u-4, *et seq.*  ECF No. 64.  The Second Amended Consolidated Complaint, filed by

20    Northeast Carpenters Pension Fund ("Lead Plaintiff") on October 8, 2021, asserts individually and

21    on behalf of a putative class violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act

22    of 1934 ("the Exchange Act") and Rule 10b-5 of the U.S. Securities and Exchange Commission

23    ("SEC") promulgated thereunder.  ECF No. 63 ("SAC").  The Court finds this matter suitable for

24    decision without oral argument pursuant to Civil Local Rule 7-1(b).  Having considered the

25    parties' submissions, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion

26    to Dismiss the SAC.

27

28    Case No.: 20-cv-02182-EJD
      ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC
                                            1

United States District Court
Northern District of California

## I.     BACKGROUND

The following recitation of facts is based on the SAC and the proposed additional allegations included in the Redline Second Amended Consolidated Complaint provided by Lead Plaintiff pursuant to the Court's March 7, 2023 order for supplemental briefing.  *See* ECF Nos. 81, 82-1.  Where appropriate, descriptions of the relevant factual and procedural background are taken from the Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Consolidated Complaint, which it issued on September 10, 2021.  ECF No. 60.

### A.     Factual Background[1]

#### 1.     Overview

##### a.     Parties

VMware, Inc. ("VMware") is a company based in Palo Alto, California that provides software products and services, including licenses, subscriptions, and software as a service ("SaaS").  SAC ¶¶ 16, 18.  VMware's CEO and CFO during the Class Period were, respectively, Defendant Patrick P. Gelsinger ("Gelsinger") and Defendant Zane Rowe ("Rowe," and with Gelsinger and VMware, "Defendants").  *Id*. ¶¶ 14–15.

Lead Plaintiff is "a defined benefit pension plan with assets of over $2.5 billion that provides retirement benefits to over 25,000 participants."  *Id.* ¶ 12.  Lead Plaintiff was a purchaser of shares of VMware and brings this action individually and on behalf of all persons other than Defendants who purchased or otherwise acquired VMware securities between August 24, 2018 and February 27, 2020, both dates inclusive ("the Class Period").  *Id*. ¶¶ 1, 12.

Throughout the Class Period, VMware stocks were actively traded on the New York Stock Exchange.  *Id.* ¶ 185.  VMware's publicly filed financial statements are subject to Generally Accepted Accounting Principles ("GAAP").  *See id*. ¶ 39.

##### b.     Backlog and Revenue Recognition

During the Class Period, VMware experienced a customer shift away from license-based

---

[1] On a motion to dismiss for failure to state a claim, the Court accepts as true all well-pleaded factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

revenue toward subscription- and SaaS-based revenue.  *See* SAC ¶ 19.  Lead Plaintiff alleges that Defendants made numerous misleading and/or false statements in VMware's SEC filings and on quarterly earnings calls for investors and analysts between September 2018 and December 2019, during VMware's Fiscal Years ("FY") 2019 and 2020.  *See id.* ¶¶ 28–45, 82–144.  These statements generally indicated that VMware was meeting and would continue to meet its expectations for revenue in FY 2019 and 2020, which Lead Plaintiff alleges was misleading because VMware failed to disclose that it was improperly managing its backlog—a representation of sales already secured but not yet fulfilled—in order to manipulate revenue records and conceal potential risks regarding future revenue.  *See id.* ¶ 28.

VMware began discretionarily holding back sales orders following its adoption of a new accounting standard for its FY2019.  ECF No. 82-1 ("Proposed TAC") [2] ¶ 87.  It referred to these discretionary holds as its "managed pipeline" ("MPL"), and used the MPL to delay the delivery of license keys to customers and thereby delay the recognition of revenue.  *Id.*  On November 19, 2018, Gelsinger and Rowe participated in a "backlog policy meeting" that also included Kevan Krysler (Chief Accounting Officer), Maurizio Carli (Executive Vice President of Worldwide Sales and Services), and VMware's most senior in-house attorneys, including Craig Norris (Vice President, Deputy General Counsel, Corporate Securities and M&A), Ana Iacovetta (Chief Ethics & Compliance Officer, Vice President and Deputy General Counsel), and Amy Fleigelman Olli (Senior Vice President, General Counsel).  SAC ¶ 73.  VMware also formalized its internal MPL

---

[2] On September 13, 2022, Lead Plaintiff filed a Statement of Recent Decision notifying the Court that the SEC had entered an order (the "SEC Order") on September 12, 2022, charging VMware with certain violations of the federal securities laws.  ECF No. 77.  As noted above, the Court subsequently issued an order permitting supplemental briefing regarding the impact of the SEC Order, if any, on this Motion.  ECF No. 81.  The Court also permitted Lead Plaintiff to attach to its brief a redline copy of the SAC showing any additional proposed allegations based on the contents of the SEC Order as relevant to this Motion.  *Id.*  Lead Plaintiff provided additional briefing, ECF No. 82, and a redlined SAC proposing a new section consisting of two introductory paragraphs followed by the entirety of the SEC Order.  *See* Proposed TAC ¶¶ 82–114.  Defendants also provided supplemental briefing.  ECF No. 83.  In the interest of judicial efficiency and to avoid an unnecessary third round of motion to dismiss briefing, the Court considers Lead Plaintiff to have adopted any well-pleaded allegations in the SEC Order, as incorporated into the Proposed TAC, and cites to those allegations using the "Proposed TAC" short citation and paragraph numbers.

Case No.: 20-cv-02182-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

1    processes in fall 2018, culminating into a written "Bookings Finalization Process & Backlog"

2    policy drafted by VMware finance and accounting personnel.  Proposed TAC ¶ 95.

3                        **c.      Implementation of the Backlog Policy**

4         VMware's written backlog policy "formally required the participation of VMware senior

5    management in the managed pipeline process, through a regularly-scheduled meeting at or around

6    Week 9 of each 13-week quarter."  Proposed TAC ¶ 95.  Under the policy, which stated that

7    discretionary holds would be placed on or after Week 9, proposed holds were to be discussed at

8    these meetings and could be "value-based, product-based, geo[graphy]-based or [a] combination."

9    *Id.*  VMware senior finance and accounting personnel made decisions on whether to release and

10   book any discretionary holds for MPL orders in the "final weeks, days, and hours of the quarter,"

11   and preliminary quarterly-bookings and quarterly-MPL summaries were "shared, essentially in

12   real time, among VMware senior management."  *Id.*  Remaining MPL orders from the end of a

13   quarter were typically booked in the first few days or week of the next quarter, with associated

14   revenue recognition occurring as licenses were delivered and services performed.  *Id.* ¶ 96.

15        Although sales contracts were usually cleared and processed within 24 hours of execution,

16   sales made toward quarter-end would not clear in that 24-hour window and could take up to

17   several days to process.  SAC ¶ 24.  Lead Plaintiff alleges "[t]here was no incentive for anyone

18   below senior level to delay executed contracts in the booking system."  *Id.* ¶ 25.  "[S]alespeople []

19   understood that . . . quarterly revenue [was] deliberately held back so [VMware] would meet but

20   not exceed Wall Street expectations and to satisfy senior executives, including [VMware's] CEO

21   and CFO."  *Id.* ¶¶ 24, 26.  Salespeople were negatively impacted by this process because their

22   commissions were delayed.  *Id.*  Further, salespeople and their direct managers—unlike Gelsinger

23   and Rowe—lacked the authority to bypass the automatic booking system.  *Id.* ¶¶ 24, 27.

