ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
– and –
SCOTT H. SAHAM (188355)
ASHLEY M. KELLY (281597)
TING H. LIU (307747)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LAMARTINA, Individually and on Behalf of All Others Similarly Situated, | Case No. 5:20-cv-02182-EJD |
| Plaintiff, | CLASS ACTION |
| vs. | THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| VMWARE, INC., et al., | DEMAND FOR JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....1

II. JURISDICTION AND VENUE ....3

III. THE PARTIES....4

IV. OVERVIEW OF THE CASE ....5

A. Background of the Company ....5

B. Contracts in the Automatic Booking System Were Delayed at Quarter End ....6

C. Defendants Materially and Artificially Inflated Backlog to Conceal the True State of VMware's Business ....8

D. Defendants Announce Record-Breaking Backlog Despite a Slowdown in the Industry ....13

E. Following the Announcement of Record-Breaking License Backlog, VMware Executives Sell Nearly $60 Million of VMware Stock at Inflated Prices....13

F. Defendants Draw Down the Backlog Slush Fund While Continuing to Falsely Reassure Investors....14

G. Defendants Gelsinger and Rowe Met with Key Executives Dozens of Times During the Class Period to Discuss Sales and Backlog ....16

H. Defendants Disclose that Backlog Has Virtually Disappeared and that VMware's Accounting for Backlog Is Being Investigated by the SEC....20

V. THE SEC ORDER CONFIRMS THE BACKLOG SCHEME ....23

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD....34

VII. ADDITIONAL SCIENTER AND MATERIALITY ALLEGATIONS....49

VIII. LOSS CAUSATION AND ECONOMIC LOSS ....58

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ....61

X. CLASS ACTION ALLEGATIONS ....62

Lead Plaintiff Northeast Carpenters Pension Fund ("Lead Plaintiff") by and through its undersigned counsel, brings this federal class action based upon personal knowledge as to those allegations concerning itself and, as to all other matters, upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made by VMware, Inc. ("VMware" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) releases and other publications disseminated by defendants; and (c) securities analyst reports, news articles, websites and other publicly available information concerning defendants.[1] Lead Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action on behalf of a Class (defined herein) consisting of all persons other than defendants who purchased or otherwise acquired VMware securities between August 24, 2018, and February 27, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers.

2. Defendants violated the federal securities laws by deceptively recording sales as backlog so that the revenue from those sales could be recognized in subsequent quarters as opposed to the quarter when they were actually made. In order to meet and not overly exceed market expectations, once quarterly sales goals were achieved, management directed the Company's personnel to hold secured contracts until the next quarter, resulting in revenue smoothing into subsequent quarters, causing reported revenue to be far more consistent across reporting periods than it actually was. This deliberate smoothing of revenue artificially inflated backlog reported to investors and created an impression of steady sales that was not indicative of actual corporate performance.

[1] "Defendants" collectively refer to VMware, Patrick P. Gelsinger and Zane Rowe. "Individual Defendants" refer to defendants Patrick P. Gelsinger and Zane Rowe.

3. Defendants materially and artificially inflated backlog using sales that were not required to meet current period guidance throughout Fiscal Year ("FY") 2019, and particularly at year end, misleading investors as to the likelihood that FY 2020 guidance would be met. Defendants treated the inflated backlog – nearly half a billion dollars at the end of FY 2019 – as a slush fund, drawing on it throughout FY 2020 rather than recognizing the revenue in FY 2019. By deferring revenue recognition to FY 2020, VMware was able to continue to deliver double digit earnings growth in FY 2020. Had VMware recognized the revenue that was deferred into backlog during FY 2019, when it was in fact secured, VMware would have delivered only low single digit revenue growth for FY 2020.

4. Backlog is an important metric to investors, as it helps inform their predictions of future revenue. Because stocks are valued, in large part, based upon future cash flows and growth potential as opposed to past earnings, the inflation of backlog and the smoothing of revenue and earnings inflated VMware's stock price during the Class Period. As a result of the inflated backlog and smoothing of revenue, the notes to VMware's financial statements during the Class Period violated Generally Accepted Accounting Principles ("GAAP") because they failed to disclose to investors sufficient information to help them understand the timing and uncertainty of the Company's projected and later, reported revenue.

5. The inflated backlog was also used to conceal the fact that VMware was plagued by weaknesses heading into FY 2020 driven by an: (i) internal segment reorganization; and (ii) VMware's failure to properly weather an industry-wide shift away from license products in favor of subscription and Software-as-a-Service ("SaaS") products.

6. The practice of deceptively pushing current quarter sales into future quarters inflated reported backlog and gave investors a false impression of the true state of the Company's FY 2020 growth and growth prospects. A series of quarterly disclosures in FY 2020 began to reveal the true state of VMware's far lower backlog, culminating on February 27, 2020, when the Company revealed that: (1) VMware's total backlog had declined 96% from its height just one year prior; (2) VMware poorly managed the industry-shift to subscription and SaaS products; and (3) VMware could not meet Q4 2020 or FY 2020 revenue guidance issued just three months prior. The same day,

VMware also announced that in December 2019, the SEC launched an investigation into the Company's backlog and associated accounting and disclosures, on the heels of the sudden resignation of the Company's Chief Accounting Officer.

7. VMware's stock price dropped swiftly and dramatically in the trading days following each partial disclosure as market participants recalibrated expectations as a result of declining backlog and slower than expected growth. In total, the value of VMware shares declined $85 per share – over 41% from its Class Period high in just nine months. From the start of the Class Period until the Company's February 27, 2020 disclosures, the Company's executives, including the Individual Defendants, took advantage of the Company's artificially inflated stock price, unloading over $118 million of VMware stock at inflated prices as detailed in the figure below, and at ¶¶145-161:




## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b),78t(a), and 78t-1), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). VMware is headquartered in this Judicial District, defendants conduct business in this Judicial District, and a significant portion of defendants' activities took place within this Judicial District.

11. In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

### Plaintiff

12. Lead Plaintiff Northeast Carpenters Pension Fund is a defined benefit pension plan with assets of over $2.5 billion that provides retirement benefits to over 35,000 participants. Lead Plaintiff purchased VMware shares and was damaged thereby as detailed in the Certification Pursuant to Federal Securities Laws, attached hereto.

### Defendants

13. VMware is incorporated in Delaware with principal executive offices located at 3401 Hillview Avenue in Palo Alta, California. VMware's common stock trades on the NYSE under the ticker symbol "VMW."

14. Patrick P. Gelsinger ("Gelsinger") served as VMware's Chief Executive Officer ("CEO") during the Class Period. During the Class Period, Gelsinger sold $23.4 million worth of VMware stock at inflated prices while in the possession of material nonpublic information, including shares sold contemporaneously with Lead Plaintiff's purchase of shares in March 2019.

15. Zane Rowe ("Rowe") served as VMware's Chief Financial Officer ("CFO") and Executive Vice President during the Class Period. During the Class Period, Rowe sold $17.8 million worth of VMware stock at inflated prices while in the possession of material nonpublic information.

# IV. OVERVIEW OF THE CASE

## A. Background of the Company

16. VMware is a software and technology firm based in Palo Alto, California. The Company provides application modernization and cloud computing and virtualization software and services for its customers throughout the world. VMware enables its customers to digitally transform their operations by allowing businesses to more efficiently use existing hardware capabilities by allowing network components, such as servers, to run multiple operating systems or host multiple dedicated applications simultaneously.

17. VMware operates in three market segments: Americas (comprised of Latin America, United States, and Canada), Asia Pacific & Japan ("APJ") and Europe Middle East and Africa ("EMEA"). Throughout the Class Period, defendants regularly touted "'broad-based strength across our diverse product portfolio and in all three geographies,'" signaling to investors that all three of the Company's operating segments – Americas, APJ, and EMEA – were experiencing periods of continued strength.

18. VMware's product offerings include licenses, subscription and SaaS, and services. During the Class Period, VMware derived revenue primarily from licensing software under perpetual licenses or consumption-based contracts and the related service revenue, which was comprised of software maintenance and support, training, consulting services and hosted services. License revenue is revenue the Company generates from selling license software through distributors, resellers, system vendors, system integrators and its direct sales force. VMware's subscription and SaaS revenue consists of hosted services, license usage fees, and perpetual or subscription license sales of its software platform. VMware's on-premises license revenue is recognized up front at a point in time, upon delivery and transfer of control of the underlying license to the customer, or upon point-of-sale to the end user. License revenue is also recognized upon consumption for rental fees of VMware's rental of on-premises licenses. In contrast, subscription and SaaS revenue is recognized on a ratable basis over the contract term generally beginning on the date the software is delivered to the customer, and thus, is recognized more slowly than license revenue.

19. During the Class Period, the Company only reported two revenue line items: license and services. Subscription and SaaS revenue was allocated between the license and services line items, with the bulk of subscription and SaaS revenue allocated to licenses. At the end of the Class Period, beginning with its FY 2020 Form 10-K, VMware began reporting subscription and SaaS revenue as a separate line item, to align with industry demands, as the industry shifted away from license products in favor of subscription and SaaS and to provide a more meaningful representation of the nature of the Company's revenue.

20. The Company recognized revenue as it performed its obligations on existing deals. Deals that were made in one quarter, but that the Company expected to deliver and recognize in revenue the next quarter, were included in the Company's "backlog." Thus, backlog is a representation of sales that were already secured, but were not yet fulfilled by the Company – revenue for deals in the Company's pipeline would be recognized as the Company performed its obligations related to its backlog the subsequent quarter. In addition to total backlog, the Company also separately disclosed the portion of backlog attributable to licenses.

21. Backlog is an important measure of the Company's existing product demand and expected future cash flows and revenue. Healthy backlog signaled to investors that the Company was experiencing robust client demand, as it was a measure of the Company's existing deal pipeline and quantified the amount of product that had been ordered by VMware's customers, but that had yet to be fulfilled as of quarter end. Analysts and investors considered backlog a key performance indicator because it essentially gave the Company a "head start" to meeting revenue and earnings targets for the subsequent financial reporting period.

### B. Contracts in the Automatic Booking System Were Delayed at Quarter End

22. VMware utilized an automatic booking system, Salesforce, through which salespeople would input and track executed contract bookings. Once a contract was executed, it was entered into the automatic booking system and automatically routed to the Company's Operations group headquartered in Palo Alto, California, where it would be cleared through Salesforce's "configure, price, and quote" program. VMware's Operations group supported the Company's

financial planning and analysis activities, and included sales, finance, and accounting professionals who reported directly to defendant Rowe.

23. Salespeople were overseen by managers who oversaw a group of 8-10 individuals. Those managers were in turn managed by regional managers and Vice Presidents. While salespeople only had access to their bookings through the automatic booking system, access to booking information increased with the level of seniority. Managers were able to review and access executed contract booking information for all of their direct reports in the aggregate. Senior level managers had access to aggregate level detail for anyone below them. The Company's most senior executives had real-time, full access to the automatic booking system, which allowed them to observe booking activity as it occurred.

24. Executed contracts that were routed through the automatic booking system were typically cleared and processed by the Operations group within 24 hours. However, as the Company approached quarter-end, sales would not clear in that 24-hour window, and in some cases would take several days to process. During regular group sales meetings, where sales projections and contract bookings were discussed, members of the sales teams discussed that revenue from executed contracts would be held beyond the standard 24-hour timeframe, especially nearing quarter-end, to be pushed into the future quarter. Salespeople, and the managers directly above them, lacked the authority to bypass the automatic booking system to hold back the executed contracts.

25. There was no incentive for anyone below senior level to delay executed contracts in the booking system, since doing so would negatively impact compensation and timing of bonuses, in addition to customer satisfaction. Managers communicated to salespeople that they would still receive their commissions, albeit delayed. When contract revenue was held back to be recognized in the next quarter, salespeople had to wait until the next quarter to receive the related commission.

26. There was no benefit to salespeople to delay booking into the next quarter, as their commissions would be delayed. Among salespeople, it was commonly understood that once quarterly revenue numbers were met, revenue was deliberately held back so the Company would meet but not exceed Wall Street expectations and to satisfy senior executives, including the

Company's CEO and CFO. In some cases, salespeople departed VMware because of its practice of delaying executed contracts into the next year.

27. Given their roles as CEO and CFO, including interacting with and overseeing the Company's Operations group, defendants Gelsinger and Rowe had access to the automatic booking system and authority to hold-back executed contracts.

### C. Defendants Materially and Artificially Inflated Backlog to Conceal the True State of VMware's Business

28. Throughout FY 2019, and particularly at fiscal year-end, defendants engaged in a practice of materially and artificially inflating both license and total backlog by pushing sales that were not required to meet current period revenue or earnings guidance because guidance had already been met from the current quarter into the next quarter, by deliberately leaving them categorized as unfulfilled at quarter end.

29. Sales personnel would submit executed contracts for processing through the systems operations group at VMware's headquarters. At the end of each quarter, and particularly at year end, VMware would deliberately leave executed contracts unprocessed, to be recognized in the subsequent quarter by funneling them into the Company's backlog. This practice served no legitimate purpose and had the effect of delaying and smoothing the recognition of revenue so that the revenue from those contracts would be recognized the next quarter rather than the quarter in which the contract execution was achieved.

30. By pushing sales not required to meet FY 2019 guidance into FY 2020, VMware was able to report a head start – ***nearly half a billion dollars*** – toward meeting revenue guidance for FY 2020. This gave analysts and investors a false impression that VMware would be able to meet FY 2020 guidance, and created the perception of a state of affairs at VMware that was dramatically different from what actually existed at the start of FY 2020. By deferring revenue recognition to FY 2020, VMware was able to continue to deliver double digit revenue growth in FY 2020. Had VMware recognized the revenue that was deferred into backlog during FY 2019 when it was in fact secured, VMware would have delivered only low single digit revenue growth for FY 2020.

31. During each quarter of FY 2019, the Company reported dramatic increases in total backlog. For FY 2019, the Company reported a 58% increase in total backlog, from $285 million at the beginning of the year, to $449 million at year-end. During the same period, license backlog likewise increased 48% from $99 million at the start of FY 2019 to $147 million at the end of FY 2019.

32. The dramatic increases in backlog the Company experienced during FY 2019, and particularly at year-end, indicated to investors that the Company had a solid head start to meet publicly communicated double digit revenue growth guidance for FY 2020. As defendants advanced a story of impressive growth and success in booking deals with customers that VMware would fulfill in subsequent quarters, the Company's stock price soared, as the market reacted positively to the increases in backlog each quarter in FY 2019. VMware stock ultimately reached a Class Period high of $205.52 on May 16, 2019, just two weeks prior to the release of the Company's Q1 2020 results, the first quarter in which VMware began to draw down on its backlog slush fund in order to meet guidance.