24                        **d.      Results of the Policy**

25        By "pushing sales that were not required to meet current period revenue or earnings

26   guidance . . . from the current quarter into the next quarter," Defendants allegedly "engaged in a

27   practice of materially and artificially inflating both license and total backlog."  SAC ¶ 28.  This

28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC
                                                4

practice "enhanced [VMware's] prospects of meeting guidance and analyst expectations in future periods, and led investors to believe that VMware's license and total revenue guidance would be met in FY 2020." *Id.* ¶ 33.  Although VMware disclosed in its SEC filings that "[t]he amount and composition of [VMware's] backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography," VMware omitted information regarding the "discretionary nature of [its] backlog, such as the extent to which VMware controlled the amount of its backlog, and how backlog was used to manage the timing of the company's recognition of total and license revenue."  Proposed TAC ¶ 88.  Specifically, the backlog inflation at VMware allowed Defendants to "conceal[] from investors and the market several issues that would plague [VMware] in FY 2020: (i) a poorly performing Americas segment following a reorganization in that region; and, (ii) a failure to successfully weather the industry-wide shift away from license products in favor of subscription and SaaS products."  SAC ¶ 35.  Overall, VMware's backlog practices "had the effect of obscuring the company's financial results and avoiding revenue shortfalls versus company financial guidance and analysts' estimates" for much of FY2020.  Proposed TAC ¶ 96.

### 2.    Defendants' Alleged Misleading Statements and Failures to Disclose

Lead Plaintiff alleges that Defendants made misleading statements in VMware's SEC filings.  SAC ¶¶ 84–85, 94–96, 97, 102–105, 106–107, 110–120, 121–122, 127–130, 131–133, 141–144.  For example, on September 11, 2018, VMware filed its quarterly Form 10-Q, stating in part that VMware's "total backlog was $320 million, generally consisting of licenses, maintenance, and services.  Our backlog related to licenses was $141 million, which [it] generally expect[s] to deliver and recognize as revenue during the following quarter."  *Id.* ¶¶ 84–85.

Lead Plaintiff also cites as misleading statements Defendants Gelsinger and Rowe's repeated positive statements during quarterly phone calls with shareholders and financial analysts. *Id.* ¶¶ 82–83, 88–93, 99–101, 108–115, 123–126, 134–140.  For example, during VMware's Q2 2019 earnings call for investors and analysts on August 23, 2018, Rowe said, "[VMware] exited Q2 [2019] with $141 million of license backlog compared with $122 million at the end of Q1."

1    *Id.* ¶ 82.  Later during the same call, Rowe further stated:

2
3
4
5
6

> And I would just say, as I said in my formal comments, . . . that we believe we are in a strong cycle.  Customers are resonating with the VMware strategy.  Our execution is good and the market for technology is strong.  And those are not this quarter statements.  Those are long-term statements where we think that the business performance, our growth rates, the ability of customers to invest in the strategic product portfolio that we have.  These are long-term trends and we believe that we're in a very good cycle for the business for not just this quarter, but well into the future.

7    *Id.* ¶ 83.  Lead Plaintiff says that these statements and other similar ones were misleading because

8    they failed to disclose that VMware was improperly managing its backlog in order to manipulate

9    revenue records and to conceal potential risks regarding future revenue.  *See, e.g.*, SAC ¶ 86.

10        According to Lead Plaintiff, VMware's practice of manipulating its revenue records by

11   inflating its backlog culminated in FY 2020.  VMware's stock price peaked in Q1 2020, and

12   VMware executives sold large quantities of their VMware stock.  *Id.* ¶¶ 145–170.  A series of

13   disclosures throughout the rest of FY 2020—particularly ones regarding VMware's declining

14   backlog—coincided with a drop in VMware stock prices.  *Id.* ¶¶ 171–181.  On February 27, 2020,

15   the last day of the Class Period, Defendants made several disclosures, including that VMware was

16   the subject of an SEC investigation concerning its backlog practices.  *Id.* ¶¶ 6–7.  Lead Plaintiff

17   alleges that these disclosures led to a dramatic drop in VMware stock prices.  *Id.*

18                    **3.    VMware Executives' Stock Sales**

19        Lead Plaintiff asserts that Gelsinger, Rowe, and other VMware executives[3] sold VMware

20   common stock without disclosing materially adverse nonpublic facts, despite their duty to refrain

21   from doing so.  SAC ¶ 145.  According to Lead Plaintiff, Gelsinger, Rowe, and other key

22   executives discussed sales and VMware's backlog "dozens of times during the Class Period."  *Id.*

23   at 16.  For example, Gelsinger and Rowe on several occasions sold shares of VMware stock at

24

25   _____

26   [3] Lead Plaintiff lists six VMware executives besides Gelsinger and Rowe: Executive VP, Worldwide Sales and Services Carli Maurizio; CAO Kevan Krysler; Senior VP and General Counsel Olli Amy Fliegelman; COO, Customer Operations Poonen Sanjay; COO, Products & Cloud Rangarajan Raghuram; and COO, Products & Cloud Rajiv Ramaswami.  SAC ¶ 149.

27

28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC
     6

United States District Court
Northern District of California

1    inflated prices "just days after [] important operating meetings" that included "at least three Chief

2    Operating Officers" for Customer Operations and Products & Cloud Services.  *Id.* ¶ 72; *see id.* ¶¶

3    152, 157–158.  Some of these meetings "provide[d] a forum for senior executives, finance teams,

4    and sales teams to discuss executed sales for the quarter that just ended."  *Id.* ¶ 66.

5         In the 18 months preceding the Class Period, Gelsinger sold no VMware stock.  Id. ¶ 146.

6    During the Class Period, he sold over 141,000 shares of VMware stock for $23.4 million.  *Id.*

7    Gelsinger sold 20,000 shares of VMware stock two days before the close of Q1 2020.  *Id*. ¶ 153.

8         In the 18 months preceding the Class Period, Rowe made two sales of VMware stock,

9    selling a total of 13,100 shares for $1.76 million.  SAC ¶ 148.  During the Class Period, Rowe sold

10   104,218 shares for more than $17.8 million.  *Id.*

11        During the 18 months directly preceding the Class Period, VMware executives collectively

12   sold 251,867 shares of VMware stock, for approximately $31.8 million.  *Id.* ¶ 150.  During the

13   Class Period, VMware executives sold over 702,000 shares of stock, for more than $118.6 million.

14   *Id*. ¶ 149.  Lead Plaintiff alleges that between August 2018 and May 2019, as VMware stock

15   prices were reaching all-time highs and as VMware backlog was increasing, VMware executives

16   made approximately $84.1 million from VMware stock sales.  SAC ¶ 151.  Lead Plaintiff further

17   alleges that:

18   - Between March 1, 2019, the day after VMware's FY 2019 earnings announcement,
        and May 2, 2019, the day before Q1 2020 ended, VMware executives sold $58.9
19       million of VMware stock, when the price of the stock was near its highest point (*id.*
        ¶ 153);
20

21   - Between June 4, 2019 and August 2, 2019 (the close of Q2 2020), VMware
        executives sold 84,053 shares for $14.6 million (*id.* ¶ 156);

22   - Between September 3, 2019, and November 1, 2019 (the close of Q3 2020),
        VMware executives sold 81,547 shares for $12.1 million (*id.* ¶ 159);
23

24   - Between the close of Q3 2020 and the announcement of Q4 2020 results, VMware
        executives sold 48,148 shares for $7.8 million (*id.* ¶ 160).

25                        **4.    VMware Disclosures and Declines in Stock Prices**

26        Lead Plaintiff alleges that, during the Class Period, a trend of VMware's disclosures—

27   particularly regarding backlog and company performance—coincided with a trend of declining

28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

*United States District Court*
*Northern District of California*

VMware stock prices.  SAC ¶¶ 167–181.