33. Defendants' motivation for racking up substantial backlog was two-fold. First, once guidance was met in FY 2019, VMware management directed that sales be deferred from the current period and recorded as backlog, so that the revenue would be available to smooth the next quarter and fiscal year results, in order to ensure that publicly communicated guidance that had been provided to investors could be met. This practice enhanced the Company's prospects of meeting guidance and analyst expectations in future periods, and led investors to believe that VMware's license and total revenue guidance would be met in FY 2020. By deferring revenue recognition to FY 2020, VMware was able to continue to deliver double digit revenue growth in FY 2020. Had VMware recognized the revenue that was deferred into backlog during FY 2019, when it was in fact secured, VMware would have delivered only low single digit revenue growth for FY 2020.

34. Second, pushing sales into backlog also allowed the Company to meet current period revenue targets while at the same time capping the current period baseline upon which future revenue growth would be measured. Recognizing the backlog sales organically in the quarter in which they were secured rather than pushing them out into the subsequent quarter would have meant

that analyst growth expectations in FY 2020 would have been harder to meet, as achieving the same percentage growth would have required nearly a ***half a billion more*** in total revenue if the backlog sales had been recognized in FY 2019.

35. Defendants' practice of deceptively pushing sales into backlog concealed from investors and the market several issues that would plague the Company in FY 2020: (i) a poorly performing Americas segment following a reorganization in that region; and, (ii) a failure to successfully weather the industry-wide shift away from license products in favor of subscription and SaaS products. During FY 2020, VMware drew down on its backlog slush fund in order to continue to conceal the impact of these adverse business conditions.

36. Unbeknownst to investors, VMware was facing several challenges that jeopardized the Company's ability to meet revenue guidance. VMware's Americas segment was in a state of turmoil – just days after the close of FY 2019 in February 2019, VMware saw the departure of its head of Americas segment, leading to the reorganization of the Americas region and appointment of a new Americas leader. This realignment resulted in deal execution problems and a subsequent slowdown in revenue following weakened performance in that region. Defendants failed to disclose this restructuring during the Q4 2019 conference call on February 28, 2019, instead three months later, defendants relayed to analysts that the restructuring of the Company's Americas segment caused "disruption" and that some of the Company's "deals were impacted."

37. Separately, as customers' consumption of software evolved, the Company was failing to address the industry-shift away from its license model, which was becoming obsolete, to subscription and SaaS products, which slowed the timing of revenue recognition and negatively impacted the Company's revenue growth. Notwithstanding this industry trend, defendants falsely assured the market that VMware's performance and pipeline were on track to deliver expected results throughout FY 2020, thanks in part, to its ability to generate strong license backlog and revenue growth.

38. In order to cushion the negative impact these events would have had on the Company's financial performance in FY 2020, defendants poured excess FY 2019 sales into VMware's backlog throughout FY 2019, thus artificially inflating backlog and misleading investors

as to VMware's prospects for FY 2020 and creating a lower threshold to measure future growth. As a result of their practice of deliberately pushing sales into backlog, defendants were aware, but failed to disclose, that backlog was no longer an accurate barometer of the Company's expected performance.

39. VMware's notes to the Class Period consolidated financial statements were inadequate in violation of GAAP. VMware disclosed in its SEC filings that "[t]he consolidated financial statements and accompanying notes have been prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') and pursuant to the rules and regulations of the [SEC] for annual financial reporting." (2019 10-K at 65). However, VMware's "Revenue Recognition" note failed to disclose to investors sufficient information to understand the timing and uncertainty of revenue, in violation of Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, Revenue from Contracts with Customers.

40. The objective of the GAAP disclosure requirements "is for an entity to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers," and to achieve that objective, an entity must disclose qualitative and quantitative information about its contracts and significant judgments. *See* ASC 606-10-50-1. An entity is required to disclose the judgments, and changes in the judgments, made in applying the revenue recognition guidance "that significantly affect the determination of the amount and timing of revenue from contracts with customers," and in particular, must explain the judgments, and changes in the judgments, used in determining the timing of satisfaction of performance obligations. *See* ASC 606-10-50-17.

41. Despite these requirements and unbeknownst to investors, VMware failed to disclose that significant judgments were made to defer recognizing revenue to a subsequent period once guidance had been met. Such judgments caused revenue to be less than it otherwise would have been in FY 2019, and more than it would have been in FY 2020.

42. Not only were VMware's financial footnote disclosures during the Class Period inadequate, but VMware's Management's Discussion & Analysis ("MD&A") disclosures were also

inadequate for failing to disclose defendants' deferral of revenue to subsequent quarters once guidance had been met, in violation of SEC disclosure requirements. VMware's undisclosed smoothing of earnings materially distorted the Company's reported results of operations. SEC Staff Accounting Bulletin ("SAB") 114, Topic 13.B. notes that significant changes in backlog that reasonably might be expected to result in a revenue change the next period should be disclosed and discussed. However, VMware failed to disclose its practice of intentionally deferring revenue to smooth earnings and the impact on its current period results and future financial results. By failing to make the required disclosures in accordance with GAAP and SEC disclosure rules, VMware's Class Period financial statements and MD&A were misleading.

43. Additionally, during the Class Period, defendants continually touted their double digit revenue growth and expected future revenue growth. For example, during the Q4 2019 earnings call, VMware reported double-digit revenue growth over the prior year and defendant Rowe provided guidance for FY 2020 for total and license revenue growth in the double-digits over FY 2019. Unbeknownst to investors, defendants were planning to achieve such growth rates by deferring revenue to manipulate revenue growth rates. Without the artificial boost to FY 2020 revenue from the deferral of revenue intentionally held as backlog at the end of FY 2019, VMware would have been forced to disclose significantly lower revenues and growth rates in FY 2020. Such information about its revenue practices and impacts were required to be disclosed.

44. The significant financial impact of the earnings manipulation on VMware's future financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules. For example:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future ***operating performance*** or of future financial condition.
>
> * * *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that

readers can ascertain the likelihood that past performance is indicative of future performance.[2]

45. By deferring revenue to future quarters, VMware was aware that revenue in the current and subsequent quarters would be impacted. As a result, VMware was required to warn investors that its reported revenue was not indicative of future results.

**D. Defendants Announce Record-Breaking Backlog Despite a Slowdown in the Industry**

46. During the Q4 2019 earnings conference call for analysts and investors on February 28, 2019, defendant Gelsinger remarked that "Q4 was a terrific ending to a strong fiscal '19," with growth "driven by broad-based strength across our diverse product portfolio in all 3 geographies," adding defendants were "very pleased with this terrific quarter and fiscal '19." Defendant Rowe shared those sentiments, claiming "broad-based strength across the business," and "record results in both Q4 and fiscal '19 for license revenue." Commenting on the strength of the Company's license backlog, Rowe stated that VMware "exited Q4 with $147 million of license backlog compared to $144 million at the end of Q3."

47. Analysts were surprised by the Company's continued growth through the quarter, as other major technology companies were experiencing slowdowns. One analyst highlighted that VMware was not seeing the same weaknesses as other companies, including VMware's competitor Nutanix, and sought clarity into the reason for the divergence. In response, inferring that VMware was a "winner" in a market full of "winners and losers," defendant Gelsinger confirmed that he was "really happy with our performance."

**E. Following the Announcement of Record-Breaking License Backlog, VMware Executives Sell Nearly $60 Million of VMware Stock at Inflated Prices**

48. Knowing that the Company's massive backlog reported at the close of FY 2019 would be drawn upon and not replenished and thus was no longer an accurate metric regarding the

---

[2] SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* (Release Nos. 33-8350; 34-48960; FR-72), Effective Date: December 29, 2003.

Company's financial health, VMware's executives began selling large quantities of their VMware stock, as the share price was inflated to all-time highs.

49. Prior to the disclosure of the Company's declining license backlog at the end of Q1 2020, Individual Defendants and other executives unloaded millions in VMware stock. From March 1, 2019 – the day immediately following the Company's Q4 2019 positive earnings announcement (including record license backlog) – through May 2, 2019 – just ***one day*** prior to the close of Q1 2020 – VMware executives, including the Individual Defendants, unloaded $58.9 ***million*** in VMware stock at inflated prices, as high as $204.83 per share. *See* Figure 2, below.

50. Notably, on March 1, 2019, the day after defendants disclosed record license backlog to end Q4 2019, defendant Gelsinger alone sold over 21,000 shares of VMware stock to yield almost $3.8 million in proceeds. Lead Plaintiff purchased 396 shares four days later.

51. VMware's key executives responsible for managing the Company's day-to-day operations continued to sell millions of dollars of VMware stock prior to each quarterly corrective disclosure – a total of $118.6 million during the Class Period. *See* §IV.H.

### F. Defendants Draw Down the Backlog Slush Fund While Continuing to Falsely Reassure Investors

52. During the Company's Q1 2020 earnings call on May 30, 2019, just two weeks after VMware's stock price hit all-time highs following a remarkable end to FY 2019, defendants disclosed a drastic decline to the Company's license backlog. At the close of Q1 2020, VMware's license backlog fell ***over 67%*** from Q4 2019 to end at just $48 million. The same day, defendants revealed that VMware's Americas segment saw the departure of its leader in February 2019 and as a result it was forced to undergo a restructuring, which resulted in deal execution problems and a subsequent slowdown in revenue for that region in the first quarter of FY 2020.

53. Defendants' revelation that the Americas segment was facing weaknesses, coupled with the drastic decline in license backlog, caused investor concern, as it evidenced reduced demand for the Company's products and ability to generate deals recognizable in future periods. Following the Company's May 30, 2019 disclosures, VMware's stock price declined over 7%.

54. Analysts were surprised by both the slowdown in the Americas segment and the sharp decline in license backlog following VMware's strong Q4 2019. The day following the Company's Q1 2020 earnings announcement, Deutsche Bank Research flagged the issues for investors, in an analyst report titled "First Signs of Macro Weakness," attributing the Company's practice of deferring historical sales to subsequent quarters for the sharp decline in license backlog to close out Q1 2020:

> VMware said that the decision to realign/simplify US sales (new Sales leader, rep territory changes) was prompted by the Feb 2019 departure of America's head Brett Shirk (who joined Rubrik). ***We suspect that VMware's reluctance to raise its FY20 guide could also be driven by a desire to assess the impact of the sales changes****. . . .* ***The unbilled license backlog fell sharply to $48m from $147m in 4QF19, implying that a good portion of 1QF20 product billings were actually 4QF19 deals that got invoiced in 1QF20****.*

55. In the following weeks, analysts continued to highlight the surprising depletion in license backlog. In a June 13, 2019 analyst report, Barclays highlighted that "***backlog is a helpful leading metric***" to understanding the Company's financial position, and that there was "***an investor debate around the depletion in license backlog*** (defined as unfulfilled POs relating to licenses and saw 40% sequential decline) for the quarter."

56. Shortly thereafter, Deutsche Bank Research issued another report again highlighting the reduction in backlog. In its June 20, 2019 report, Deutsche Bank confirmed its previous report regarding the Company's realignment in its Americas segment "***caused some unexpected disruption***," and "***deals were impacted***." The Company spent the next several months "rebuilding [the] momentum in the Americas," that was lost in Q1 2020.

57. The bad news continued. On August 22, 2019 (Q2 2020), the Company announced another substantial decrease in its backlog – this time revealing that the Company's ***total*** backlog plummeted 74% from a Class Period high of $449 million at the end of FY 2019 just six months prior, to $117 million at the close of Q2 2020 – a decline of 35% from the prior quarter. Likewise, the Company announced another large drop in its license backlog – a 73% decline from the previous quarter, and a 91% decline over the course of six months – to end with just $13 million, signaling weakened demand for the Company's license products.

58. The same day, defendants also announced they were ***decreasing*** the Company's license revenue guidance for the second half of FY 2020. Though defendants repeatedly assured investors during the Class Period that the Company was successfully managing the industry-shift to subscription and SaaS products, defendants attributed the lowered full FY 2020 guidance to precisely that, the incremental mix shift toward subscription and SaaS. The shift to subscription and SaaS product offerings negatively impacted the revenue the Company would recognize, as it was ratably recognized over the subscription term, as opposed to license revenue that was recognized more swiftly. Following VMware's August 22, 2019 disclosures, the Company's stock price again dropped, falling from $148 per share to $133 per share – a decline of 10% – in one trading day.

59. Undeterred by the headwind the Company was facing on the timing of revenue recognition in the subscription and SaaS product offerings, defendants continued to tout the strength of its bookings pipeline heading into Q4 2020. During the earnings conference call for analysts and investors on November 26, 2019 following the close of Q3 2020, defendants assured the market that it remained "comfortable" with the balance of its revenue mix, and increased both FY 2020 total revenue and license revenue guidance.

60. The same day, however, defendants announced yet another significant reduction in the Company's total backlog – a drop of another 39% from Q2 2020, to end the quarter at just $71 million. In just nine months, VMware's total backlog fell over 84%. Yet again, the Company's revelations of declining backlog caused VMware's stock price to fall, this time nearly 6% in the two trading days following the Company's announcement.

### G. Defendants Gelsinger and Rowe Met with Key Executives Dozens of Times During the Class Period to Discuss Sales and Backlog

61. Defendants Gelsinger and Rowe met regularly with members of the Company's Operating group and other key executives to discuss sales-related activities and backlog.

62. On at least ten occasions during the Class Period, defendant Gelsinger organized meetings in his office with Chief Operating Officer of Customer Operations Sanjay Poonen, and Executive Vice President of Worldwide Sales and Services Maurizio Carli to discuss the Company's sales activities and updates ("Sales Activities Update" meetings). As Chief Operating Officer of

Customer Operations, Sanjay Poonen was responsible for leading VMware's front-office functions, including sales. In addition to Poonen and Carli, the meetings organized by defendant Gelsinger also included Vice President, Strategy, Planning & Operations for Americas, Magdeleine Bourgoin; and, on at least one occasion, Senior Director of Operations, Michael Hofer.

63. One Sales Activities Update meeting was organized for 4:30 p.m. on January 28, 2019, in defendant Gelsinger's office, just four days before the close of Q4 2019, the quarter in which VMware recorded record-breaking license backlog. Defendant Gelsinger organized another Sales Activities Update meeting with Chief Operating Officer of Customer Operations, Sanjay Poonen; Executive Vice President of Worldwide Sales and Services, Maurizio Carli; and Vice President, Strategy, Planning & Operations for Americas, Magdeleine Bourgoin, at 4:30 p.m. on February 22, 2019 (Q1 2020). The February 22, 2019 Sales Activities Update meeting was just one week after the Company's scheduled 4Q 2019 Sales Quarterly Business Review (described below) on February 14, 2019. These meetings occurred at a vital time during which VMware's Americas segment was undergoing a restructuring, which caused "disruption," and as a result, some "deals were impacted," negatively impacting revenue.

64. Defendant Gelsinger organized another Sales Activities Update meeting with Chief Operating Officer, Poonen; Executive Vice President Carli; and Vice President of Strategy, Planning, and Operations for Americas, Magdeleine Bourgoin, was scheduled in defendant Gelsinger's office for 12:00 p.m. on May 3, 2019, the last day of Q1 2020. The May 3, 2019, update meeting was less than 2 weeks before VMware's stock reached its Class Period high, and less than 4 weeks before VMware announced its first Class Period draw-down of backlog.