### a.      May 30, 2019 Disclosures

During the Q1 2020 earnings call on May 30, 2019, Defendants disclosed that VMware's license backlog had declined approximately 67% from Q4 2019.  *Id.* ¶ 172.  Gelsinger further said that VMware's Americas regional segments "trailed" other regional segments, resulting in "territory realignments" and "adjustments to the org[anization]" that led to lower revenue in the region.  *Id.*  The following day, VMware's stock price dropped approximately 7%.  *Id.*

### b.      August 22, 2019 Disclosures

During the Q2 2020 earnings call on August 22, 2019, Defendants disclosed that VMware's total backlog had declined approximately 35% since Q1 2020 and approximately 74% in the past six months.  *Id*. ¶ 174.  Backlog at that time totaled $117 million, in contrast to the Class Period high point of $449 million at the end of FY 2019.  *Id.*  Defendants disclosed VMware's license backlog had declined 73% since Q1 2020.  *Id.*  The following day, VMware's stock price dropped approximately 10%.  *Id.*

### c.      November 26, 2019 Disclosures

During the Q3 2020 earnings call on November 26, 2019, Defendants announced that VMware's total backlog had declined approximately 39% since Q2 2020.  SAC ¶ 175.  Backlog at that time totaled $71 million, an 84% drop from nine months prior.  *Id.*  In the two days following this disclosure, VMware's stock price dropped approximately 6%.  *Id.*

### d.      February 27, 2020 Disclosures

During the Q4 2020 earnings call on February 27, 2020, Defendants disclosed that total backlog had dropped to $18 million, $5 million of which was license backlog.  *Id.* ¶ 176.  This represented a 96% and 97% drop, respectively, from VMware's backlog highs at the end of FY 2019.  *Id.*  Gelsinger stated that, partly due to an industry shift from licensing to subscription and SaaS models, VMware did not meet its license revenue growth targets for Q4 2020 or for FY 2020 and "missed the Q4 2020 license revenue guidance defendants issued . . . three months prior by 5%."  *Id.* ¶ 178.

1      That same day, Defendants filed with the SEC a Form 8-K that disclosed that VMware was

2   "subject to an ongoing SEC investigation into [VMware's] backlog of unfilled orders."  SAC ¶

3   177.  Specifically, the Form 8-K stated, "In December 2019, the staff of the Enforcement Division

4   of the [SEC] requested documents and information related to VMware's backlog and associated

5   accounting and disclosures."  *Id.*  The Form 8-K further stated, "VMware is fully cooperating with

6   the SEC's investigation, [and is] unable to predict the outcome of this matter at this time."  *Id.*

7   This SEC investigation appears to have begun around the same time VMware's Chief Accounting

8   Officer resigned from VMware.  *See id.* ¶ 6.

9      The following day, VMware's stock price dropped 11%, closing at a 52-week low of

10  $120.52 per share.  *Id.* ¶ 179.  A Deustche Bank analyst report issued on February 28, 2020,

11  described VMware's results "disappointing" and "a messy and uninspiring print."  *Id.* ¶ 180.

12      **B.      Procedural Background**

13      On March 31, 2020, Plaintiff William Lamartina filed a putative class action federal

14  securities complaint with the Court.  ECF No. 1.  On July 20, 2020, the Court appointed Northeast

15  Carpenters Pension Fund as Lead Plaintiff and its counsel as lead counsel.  ECF No. 45.  On

16  September 18, 2020, pursuant to the parties' stipulated agreement, ECF No. 48, Lead Plaintiff

17  filed an amended consolidated complaint.  ECF No. 50 ("FAC").  Defendants moved to dismiss

18  the FAC, ECF No. 51, and on September 10, 2021, the Court granted in part and denied in part the

19  motion, with leave to amend.  ECF No. 60.  Lead Plaintiff filed the operative SAC on October 8,

20  2021, ECF No. 63, and Defendants filed the present motion to dismiss on November 5, 2021.

21  ECF No. 64 ("Mot.").  On September 13, 2022, Lead Plaintiff filed a Statement of Recent

22  Decision to alert the Court of the SEC Order.  ECF No. 77.  On March 7, 2023, the Court issued

23  an order requesting supplemental briefing.  ECF No. 81.  Lead Plaintiff and Defendants filed their

24  briefs on, respectively, March 14, 2023, and March 21, 2023.  ECF Nos. 82, 83.  Lead Plaintiff

25  attached a redline copy of the SAC with additional allegations from the SEC Order to its

26  supplemental brief.  ECF No. 82-1 ("Proposed TAC").

27

28  Case No.: 20-cv-02182-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

United States District Court
Northern District of California

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Dismissal of a claim under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face."  *Twombly*, 550 U.S. at 556–57.

At the motion to dismiss stage, the Court must read and construe the complaint in the light most favorable to the non-moving party.  *Reese*, 643 F.3d at 690.  The Court must accept as true all "well-pleaded factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555.  "In all cases, evaluating a complaint's plausibility is a context-specific endeavor that requires courts to draw on . . . judicial experience and common sense."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)) (internal quotation marks omitted).

In addition to Rule 8's requirements, fraud cases are also governed by the heightened pleading standard of Rule 9(b).  A plaintiff averring fraud or mistake must plead with particularity the circumstances constituting fraud, but malice, intent, knowledge and other conditions of the mind may be averred generally.  *See* Fed. R. Civ. P. 9(b).  Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  Securities fraud claims must also satisfy the pleading requirements of the PSLRA, which states that the complaint "shall specify each statement alleged

1    to have been misleading, the reason or reasons why the statement is misleading, and, if an

2    allegation regarding the statement or omission is made on information and belief, the complaint

3    shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

4    The PSLRA also requires a plaintiff to state with particularity facts giving rise to a strong

5    inference of a defendant's scienter.  *See id.* § 78u-4(b)(2).

6        When deciding whether to grant a motion to dismiss, the Court generally "may not

7    consider material outside the pleadings."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998

8    (9th Cir. 2018).   However, the Court may consider material submitted as part of the complaint or

9    relied upon in the complaint, and it may also consider material subject to judicial notice.  *See id.*

10   In the event that a motion to dismiss is granted, "a district court should grant leave to amend even

11   if no request to amend the pleading was made, unless it determines that the pleading could not

12   possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.

13   2000) (internal quotation marks omitted).

14   **III.    DISCUSSION**

15          **A.    Request for Judicial Notice**

16        Federal Rule of Evidence 201 permits a court to judicially notice an adjudicative fact if it is

17   "'generally known,' or 'can be accurately and readily determined from sources whose accuracy

18   cannot reasonably be questioned.'"  *Khoja*, 899 F.3d at 999.  Accordingly, "[a] court may take

19   judicial notice of matters of public record without converting a motion to dismiss into a motion for

20   summary judgment," but it may not take judicial notice of disputed facts contained in such public

21   records.  *Id.* (internal quotation marks omitted).

22        Defendants request the Court take judicial notice of the documents attached as exhibits to

23   the declaration of Elliot Greenfield filed in support of Defendants' Motion.  Mot. at 4 n.1; *see* ECF

24   No. 64-1 ("Greenfield Decl.").  The Court previously took judicial notice of Exhibits A through

25   Z—consisting of VMware's Form 10-K, 10-Q, and 8-K reports filed with the SEC; transcripts of

26   VMware earnings calls; and Gelsinger and Rowe's Form 4 filings submitted to the SEC—and

27   does so here for the reasons described in its order on Defendants' motion to dismiss the FAC.

28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

United States District Court
Northern District of California

1   ECF No. 60 ("Prior Order") at 9–10; *compare* ECF No. 51-1 ("FAC Greenfield Decl.") at 1–3,

2   *with* Greenfield Decl. at 1–3.  The five remaining exhibits are all documents filed with the SEC:

3   VMware's Form 8-K, dated November 19, 2019, and four additional Form 4 filings submitted by

4   Gelsinger and Rowe.  Greenfield Decl. at 3 & Exhibits AA–EE.  Lead Plaintiff does not oppose

5   Defendants' request for judicial notice.  *See* ECF No. 66 ("Opp.").  As with the other SEC filings,

6   the Court finds it appropriate to take judicial notice of Exhibits AA–EE.  *See, e.g.*, *Northstar Fin.*

7   *Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015) ("[I]t is appropriate to take

8   judicial notice of this information, as it was made publicly available by [the SEC], and neither

9   party disputes the authenticity of the [documents] or the accuracy of the information displayed

10  therein.") (internal quotations and citations omitted).  Accordingly, the Court GRANTS

11  Defendants' request for judicial notice.

12          **B.      Section 10(b) and Rule 10b-5 Claims for Securities Fraud**

13          Lead Plaintiff alleges that all Defendants engaged in a scheme to defraud the market in

14  violation of § 10(b) and Rule 10b-5 when they disseminated materially misleading statements in

15  VMware's SEC filings and press releases and during VMware's earnings calls.  *See* SAC ¶¶ 190–

16  200.  Section 10(b) of the Exchange Act provides that "[i]t shall be unlawful for any person . . .