65. Earlier in the Class Period, Sales Activities Update meetings were scheduled about once a month. During Q2 2020, however, defendant Gelsinger organized 4-5 Sales Activities Update meetings with the Chief Operating Officer of Customer Operations; Executive Vice President of Worldwide Sales and Services; Vice President, Strategy, Planning & Operations for Americas; and, Senior Director of Operations, Michael Hofer.

66. In addition to the Sales Activities Update meetings, during the Class Period, defendants Gelsinger and Rowe would have met with members of the Company's Operations group

during Sales Quarterly Business Reviews (or QBRs) to discuss the Company's sales and pipeline. A typical Sales QBR provides a forum for senior executives, finance teams, and sales teams to discuss executed sales for the quarter that just ended, in addition to the risks and opportunities for the next quarter, allowing business leaders to update and finalize the business forecast based upon information gathered at the Sales QBR.

67. VMware's Sales QBR meetings were scheduled to be held in the Company's Stanford Conference Room at VMware's headquarters in Palo Alto, CA, and were typically scheduled to last several hours. VMware's Sales QBRs occurred 2-3 weeks after the end of the quarter, during the periods within which VMware would have been closing its quarterly/yearly financials by recording its closing entries and making adjustments and updating forecasts, just 10-14 days prior to the Company's official earnings announcements to analysts and investors.

68. Just two weeks prior to VMware's February 28, 2019, announcement of record-breaking license backlog, defendant Gelsinger was scheduled to attend the Q4 2019 Sales QBR. The February 14, 2019 Sales QBR provided an opportunity for defendant Gelsinger and other senior executives and insiders to learn, directly from the Operations group, about the Company's executed contracts, sales, backlog and financial forecast heading into FY 2020. The 4Q 2019 Sales QBR came at a pivotal time for VMware, as during the same month, VMware's Americas segment saw the departure of its leader, which VMware later revealed to have resulted in deal execution problems and a subsequent slowdown in revenue for that region in the first quarter of FY 2020.

69. On at least two occasions during the Class Period, Paula Delaney, then VMware's Vice President of Finance – Customer Operations & Revenue Accounting, who reported directly to defendant Rowe, organized the Sales QBRs. In her role, Ms. Delaney was responsible for leading a team of 300+ finance and accounting professionals, led the Company's Revenue Accounting team, which included revenue forecasting, deal assurance, and technical accounting with a focus on Accounting Standards Codification Topic 606, Revenue from Contracts with Customers (*see* ¶¶39-40) and organized a meeting surrounding the Company's backlog policy with defendants Gelsinger and Rowe during the Class Period (*see* ¶¶73, 166).

70. Ms. Delaney scheduled the Q1 2020 Sales QBR with defendants Gelsinger and Rowe, in addition to other Company insiders, including Chief Operating Officer of Customer Operations, Sanjay Poonen, Executive Vice President of Worldwide Sales and Services, Maurizio Carli, and Chief Accounting Officer Kevan Krysler. The May 20, 2019, Sales QBR, scheduled from 8:30 a.m. to 4:00 p.m. in VMware's Stanford Conference Room, provided an opportunity for leaders of VMware's Operations and finance groups to discuss Q1 2020 executed contracts as well as the Company's pipeline, and gave VMware's leaders an opportunity to update and finalize the business forecast based upon information gathered at the Sales QBR, heading into Q2 2020. Notably, the May 20, 2019 Sales QBR came just 4 days after VMware's stock reached its Class-Period peak, and just 10 days before VMware announced a drastic, 67% decline in license backlog on May 30, 2019.

71. The following quarter, Ms. Delaney organized another Sales QBR, again with defendants Gelsinger and Rowe, Chief Operating Officer of Customer Operations, Sanjay Poonen; Executive Vice President of Worldwide Sales and Services, Maurizio Carli; and, Chief Accounting Officer Kevan Krysler, among others. The August 14, 2019, Sales QBR was scheduled from 9:30 a.m. to 4:00 p.m. in the Stanford Conference Room at VMware's headquarters in Palo Alto, CA. The Q2 2020 Sales QBR provided an opportunity for leaders of VMware's Operations and finance groups to discuss Q2 2020 executed contracts, as well as the Company's pipeline heading into 3Q 2020, and gave VMware's leaders an opportunity to update and finalize the business forecast based upon information gathered at the Sales QBR heading into Q3 2020. Notably, the Q2 2020 Sales QBR was scheduled just one week prior to the Company's Q2 2020 earnings announcement for analysts and investors on August 22, 2019, the day defendants announced another significant reduction in backlog.

72. In addition to Sales Activities Update and Sales QBR meetings, during the Class Period, defendant Gelsinger, his executive assistant, and the Chiefs of Staff to the CEO, organized dozens of "Core Team" meetings. The Core Team consisted of defendants Gelsinger and Rowe, and other senior executives and Company insiders, including at least three Chief Operating Officers – Chief Operating Officer of Customer Operations, Sanjay Poonen; VMware's Chief Operating Officers of Products & Cloud Services, Raghu Raghuram and Rajiv Ramaswami; Chief Accounting

Officer, Kevan Krysler; and, corporate insiders including Executive Vice President of Worldwide Sales and Services, Maurizio Carli, and Senior Vice President, General Counsel Amy Fliegelman Olli. The Core Team meetings were typically scheduled to last 1-3 hours in the corporate boardroom at the Company's world headquarters in Palo Alto, CA. On several occasions during the Class Period, defendants Gelsinger and Rowe sold their shares of VMware stock just days after these important operating meetings at inflated prices.

73. In addition to the numerous Sales QBR, Sales Activities Update, and Core Team meetings throughout the Class Period, defendants Gelsinger and Rowe were also included in a Class Period meeting related to VMware's accounting for backlog. For example, on November 19, 2018 (Q4 2019), Paula Delaney, then VMware's Vice President of Finance – Customer Operations & Revenue Accounting, organized a backlog policy meeting at VMware's Hilltop Building A at VMware's worldwide headquarters in Palo Alto, CA. The meeting included defendants Gelsinger and Rowe, Chief Accounting Officer Kevan Krysler, Executive Vice President of Worldwide Sales and Services, Maurizio Carli, and VMware's most senior in-house attorneys, including Craig Norris (Vice President, Deputy General Counsel, Corporate Securities and M&A), Ana Iacovetta (Chief Ethics & Compliance Officer, Vice President and Deputy General Counsel) and Amy Fleigelman Olli (Senior Vice President, General Counsel) to discuss the Company's backlog policy. The November 19, 2018 backlog policy meeting was held at the beginning of Q4 2019, and came at a pivotal time for the Company as it continued to record quarterly increases in both license and total backlog throughout FY 2019, before defendants announced record-breaking backlog at the end of FY 2019.

### H. Defendants Disclose that Backlog Has Virtually Disappeared and that VMware's Accounting for Backlog Is Being Investigated by the SEC

74. On February 27, 2020, one year after VMware posted record-breaking backlog, defendants disclosed that ***despite*** the substantial backlog it had entering FY 2020, VMware was unable to meet license and total revenue guidance for Q4 2020 and FY 2020. The Company also revealed that total backlog had declined to only $18 million, which included just $5 million in license backlog – a staggering decline of 96% and 97% for total and license backlog, respectively,

from Q4 2019. As explained by defendant Rowe, the Company's backlog was a driver for the disappointing results as "in Q4 last year, we had . . . strong backlog that we were able to utilize." Defendant Rowe added that we were "disappointed in our ability to execute" at the end of the quarter.

75. In a Form 8-K filed with the SEC the same day, the Company also revealed it was subject to an ongoing SEC investigation into the Company's backlog of unfilled orders. Specifically, the Form 8-K advised investors that, "[i]n December 2019, the staff of the Enforcement Division of the [SEC] requested documents and information related to VMware's backlog and associated accounting and disclosures." The Form 8-K also advised investors that, although "VMware is fully cooperating with the SEC's investigation," it was "unable to predict the outcome of this matter at this time."

76. After regularly remarking over the course of the prior six quarters that the Company was weathering the industry shift away from license products in favor of subscription and SaaS products, defendants also finally revealed that the Company was in fact ***not*** managing the shift from license to subscription and SaaS revenue well. Defendants also disclosed that VMware failed to meet its license revenue growth targets for both Q4 2020 and FY 2020, and missed the Q4 2020 license revenue guidance defendants issued just three months prior by 5%. During the earnings conference call on February 27, 2020, defendant Gelsinger also revealed "revenue came in a bit short of expectations due to a higher mix of subscription and SaaS."

77. The revenue shift toward subscription and SaaS products resulted in VMware reclassifying its revenue line items to specifically include subscription and SaaS as an individual line item, along with license and services. This reclassification was necessary so that the Company's financial statements would finally reflect the nature of VMware's revenue streams as the industry shifted away from a license model, which was becoming obsolete, in favor of the subscription and SaaS model. Defendants further revealed that they "expect on-premises license revenue to fluctuate more on a quarter-by-quarter basis than what we've seen previously. This is driven by a higher percent of subscription and SaaS being sold as well as the variability of large deals between quarters that have historically had a large license revenue impact."

78. The Company's stock price plummeted on the news, closing at a 52-week low of $120.52 per share the next day – a one-day decline of over 11% – and a startling decline of over 41% from the Class Period high reached during Q1 2020.

79. Analysts were concerned about the decline in backlog and resultant SEC investigation. In a March 5, 2020 analyst report Deutsche Bank reported:

> **The SEC Request and VMware's Backlog**
>
> On the night of its earnings release last week, VMware also disclosed that the SEC "requested documents and information related to VMware's backlog and associated accounting and disclosures." VMware did not disclose any additional information but this has generated a few (not a ton of) questions from investors since the print. We believe that the document request related to VMware's "unbilled backlog" disclosure, not to more critical and conventional backlog numbers like RPO or DR. ***In 4QF20, VMware's "unbilled backlog" metric (different than the gap between DR and RPO) of $18 million was down massively from $449 million in the year-ago quarter. VMware refers to this as a measure of "extended pipeline," essentially signed or completed deals that have not yet been fulfilled or billed***. Frankly, we're unsure what to make of this metric as it only represents a fraction of VMware's pipeline, ***but needless to say the steep y/y decline doesn't make us feel great. Evidently the SEC has questions too***.

80. Throughout the Class Period, defendants touted the Company's strong financial performance and repeatedly affirmed broad-based strength and growth across its product portfolio in each of its three geographic segments, while utilizing deliberately inflated backlog numbers to conceal the truth that VMware's financial metrics were the product of an unsustainable license bookings revenue model that was becoming obsolete in the industry, and that the Company was plagued by decreased customer demand and execution problems, and weaknesses in its Americas segment.

81. While Lead Plaintiff and other members of the Class (as defined below) who purchased VMware shares at inflated prices have suffered hundreds of millions of dollars in harm as the truth entered the market, Company executives were able to unload over $93 million of their own VMware stock at inflated prices in FY 2020 as illustrated in the figure below.

Figure 2:




## V. THE SEC ORDER CONFIRMS THE BACKLOG SCHEME

82. On September 12, 2022, the SEC entered an Order Instituting Cease-and Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (the "SEC Order").

**83.** The SEC Order (included herein at ¶¶84-114 with original paragraph numbers from the SEC Order removed) contains detailed findings concerning the SEC's investigation into VMware's accounting for backlog and related disclosures.

84. The Securities and Exchange Commission ("Commission") deems it appropriate that cease- and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against VMware, Inc. ("VMware" or "Respondent").

85. In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except

as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

86. On the basis of this Order and Respondent's Offer, the Commission finds[3] that:

**Summary**

87. This matter concerns VMware's omission of material information in its disclosures concerning its order "backlog" and revenue management, in quarterly and annual Exchange Act reports, on earnings calls, and in earnings releases, during its 2019 and 2020 fiscal years (the "relevant period").[4] This information was necessary in order to make such statements, in light of the circumstances under which they were made, not misleading. Beginning with the adoption of a new accounting standard for its FY2019, VMware began discretionarily holding back some sales orders, which were otherwise ready to be booked and recorded as revenue in the current quarter, in an effort to delay revenue and control the timing of revenue recognition, which was important to the company. These discretionary holds, which VMware referred to internally as "managed pipeline" or "MPL," delayed the delivery of license keys to customers and thus, according to VMware's revenue recognition policy, delayed the recognition of license revenue to the next quarter or service revenue to future quarters as services were performed. As a result, VMware shifted tens of millions of dollars in revenue into future quarters.

88. VMware utilized discretionary holds if the company was on track to meet its financial guidance to securities analysts and investors. The holds then would be released shortly after the end of the quarter. This had the effect of increasing the amount of backlog that VMware reported in its Forms 10-Q and 10-K and delaying revenue recognition into future quarters. Beginning with its

---

[3] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[4] VMware's fiscal-year numbering runs nearly a full year ahead of the calendar year. The FY19- FY20 period at issue herein ran from February 3, 2018 through January 31, 2020. As a result, the Forms 10-Q and 10-K at issue herein relate to the quarters Q1 FY19 (Form 10-Q filed on June 11, 2018) through Q4 FY20 (Form 10-K filed on March 26, 2020).

Form 10-Q filed for Q1 FY19, VMware began disclosing in its filings that "[t]he amount and composition of [VMware's] backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography," but the disclosure omitted material information regarding the discretionary nature of VMware's backlog, the extent to which VMware controlled the amount of its backlog, and how backlog was used to manage the timing of the company's recognition of total and license revenue. In actuality, VMware's backlog practices during the relevant period were controlled for the purpose of determining in which quarters revenue would be recognized, and had the effect of obscuring the company's financial results and avoiding revenue shortfalls versus company financial guidance and analysts' estimates in at least three quarters during FY20, as well as full-year FY20.

**Respondent**

89. VMware, Inc. is a Delaware corporation based in Palo Alto, California. Its common stock has been registered pursuant to Exchange Act Section 12(b) and listed on the New York Stock Exchange since 2007. VMware primarily engages in the sale of cloud-storage software and services, in areas including hybrid cloud, multi-cloud, modern applications, networking and security, and digital workspaces.

**Facts**

***Background***

90. During the relevant period, VMware's backlog at the end of each reporting period consisted of the company's unfulfilled orders for software, maintenance, and related professional services. Under U.S. generally accepted accounting principles ("GAAP"), revenue is recognized upon transfer of control. VMware recognizes revenue upon delivery to customers of license keys to access on-premises or cloud-based software, or through delivery of services – such as technology support and consulting work – as such services are performed.

91. During FY19 and FY20, VMware controlled the timing of its revenue recognition by placing discretionary holds on selected sales orders, which delayed the delivery of license keys.

VMware employed discretionary holds when business objectives – including those for "bookings"[5] and revenue – had been achieved, in order not to exceed the company's revenue guidance by too much and as a way, in the words of VMware personnel, to start the next quarter with a buffer or more momentum than it might have had otherwise.