17  [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or

18  deceptive device or contrivance in contravention of such rules and regulations . . . ."  15 U.S.C. §

19  78j(b).  SEC Rule 10b-5 implements this provision by making it unlawful for any person:

20                  (a) [t]o employ any device, scheme, or artifice to defraud,

21                  (b) [t]o make any untrue statement of a material fact or to omit to
                    state a material fact necessary in order to make the statements made,
22                  in the light of the circumstances under which they were made, not
                    misleading, or
23
                    (c) to engage in any act, practice, or course of business which
24                  operates or would operate as a fraud or deceit upon any person, in
                    connection with the purchase or sale of any security.
25
    17 C.F.R. § 240.10b–5(b).  To state a claim under § 10(b) and Rule 10b-5, Lead Plaintiff must
26
    allege facts sufficient to establish: "(1) a material misrepresentation or omission by the defendant;
27

28  Case No.: 20-cv-02182-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks omitted).

Defendants argue Lead Plaintiff fails to state a claim under § 10(b) or Rule 10b–5 that satisfies the PSLRA's heightened pleading standards. *See* Mot. at 7–20. As in their motion to dismiss the FAC, Defendants argue that Lead Plaintiff has failed to plead facts sufficient to establish (1) an actionable material misstatement or omission, (2) a strong inference of scienter, and (3) loss causation. *Id.* at 7. The Court addresses each argument in turn.

### 1.   Material Misstatement or Omission

To sufficiently allege a material misstatement for a § 10(b) claim, a plaintiff must specify each allegedly misleading statement and the reason(s) why each statement is misleading. If those allegations are made on information and belief, the plaintiff must also allege all facts on which that belief is formed. *In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir. 2005), *abrogation on other grounds recognized by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, — F.4th —, 2023 WL 2532061, at *11 (9th Cir. Mar. 16, 2023); *see also* 15 U.S.C. § 78u-4(b)(1). A misleading omission "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002). A material omission is one that a reasonable investor would consider to significantly alter the total mix of information. *Matrixx Initiatives,* 563 U.S. at 37. "Silence, absent a duty to disclose is not misleading under Rule 10b-5." *Basic v. Levinson,* 485 U.S. 224, 238, 239 & n.17 (1988). A duty to disclose exists only "to . . . make statements in light of the circumstances under which they were made not misleading." 17 C.F.R. § 240.10b-5(b).

In its Prior Order, the Court held Lead Plaintiff had not alleged with sufficient particularity that Defendants' statements about VMware's revenue and backlog status were misleading due to VMware's alleged manipulation of backlog to smooth revenue. Prior Order at 11–13. The Court further held that Defendants' other allegedly misleading statements were not actionable because—

United States District Court
Northern District of California

to the extent they did not depend on Lead Plaintiff's unsubstantiated and insufficiently pleaded theory of a manipulated backlog—they were either forward-looking (and therefore protected by the PSLRA's safe harbor provision) or statements of corporate optimism or puffery.  Prior Order at 13–19.  Defendants argue that Lead Plaintiff has not rectified the three deficiencies identified in the Prior Order in either the SAC or the Proposed TAC.  Mot. at 8; ECF No. 83 ("Suppl. Mot.") at 3.  The Court now turns to each of the three categories.

### a.      Statements About Backlog and Revenue Recognition

Defendant first argues that the new allegations do not plead with particularity the "'who, what, when, where, and how' of the misconduct alleged."  Mot. at 11–12; *see* Suppl. Mot. at 3; *Kearns*, 567 F.3d at 1124.  Specifically, Defendants contend that Lead Plaintiff's allegations about VMware's automated booking system and its senior management's meetings to discuss backlog remain impermissibly conclusory and lack particularized allegations about anyone at VMware— let alone Gelsinger or Rowe—engaging in improper accounting manipulation.  Mot. at 11–12. Defendants further assert that the backlog disclosures—the focus of the SEC Order—could not have concealed VMware's weaknesses from the public when Lead Plaintiff alleges that some analysts "understood the revenue impact of VMware's backlog declines."[4]  Suppl. Mot. at 2.

The Court disagrees.  Lead Plaintiff's new allegations in the SAC and Proposed TAC are sufficiently particularized to permit an inference that Defendants' statements concerning its backlog were misleading.  In its Prior Order, the Court noted that although a manipulated backlog theory could have been a viable basis for asserting that Defendants' statements about VMware's backlog and revenue recognition were misleading, the FAC contained scant allegations about VMware deliberately delaying contract fulfillment to pad its backlog.  Prior Order at 12.  Between the SAC and the Proposed TAC, Lead Plaintiff now alleges the following particularized facts:

- VMware used an automatic booking system—Salesforce—that routed executed

---

[4] Defendants note that the Court "need not accept as true the SEC's conclusions of law or fact." Suppl. Mot. at 2.  As noted above, the Court considers the Proposed TAC to have incorporated the SEC Order.  *Supra*, at n.2.  It therefore accepts as true any well-pleaded allegations based on the SEC Order, but will not give weight to legal conclusions.  *Twombly*, 550 U.S. at 555.

Case No.: 20-cv-02182-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC
14

contracts to VMware's Operations group to be cleared (SAC ¶ 22);

- The Operations group reported directly to Rowe (*id.*);

- On November 19, 2018, Gelsinger and Rowe participated in a "backlog policy meeting" with several specified key executives, including Kevan Krysler (Chief Accounting Officer), Maurizio Carli (Executive Vice President of Worldwide Sales and Services), Craig Norris (Vice President, Deputy General Counsel, Corporate Securities and M&A), Ana Iacovetta (Chief Ethics & Compliance Officer, Vice President and Deputy General Counsel), and Amy Fleigelman Olli (Senior Vice President, General Counsel) (*id.* ¶ 73);

- Also in fall 2018, VMware formalized its processes for discretionarily holding back sales orders in its "managed pipeline," or "MPL," into a written "Bookings Finalization Process & Backlog" policy (Proposed TAC ¶ 95);

- VMware's written backlog policy "formally required the participation of VMware senior management in the managed pipeline process, through a regularly-scheduled meeting at or around Week 9 of each 13-week quarter" (*id.*);

- Under the policy, proposed holds were to be discussed at these meetings (*id.*);

- Preliminary quarterly-bookings and quarterly-MPL summaries were shared among VMware senior management (*id.*);

- Although the Operations group typically cleared and processed executed contracts within 24 hours, sales made toward quarter-end would not clear in that 24-hour window and could take up to several days to process (SAC ¶ 24);

- There was no incentive for anyone below senior level to delay executed contracts in the booking system (*id.* ¶ 25);

- Gelsinger and Rowe and other senior executives had the authority to bypass the automatic booking system and hold back executed contracts, but salespeople and their direct managers did not (*id.* ¶¶ 24, 27);

- In the "final weeks, days, and hours of the quarter," VMware senior finance and accounting personnel made decisions on whether to release and book any discretionary holds for particular MPL orders (Proposed TAC ¶ 95);

- By "pushing sales that were not required to meet current period revenue or earnings guidance . . . from the current quarter into the next quarter," Defendants artificially engaged VMware's backlog (SAC ¶ 28); and

- Orders remaining in MPL at the end of a quarter were typically booked in the first few days or first week of the next quarter, with associated revenue recognition occurring as licenses were delivered and services performed (Proposed TAC ¶ 96).

These allegations, taken as a whole, describe a course of action decided upon or condoned by Gelsinger, Rowe, and several other senior VMware executives under which senior VMware employees methodically reviewed executed contracts and decided which ones to hold back at the

1   end of a quarter, thereby exercising control over and discretionarily increasing VMware's backlog.

2   Beginning in Q1 FY2019 and continuing through the start of the Class Period in Q2 FY 2019 to at

3   least January 31, 2020, VMware disclosed in its quarterly and annual reports filed with the SEC

4   that "[t]he amount and composition of [VMware's] backlog will fluctuate period to period, and

5   backlog is managed based upon multiple considerations, included product and geography."