92. Through the use of discretionary holds, MPL orders were entered into VMware's system, but order booking – and the coincident, automated email delivery of license keys – was suspended until just after quarter-end, at which point the hold was released, the order booked, and revenue subsequently recognized.

***VMware's Backlog Disclosures and Practices***

93. During the relevant period, VMware disclosed a backlog metric in its quarterly and annual reports. That backlog metric included orders withheld from booking for both nondiscretionary and discretionary reasons, but did not disclose this. The largest category of nondiscretionary backlog consisted of orders held for regulatory export compliance reasons, but the great majority of backlog during the relevant period consisted of discretionarily held orders, or MPL.

94. Beginning with Q1 FY19 (*i.e.*, the company's June 11, 2018 Form 10-Q), the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of VMware's quarterly and annual reports disclosed, *inter alia*, that "[t]he amount and composition of [VMware's] backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography." This disclosure (the "managed backlog disclosure") was formulated by VMware senior finance and accounting personnel with review and opportunity for input from others, including senior management, the audit committee, and VMware's independent auditor, shortly before the Q1 FY19 Form 10-Q was filed. An earlier, filed version of the MD&A backlog disclosure first appeared in the Business section of VMware's FY16 Form 10-K, although without the "managed" language. The FY19 and FY20 Forms 10-K included the managed backlog disclosure in both the Business and MD&A sections of

[5] VMware's bookings are, essentially, non-cancellable customer orders that have been fully processed or "booked" within VMware's order management system. When an order is fully processed, the order management system automatically generates and delivers license keys for the software components of the order.

each report, while the Forms 10-Q during that time, which did not have a Business section, included the disclosure in MD&A.

95. Beginning in Q3 FY19 (*i.e.*, fall 2018), VMware formalized its internal MPL processes into a written "Bookings Finalization Process & Backlog" policy, which was drafted by VMware finance and accounting personnel. The written policy formally required the participation of VMware senior management in the managed pipeline process, through a regularly-scheduled meeting at or around Week 9 of each 13-week quarter. The policy further required that discretionary holds were to be discussed at the meeting and could be "value-based, product-based, geo[graphy]-based or any combination," and stated that such holds would be placed on or after Week 9. Decisions whether to release and book any discretionary holds for particular MPL orders were made in the final weeks, days, and hours of the quarter by VMware senior finance and accounting personnel. Preliminary quarterly-bookings and quarterly-MPL summaries were shared, essentially in real time, among VMware senior management.

96. License orders that were still in MPL at quarter-end were typically booked, and the license revenue recognized, within the first few days of the next quarter. Non-license, quarter-end MPL orders were also typically booked in the first week of the next quarter, with associated revenue recognition occurring based on the product in accordance with VMware's revenue recognition policy, potentially over multiple quarters, as services were performed.

***MPL Increases and Reductions: Fiscal Years 2019 and 2020***

97. Over the course of FY19, VMware's quarter-end MPL increased by approximately 50%, from roughly $273 million at the beginning of Q1 to about $409 million at the end of Q4, with license-related MPL orders ("license MPL"), in particular, increasing by approximately 32%, from nearly $94 million at the beginning of Q1 to nearly $124 million at the end of Q4. VMware's license revenue, license bookings, and license backlog were a particular focus of securities analysts during the relevant period because software licenses had historically been seen as the key driver of VMware's entire business. At the end of FY19, approximately 91% of VMware's reported total backlog of $449 million consisted of MPL, *i.e.,* discretionarily held orders, and roughly 84% of reported license backlog consisted of license MPL. The approximately $409 million in MPL at the

end of Q4 represented approximately 10% of all completed, ready-to-book VMware orders at the end of Q4 – the rest of which were in fact booked in Q4.

98. During the course of FY20, however, VMware's business continually slowed versus the expectations quantified in the company's own guidance and in analysts' revenue estimates. This occurred partially because of macro factors but also because VMware had accelerated its move to subscription-based software sales, which slowed the company's license revenue growth and shifted revenue from on-premises licenses with upfront revenue recognition upon delivery to cloud-based, subscription software requiring ratable revenue recognition over the term of the contract. However, VMware's quarter-over-quarter net reductions in the large end-of- quarter backlog numbers that it had initially carried into FY20 from FY19 obscured this shift. The existence and net (*i.e.*, quarter over quarter) reduction of that backlog throughout FY20 resulted in more revenue being recognized in each quarter than would otherwise have been recognized, allowing VMware to meet analyst estimates it would otherwise have missed. Internal FY20 emails at VMware noted the company's ongoing "use" or "burn[ing]" of MPL.[6]

99. Analysts who inquired about the continued trend in backlog reduction – with VMware's investor relations ("IR") staff or with VMware executives at organized IR events – were told that "[b]acklog only represents a small subset of our future revenues," without any disclosure regarding the largely discretionary nature of VMware's backlog and VMware's use of backlog to manage its quarterly total and license revenue.

***Revenue Impact of FY20 MPL Reductions***

100. VMware's net reduction in quarter-end license MPL was material to reported license revenue in Q1 FY20, enabling VMware to boost reported license revenue by approximately 11%. VMware's continual MPL reductions over the course of FY20 were likewise material, enabling the

[6] VMware effectively "used" discretionary backlog to increase revenue in a given quarter by choosing, at quarter's end, to carry over *less* MPL into the next quarter than it had carried into the current quarter, for a net reduction in quarterly MPL. VMware's net reductions in quarterly MPL during FY20, and its prior net increases in MPL during FY19, were undertaken to manage revenue to meet company guidance and analysts' expectations.

company to meet guidance and analyst estimates, or reducing the amount by which it missed guidance and/or estimates, during multiple quarters, for both total and license revenue.

101. In all, the MPL or discretionary component of VMware's total backlog fell each quarter during FY20, by a total of nearly 99% over the course of the entire fiscal year, from roughly $409 million at the end of Q4 FY19 to only, approximately, $4 million at the end of Q4 FY20, as the company essentially "used" or "burned" the entirety of its MPL. Moreover, VMware's license MPL fell in three of four quarters during FY20, by a total of nearly 100% over the course of the fiscal year, from nearly $124 million to approximately $0.1 million. By FY20 year-end, VMware's business had slowed to such an extent versus expectations that it was essentially no longer generating any perceived excess sales to "hold" as MPL. In parallel, VMware's stock price fell by approximately 37% from its closing price during trading on May 30, 2019, prior to the company's after-the-close announcement of Q1 FY20 results, to its closing price on February 28, 2020, the day following VMware's after-the-close announcement of Q4 FY20 and full-year FY20 results.

***Quarterly Earnings Calls***

102. VMware's earnings calls largely were scripted. Call scripts, including sample question-and-answer ("Q&A") scripts, were drafted by the IR department and reviewed in advance by VMware executives and the legal department.

103. VMware's Q1 FY20 earnings call cited the company's "consistency" and assured investors and analysts that the company was "seeing strong execution by our teams" and was "feeling quite good about the momentum that we see going into Q2 and for the second half." In the second quarter, VMware continued the narrative of strong growth, stating on its earnings call, "[W]e demonstrated strong performance . . . in all 3 geographies." All the while, VMware's internal Q&A preparation for the earnings calls anticipated analysts' concern with the "continued . . . decline" in total and license backlog numbers. Reports from analysts indicated that some of them had calculated and understood the revenue impact of VMware's backlog declines, but when asked about these declines subsequent to the Q1 and Q2 earnings calls, VMware provided only scripted replies, such as "[w]e are pleased with the performance of the quarter," and "[b]acklog is only one part of our overall sales pipeline."

104. On its Q3 FY20 earnings call, VMware dismissed questions from analysts regarding the apparent "gap" or "delta" between the "strong growth that VMware is seeing" and weak or mixed results seen from hardware vendors, citing "the ongoing strength of [VMware's] business" and affirming, "So yes, we feel good about the [Q4] guide. We feel good about our pipeline heading into Q4 . . . and the solid guide for the [fiscal] year." For its fourth quarter and full-year FY20 results, VMware changed the presentation of its financial results to account for a merger and to add a "subscription" revenue line item reflective of the increase in VMware's subscription-based software sales. Reconciliation with the prior presentation, provided in VMware's slides for its fourth quarter earnings call, showed substantial misses to guidance and analyst estimates for quarterly and full-year revenue despite the company's nearly total net depletion of quarter-end MPL. VMware acknowledged on the earnings call only that "for the quarter and year, revenue came in a bit short of expectations" and attributed the miss to "a higher mix of SaaS [*i.e.*, subscription] as well as . . . deal execution challenges . . . at the end of the quarter."

***VMware's Statements Were Misleading***

105. In making public statements regarding its backlog, VMware omitted material information regarding the extent to which the company controlled its quarter-end total and license backlog numbers through its use of discretionary holds, and the extent to which it used backlog to control the timing of revenue recognition generally. The managed backlog disclosure did not convey to investors the material information that backlog was used by VMware to manage the timing of revenue recognition based upon factors such as the company's financial guidance and analysts' estimates. This information was necessary in order to make VMware's statements regarding its backlog, in light of the circumstances under which they were made, not misleading.

106. In each quarter during FY20, VMware's practice of managing the timing of revenue recognition through its use of backlog enabled it to more closely match guidance and analyst estimates for its total and license revenue. Without disclosure regarding all material aspects of the backlog, investors lacked necessary information to meaningfully evaluate VMware's reported financial results and the extent to which those results might be indicative of future results. VMware

thus made materially misleading disclosures regarding its backlog practices in its FY19 and FY20 periodic reports.

107. Additionally, during FY20, VMware misleadingly reassured investors on quarterly earnings calls and in earnings-related press releases and other earnings materials furnished as Form 8-K attachments or made available on its website, that its revenue growth was meeting expectations, when revenue actually would not have met expectations or would have missed expectations by a larger amount without VMware's continual net reductions in its discretionary backlog. These statements were misleading by virtue of VMware's omission of material information regarding the full extent of its backlog practices.

108. Furthermore, FY20 year-over-year percentage increase figures provided by VMware on a quarterly basis for total and license revenue, on earnings calls and in the aforementioned materials, as well as in periodic filings, misleadingly portrayed the company's revenue growth. This was the case not only because the FY20 results were almost always higher than they would have been without VMware's quarter-end backlog reductions but also because the prior fiscal year's results had been generally held back by VMware's quarter-end backlog *increases* during FY19 – meaning FY19 orders that otherwise could have been booked had instead been discretionarily held in order to more closely track revenue to VMware's FY19 quarterly guidance and analysts' estimates.

109. The year-over-year percentage increase figures and disclosure omissions were material. As the company was aware, VMware's ability to meet guidance and analysts' estimates was material to its stock price. In fact, VMware specifically cited this as a "risk factor" in its Forms 10-K and 10-Q throughout the relevant period, as follows: "If our revenue or operating results fall below the expectations of investors or securities analysts or below any guidance we may provide to the market, the price of our Class A common stock would likely decline substantially." License revenue, in particular, was a specific focus of securities analysts who covered VMware's stock and was reported by VMware as a separate revenue line item in its financial statements. Without its FY20 quarter-end backlog reductions:

- VMware, in Q1, would have missed rather than met guidance and analyst consensus estimates for total revenue, and guidance for license revenue;

- VMware, in Q2, would have missed rather than met guidance for license revenue;
- VMware, in Q2 and Q3, may have missed guidance and analyst consensus estimates for total revenues, rather than meeting them; and
- VMware, in Q4 and full-year FY20, would have missed guidance and analyst consensus estimates for total revenue and guidance for license revenue, by substantially larger percentages than disclosed.

VMware's statements and omissions regarding its quarterly revenue and revenue growth, without disclosing the impact that the company's discretionary backlog practices and revenue management had on reported revenue, materially concealed a substantial FY20 slowing in the company's recognized revenue growth versus expectations.

110. Reasonable investors would have considered the foregoing information to have been important in deciding whether to purchase VMware securities during the relevant period. In addition, this was important information to analysts, who began questioning VMware's backlog "drawdown" following the company's Q1 earnings call and continued to question the continual reductions in quarter-end backlog numbers throughout the remainder of the fiscal year. VMware recognized the materiality of the issue when preparing its Q&A scripts.

***VMware Offered and Sold Securities During the Relevant Period***

111. During the relevant period, VMware offered and sold securities, including selling shares under the company's employee stock purchase plan, issuing restricted stock as compensation to certain employees under its employee incentive plan, and selling notes.

**Violations**

112. As a result of the conduct described above, VMware violated Sections 17(a)(2) and (3) of the Securities Act, which prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities. A violation of these provisions does not require *scienter* and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

113. Also as a result of the conduct described above, VMware violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13 and 12b-20 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and annual, current, and quarterly reports as the Commission may require – including information required by Regulation S-K Item 101(c) to be contained in annual reports – and mandate that periodic reports contain such further material information as may be necessary to make the required statements not misleading.

114. In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent VMware's Offer.

Accordingly, it is hereby ORDERED that**:**

A. Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and (a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder.

B. Respondent shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $8,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying VMware as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Jeffrey P. Weiss, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

C. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

115. After the market closed on August 23, 2018, defendants held the Company's Q2 2019 earnings call for investors and analysts. During the earnings call, defendant Rowe remarked that the Company "exited Q2 [2019] with $141 million of license backlog compared with $122 million at the end of Q1."

116. During the question and answer segment on the earnings call, defendant Gelsinger explained that VMware was experiencing a "strong cycle" that would carry the Company through the long-term and "well into the future":

> And I would just say, as I said in my formal comments, Mark, that we believe we are in a strong cycle. Customers are resonating with the VMware strategy. ***Our execution is good and the market for technology is strong. And those are not this quarter statements. Those are long-term statements where we think that the***

> ***business performance, our growth rates, the ability of customers to invest in the strategic product portfolio that we have. These are long-term trends and we believe that we're in a very good cycle for the business for not just this quarter, but well into the future.***

117. On September 11, 2018, VMware filed with the SEC its quarterly report on Form 10-Q providing the Company's financial and operating results for Q2 2019. Defendants Gelsinger and Rowe certified that the financial information in the 10-Q fairly represented, in all material respects, the financial condition and results of VMware's operations, and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

118. The Form 10-Q also stated that VMware's "total backlog was $320 million, generally consisting of licenses, maintenance and services. Our backlog related to licenses was $141 million, which [it] generally expect[s] to deliver and recognize as revenue during the following quarter."

119. Unbeknownst to analysts and investors, defendants knew or recklessly disregarded that the statements set forth in ¶¶82-85 above were each false and misleading or omitted material information necessary to make the statements not misleading, when made. The true facts, which were then known to, or recklessly disregarded by, the defendants based upon their access to and review of internal Company information, were:

(a) Defendants had misleadingly inflated license and total backlog by deferring current period sales to subsequent quarters; and

(b) The Company was experiencing an adverse shift toward subscription and SaaS product offerings, and its license model was becoming obsolete, impacting the rate at which VMware was able to recognize revenue.