6   Proposed TAC ¶ 94; *see id.* ¶ 87 n.5; SAC ¶ 82.  VMware also made statements in its SEC filings

7   and earnings calls during the Class Period regarding the amount of its backlog and revenues.  *See*

8   SAC ¶¶ 84–85, 87, 95, 99, 104, 110, 119, 124, 129, 136, 143.  Defendants did not disclose the

9   scope of their management of VMware's backlog or its effect on revenue recognition.

10          As required by the PSLRA, Lead Plaintiff alleges Defendants' statements about VMware's

11   backlog were misleading—or omitted material information necessary to make the statements not

12   misleading—because Defendants had "misleadingly inflated license and total backlog by deferring

13   current period sales to subsequent quarters; and [VMware] was experiencing an adverse shift

14   toward subscription and SaaS product offerings, and its license model was becoming obsolete,

15   impacting the rate at which VMware was able to recognize revenue."  *E.g.*, SAC ¶ 86; *see In re*

16   *VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) ("The PSLRA mandates

17   that 'the complaint shall specify each statement alleged to have been misleading, [and] the reason

18   or reasons why the statement is misleading….'") (quoting 15 U.S.C. § 78u–4(b)(1)(B)).  In light

19   of the particularized allegations in the SAC and Proposed TAC, including those described above,

20   the Court finds that Defendants' statements about VMware's backlog omitted material information

21   about the degree of control Defendants exerted over VMware's backlog and its effect on revenue

22   recognition.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce

23   defendants chose to tout the company's backlog, they were bound to do so in a manner that

24   wouldn't mislead investors.").  Lead Plaintiff has plausibly stated with the requisite particularity a

25   theory that Defendants enacted a practice that allowed them to understate a current quarter's

26   revenue in favor of a future quarter in order to "smooth" revenues.  *See Okla. Firefighters Pension*

27   *& Ret. Sys. V. IXIA*, 50 F. Supp. 3d 1328, 1358 (C.D. Cal. 2014) (finding plausible plaintiff's

28   Case No.: 20-cv-02182-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

1    earnings understatement theory); *S.E.C. v. Stanard*, 2009 WL 196023, *19 (S.D.N.Y. Jan. 27,

2    2009) (holding CEO's actions to "smooth earnings" by deferring income constituted plausible

3    securities fraud theory).

4                    **b.      PSLRA Safe Harbor for Forward-Looking Provisions**

5                    Defendants again argue that several of the statements alleged by Lead Plaintiff to be

6    misleading are forward-looking statements protected by the PSLRA's safe harbor provision.  Mot.

7    at 12–14.  Forward-looking statements are not actionable as a matter of law if they are identified

8    as such and accompanied by "meaningful cautionary statements identifying important facts that

9    could cause actual results to differ materially from those in the forward[-]looking statement."  15

10   U.S.C. § 78u-5(c)(1)(A)(i).  "A forward-looking statement is any statement regarding (1) financial

11   projections, (2) plans and objectives of management for future operations, (3) future economic

12   performance, or (4) the assumptions underlying or related to any of these issues."  *In re Facebook,*

13   *Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 834 (N.D. Cal. 2019) (quoting *No. 84 Emp'r Teamster Joint*

14   *Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)) (internal

15   quotation marks omitted).  "[I]f a forward-looking statement is identified as such and accompanied

16   by meaningful cautionary statements, then the state of mind of the individual making the statement

17   is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."

18   *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

19                   Defendants argue that paragraphs 89, 99, 101, 107, 108, 110, 113–115, 122, and 138–140

20   contain statements protected under the PSLRA's safe harbor provision because they are forward-

21   looking and accompanied by meaningful cautionary language.  Mot. at 13.  Lead Plaintiff

22   contends that "where an otherwise forward-looking statement includes a non-forward-looking

23   statement, that non-forward looking statement is not protected under the PSLRA safe harbor."

24   Opp. at 11 (citing Prior Order at 16; *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th

25   Cir. 2017)).  The statements at issue are as follows:[5]

26   _____

27   [5] Where Defendants do not specify the challenged portion of a paragraph, the Court reviews those
     portions of the paragraph that Lead Plaintiff emphasizes in bold and italics in the SAC.

28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

- **Paragraph 89**: "We're comfortable with the SaaS mix and the hybrid cloud mix that we're growing here at VMware.  It's obviously highlighted in the guide for Q4 as well as in the guide for FY '20.  So nothing there I would call out other than the fact that the business is performing well and <u>we feel very confident heading into the next year</u>."

- **Paragraph 99**: "[VMware] exited Q4 with $147 million of license backlog compared to $144 million at the end of Q3."

- **Paragraph 101**: "[W]e do continue to see that <u>it will be a good IT market into the future overall</u>."

- **Paragraph 107**: "Q1 was a good start to fiscal 2020 with strength across our comprehensive solutions portfolio."

- **Paragraph 108**: "[R]evenue for the quarter increased 13% year-over-year . . . [VMware is] <u>very well positioned to execute on our plans for the full year</u>."

- **Paragraph 110**: "Q1 was a good start to FY '20, and <u>we're maintaining our positive outlook for the year . . . . [VMware's performance during Q1 2020] has us well positioned to execute on our plans for the year</u>."

- **Paragraph 113**: "But beyond [the volatility and uncertainty tied to the macroeconomic environment], we're comfortable with what we're seeing early and <u>feel good about our forecast for the year</u>."

- **Paragraph 114**: "<u>And we're feeling quite good about the momentum that we see going into Q2 and for the second half</u>."

- **Paragraph 115**: "<u>[Defendants are] comfortable with how [VMware is] positioned for the year</u> [despite] some of our competitors seeing a little bit of weakness and some volatility and variability quarter-to-quarter."

- **Paragraph 122**: "[VMware is b]uilding on another solid quarter . . . We are pleased with our strong financial performance in Q2, which reflected broad-based strength in all three geographies."

- **Paragraph 138**: "I talked about RPO, which, for the third quarter, was $8.5 billion, which has also grown nicely year-over-year, reflecting the ongoing strength of the business.  So yes, <u>we feel good about the guide.  We feel good about our pipeline heading into Q4</u>."

- **Paragraph 139**: "<u>But again, if you recall, the guide also highlighted some of the growth that we're anticipating for the second half of the year based on what we said last quarter.  So we feel really good about the pipeline heading into the fourth</u>

United States District Court
Northern District of California

quarter and the solid guide for the year."

- **Paragraph 140**: "But in aggregate, you're right, there's always that balance when you're considering a perpetual model versus the SaaS model, but we're comfortable with that balance.  We've maintained the annual guide.  <u>We feel good about the trajectory heading into next year</u>."

SAC ¶¶ 89, 99, 101, 107, 108, 110, 113–115, 122, 138–140.  With the exception of paragraphs 99 and 101, the above excerpts are the same ones the Court reviewed in its Prior Order.  *See* Prior Order at 15–16; ECF No. 63-1 ("FAC/SAC Redline") at 25–37.  The Court finds that the underlined portions of the above paragraphs are forward-looking as they are about VMware's financial projections, Defendants' plans and objectives for future operations, VMware's future economic performance, or the assumptions underlying or related to these issues.  *See In re Facebook*, 405 F. Supp. at 834.

A forward-looking statement must be accompanied by meaningful cautionary language to fall into the PSLRA's safe harbor provision.  15 U.S.C. § 78u-5(c)(1)(A)(i).  Defendants argue that VMware's SEC filings, press releases, and statements at the beginnings of its earnings calls constituted adequate cautionary language.  Mot. at 13–14 (quoting, *e.g.*, disclosure in SEC filing that VMware's "operating results may fluctuate significantly," including due to "the timing of when sales orders are processed, which can cause fluctuations in our backlog and impact our bookings and timing of revenue recognition.").  Lead Plaintiff asserts that Defendants' allegedly misleading statements regarding VMware's backlog means that "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate."  Opp. at 12–13 (quoting *Quality Sys.*, 865 F.3d at 1148).