120. After the market closed on November 29, 2018, the Company held its Q3 2019 earnings call with analysts and investors. During that call, defendant Rowe highlighted the strength of the Company's license backlog, informing analysts and investors that VMware "exited Q3 with $144 million of license backlog compared with $141 million at the end of Q2 [2019]. . . . As we've mentioned, license backlog is the license portion of unfulfilled orders at quarter end."

121. During the call, defendant Rowe also provided insight into FY 2020, stating "[w]e expect the strength we're seeing in the business to continue next year and are currently planning on total revenue growth of approximately 12% for FY '20, which includes accelerating our growth in hybrid cloud subscription and SaaS." Rowe continued, stating that the Company's increased guidance for FY 2020, and positive outlook for FY 2020 "***reflect the strength we continue to see in the business***."

122. During the question and answer segment of the earnings call, defendant Rowe responded to an analyst question, explaining that defendants were comfortable with the Company's revenue mix between license bookings and subscription and SaaS bookings, and felt "very confident heading into [FY 2020]":

> So we're very comfortable – if you take it all in aggregate, we're comfortable with that mix. ***We're comfortable with the SaaS mix and the hybrid cloud mix that we're growing here at VMware. It's obviously highlighted in the guide for Q4 as well as in the guide for FY '20. So nothing there I would call out other than the fact that the business is performing well and we feel very confident heading into the next year***.

123. An analyst from Deutsche Bank described that the Company's preliminary FY 2020 revenue growth of 12%, was "appreciably above" the growth that analyst was modeling, and questioned whether "there [are] any other variables that might explain that good number that you'd care to highlight?"

124. Defendant Gelsinger responded:

> Great. Thank you, Karl. ***Sounds like you need to update your model***. So we're well underway in planning for next year, Karl. And with that, we're building detailed models for – across all the product lines, business investments, et cetera. And as indicated, we felt it was the appropriate time to get some direction for where we expect to land next year. Overall, we're not expecting anything, I'll say, dramatic, right, with the economic view. We continue to believe that technology is well positioned in the broader economic, so we expect that we're well outgrowing the overall economy as tech spend has the last couple of years and as I've described it as tech breaking out of tech and what I've described as a superpower, mobility, cloud, IoT and AI, that these continue to be powerful trends that make technology more important in more areas of the business. But it isn't just those broader views. ***It really is that we're supporting that by the detailed planning that we're well underway with as we build our plan for next year and the product opportunities***. And Zane will describe a little bit more in the pieces inside of that as you're calling out, in particular with some of these new areas of revenue, hybrid cloud, SaaS opportunities, the new acquisitions contributing to that as well.

125. Defendant Rowe added, "[w]e're very pleased with the growth, as you all know, with all of the emerging parts of the portfolio that we would expect to see continued growth in next year."

126. In closing, defendant Gelsinger reiterated that the Company was continuing its strong performance, highlighting the strength the Company expected in FY 2020:

> Q3 was another strong quarter for us. We continue to be very pleased with the strong performance, our strategy, solutions as they resonate with customers. ***We also pleased to give you our preliminary outlook on fiscal 2020, and it really reflects the strength we continue to see in the business and our strategy***.

127. On December 10, 2018, VMware filed with the SEC its quarterly report on Form 10-Q providing the Company's financial and operating results for Q3 2019. Defendants Gelsinger and Rowe certified that the financial information in the Form 10-Q fairly represented, in all material respects, the financial condition and results of VMware's operations, and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

128. The Form 10-Q stated that VMware's "total backlog was $324 million." Of that total, the "backlog related to licenses was $144 million, which [the Company] generally expect[s] to deliver and recognize as revenue during the following quarter."

129. Unbeknownst to analysts and investors, defendants knew or recklessly disregarded that the statements set forth in ¶¶87-95 above were each false and misleading or omitted material information necessary to make the statements not misleading, when made. The true facts, which were then known to, or recklessly disregarded by, the defendants based upon their access to and review of internal Company information, were:

(a) Defendants had misleadingly inflated license and total backlog by deferring current period sales to subsequent quarters; and

(b) The Company was experiencing an adverse shift toward subscription and SaaS product offerings, and its license model was becoming obsolete, impacting the rate at which VMware was able to recognize revenue.

130. On February 28, 2019, VMware filed with the SEC a Form 8-K attaching a press release announcing the Company's results of operations for the quarter and fiscal year ended

February 1, 2019 (Q4 2019). In the press release, remarking on behalf of the Company, defendant Gelsinger stated "'Q4 was a terrific ending to a strong fiscal '19 driven by broad-based strength across our diverse product portfolio ***and in all three geographies***.'"

131. The same day, the Company held an earnings conference call for investors and analysts. During that call, Gelsinger touted that "***Q4 was a terrific ending to a strong fiscal '19***," with double-digit revenue growth "driven by broad-based strength across our diverse product portfolio ***and in all 3 geographies***."

132. Commenting on the strength of the Company's license backlog, Rowe stated that VMware "exited Q4 with $147 million of license backlog compared to $144 million at the end of Q3." Following the strong license growth to end FY 2019, the Company upwardly revised FY 2020 guidance.

133. Analysts were curious how VMware was experiencing continued revenue growth while other major tech companies were experiencing slowdowns. During the earnings call, one analyst at Deutsche Bank highlighted his concern about potential downturns in the industry:

> It felt to me like in 2018, that every single tech supplier exposed to infrastructure IT had a terrific year, but in the last month-or-so, we've seen weakness from Intel, NVIDIA, NetApp, HP, and now Nutanix tonight, and ***yet you just posted one of your strongest revenue growth quarters in years. And I'm wondering if you could just explain that apparent divergence***. Is it a function of the emerging products becoming a larger portion of the mix? Is it enterprise demand maybe transitioning from hardware to more software defined? Your thoughts will be welcome."

134. In response to the analyst's concerns, defendant Gelsinger reassured investors that VMware was "extremely" well-positioned to navigate the turbulent IT market as a tech "winner[]":

> Thanks, Karl, and yes, we are very happy with the quarter's performance. And we do continue to see that it will be a good IT market into the future overall. And as you've heard me talk about in the past, I see it as sort of tech breaking out of tech. More areas consuming technology, more areas of every business differentiating and it's no longer IT is buying technology, it's now every aspect of the business. So overall, we continue to see a good tech market. Now inside of that, hey, I think there's some turbulence. There's going to be winners and losers. We continue to see lots of questions on cloud, private and public cloud, and how hybrid cloud transitions. You're clearly going to see these normal cycles of over and undersupply as people are building up rapidly in different geos. Clearly, there is a whole lot of those other effects that are going to play out where I think we're going to see some winners and losers. ***When we look at that against our business, we've just positioned ourself, we believe, extremely well in many of these growth sectors. And we're no longer dependent on any geo or any individual product, but the real breadth of our portfolio is nicely rewarding us across the broad landscape of, we***

> ***believe a good tech market that's going to continue well into the future. And there will be winners and losers inside of that because there is so much change going on in the marketplace with these powerful trends. You might remember, I've talked about the 4 superpowers: cloud, mobility, AI and Edge and IoT, and all of those will have different effects of who's going to be the winners and losers inside of it. But it's a good market and really happy with our performance***. Thank you, Karl.

135. On March 29, 2019, VMware filed with the SEC its annual report on Form 10-K providing the Company's financial and operating results for the fiscal year ended February 1, 2019. Defendant Gelsinger signed the FY 2019 Form 10-K and defendants Gelsinger and Rowe certified that the financial information in the 10-K represented, in all material respects, the financial condition and results of VMware's operations, and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

136. The Form 10-K stated that license revenue "continued to benefit from broad-based growth across our diverse product portfolio and across our U.S. and international geographies."

137. The Form 10-K also stated that "As of February 1, 2019, our total backlog was approximately $449 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was approximately $147 million, which we generally expect to deliver and recognize as revenue during the following quarter."

138. Unbeknownst to analysts and investors, defendants knew or recklessly disregarded that the statements set forth in ¶¶97-104 above were each false and misleading or omitted material information necessary to make the statements not misleading, when made. The true facts, which were then known to, or recklessly disregarded by, the defendants based upon their access to and review of internal Company information, were:

(a) Defendants had misleadingly inflated license and total backlog by deferring current period sales to subsequent quarters;

(b) The Company was experiencing an adverse shift toward subscription and SaaS product offerings, and its license model was becoming obsolete, impacting the rate at which VMware was able to recognize revenue; and

(c) The Company was experiencing turmoil in its Americas region following the departure of its segment leader just weeks prior, resulting in a restructuring in that region, which compromised VMware's ability to execute deals and recognize revenue in that region.

139. On May 30, 2019, VMware filed with the SEC a Form 8-K attaching a press release announcing the Company's results of operations for the quarter ended May 3, 2019 (Q1 2020). The press release disclosed "[t]otal revenue growth of 13% year-over-year," total "[r]evenue for the first quarter was $2.27 billion, an increase of 13% from the first quarter of fiscal 2019," and "[l]icense revenue for the first quarter was $869 million, an increase of 12% from the first quarter of fiscal 2019." According to the Company, "[t]otal revenue plus sequential change in total unearned revenue grew 25% year-over-year," while "[l]icense revenue plus sequential change in unearned license revenue grew 23% year-over-year."

140. In the press release, remarking on behalf of the Company, defendant Gelsinger stated "'Q1 was a good start to fiscal 2020 with strength across our comprehensive solutions portfolio.'"

141. After market hours the same day, the Company held an earnings conference call for investors and analysts. During that call, defendant Gelsinger stated that the Company's "revenue for the quarter increased 13% year-over-year," and remarked that the Company was "***very well positioned to execute on our plans for the full year***."

142. Also during the earnings call, defendant Rowe reiterated that "[i]n Q1, total revenue grew 13% and license revenue increased 12% year-over-year," and detailed that the Company's "[g]rowth in revenue, plus the sequential change in unearned revenue for the quarter, was 25% or up 20% when excluding an ASC 606 reclassification adjustment, which reduced unearned revenue in Q1 of fiscal '19." At the same time, defendant Rowe stated, "[l]icense revenue, plus the sequential change in unearned license revenue, grew 23% year-over-year or up 17%, excluding the same 606 reclassification adjustment in Q1 of '19."

143. During the earnings call, defendant Rowe also informed investors that the Company's license backlog fell drastically from the prior quarter, stating "[w]e exited Q1 with $48 million of license backlog compared to $147 million at the end of Q4 FY '19." Rowe confirmed that Q1 2020 was a "***Q1 was a good start to FY '20, and we're maintaining our positive outlook for the year***,"

including full-year "total revenue growth of 11.8% year-over-year to $10.030 billion. . . . [and] [l]icense revenue growth of 12.8% to $4.275 billion." Defendant Rowe stated that "[f]or Q2 FY '20, total revenue is expected to be $2.425 billion, up 11.5% year-over-year with license revenue of $1 billion, an increase of 11.1% year-over-year." The Company's performance during Q1 2020, defendant Rowe stated, "***has us well positioned to execute on our plans for the year***."

144. For the second quarter in a row, analysts questioned how VMware was able to maintain such strong guidance when other infrastructure software companies had "soft quarter[s]," with a Jefferies LLC analyst asking how VMware was unaffected by the downturn in the market:

> And I don't want to spend too much time on that because it was really strong results here. But VMware side, I guess, Pat and Zane, too, if you have anything to contribute here, you have a view that we don't have, right? Like why do you think so many others are seeing some softness out there? Because they are. I mean, I got 3 companies tonight and you guys are a lot better than the other 2. I don't know.
>
> Is it – are there hardware issues out there? Like, with tariffs and other things, which has now trickled to infrastructure software and then apps? But that seems too early for something like that to happen. Do you have anything you can share with us here? And also, why hasn't this really affected you?

145. Again, defendant Gelsinger alluded that VMware was a "winner[]" in the tech market, which lead to the solid quarter:

> Thanks, John, for the comments. We do think that some of the macroeconomic effects, that will affect everybody, right, in that environment. ***As you've heard me say before, there's going to be some winners and losers on different technology trends inside of that***.
>
> Overall, we continue to be optimistic. We continue to be optimistic on the long-term view of the market, that IT growth is going to outpace GDP growth, enterprise as a software growth will outpace IT growth. We see this sort of tech breaking out of tech and more businesses, right, being – becoming centered on their technology differentiation.
>
> Clearly, some of the trade aspects, some of the different cyclicality going on affects different players. But overall, we remain optimistic. ***Our strategy is resonating well into the future and super pleased with the execution of my team to deliver a very solid quarter***.

146. Defendant Rowe echoed defendant Gelsinger's comments, citing the Company's "consistency" in the face of market volatility and uncertainty:

> John, I would just add to Pat's point. We're not immune to it. We feel good about the start of the year, as you pointed out, and we feel like we've had some consistency as we thought about the year and it's playing out to some degree and to some extent as we expected.

> I'll also point out the customer ROI for their investment in our product portfolio is strong. So I think that resonates. I think the strategy resonates and we're benefiting from that. I think some of what you're seeing across the broader landscape is some volatility and obviously uncertainty tied to the macroeconomic environment. ***But beyond that, we're comfortable with what we're seeing early and feel good about our forecast for the year***.

147. In response to another analyst's question, defendant Gelsinger stated he felt "comfortable" maintaining guidance for the first half of the year, but indicated the Company expected to see momentum heading into the second half of FY 2020:

> We are seeing strong execution by our teams that's continuing to give us strength. We think our strategy is well positioned for it. But it's still early in the year. We've got a lot of year to go execute yet with some of those uncertainties around us. ***And we're feeling quite good about the momentum that we see going into Q2 and for the second half***.

148. Defendant Rowe reiterated that defendants remained "comfortable with how [VMware is] positioned for the year," despite "some of our competitors seeing a little bit of weakness and some volatility and variability quarter-to-quarter."

149. On June 10, 2019, VMware filed with the SEC its quarterly report on Form 10-Q providing the Company's financial and operating results for the quarter ended May 3, 2019. In the Form 10-Q, the Company reported Q1 2020 total revenue of $2.266 billion, and license revenue of $869 million for the quarter.

150. Defendants Gelsinger and Rowe certified that the financial information in the Form 10-Q fairly represented, in all material respects, the financial condition and results of VMware's operations, and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

151. The Form 10-Q stated that license revenue "continued to benefit from broad-based growth across our diverse product portfolio and across our U.S. and international geographies."

152. The Form 10-Q also stated that "As of May 3, 2019, our total backlog was $180 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $48 million, which we generally expect to deliver and recognize as revenue during the following quarter."