"The safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized."  *Washtenaw Cnty. Emps. Ret. v. Celera Corp.*, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012) (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991); *see also Berson*, 527 F.3d at 986 (holding that a company's warning language was misleading because it did not indicate that the warned-of risk may have already come to fruition).  Because the Court finds that Lead Plaintiff has plausibly

pleaded a theory under which Defendants omitted material information about their control over VMware's backlog and consequent revenue recognition, it finds that even the most cautionary language Defendants point to—the SEC filing disclosure that "the timing of when sales orders are processed [] can cause fluctuations in our backlog and impact our bookings and timing of revenue recognition"—is insufficient to bring the above forward-looking statements into the PSLRA's safe harbor. Defendants had superior knowledge about their control over the very metric—*i.e.*, the timing of the processing of sales orders—at issue in the cautionary language, and the safe harbor is not available to them. *Washtenaw Cty. Emps. Ret.*, 2012 WL 3835078, at *4 (holding statutory safe harbor did not apply because plaintiff adequately alleged that defendants knew of problems which they represented to be merely risks or uncertainties).

### c.   Corporate Optimism and Puffery

In the Prior Order, the Court found all of VMware's public statements quoted in the FAC—which are unchanged in the SAC—to be non-actionable puffery, with the exception of "factual statements concerning specific revenue and backlog amounts, forward-looking statements about projected revenue, and concrete descriptions of the past and present state of revenue recognized over a period of time." Prior Order at 18–19. Defendants ask that this Court leave its analysis unchanged. *See* Mot. at 14. Lead Plaintiff argues that none of Defendants' statements were puffery because Defendants "affirmatively created the misleading impression that VMware was poised for continued success when in fact they knew – based on their actual access to backlog information – that VMware had deceptively pushed nearly half a billion dollars of sales not required to meet FY 2019 guidance into FY 2020." Opp. at 14 (citing *Brody*, 280 F.3d at 1006).

Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Generalized statements of corporate optimism, such as business being "healthy," may be considered puffery and are not actionable. *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014); *see, e.g.*, *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("[A]lleged optimistic statements indicating that a company is 'on

1  track' to meet a certain goal are, without more, inactionable puffery."); *Fadia v. FireEye, Inc.*,

2  2016 WL 6679806, at *9 (N.D. Cal. Nov. 14, 2016) (statements about business being "very

3  healthy" and sales cycles being "consistent" were nonactionable puffery); *In re Rackable Sys., Inc.*

4  *Sec. Litig.*, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (statements that relationship with

5  customers was "pretty strong" and "solid" not actionable) (citation omitted).  But "even general

6  statements of optimism, when taken in context, may form a basis for a securities fraud claim when

7  those statements address specific aspects of a company's operation that the speaker knows to be

8  performing poorly."  *In re Quality Sys.*, 865 F.3d at 1143 (internal quotation marks omitted); *see*

9  *also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018) (declining to

10  dismiss factual statements about certain aspects of defendant's business as nonactionable puffery).

11         The Court sees no reason to disturb its prior analysis.  The Court's finding that Lead

12  Plaintiff's additional allegations are sufficiently particularized as to statements about VMware's

13  backlog and consequent revenue recognition does not lead to the conclusion that statements other

14  than "factual statements concerning specific revenue and backlog amounts, forward-looking

15  statements about projected revenue, and concrete descriptions of the past and present state of

16  revenue recognized over a period of time" are actionable.  *See* Prior Order at 15.  The only set of

17  allegations Lead Plaintiff specifically addresses in its Opposition are Defendants' allegedly false

18  statements about VMware's "strength in 'all three geographies,' including the Americas region.'"

19  Opp. at 14 (citing SAC ¶¶ 46, 97, 98).  However, Lead Plaintiff has not alleged that Defendants'

20  statements "address[ed] specific aspects of [VMware's] operation that the speaker knows to be

21  performing poorly."  *Quality Sys.*, 865 F.3d at 1143.  The only allegations about the Americas

22  segment are conclusory assertions that it was in a "state of turmoil" and that a reorganization of

23  the segment following the departure of the region's head resulted in "deal execution problems."

24  SAC ¶ 36.  Without more specific allegations regarding the performance of the Americas segment,

25  the Court will not find that Defendants' allegedly misleading statements about VMware's

26  companywide backlog and revenue recognition—which it has already found are not puffery—

27  cause statements about the performance of certain regions to be misleading.

28

United States District Court
Northern District of California

1    Accordingly, the Court finds that Lead Plaintiff has sufficiently pleaded actionable

2    misleading statements with respect to Defendant's factual statements concerning specific revenue

3    and backlog amounts, forward-looking statements about projected revenue, and concrete

4    descriptions of the past and present state of revenue recognized over a period of time.

5                    **2.    Strong Inference of Scienter**

6    The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong

7    inference that the defendant acted with the required statement of mind." 15 U.S.C. § 78u-4(b)(2).

8    "A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental

9    state that not only covers intent to deceive, manipulate, or defraud, but also deliberate

10   recklessness.'" *City of Dearborn Heights Act Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856

11   F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705

12   (9th Cir. 2016)). "Deliberate recklessness is 'an *extreme* departure from the standards of ordinary

13   care . . . which presents a danger of misleading buyers or sellers that is either known to the

14   defendant or is so *obvious* that the actor must have been aware of it.'" *Schueneman*, 840 F.3d at

15   705 (emphases original). In ruling on a motion to dismiss, the inquiry is "whether *all* of the facts

16   alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

17   allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights,*

18   *Ltd.*, 551 U.S. 308, 310 (2007) (emphasis original). "A securities fraud complaint will survive a

19   motion to dismiss under Rule 12(b)(6) 'if a reasonable person would deem the inference of

20   scienter cogent and at least as compelling as any opposing inference one could draw from the facts

21   alleged.'" *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)

22   (quoting *Tellabs*, 551 U.S. at 324).

23   Defendants argue that Lead Plaintiff's "scienter allegations in the SAC are not significantly

24   changed from those in the [FAC], and Plaintiff therefore fails once again to satisfy the PSRLA's

25   heightened pleading standard." Mot. at 14–15.[6] Lead Plaintiff responds that it has pleaded facts

26

27   ────────────────
     [6] Defendants also note that the SEC did not assert a charge of scienter-based fraud against VMware.
     Suppl. Mot. at 2. This fact does not affect the scienter analysis. *See In re VeriFone*, 704 F.3d at 707
28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC
     22

*United States District Court*
*Northern District of California*

alleging a strong inference of scienter, including that Gelsinger and Rowe made unusual or suspicious stock sales and were involved in the creation and implementation of the backlog policy and controlled backlog reporting.  Opp. at 16–22; Suppl. Opp. at 5–7.

### a.  Stock Sales

"[U]nusual" or "suspicious" stock sales by corporate insiders that are dramatically out of line with prior trading practices at times calculated to maximize personal benefit may support a strong inference of scienter.  *See In re Quality Sys.*, 865 F.3d at 1146; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066–67 (9th Cir. 2008).  "Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history."  *Metzler*, 540 F.3d at 1067.

For the same reasons described in the Prior Order, the Court finds that the timing and amounts of the sales of Gelsinger's and Rowe's trading histories support an inference of scienter. Prior Order at 20–23.  In particular, Lead Plaintiff alleges that Gelsinger sold no VMware stock before the Class Period began, even though his exercisable shares vested as early as 2014— followed by 17 sales within a year during the Class Period.  SAC ¶¶ 146, 149.  Lead Plaintiff further alleges that in the 18 months preceding the Class Period, Rowe sold VMware stocks on only two occasions for total proceeds of $1.76 million, and then made 12 sales within a year during the Class Period.  *Id.* ¶¶ 129, 130.  Additionally, of Rowe's total $17.8 million sales proceeds received during the Class Period, Rowe made $8.9 million on April 2, 2019, directly prior to the May 2019 disclosures after which VMware's stock price dropped approximately 7%. *Id.* ¶ 149.  Of Gelsinger's total $23.4 million sales proceeds received during the Class Period, Gelsinger made $4.1 million on May 1, 2019, directly before the May 2019 disclosures.  *Id.*  The Court finds these allegations demonstrate a notable increase in the amount and frequency of sales and that—in the absence of any rebuttal information from the 10b5-1 plans, *see Metzler*, 540 F.3d

n.5 ("We draw no inference from the SEC's decision not to plead scienter or charge defendants with fraud. The district court erred in concluding that 'the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong inference of scienter.'").