153. Unbeknownst to analysts and investors, defendants knew or recklessly disregarded that the statements set forth in ¶¶106-119 above were each false and misleading or omitted material information necessary to make the statements not misleading, when made. The true facts, which were then known to, or recklessly disregarded by, the defendants based upon their access to and review of internal Company information, were:

(a) Defendants had misleadingly inflated license and total backlog by deferring current period sales to subsequent quarters;

(b) Had VMware recognized the revenue that was deferred into backlog during FY 2019 when it was in fact secured, VMware would have delivered only low single digit revenue growth for FY 2020;

(c) The Company was experiencing an adverse shift toward subscription and SaaS product offerings, and its license model was becoming obsolete, impacting the rate at which VMware was able to recognize revenue;

(d) The Company was not well positioned to execute for the year, because VMware lacked the ability to properly execute its pipeline and suffered from deal timing issues that negatively affected the Company's ability to meet revenue guidance; and

(e) Reported revenue was misleading as it included revenue from sales that were secured in, and should have been recognized in, FY 2019.

154. On August 22, 2019, VMware filed with the SEC a Form 8-K attaching a press release announcing the Company's results of operations for the quarter ended August 2, 2019 (Q2 2020). In the press release, the Company announced "Strong Q2 performance; Total revenue growth of 12% year-over-year," with total "[r]evenue for the second quarter [of] $2.44 billion, an increase of 12% from the second quarter of fiscal 2019," and "[l]icense revenue for the second quarter [of] $1.01 billion, an increase of 12% from the second quarter of fiscal 2019." The press release revealed total revenue of $2.439 billion, and license revenue of $1.011 billion, and that "[t]otal revenue plus sequential change in total unearned revenue grew 17% year-over-year," while "[l]icense revenue plus sequential change in unearned license revenue grew 12% year-over-year."

155. Remarking on behalf of the Company, defendant Gelsinger stated the Company was "'[b]uilding on another solid quarter,'" and defendant Rowe stated "'[w]e are pleased with our strong financial performance in Q2, which reflected broad-based strength in all three geographies.'"

156. After market hours the same day, the Company held an earnings conference call for investors and analysts, during which defendant Gelsinger reiterated "[t]otal revenue for the quarter increased 12% year-over-year," with defendant Rowe echoing "[w]e're pleased with our performance in Q2. We reported 12% year-over-year growth in total revenue and license revenue driven by strength across our broad products and solutions portfolio in all 3 geographies."

157. For the second quarter in a row, the Company reported a dramatic shift in license backlog. During the conference call, defendant Rowe reported that, at the end of Q2 2020, the Company "had license backlog of $13 million and total backlog of $117 million."

158. During the earnings call, defendant Rowe informed investors and analysts that "[w]e're forecasting growth in total revenue plus the sequential change in total unearned revenue to be approximately 13% year-over-year in the quarter and up about 2 percentage points versus Q3 FY '19."

159. During the earnings call, a Citigroup Inc. analyst asked whether the progression to subscription and SaaS products would "suppress license growth." In response, defendant Rowe confirmed that he believed the Company "can grow both the perpetual [license] side of the business as well as grow the SaaS side."

160. On September 9, 2019, VMware filed with the SEC its quarterly report on Form 10-Q providing the Company's financial and operating results for the quarter ended August 2, 2019. In the Form 10-Q, the Company disclosed total revenue of $2.439 billion, of which $1.011 billion was license revenue. Defendants Gelsinger and Rowe certified that the financial information in the Form 10-Q fairly represented, in all material respects, the financial condition and results of VMware's operations, and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

161. The Form 10-Q again stated that license revenue "continued to benefit from broad-based growth across our diverse product portfolio and across our U.S. and international geographies."

162. The Form 10-Q also stated that "[a]s of August 2, 2019, our total backlog was $117 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $13 million, which we generally expect to deliver and recognize as revenue during the following quarter."

163. Unbeknownst to analysts and investors, defendants knew or recklessly disregarded that the statements set forth in ¶¶121-129 above were each false and misleading or omitted material information necessary to make the statements not misleading, when made. The true facts, which were then known to, or recklessly disregarded by, the defendants based upon their access to and review of internal Company information, were:

(a) Defendants had misleadingly inflated license and total backlog by deferring current period sales to subsequent quarters;

(b) Had VMware recognized the revenue that was deferred into backlog during FY 2019 when it was in fact secured, VMware would have delivered only low single digit revenue growth for FY 2020;

(c) The Company was experiencing an adverse shift toward subscription and SaaS product offerings, and its license model was becoming obsolete, impacting the rate at which VMware was able to recognize revenue;

(d) The Company was not well positioned to execute for the year, because VMware lacked the ability to properly execute its pipeline and suffered from deal timing issues that negatively affected the Company's ability to meet revenue guidance; and

(e) Reported revenue was misleading as it included revenue from sales that were secured in, and should have been recognized in, FY 2019.

164. On November 26, 2019, VMware filed with the SEC a Form 8-K attaching a press release announcing the Company's results of operations for the quarter ended November 1, 2019 (Q3 2020). In the press release, the Company disclosed "[t]otal revenue growth of 12% year-over-year,"

with "[r]evenue for the third quarter [of] $2.46 billion, an increase of 12% from the third quarter of fiscal 2019," and "[l]icense revenue for the third quarter [of] $974 million, an increase of 10% from the third quarter of fiscal 2019."

165. The press release disclosed that "[t]otal revenue plus sequential change in total unearned revenue grew 18% year-over-year," or 12% year-over-year excluding the excluding the unearned revenue assumed by the Company with its acquisition of Carbon Black, while at the same time, "[l]icense revenue plus sequential change in unearned license revenue grew 21% year-over-year," or 13% excluding unearned revenue assumed during the acquisition.

166. In the press release, remarking on behalf of the Company, defendant Gelsinger stated "'***Q3 was another solid quarter for VMware, and we're pleased with our results***. We continue to see traction and customer momentum in support of VMware's vision to deliver a software architecture that enables any app, on any cloud, delivered to any device.'" Defendant Rowe echoed that sentiment, stating "'***[w]e're pleased with our financial performance and execution this quarter, which reflected broad-based strength across our product and solutions portfolio***.'"

167. After market hours the same day, the Company held an earnings conference call for investors and analysts. During that call, Defendant Gelsinger remarked that "Q3 was another solid quarter for VMware, and we're pleased with our results. We continue to see traction and customer momentum in support of VMware's vision to deliver a software architecture that enables any app, on any cloud, delivered to any device." Defendant Gelsinger disclosed "[i]n Q3, total revenue increased 12% year-over-year."

168. Defendant Rowe again touted the Company's performance, stating "[w]e're pleased with our financial performance and execution this quarter, which resulted in total revenue growth of 12% and license revenue growth of 10% year-over-year."

169. For the third quarter in a row, defendant Rowe announced a significant reduction in the Company's license backlog, stating "[a]t quarter end, we had license backlog of $33 million and total backlog of $71 million."

170. As a result of the Company's Q3 2020 performance, defendants increased guidance for the full-year FY 2020. Defendant Rowe disclosed, "[f]or the full year, we are projecting an

increase in total revenue to $10,100,000,000, up 12.5% year-over-year. This includes the addition of Carbon Black's financials post close, which accounts for the largest portion of the revenue increase. We expect license revenue of $4,245,000,000 for FY '20, up 12% year-over-year." As for the final quarter of FY 2020, defendant Rowe stated, "[m]oving to our Q4 guidance. License revenue is expected to be $1,390,000,000, an increase of 13% year-over-year, and total revenue is expected to be $2,950,000,000, up 13.8% year-over-year."

171. During the question and answer session of the earnings call, defendant Rowe reiterated that the Company saw strength in Q3 2020, and expected that strength to continue with a solid pipeline of bookings heading into Q4 2020, which was reflected in the Company's Remaining Performance Obligations ("RPO") line item, within which license backlog was included:

> As you point out, we saw really good booking strength in the quarter. And we have a solid guide for the rest of the year. I talked about RPO, which, for the third quarter, was $8.5 billion, which has also grown nicely year-over-year, ***reflecting the ongoing strength of the business. So yes, we feel good about the guide. We feel good about our pipeline heading into Q4***.

172. Responding to a separate analyst question about the Company's revenue guidance for Q4 2020 and FY 2021, defendant Rowe again reiterated that VMware's revenue guidance was driven by the Company's pipeline heading into Q4 2020:

> But again, if you recall, the guide also highlighted some of the growth that we're anticipating for the second half of the year based on what we said last quarter. So ***we feel really good about the pipeline heading into the fourth quarter and the solid guide for the year***.

173. The revenue mix shift from licenses to subscription and SaaS was important to analysts. When specifically asked by a Mizuho Securities USA LLC analyst whether the Company anticipated a "headwind on revenue growth" due to the slower revenue recognition stream of subscription and SaaS. Defendant Rowe assured the analysts and investors that the Company "feel[s] good about the trajectory heading into next year,"

> Yes. It's a great question. I'm not sure it's as good as Pat's. But as we called out, as we called out in the third quarter, it was more pronounced on the license revenue side, and what we've generally done is steered you more towards total revenue and with the strength we've seen in the third quarter, candidly, in both categories. I mean as you know, hybrid cloud subscription and SaaS, while we get the bookings now, we recognize the revenue over an extended period of time. And that's sort of the nuance when you're thinking about the balance between license revenue versus hybrid cloud subscription SaaS. That's sort of the balance that we

> were contemplating in the third quarter. And we mentioned, with that strength, we saw the guide continue through the year.
>
> So there's always a little bit of headwind, especially as you're growing that just because you essentially recognize the revenue slightly differently. We wouldn't call it out specifically as far as a percent because I think all of our – when we think about those businesses, they're all in different points on the maturity curve. ***But in aggregate, you're right, there's always that balance when you're considering a perpetual model versus the SaaS model, but we're comfortable with that balance. We've maintained the annual guide. We feel good about the trajectory heading into next year***.

174. On December 6, 2019, VMware filed with the SEC its quarterly report on Form 10-Q providing the Company's financial and operating results for the quarter ended November 1, 2019. In the Form 10-Q the Company disclosed total revenue of $2.456 billion, and license revenue of $974 million. Defendants Gelsinger and Rowe certified that the financial information in the Form 10-Q fairly represented, in all material respects, the financial condition and results of VMware's operations, and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

175. The Form 10-Q again stated that license revenue "continued to benefit from broad-based growth across our diverse product portfolio and across our U.S. and international geographies."

176. The Form 10-Q also stated that "[a]s of November 1, 2019, our total backlog was $71 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $33 million, which we generally expect to deliver and recognize as revenue during the following quarter."

177. Unbeknownst to analysts and investors, defendants knew or recklessly disregarded that the statements set forth in ¶¶131-143 above were each false and misleading or omitted material information necessary to make the statements not misleading, when made. The true facts, which were then known to, or recklessly disregarded by, the defendants based upon their access to and review of internal Company information, were:

(a) Defendants had misleadingly inflated license and total backlog by deferring current period sales to subsequent quarters;

(b) Had VMware recognized the revenue that was deferred into backlog during FY 2019 when it was in fact secured, VMware would have delivered only low single digit revenue growth for FY 2020;

(c) The Company was experiencing an adverse shift toward subscription and SaaS product offerings, and its license model was becoming obsolete, impacting the rate at which VMware was able to recognize revenue;

(d) The Company was not well positioned to execute for the year, because VMware lacked the ability to properly execute its pipeline and suffered from deal timing issues that negatively affected the Company's ability to meet revenue guidance; and

(e) Reported revenue was misleading as it included revenue from sales that were secured in, and should have been recognized in, FY 2019.

## VII. ADDITIONAL SCIENTER AND MATERIALITY ALLEGATIONS

178. During the Class Period, defendants were in possession of material nonpublic information concerning VMware's operations, finances, financial condition, and future business prospects, including, but not limited to, the true facts referenced above. Notwithstanding their duty to refrain from trading in VMware common stock, without disclosing the foregoing materially adverse nonpublic facts, the Individual Defendants and other VMware executives sold 702,270 shares of VMware common stock during the Class Period at highly inflated prices, while in possession of material nonpublic information.

179. During the Class Period defendant Gelsinger sold $23.4 million of VMware stock (over 141,000 shares) at inflated prices while in the possession of material non-public information. In contrast to his large Class Period stock sales, prior to the start of the Class Period, defendant Gelsinger sold ***no*** VMware stock in the 18 months directly preceding the Class Period. In fact, despite the vesting of defendant Gelsinger's exercisable shares as early as 2014, defendant Gelsinger sold none of his VMware stock until September 2018, just after the start of the Class Period.

180. On March 1, 2019, the day after the Company disclosed record-breaking license backlog, defendant Gelsinger sold 21,086 shares of his VMware stock at prices as high as $181.61 per share for proceeds of $3.77 million.

181. During the Class Period, defendant Rowe sold 104,218 shares of VMware stock at inflated prices while in the possession of material nonpublic information to yield proceeds of $17.8 million. Notably, in the 18 months preceding the Class Period, defendant Rowe made only two transactions, selling a total of only 13,100 shares for $1.76 million in proceeds. In contrast, during the Class Period defendant Rowe sold 104,218 shares for proceeds of more than $17.8 million, an increase of ***915%***.