Case No.: 20-cv-02182-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

at 1067 n.11— this showing provides some support for an inference of scienter.

Defendants argue that Gelsinger and Rowe increased their holdings of VMware stock during the Class Period by over 31% and 19%, respectively, thereby increasing their personal financial exposure to VMware's financial performance and demonstrating not scienter but rather good faith.  Mot. at 17 (citing Exhibits AA–DD to Greenfield Decl.); Reply at 9.  However, Lead Plaintiff counters—and Defendants concede—that the increase in holdings were the result of compensation awards rather than stock purchases.  Opp. at 18; Reply at 9.  The Court is unpersuaded by Defendants' argument that a stock award demonstrates the same good faith as a stock purchase.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (noting defendant's acquisition of shares without personal cost did not demonstrate lack of scienter).  As such, the Court's analysis remains unchanged from the Prior Order, and it holds that Gelsinger's and Rowe's stock sales were suspiciously timed and support an inference of scienter.

### b.     Control of Backlog Policy and Reporting

The Court held in the Prior Order that the FAC's general allegations regarding Gelsinger's and Rowe's oversight of VMware's financial operations and access to information about its backlog and revenue practices were insufficient to support a finding of scienter.  Prior Order at 24–25.  Lead Plaintiff asserts that the new, detailed allegations in the SAC and Proposed TAC about Gelsinger's and Rowe's involvement in the backlog policy, along with its implementation and reporting, give rise to a strong inference of scienter.  Opp. at 20–22; Suppl. Opp. at 5–7. Defendants maintain that the allegations fall short of the PSLRA standard and argue that Lead Plaintiff "improperly conflates knowledge of VMware's managed pipeline with scienter as to VMware's backlog *disclosure*."  Mot. at 19; Suppl. Mot. at 2.

As a general matter, corporate management's general awareness of the day-to-day workings of the business does not establish scienter absent additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (citation omitted). However, allegations regarding management's role in a corporate structure may be considered as

1    part of the *Tellabs* holistic analysis, and such allegations can independently satisfy the PSLRA

2    where they are "particular and suggest that defendants had actual access to the disputed

3    information." *Id.* at 785–86.  Management's role and the importance of the corporate information

4    in question may create a strong inference of scienter when made in conjunction with "detailed and

5    specific allegations about management's exposure to factual information within the company." *Id.*

6    at 785; *Zucco Partners LLC v. Digimarc Corp.,* 552 F.3d 981, 1000 (9th Cir. 2009).  In "rare

7    circumstances," particularized allegations are not needed where the nature of the relevant fact is of

8    such prominence that it would be "absurd" to suggest that management did not have knowledge of

9    it.  *S. Ferry LP*, 542 F.3d at 786.

10          The Court finds that the SAC and Proposed TAC include "detailed and specific allegations

11   about management's exposure to factual information" that create a strong inference of scienter.

12   *Id.* at 785.  Lead Plaintiff alleges that Gelsinger and Rowe participated in a "backlog policy

13   meeting" with other key VMware executives in November 2018, and that VMware codified its

14   backlog policy during that same fall season into a written "Bookings Finalization Process &

15   Backlog" document.  SAC ¶ 73; Proposed TAC ¶ 95.  Further, the backlog policy formally

16   required the "participation of VMware senior management in the managed pipeline process,

17   through a regularly-scheduled meeting," and VMware senior management shared "preliminary

18   quarterly-bookings and quarterly-MPL summaries . . . essentially in real time" among themselves.

19   Proposed TAC ¶ 95.  Lead Plaintiff alleges that only senior VMware managers and executives,

20   including Gelsinger and Rowe, had the authority to delay the execution of contracts at the end of a

21   quarter.  SAC ¶¶ 24, 27.  Although Defendants argue that Gelsinger and Rowe's knowledge of

22   VMware's managed pipeline is distinct from scienter as to the backlog disclosure, and that the

23   backlog disclosure in fact supports an inference of transparency and nonfraudulent intent, the

24   inference of scienter from the detailed allegations described above is "at least as compelling as any

25   opposing inference."  *Tellabs*, 551 U.S. at 309.

26          Although factual discovery may well prove otherwise, the Court finds that the allegations

27   in the SAC and Proposed TAC regarding Gelsinger and Rowe's involvement in the "backlog

28

policy meeting" and the policy requirements regarding the involvement of senior management and quarterly meetings about implementation—combined with the stock sales discussed above—support a strong inference of scienter.

### 3. Loss Causation

Defendants argue that VMware's announcements of a shrinking backlog were not "corrective disclosures" and that Lead Plaintiff's allegations as to the SEC's request for information about VMware's backlog practices do not suffice to plead loss causation. Mot. at 20. These arguments do not persuade the Court to revise its finding that Lead Plaintiff has pleaded sufficient facts to give rise to a plausible inference that Defendants' disclosures were at least partially responsible for Lead Plaintiff's and other putative class members' economic losses. *See* Prior Order at 27–28. An inquiry into loss causation "requires no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Id.* (internal quotation marks and citations omitted). "A plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value," but it must set forth facts that "if assumed true, are sufficient to provide [the defendant] with some indication that the drop in [defendant's] stock price was causally related to [the defendant's] financial misstatement[s]." *In re Daou Sys.*, 411 F.3d at 1025–26 (internal quotation marks omitted, emphasis original). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Lead Plaintiff alleges that Defendants failed to disclose the nature of VMware's backlog policy and consequent revenue recognition, which kept investors ignorant of the "true state of [VMware's] operations" and led Lead Plaintiff and other members of the putative class to purchase or otherwise acquire VMware common stock while "relying upon the integrity of the market price for VMware's common stock and market information relating to VMware." SAC ¶

171.  Lead Plaintiff further alleges that Defendants made a series of disclosures regarding VMware's backlog, revenue, and the SEC investigation; that VMware's stock price dropped; and that Lead Plaintiff and other members of the putative class suffered economic loss.  *Id.* ¶¶ 171–181.  Although Defendants dispute the characterization of the disclosures as "corrective disclosures," *see* Mot. at 20, on a motion to dismiss the Court is concerned only with the sufficiency of the allegations—and Lead Plaintiff here has plainly alleged "corrective disclosures" based on "fraudulent misrepresentations and omissions."  *See, e.g.*, SAC ¶ 181.  Combined with the allegations of the disclosure of the SEC investigation and the resulting stock price changes, the Court finds again that Lead Plaintiff has sufficiently pleaded loss causation.

In sum, the Court finds that Lead Plaintiff has pleaded facts sufficient to state a claim against Defendants for violations of § 10(b) of the Exchange Act and Rule 10b-5.

### C.      Section 20(a) Claim for Control Person Liability

Lead Plaintiff asserts § 20(a) claims for control person liability against Gelsinger and Rowe.  SAC ¶¶ 201–208.  Under this section, certain "controlling" individuals may be held liable for violations of § 10(b) and its underlying regulations.  *In re VeriFone* 704 F.3d at 711; *Zucco Partners*, 552 F.3d at 990.  In relevant part, § 20(a) states that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To prevail on a § 20(a) claim, a plaintiff must demonstrate (1) "a primary violation of federal securities law" and (2) that "the defendant exercised actual power over the primary violator."  *In re VeriFone*, 704 F.3d at 711 (quoting *Zucco Partners*, 552 F.3d at 990).