182. In total, VMware executives sold over 702,000 shares of stock during the Class Period at inflated prices for proceeds in excess of $118.6 million. These sales, together with certain key meetings between executives and other relevant insiders, are summarized in the following chart:

**VMware.com (VMW) 08/24/2018 – 2/27/2020 Executive Sales and Key Meetings Summary**

| Filer Name | Transaction Date | Price | Shares Sold | | Proceeds |
|---|---|---|---|---|---|
| Carli Maurizio | 9/7/2018 | $152.54 | 3,779 | $ | 576,449 |
| | 11/19/2018 | Backlog Policy Meeting | | | |
| Executive Vice President, Worldwide Sales and Services | 1/11/2019 | Core Team Meeting | | | |
| | 1/11/2019 | $147.58 | 1,989 | $ | 293,537 |
| | 1/11/2019 | $146.74 | 34,859 | $ | 5,115,210 |
| | 3/12/2019 | $174.25 | 5,446 | $ | 948,966 |
| | 4/2/2019 | $182.63 | 14,000 | $ | 2,556,820 |
| | 4/2/2019 | $183.60 | 13,647 | $ | 2,505,589 |
| | 10/8/2019 | Week 10 Review Meeting | | | |
| | 10/11/2019 | $156.37 | 26,899 | $ | 4,206,197 |
| | 12/12/2019 | $154.20 | 2,075 | $ | 319,965 |
| | **Class Period Total:** | | **102,694** | **$** | **16,522,731** |
| Gelsinger (Patrick P) | 9/4/2018 | $152.61 | 11,804 | $ | 1,801,408 |
| Chief Executive Officer | 9/4/2018 | $150.69 | 1,602 | $ | 241,405 |
| | 9/4/2018 | $151.84 | 11,594 | $ | 1,760,433 |
| | 11/7/2018 | $150.00 | 25,000 | $ | 3,750,000 |
| | 11/19/2018 | Backlog Policy Meeting | | | |
| | 1/11/2019 | Core Team Meeting | | | |
| | 1/11/2019 | $146.64 | 18,058 | $ | 2,648,025 |
| | 1/11/2019 | $147.37 | 9,437 | $ | 1,390,731 |
| | 1/11/2019 | $145.56 | 2,600 | $ | 378,456 |
| | 3/1/2019 | $180.51 | 1,965 | $ | 354,702 |
| | 3/1/2019 | $179.51 | 4,792 | $ | 860,212 |
| | 3/1/2019 | $181.61 | 900 | $ | 163,449 |
| | 3/1/2019 | $177.62 | 4,452 | $ | 790,764 |

| | | | | | |
|---|---|---|---|---|---|
| | 3/1/2019 | $176.52 | 1,500 | $ | 264,780 |
| | 3/1/2019 | $178.55 | 7,477 | $ | 1,335,018 |
| | 4/10/2019 | Discussion on Stock | | | |
| | 4/12/2019 | Sales Activities Update Meeting | | | |
| | 5/1/2019 | $204.83 | 5,786 | $ | 1,185,146 |
| | 5/1/2019 | $203.85 | 9,113 | $ | 1,857,685 |
| | 5/1/2019 | $202.89 | 5,101 | $ | 1,034,942 |
| | 7/3/2019 | Core Team Meeting | | | |
| | 7/10/2019 | Core Team Meeting | | | |
| | 7/16/2019 | Core Team Meeting | | | |
| | 7/17/2019 | Core Team Meeting | | | |
| | 7/18/2019 | Sales Activities Update Meeting | | | |
| | 7/19/2019 | Week 10 Review Meeting | | | |
| | 7/19/2019 | $180.00 | 20,000 | $ | 3,600,000 |
| | **Class Period Total:** | | **141,181** | **$** | **23,417,158** |
| Krysler (Patrick Kevan) | 9/20/2018 | $152.28 | 4,984 | $ | 758,964 |
| Chief Accounting Officer | 4/3/2019 | $185.78 | 4,749 | $ | 882,269 |
| | 4/3/2019 | $184.86 | 3,800 | $ | 702,468 |
| | 4/4/2019 | $180.75 | 3,444 | $ | 622,503 |
| | 6/11/2019 | $173.96 | 2,661 | $ | 462,908 |
| | 9/10/2019 | $145.00 | 1,589 | $ | 230,405 |
| | **Class Period Total:** | | **21,227** | **$** | **3,659,516** |
| Olli Amy Fliegelman | 9/20/2018 | $152.77 | 1,500 | $ | 229,155 |
| | 11/19/2018 | Backlog Policy Meeting | | | |
| Senior Vice President, General Counsel | 3/14/2019 | $178.98 | 1,723 | $ | 308,383 |
| | 4/22/2019 | $189.32 | 100 | $ | 18,932 |
| | 4/22/2019 | $188.69 | 1,400 | $ | 264,166 |
| | 4/22/2019 | $187.58 | 957 | $ | 179,514 |
| | 9/9/2019 | Core Team Meeting | | | |
| | 9/10/2019 | $150.00 | 2,753 | $ | 412,950 |
| | 10/2/2019 | $151.62 | 1,228 | $ | 186,189 |
| | **Class Period Total:** | | **9,661** | **$** | **1,599,289** |
| Poonen Sanjay | 1/8/2019 | $145.55 | 3,400 | $ | 494,870 |
| Chief Operating Officer, Customer Operations | 1/8/2019 | $146.27 | 5,056 | $ | 739,541 |
| | 1/9/2019 | $149.98 | 7,679 | $ | 1,151,696 |
| | 3/18/2019 | $182.60 | 50,000 | $ | 9,130,000 |
| | 4/12/2019 | Sales Activities Update Meeting | | | |
| | 4/15/2019 | $191.97 | 30,000 | $ | 5,759,100 |
| | **Class Period Total:** | | **96,135** | **$** | **17,275,208** |
| Raghuram (Rangarajan) | 3/11/2019 | $169.77 | 14,412 | $ | 2,446,725 |
| Chief Operating Officer, Products & Cloud | 3/11/2019 | $170.55 | 21,899 | $ | 3,734,874 |
| | 4/1/2019 | $182.39 | 13,000 | $ | 2,371,070 |
| | 4/1/2019 | $184.15 | 200 | $ | 36,830 |

| | | | | | |
|---|---|---|---|---|---|
| | 4/1/2019 | $181.20 | 4,800 | $ | 869,760 |
| | 4/1/2019 | $183.03 | 27,741 | $ | 5,077,435 |
| | 8/29/2019 | Core Team Meeting | | | |
| | 9/3/2019 | $141.02 | 2,459 | $ | 346,768 |
| | 9/3/2019 | $140.58 | 22,319 | $ | 3,137,605 |
| | 10/2/2019 | $151.62 | 2,150 | $ | 325,983 |
| | 10/28/2019 | Core Team Meeting | | | |
| | 11/4/2019 | $163.87 | 13,629 | $ | 2,233,384 |
| | 11/4/2019 | $162.99 | 10,283 | $ | 1,676,026 |
| | 11/4/2019 | $164.67 | 800 | $ | 131,736 |
| | **Class Period Total:** | | **133,692** | **$** | **22,388,198** |
| Ramaswami (Rajiv) | 9/14/2018 | $160.00 | 6,000 | $ | 960,000 |
| Chief Operating Officer, Products & Cloud | 11/2/2018 | $142.92 | 3,575 | $ | 510,939 |
| | 11/2/2018 | $144.64 | 3,670 | $ | 530,829 |
| | 11/2/2018 | $143.65 | 5,100 | $ | 732,615 |
| | 4/2/2019 | $184.68 | 4,430 | $ | 818,132 |
| | 5/2/2019 | $200.34 | 1,800 | $ | 360,612 |
| | 5/2/2019 | $199.05 | 1,902 | $ | 378,593 |
| | 5/2/2019 | $198.46 | 4,068 | $ | 807,335 |
| | 5/2/2019 | $202.19 | 3,665 | $ | 741,026 |
| | 5/2/2019 | $201.41 | 3,427 | $ | 690,232 |
| | 5/31/2019 | Core Team Meeting | | | |
| | 6/4/2019 | $171.63 | 4,773 | $ | 819,190 |
| | 6/4/2019 | $170.85 | 18,533 | $ | 3,166,363 |
| | 6/4/2019 | $169.93 | 15,507 | $ | 2,635,105 |
| | 10/2/2019 | $151.62 | 2,150 | $ | 325,983 |
| | 10/28/2019 | Core Team Meeting | | | |
| | 11/4/2019 | $163.22 | 8,238 | $ | 1,344,606 |
| | 11/4/2019 | $163.99 | 6,424 | $ | 1,053,472 |
| | 11/4/2019 | $164.73 | 200 | $ | 32,946 |
| | **Class Period Total:** | | **93,462** | **$** | **15,907,979** |
| | | | | | |
| Rowe (Zane C) | 11/19/2018 | Backlog Policy Meeting | | | |
| Executive Vice President and Chief Financial Officer | 12/10/2018 | Core Team Meeting | | | |
| | 12/12/2018 | $165.08 | 6,500 | $ | 1,073,020 |
| | 4/2/2019 | $183.56 | 27,530 | $ | 5,053,407 |
| | 4/2/2019 | $182.61 | 17,990 | $ | 3,285,154 |
| | 4/2/2019 | $184.26 | 3,110 | $ | 573,049 |
| | 6/11/2019 | Core Team Meeting | | | |
| | 6/13/2019 | $175.52 | 7,920 | $ | 1,390,118 |
| | 6/13/2019 | $174.86 | 13,208 | $ | 2,309,551 |
| | 6/13/2019 | $176.71 | 1,451 | $ | 256,406 |
| | 8/29/2019 | Core Team Meeting | | | |
| | 9/5/2019 | $148.18 | 3,656 | $ | 541,746 |

| | | | | | |
|---|---|---|---|---|---|
| | 9/5/2019 | $148.85 | 2,900 | $ | 431,665 |
| | 9/5/2019 | $147.08 | 13,444 | $ | 1,977,344 |
| | 12/6/2019 | $148.38 | 6,309 | $ | 936,129 |
| | 12/6/2019 | $148.89 | 200 | $ | 29,778 |
| | **Class Period Total:** | | **104,218** | **$** | **17,857,367** |
| | **Class Period Grand Total:** | | **702,270** | **$** | **118,627,445** |

183. The executives' Class Period sales were dramatically out of line with the executives' prior trading practices. During the 18 months prior to the Class Period (February 23, 2017 to August 23, 2018), VMware executives collectively sold only 251,867 shares of VMware stock, for proceeds of under $31.8 million.[7] Thus the total number of shares sold, and proceeds received during the Class Period, by VMware's executives increased by 179% and 272%, respectively.

184. The executive sales were also suspicious in timing as they occurred at times calculated to maximize personal benefit from undisclosed inside information. As demonstrated above, VMware executives sold $84.1 million in VMware stock between August 2018 and May 2019, at inflated prices as high as $204.83 per share (just $0.69 shy of VMware's all-time high), during the period that backlog was increased by deferring current period sales into future periods.

185. On December 12, 2018, just two days after the Core Team's scheduled FY 2020 Sales Compensation meeting, defendant Rowe sold 6,500 shares for proceeds of over $1 million, when VMware's backlog was reaching all-time highs in Q4 2019.

186. As illustrated in the chart above, from March 1, 2019 – the day immediately following the Company's FY 2019 positive earnings announcement of record-breaking backlog numbers – through May 2, 2019 – just ***one day*** prior to the close of Q1 2020 – VMware executives, including the Individual Defendants, unloaded $58.9 ***million*** in VMware stock at inflated prices, as high as $204.83 per share.[8] Thus, ***50%*** of the executives' sales during the Class Period were made in

[7] Pre-Class Period executive transactions include 11,167 shares of stock sold by Sybil Dawn Smith, VMware's former Senior Vice President, Chief Legal Officer and Chief Compliance Officer, in March 2017 for proceeds of just under $1 million. Ms. Smith departed VMware in May 2017, and accordingly, had no Class Period transactions.

[8] This included almost $4 million in sales (21,086 shares) by defendant Gelsinger alone on March 1, 2019, the day after the Company's 4Q 2019 earnings call, and just three days before the

the ***3-month period*** between the Company's announcement of all-time high license backlog on February 28, 2019, and the time the Company announced a drastic, 67% decline in license backlog on May 30, 2019. Over 48,000 of those shares (over $8.9 million) were sold by defendant Rowe on April 2, 2019, just four days after the Company filed its 2019 Form 10-K on March 29, 2019, which highlighted record-breaking total backlog and license backlog of $449 million and $147 million, respectively (*see* ¶¶102-104). And, defendant Gelsinger alone sold 20,000 shares on May 1, 2019, just two days before the close of Q1 2020, at prices near the Company's all-time high, for proceeds of approximately $4 million.

187. Defendant Gelsinger's May 1, 2019 sales came just after Gelsinger organized key meetings with Company insiders. Notably, on April 10, 2019, defendant Gelsinger organized a "Discussion on Stock" meeting in his office to discuss the Company's stock with Company insiders Betsy Sutter (Corporate Senior Vice President and Chief People Office), Amy Fleigelman Olli (Senior Vice President, General Counsel), and Claire Dixon (Senior Vice President Chief Communications Officer). Two days later, on April 12, 2019, defendant Gelsinger organized a Sales Activities Update meeting with Chief Operating Officer of Customer Operations, Sanjay Poonen and Executive Vice President of Worldwide Sales and Services, Maurizio Carli.

188. On April 15, 2019, just three days after his scheduled Sales Activities Update meeting with defendant Gelsinger, Chief Operating Officer of Customer Operations Sanjay Poonen sold over $5.7 million in Company stock.

189. The executives' suspicious trading continued throughout the Class Period, as defendants and other executives took advantage of the artificial inflation in VMware's stock price, repeatedly selling their shares in FY 2020 prior to each disclosure of declining backlog. Between June 4, 2019 and August 2, 2019 (the close of Q2 2020), the Company's executives sold an additional 84,053 shares of VMware stock at inflated prices for $14.6 million in proceeds.

190. Defendant Rowe's June 13, 2019 sale of over 22,500 shares for proceeds of nearly $4 million came just two days after a June 11, 2019 Core Team Meeting in Palo Alto. A third sale by

---

Company issued a press release announcing the replacement of its Americas segment leader on March 4, 2019. *See* ¶¶50, 147, 149 above.

defendant Rowe resulted in proceeds of over $2.950 million (20,000 shares) just one week after the August 29, 2019, Core Team meeting in the Company's boardroom.

191. On July 19, 2019, the day immediately following the July 18, 2019 Sales Activities Update meeting with Chief Operating Officer of Customer Operations, Sanjay Poonen and Executive Vice President of Worldwide Sales and Services, Maurizio Carli, and the July 16, and July 17, 2019, Core Team meetings, all organized by defendant Gelsinger, Gelsinger sold $3.6 million of VMware stock (20,000 shares). Defendant Gelsinger's July 19, 2019 stock sale also came on the same day as a "Week 10 Review" meeting organized by Paula Delaney, then Vice President of Finance – Customer Operations & Revenue Accounting, a topical business review meeting presumably to update defendants Gelsinger and Rowe, as well as other corporate insider attendees, including Chief Operating Officer of Customer Operations Sanjay Poonen; Chief Accounting Officer Kevan Krysler; Executive Vice President of Worldwide Sales and Services Maurizio Carli; and, Senior Vice President, General Counsel Amy Fliegelman Olli, on the Company's operations for the first 10 weeks of Q2 2020.

192. Between September 3, 2019 and November 1, 2019 (the close of Q3 2020), the Company's executives sold an additional 81,547 shares of VMware stock at inflated prices for proceeds of $12.1 million.

193. After the close of Q3 2020 but before the Company announced its Q4 2020 results including further declines in backlog, VMware executives sold an additional 48,158 shares of VMware stock at inflated prices for proceeds of $7.8 million.

194. The above stock sales were each close in time and proximity to the Company's Class Period misrepresentations and partial disclosures of declining backlog and were made while the executives were in possession of material nonpublic information obtained within the scope of running the Company's day-to-day operations. By selling the above VMware shares, defendants Gelsinger and Rowe and the other VMware executives were able to avoid the significant losses in share value that followed from the disclosure of declining backlog. VMware executives sold substantial amounts of their VMware shares at artificially inflated prices before the full truth about VMware's misleading practices was revealed.

195. Throughout the Class Period, VMware's financial operations were overseen by defendants Gelsinger and Rowe. They also repeatedly spoke on investor conference calls with analysts concerning the Company's financial results. Defendants Gelsinger and Rowe had in place extensive processes to track VMware's financial performance, including backlog, on a daily, quarterly, and yearly basis.

196. One such tool was the Company's automatic booking system, Salesforce, which conveyed to the Company's most senior executives, including defendants Gelsinger and Rowe, details surrounding the Company's then-existing executed contracts in real time. Executed contracts were directed through the automatic booking system to the Operations group at the Company's headquarters for clearing. Salespeople lacked the authority to bypass the automatic booking system to delay contracts. As seniority progressed, so did authority and visibility into executed contracts pending in the automatic booking system.