For the reasons discussed above, Lead Plaintiff has stated a claim for a primary violation of the securities law against all Defendants, including Gelsinger and Rowe.  Lead Plaintiff has therefore adequately alleged Gelsinger's and Rowe's status as control persons over a primary violator.  *See In re NetSol Techs., Inc., Sec. Litig.*, 2015 WL 13916921, at *6–*7 (C.D. Cal. June

United States District Court
Northern District of California

1   22, 2015) (finding plaintiff alleged control person liability against individual defendant who was

2   also primary violator).  The Court notes, however, that the SAC predicates "control person"

3   liability only on Gelsinger's and Rowe's control over VMware.  SAC ¶¶ 201–208.  It nonetheless

4   finds that Lead Plaintiff has adequately alleged Gelsinger's and Rowe's control over VMware.

5       An individual's status as a CEO or other high-ranking officer within a company does not

6   create a presumption that he or she is a controlling person.  *S.E.C. v. Todd*, 642 F.3d 1207, 1223

7   (9th Cir. 2011) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir.

8   1996)).  "Rather, indicia of control include whether the person managed the company on a day-to-

9   day basis and was involved in the formulation of financial statements, which is sufficient to

10  presume control over the transactions giving rise to the alleged securities violation." *Id.* (citing

11  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)) (internal quotation marks

12  omitted).  Actual authority over the preparation and presentation to the public of financial

13  statements is sufficient to demonstrate control.  *Howard*, 228 F.3d at 1066; *see In re Amgen Inc.*

14  *Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) ("While an individual's status as an

15  officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the

16  exercise of control, persuasive authority indicates that an officer or director who has signed

17  financial statements containing materially false or misleading statements qualifies as a control

18  person.") (citing cases).

19      Here, Defendants do not argue that Gelsinger and Rowe lacked day-to-day control over

20  VMware.  *See* Mot.  Further, Lead Plaintiff alleges that Gelsinger and Rowe were VMware's CEO

21  and CFO throughout the Class Period, certified the SEC filings containing allegedly misleading

22  statements, and had direct or supervisory responsibility over VMware's day-to-day operations.

23  *See, e.g.*, SAC ¶¶ 84, 165, 206.  Lead Plaintiff additionally asserts that Gelsinger and Rowe were

24  involved in VMware's meetings related to the company's backlog accounting, starting with the

25  November 2018 "backlog policy meeting." *Id.* ¶¶ 166.  The Court finds Lead Plaintiff has

26  adequately alleged Gelsinger's and Rowe's control over VMware, so that Lead Plaintiff has stated

27

28  Case No.: 20-cv-02182-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC
    28

1    a § 20(a) claim against each individual defendant.[7]

2         **D.    Section 20A Claim for Insider Trading**

3         Lead Plaintiff lastly asserts a § 20A claim against Gelsinger.  SAC ¶¶ 209–218.  "Section

4    20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading."

5    *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020).  "To satisfy

6    § 20A, a plaintiff must plead [(1)] a predicate violation of the securities laws; and (2) facts

7    showing that the trading activity of plaintiffs and defendants occur contemporaneously."  *Id.*

8    (internal quotation marks omitted).  Contemporaneous trading must be pleaded with specificity

9    under Rule 9(b).  *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993).  The Ninth Circuit has

10   not delineated the boundaries of contemporaneity, and courts in this circuit have adopted

11   thresholds ranging from same-day trading to several day gaps.  *See Brody*, 280 F.3d at 1005 ("[A]

12   shareholder must have traded with an insider or have traded at about the same time as an insider to

13   be harmed by the insider's trading."); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp.

14   2d 1044, 1074–75 (C.D. Cal. 2008) ("[T]he Ninth Circuit [has] . . . expressly declined to elaborate

15   on [the] 'exact contours' of "the period in which an insider defendant's trade can be considered

16   'contemporaneous' with the plaintiff's."); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *12

17   (N.D. Cal. Feb. 27, 2018) ("[T]rading on the same day or the day after is 'contemporaneous.'")

18   (citing *In re Countrywide*, 554 F. Supp. 2d at 1205); *In re Connetics Corp. Sec. Litig.*, 2008 WL

19   3842938, at *14–*15 (N.D. Cal. Aug. 14, 2008) (permitting § 20A claim where plaintiff alleged

20   trading gap of five days).

21        Lead Plaintiff has pleaded a predicate violation of the securities laws for the reasons

22   described above.  Defendants argue that even if a predicate violation is alleged, Lead Plaintiff did

23   not trade contemporaneously with Gelsinger.  Mot. at 21–22.  The closest transactions are

24

25   ───────────────

     [7] Defendants assert that § 20(a) claims are subject to the same heightened standard as § 10(b)
     claims.  Mot. at 22.  The appropriate pleading standard remains an open question in this circuit.
26   This Court, like others, is not persuaded that § 20(a) control person allegations are governed by
     Rule 9(b).  *See In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *22–*23 (S.D. Cal. May
27   23, 2017).  However, the Court finds that the allegations described above are pleaded with
     sufficient particularity to state a § 20(b) under a heightened pleading standard under Rule 9(b).

28   Case No.: 20-cv-02182-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

United States District Court
Northern District of California

Gelsinger's stock sale on March 1, 2019, followed by Lead Plaintiff's stock purchase on March 5, 2019.  *Id.* (citing SAC ¶ 149; SAC Schedule A).  Defendants urge this Court to adopt a same-day or next-day trading requirement and assert that Lead Plaintiff's § 20A claim also fails because Gelsinger sold his stock at a higher price than Lead Plaintiff's purchase price.  *Id.* at 22 (citing *SEB Inv. Mgmt. AB*, 485 F. Supp. 3d at 1136 ("[C]ourts have consistently held that shares purchased below the defendant's sale price *cannot* satisfy the contemporaneity requirement, because it is *impossible* that those trades occurred with defendant at an unfair advantage.")).  Lead Plaintiff responds that a four-day trading period is routinely found contemporaneous, and that *SEB Investment* is inapposite because there was "no indication that the 'trades occurred with defendant at an unfair advantage.'"  Opp. at 24–25; *SEB Inv. Mgmt. AB*, 485 F. Supp. 3d at 1136.

In light of the Ninth Circuit's refusal to strictly restrict the contours of a contemporaneous trade for purposes of § 20A, this Court declines Defendants' invitation to do so by requiring a same-day or next-day trade.  Nor will the Court accept Lead Plaintiff's suggestion of the opposite rule, *i.e.*, permitting a class action to be "maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information."  Opp. at 24 (citing *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007)).  However, the Court finds ample precedent in this circuit for a finding that a four-day trading gap may be considered contemporaneous.  *See Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1196 (permitting eight-day gap); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *14–*15 (five-day gap); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, *37 (S.D. Cal. Aug. 1, 2006) (finding seven- or eight-day gap "on the border of an acceptable time period"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) (concluding that six days is outer limit for contemporaneous trading).  The Court therefore finds that Lead Plaintiff has stated a claim for § 20A liability against Gelsinger.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

    1.    Defendants' motion to dismiss Lead Plaintiff's § 10(b) and Rule 10b-5 claim is

Case No.: 20-cv-02182-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFTS.' MOT. TO DISMISS SAC

DENIED with respect to Lead Plaintiff's claims based on factual statements concerning specific revenue and backlog amounts, forward-looking statements about projected revenue, and concrete descriptions of the past and present state of revenue recognized over a period of time;

2.  Defendants' motion to dismiss Lead Plaintiff's § 10(b) and Rule 10b-5 claim is GRANTED with respect to Lead Plaintiff's claims based on all other categories of statements, including statements about the strength of VMware's business, Defendants' general thoughts about or happiness with VMware's performance or pipeline, Defendants' confidence in or optimism about VMware's positioning and future prospects in different geographic and product segments, VMware's readiness for industry shifts, and VMware's future strategies and momentum;

3.  The motion to dismiss Lead Plaintiff's § 20(a) claim is DENIED;

4.  The motion to dismiss Lead Plaintiff's § 20A claim is DENIED;

5.  Lead Plaintiff shall file its Proposed TAC as a Third Amended Consolidated Complaint by April 6, 2023; and

6.  Defendants shall file their answer to the Third Amended Complaint within 14 days of its filing.

**IT IS SO ORDERED.**

Dated: March 31, 2023

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California