197. As the Company's most senior executives, defendants Gelsinger and Rowe had exposure to all contract detail in the automatic booking system, and were able to observe contract activity as it occurred. Defendants Gelsinger and Rowe met regularly with senior members of the Operations group during Sales QBRs and Sales Activities Update meetings to discuss and review sales and pipeline.

198. Due to their positions as CEO and CFO, defendants Gelsinger and Rowe stood to benefit from the holding back of executed contracts to meet but not exceed Wall Street's expectations – in contrast, the salespeople who entered the contracts into the automatic booking system would be disadvantaged by the delay in revenue recognition, as it negatively affected their compensation.

199. Defendants Gelsinger and Rowe were also included in meetings related to VMware's accounting for backlog. For example, on November 19, 2018, Paula Delaney, then VMware's Vice President of Finance – Customer Operations & Revenue Accounting, organized a backlog policy meeting at VMware's Hilltop Building A at VMware's worldwide headquarters in Palo Alto, CA. The meeting included defendants Gelsinger and Rowe, Chief Accounting Officer Kevan Krysler, Executive Vice President of Worldwide Sales and Services Maurizio Carli, and VMware's most

senior in-house attorneys, including Craig Norris (Vice President, Deputy General Counsel, Corporate Securities and M&A), Ana Iacovetta (Chief Ethics & Compliance Officer, Vice President and Deputy General Counsel) and Amy Fleigelman Olli (Senior Vice President, General Counsel) to discuss the Company's backlog policy. The November 19, 2018, backlog policy meeting came at a pivotal time for the Company as it neared the close of FY 2019 and recorded record-breaking backlog.

200. Backlog is widely recognized by industry analysts as an important leading metric for investors, and was a fundamental and central part of VMware's operations, as it was used to help inform the magnitude of sales the Company had already secured, the revenue from which would be recognized in subsequent quarters. At the end of FY 2019, the Company's total backlog and license backlog were $449 million and $147 million, respectively. The backlog numbers were inflated at the direction of management as employees were instructed to push sales orders into future quarters once the Company had recorded enough revenue in order to meet current period guidance. As a result the Company both reduced the amount of revenue required to meet FY 2020 revenue guidance and obtained a head start toward meeting that guidance.

201. At the end of FY 2019, total backlog, which the Company disclosed as revenue it expected to likely recognize the subsequent quarter, constituted 20% of the Company's anticipated Q1 2020 total revenue. Likewise, license backlog at the end of FY 2019 represented 17% of the Company's license revenue guidance for Q1 2020. By the end of the Class Period these numbers had fallen to 0.7% and approximately 0.4% of quarterly total revenue and license revenue, respectively.

202. VMware's Chief Accounting Officer, who had signed each quarterly and annual report filed with the SEC from August 2018 through December 2019, abruptly resigned from VMware after six years of service, the same month the SEC began its investigation into the Company's accounting for backlog and related disclosures.

203. Given their roles as CEO and CFO of the Company, defendants Gelsinger and Rowe had access to material adverse non-public information about Company performance and the

improper, unsustainable business practice of VMware deferring revenue not required to meet current period guidance into backlog so that it could be recognized in subsequent periods.

## VIII. LOSS CAUSATION AND ECONOMIC LOSS

204. The market for VMware's common stock was open, well-developed and efficient at all relevant times. Throughout the Class Period, VMware's common stock traded at artificially inflated prices as a direct result of defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Because defendants failed to disclose the true state of the Company's backlog and revenue, investors were not aware of the true state of the Company's operations as they were provided with a misleading picture of VMware's business. Lead Plaintiff and other members of the Class purchased or otherwise acquired VMware common stock relying upon the integrity of the market price for VMware's common stock and market information relating to VMware, and suffered economic loss, *i.e.*, damages, under the federal securities laws as detailed below and in §§IV.F-H *supra*.

205. On May 30, 2019, after the market closed, VMware held a conference call to discuss its financial results for Q1 2020, as well as its business outlook for FY 2020. During the earnings call, defendants ***disclosed a significant decline in the Company's license backlog of over 67% from Q4 2019***. And, despite continued assurances previous quarters (including on February 28, 2019) that the Company was experiencing strength in each of its three geographical areas, defendant Gelsinger disclosed during the Q1 2020 conference call that "the Americas trailed" the Company's other regional segments and was performing weaker than anticipated due to the departure of the region's leader in February 2019, resulting in "territory realignments" and "adjustments to the org[anization]," which negatively affected the revenue recognized in that region. VMware's stock dropped over 7% in the trading day following the Company's May 30, 2019 disclosure. The same day, the S&P 500 index declined just over 1%.

206. VMware's stock price continued to fall in tandem with the Company's disclosures of declining backlog throughout the Class Period.

207. On August 22, 2019, the Company held its earnings conference call for analysts and investors. During that call, defendants again disclosed a substantial decrease in backlog – this time revealing that the Company's ***total backlog plummeted from a Class Period high of $449 million at the end of FY 2019 to $117 million at the close of Q2 2020 – a decline of 35% from the prior quarter and a 74% drop from just six months prior***. The Company also announced a ***73% decline in license backlog from the previous quarter – to end with just $13 million***, signaling weakened demand for the Company's products. Defendants also ***decreased*** the Company's license revenue guidance for the second half of FY 2020. Though defendants repeatedly assured investors during the Class Period that the Company was fully managing the industry-shift to subscription and SaaS products, defendants attributed the lowered full FY 2020 guidance to precisely that – the incremental mix shift toward subscription and SaaS. Following this news, the Company's stock price fell over $12 per share – a decline of 10% in one trading day. The same day, the S&P 500 index decreased just 2.5%.

208. On November 26, 2019, after the market closed, defendants held an earnings conference call for analysts and investors to disclose the Company's Q3 2020 results. During that call, defendants announced yet another significant reduction in the Company's total backlog – a drop of 39% from Q2 2020, to end the quarter at just $71 million. In just nine months, VMware's total backlog fell over 84%. Following this announcement, VMware's stock price fell nearly 6% in the two trading days following the disclosure, while the S&P 500 was unchanged during the same period.

209. On February 27, 2020, one year after VMware posted record-breaking backlog, VMware's backlog scheme finally unraveled. Defendants admitted that the Company was unable to meet license and total revenue guidance ***despite*** the substantial backlog it had entering FY 2020. Defendants announced a dismal $18 million in total backlog and just $5 million in license backlog – a staggering decline of 96% and 97% to total backlog and license backlog, respectively, from the inflated backlog reported at the end of FY 2019. As explained by defendant Rowe, the Company's backlog was a driver for the disappointing results as "in Q4 last year, we had . . . strong backlog that we were able to utilize." Thus, defendant Rowe admitted that lower-than-expected FY 2020 revenue

numbers were the result of among other things the Company's inability to continue to draw on its backlog as it had in prior periods.

210. To make matters worse, in a Form 8-K filed with the SEC the same day, the Company revealed it was subject to an ongoing SEC investigation into the Company's backlog of unfilled orders. Specifically, the Form 8-K advised investors that, "[i]n December 2019, the staff of the Enforcement Division of the [SEC] requested documents and information related to VMware's backlog and associated accounting and disclosures." The Form 8-K also advised investors that, although "VMware is fully cooperating with the SEC's investigation," it was "unable to predict the outcome of this matter at this time."

211. Defendants further revealed – after regularly remarking over the course of the prior six quarters that the Company was weathering the industry shift away from license products in favor of subscription and SaaS products – that the Company was in fact ***not*** successfully managing the shift from license to subscription and SaaS revenue well. During the earnings conference call on February 27, 2020, defendant Gelsinger stated that "revenue came in a bit short of expectations due to a higher mix of subscription and SaaS." The Company failed to meet its license revenue growth targets for both Q4 2020 and FY 2020, and missed the Q4 2020 license revenue guidance defendants issued just three months prior by 5%.[9]

212. The Company's stock price plummeted on the Company's February 27, 2020 news, closing at a 52-week low of $120.52 per share the next day – a one-day decline of over 11%, and startling decline of $85 per share or 41% – from the Class Period high reached during Q1 2020. The same day, the S&P 500 index saw a decline of less than 1%.

213. In an analyst report issued the next day, Deutsche Bank called VMware's results "disappointing," and "a messy and uninspiring print."

214. The declines in the price of VMware stock after each corrective disclosure came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations and

---

[9] Defendants' guidance did not factor in amounts for the then-pending Pivotal acquisition, which was completed in Q4 2020. Accordingly, for comparative purposes, reported revenue amounts used herein to compare to guidance also exclude Pivotal.

omissions and the impact of the truth being revealed to investors and the market and were a substantial cause of the declines. The timing and magnitude of the price declines in VMware's stock compared to the market negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate the price of VMware's stock and the subsequent decline in the value of VMware's stock when defendants' prior misrepresentations, omissions and other fraudulent conduct were revealed.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

215. At all relevant times, the market for VMware stock was an efficient market for the following reasons, among others:

(a) VMware met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, VMware filed periodic public reports with the SEC and the NYSE;

(c) VMware regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) VMware was followed by securities analysts employed by major brokerage firms who wrote reports that were widely distributed. Each of these reports was publicly available and entered the public market place; and

(e) VMware's stock price reacted in response to new material about VMware's business.

216. As a result of the foregoing, the market for VMware stock promptly digested current information regarding VMware from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of VMware stock during the Class

Period suffered similar injury through their purchase of VMware stock at artificially inflated prices and a presumption of reliance applies.

## X. CLASS ACTION ALLEGATIONS

217. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased VMware common stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

218. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, VMware shares were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members of the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by VMware, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

219. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

220. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

221. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of VMware;

(c) whether the price of VMware stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

222. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

223. Lead Plaintiff repeats and re-alleges every allegation contained above as if set forth herein.

224. This Count is brought by Lead Plaintiff on behalf of itself and the Class.

225. This Count is brought against VMware and all Individual Defendants.

226. During the Class Period, each of the defendants named in this Count disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of VMware stock during the Class Period.

228. Defendants, individually and together, directly and indirectly, by the use, means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material about VMware's business, operations, and financial condition as specified herein.

229. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

230. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of VMware common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased VMware common stock during the Class Period at artificially high prices and were damaged thereby.

231. Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for VMware common stock, and suffered losses when the relevant truth was revealed. Lead Plaintiff and the Class would not have purchased VMware common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these defendants' misleading statements.

232. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in VMware common stock.

233. By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**

**For Violations of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

234. Lead Plaintiff repeats and re-alleges every allegation contained above as if set forth herein.

235. This Count is brought by Lead Plaintiff on behalf of itself and the Class.

236. This Count is brought against the Individual Defendants.

237. The Individual Defendants were each control persons of VMware during the Class Period by virtue of their positions as senior officers of VMware.

238. Each of the defendants named in this Count acted as a controlling person of VMware within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions as officers and/or directors of VMware, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

239. In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

240. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period when the relevant truth was revealed.

241. By reason of the foregoing, the defendants named in this Count violated §20(a) of the Exchange Act.

## COUNT III

### For Violations of §20A of the Exchange Act (Against Defendant Gelsinger)

242. Lead Plaintiff repeats and re-alleges every allegation contained above as if set forth herein.

243. This Count is brought by Lead Plaintiff on behalf of itself and the members of the Class who purchased VMware common stock contemporaneously with defendant Gelsinger's sales of VMware common stock.

244. This Count is brought against defendant Gelsinger.

245. During the Class Period, defendant Gelsinger was privy to confidential information concerning VMware's backlog, operations, finances, financial condition, and future business prospects, including, but not limited to, the false statements disseminated to the investing public. Notwithstanding his duty to refrain from trading in VMware common stock without disclosing the foregoing materially adverse facts, and in violation of his fiduciary duties to Class members, defendant Gelsinger sold VMware common stock contemporaneously with Lead Plaintiff's purchase and the purchases of VMware common stock by other Class members.

246. On March 1, 2019, the day after the Company disclosed record-breaking license backlog, defendant Gelsinger sold 21,086 shares of his VMware stock at prices as high as $181.61 per share for proceeds of $3.77 million. Four days later on March 5, 2019, Lead Plaintiff bought shares of VMware common stock. *See* Certification Pursuant to Federal Securities Laws, ECF No. 50, at 53. Defendant Gelsinger sold his VMware shares as alleged above at prices artificially inflated by the non-disclosure of material adverse non-public facts and misrepresentations of fact made during the Class Period.

247. Defendant Gelsinger was aware that he was in possession of material adverse information that was not known to the investing public, including Lead Plaintiff and other members of the Class. Defendant Gelsinger was obligated to disclose the material nonpublic adverse information to Lead Plaintiff and other members of the Class before selling his stock.

248. By reason of the foregoing, defendant Gelsinger directly and indirectly, by use of the means and instrumentalities of interstate commerce, electronic communications, mailings and the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud and engaged in acts and transactions and a course of business that operated as a fraud or deceit upon members of the investing public who purchased VMware common stock contemporaneously with the sales by the defendant named in this Count.

249. As a result of the foregoing, Lead Plaintiff and the other members of the Class who purchased VMware common stock contemporaneously with the sale of VMware common stock by defendant Gelsinger have suffered substantial damages measured by the amount of profits gained or losses not incurred by reason of defendant Gelsinger's stock sales.

250. This action was commenced within five years after defendant Gelsinger made his sales while in the possession of material non-public adverse information.

251. By reason of the foregoing, defendant Gelsinger violated §20A of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action by certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding injunctive and such other equitable relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED: April 6, 2023

ROBBINS GELLER RUDMAN
& DOWD LLP
SCOTT H. SAHAM
ASHLEY M. KELLY
TING H. LIU

s/ Scott H. Saham
SCOTT H. SAHAM

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Lead Counsel for Lead Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 6, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Scott H. Saham
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: scotts@rgrdlaw.com

# Mailing Information for a Case 5:20-cv-02182-EJD Lamartina v. VMware, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com
- **Asim M. Bhansali**
  abhansali@kblfirm.com,asim-bhansali-6238@ecf.pacerpro.com
- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com
- **Elliot Greenfield**
  egreenfi@debevoise.com,jtancil@debevoise.com,mao-ecf@debevoise.com
- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Ashley Michelle Kelly**
  akelly@rgrdlaw.com,e_file_sd@rgrdlaw.com,AKellyRGRD@ecf.courtdrive.com
- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,fgravenson@pomlaw.com,ipareja@pomlaw.com
- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com
- **Maeve O'Connor**
  mloconnor@debevoise.com,mrtownsend@debevoise.com,mao-ecf@debevoise.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com,fgravenson@poml
- **Nicholas Alan Roethlisberger**
  nroethlisberger@kblfirm.com
- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com
- **Scott H. Saham**
  scotts@rgrdlaw.com,agonzales@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_SD@rgrdlaw.com
- **Brian Jared Schall**
  brian@schallfirm.com
- **Matthew John Sorensen**
  mjsorensen@debevoise.com,mao-ecf@debevoise.com
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)