UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Magistrate Judge

LAMARTINA,                      ) No. C 20-02182-EJD
                                )
          Plaintiff,            )
                                )
vs.                             )
                                )
VMWARE, INC., et al.,           )
                                )
          Defendants.           )
_____)

                                San Jose, California
                                Tuesday, November 14, 2023

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 10:00 - 11:30 = 90 MINUTES

APPEARANCES:

For Plaintiff:
                                Robbins Geller Rudman & Dowd
                                  LLP
                                655 West Broadway
                                Suite 1900
                                San Diego, California 92101
                                (619) 231-1058
                           BY:  SCOTT H. SAHAM, ESQ.
                           BY:  ASHLEY MICHELLE KELLY, ESQ.
                           BY:  SPENCER A. BURKHOLZ, ESQ.

                                Ting Hsiang Liu, Esq.
                                655 West Broadway
                                San Diego, California 92101
                                (619) 338-4522
                           BY:  TING HSIANG LIU, ESQ.

APPEARANCES:   (Cont'd.)

For Defendants:

                             Debevoise & Plimpton LLP
                             66 Hudson Boulevard
                             New York, New York 10001
                             (212) 909-6000
                        BY:  MAEVE O'CONNOR, ESQ.
                        BY:  ELLIOT GREENFIELD, ESQ.

Transcribed by:         Echo Reporting, Inc.
                        Contracted Court Reporter/
                        Transcriber
                        echoreporting@yahoo.com

3

                    P-R-O-C-E-E-D-I-N-G-S

                         --oOo--

          THE CLERK:  All rise.  United States District Court for the Northern District of California is now in session, the Honorable Virginia K. DeMarchi presiding.

          THE COURT:  Good morning.  Please be seated.

          THE CLERK:  Calling 20CV-02182-EJD, Lamartina versus VMware, Inc., et al., on for discovery hearing.

     If the parties could state their appearances, please, beginning with Plaintiffs.

          MR. SAHAM:  Good morning, your Honor.  Scott Saham and Ashley Kelly for the lead Plaintiff.

          THE COURT:  Good morning.

          MR. SAHAM:  Good morning.

          MS. O'CONNOR:  And good morning, your Honor.  Maeve O'Connor and Elliot Greenfield for the Defendants.

          THE COURT:  Okay.  Good morning.

          MS. O'CONNOR:  Good morning.

          MR. GREENFIELD:  Good morning.

          THE COURT:  So this dispute is regarding the unwarranted assertion of privilege and work product protection regarding certain documents shared with the SEC and whether there's been a waiver of that privilege or protection.

4

I wanted to just start by addressing a confidentiality issue, just to make sure we don't have any difficulty.  So the discovery dispute letter was filed publicly, and it excerpts some parts of two documents that are designated confidential by VMware, and, as you all know, I asked VMware to share with the Court, in camera, the complete versions of those documents, which they did, and I don't think this hearing will involve disclosure of more of the contents of those documents than what you all excerpted, but I just want to be sensitive to that issue, since VMware has alerted me to the need to keep those documents protected.

So I just ask counsel to be sensitive to the issue, and just alert the Court if you feel like responding to any of my inquiries, my required disclosure of things that you haven't agreed can be publicly disclosed, and we'll make an adjustment and address it at that time.  Okay?

MS. O'CONNOR:  Thank you.  Yes.

THE COURT:  Okay.  So the first question I have is just to clarify.  The Plaintiff doesn't dispute that the materials in question qualify for privilege or, as the case may be, work product protection.  The issue is really waiver.  Is that right?

MR. SAHAM:  It is, your Honor, in part.  It's very interesting, though.  There are certain e-mails that were produced to both the SEC and the Plaintiffs here.  I brought

copies of those.  They're referenced specifically in the presentation that your Honor has.

The defense counsel, Debevoise, who represented the company in front of the SEC, asserts that documents that are actually stamped as privileged -- and I believe are senior executives asking for legal advice and receiving legal advice from their in-house counsel -- they asserted in a letter that they sent to the SEC that those documents are not, in fact, privileged.

So we believe they are privileged.  When you look at them, they have a stamp that's "Privileged" on them, but the defense counsel, which is an interesting sort of turn of events here from what you would usually have, has written in a specific letter to the SEC that they do not believe that the documents that are stamped "Privileged" are privileged, and that's why they say there's no waiver, because they say they produced documents to the SEC.

THE COURT:  Right.  No, I understand that argument, but, in terms of the -- there are certain things that, at the present time, VMware is saying, "These are privileged or work product material.  We are not going to produce them to you," and you say, "You must, because you've already waived whatever privilege or work product protection you have."  So is that a fair characterization of your argument?

MR. SAHAM:  It is, with one slight caveat, your Honor, because, if the Court adopted Defendants' assertion that the documents that were produced are not privileged, even though they're stamped "Privileged," then it's our assertion that you'd have to look at the other 52 documents that they're withholding as privileged to see if those are exactly the same.  If they're lawyers discussing with the senior executives the disclosure at issue, and if the ones that are stamped "Privileged" that were produced to us are not, in fact, privileged, then those other documents aren't privileged either, I would assert.

THE COURT:  I see.  So you're worried that maybe there's been a selective description of some documents are privileged and others as not privileged when, in fact, they cover the same ground and reveal the same level or kind of legal advice of nonlegal advice, whatever the case may be.  They should be treated comparably, and your suspicion is that they are not?

MR. SAHAM:  Correct.

THE COURT:  Okay.  But then that isn't really briefed in front of me.  That's just lurking in the background as a possible issue.

MR. SAHAM:  Correct.  We say there's waiver, so I'm producing a privileged document.  They say it wasn't privileged.  So we either think there's waiver, and we get

7

them all, or, if it's not privileged, as they assert in their response in our letter, then you would have to look at the other 46 documents to see if they are about the exact same topic, the exact same subject matter, and, therefore, are not privileged, either.  So it's one or the other.

THE COURT:  Okay.  But the dispute as presented to me really focuses on language in either this written submission or this trading analysis document as the basis for waiver, not the underlying documents themselves.  You quote from, meaning the Plaintiff quotes from, one or the other of those two documents in making its point as to sort of the three categories of subject matter that are at issue.

So what I don't have in front of me is "Here's a document that has already been produced to us that was marked 'Privileged' but is now being contended as, you know, not privileged, and we think that, in itself, is a waiver." So, you know, there's a little bit of a disconnect between -- I take your point, and maybe that's just a dispute for another day, but the argument seems to be based on what was disclosed to the SEC in this presentation.

MR. SAHAM:  Well, your Honor, on page 16 of the presentation -- and their main argument, which is on page 16, is that legal professionals, after due consideration, approved the disclosure, and then they cite in footnote 34 six or seven e-mails which, under your Honor's local rule,

8

we weren't allowed to attach those e-mails.  We would have certainly attached them, because it's our argument in the letter that both the argument contained in the presentation as well as the production of the documents referenced in the presentation are both, in and of themselves, equally waiver.

THE COURT:  Okay.

MR. SAHAM:  I'm sorry for the long-winded answer.

THE COURT:  No, that's okay.  No.  It's helpful to be clear on this point.  So let's turn to the question of waiver.  Is the Plaintiff contending that there is an express waiver, an implied waiver, or both?

MR. SAHAM:  Your Honor, semantically, it could be either.  To quote Judge Alsup --

THE COURT:  No, let's not quote Judge Alsup.

MR. SAHAM:  We won't quote Judge Alsup.

THE COURT:  No.  Judge Alsup is not where it's at right here.  I'm really -- they are not the same.  Express waiver and implied waiver are different.  So I'm trying to understand what the Plaintiffs' argument is, and maybe it depends on what we're talking about.

MR. SAHAM:  Well, I believe it's an express waiver, your Honor.  They went to the SEC, and they said in a written filing that lawyers approved the disclosure, and, therefore, they acted in good faith and without scienter,

9

which is an element in both an SEC securities fraud claim and a securities fraud claim brought by the Plaintiffs here, which are identical.

THE COURT:  Now, are you speaking specifically about the backlog disclosure, the pre-clearance issue for insider transactions, or something else?

MR. SAHAM:  Well, it's really both.  Specifically, on page 15, we're talking about the backlog disclosure.

THE COURT:  Okay.

MR. SAHAM:  Essentially, their argument that they presented to the SEC -- and it's spelled out in these five pages of the presentation, or the brief, starting at page 15 -- is that we acted in good faith, without the requisite scienter, because our lawyers both drafted and approved the backlog disclosure.

THE COURT:  Okay.

MR. SAHAM:  So I think that's an express waiver of the privilege.

THE COURT:  So I did look at those pages, those five pages that you've pointed me to, and these are at the Bates number -- I am using the Bates number, not the internal pages -- Bates ending 472 and 485 through 490. There is not in those pages, at least to my eye, anything that is an express waiver of a substantive communication from a lawyer.

What it looks like is, first of all, the focus is reliance on PWC's recommendation and approval, although there is mention that lawyers looked at this, too, but it seems like the lawyers' principal role was to communicate with the auditors, number one, and there's, I'll grant you, an impression that the lawyers didn't have any issue with the disclosure, either, but the substantive advice is not disclosed.  So that's why I put the question to you, express waiver or implied waiver?

MR. SAHAM:  Well, your Honor, just unraveling the onion, we've got footnote 34, which are the e-mails in question that go back and forth between the chief accounting officer, the chief financial officer, who is a Defendant in this case, and, three, in-house counsel, including the general counsel and two others.

If you just look at a couple of those documents, they're stamped "Privileged," as we say in our brief, at the third page of our brief, point number three, that they produced documents to the SEC and the Debtor that are stamped "Privileged," that are clearly, under any view, if you just look at them -- and we could present them to your Honor -- lawyers providing legal advice about a disclosure, and the CFO and the chief accounting officer asking for legal advice, and that's an express waiver, and we could present that to the Court.

11

THE COURT:  Okay.  And maybe that is necessary, for me to look at those, but I just want to -- because I zeroed in on footnote 34 as well.  What I can't tell from the description in the submission is who's within the scope of the privilege and who's outside.

So, in other words, if VMware is saying, "Well, these were lawyers communicating with people, but they were not people within the scope of the privilege.  They were lawyers communicating with independent auditors or lawyers communicating with other people, or the communications just did not involve legal advice even if they were internal and with people who, you know, could be within the scope of privilege," I can't tell from the description, but your assertion is that if I only had the opportunity to review these e-mails, I would see that they are all legal advice, or at least some subset of them?

MR. SAHAM:  Could I present those to the Court?

THE COURT:  Well, I'm not going to do it just, like, on the fly, but it may be that it would be appropriate, just as I asked VMware to submit the entirety of the presentation and the analysis, to have you submit these documents, also.

MR. SAHAM:  That would be fine, your Honor.  Certainly, if we can't resolve it on what we have today, I would propose if we submitted another letter, where we could

12

attach these few e-mails.  It's not a lot.  It's two or three e-mails.

THE COURT:  But I'm just asking what the contention is.

MR. SAHAM:  Yes.

THE COURT:  So is your contention that, if I had the opportunity to look at this, I would see that these are clearly privileged communications, not with an outside auditor, but with people within the fold?

MR. SAHAM:  Yes, and I can tell you the communications are between the chief accounting officer, the chief financial officer, and three in-house lawyers, Mr. Craig Norris, Ms. Amy Olli, and Mr. Larry Wainblat.  All three of those are lawyers, and it's unequivocal from looking at the document that it's the provision of legal advice and the receipt of legal advice.

THE COURT:  Okay.  And these, of course, are documents that you already have by virtue of the production in the case, and they were documents the SEC also had?

MR. SAHAM:  Correct.

THE COURT:  Okay.

MR. SAHAM:  All we've received in discovery so far are the documents the SEC had, and that included the presentations that VMware made to the SEC, and the documents produced, including about five or six documents that they

13

originally asserted privilege on to the SEC, and they're stamped "Privileged."  So they were privileged documents --

THE COURT:  Well, okay.

MR. SAHAM:  Yes.  Sorry.

THE COURT:  The stamp is one thing.

MR. SAHAM:  Yes.

THE COURT:  Sometimes people over-stamp things. I'm not going to let that drive the analysis, but, you know, it's the nature of the communication is what's really at issue, and with whom.

Okay.  So that's the backlog disclosure, and so I understand that your argument is "Certainly there's been an express waiver," but then I do observe in the papers that the premise that the Plaintiff is advocating is also relying on this idea of sword and shield and fairness, which is -- the fairness is the implied waiver language, right?  So that's the idea there, and so that's why I was a little bit confused.

VMware says, "We're not going to rely in this litigation on advice of counsel," and they also say, "We didn't rely on it before the SEC," but I do want to drill down on how the Plaintiff believes VMware is using its privilege as both a sword and a shield, you know, and in what way is the Plaintiff not able to adequately prove or dispute a claim or a defense by VMware without access to

14

privileged materials?  I'd really like to understand what that is.

MR. SAHAM:  Certainly, and I understand, your Honor, that would be the implied waiver, which is also an argument we're making.  Both their fifth affirmative defense in their answer, which is ECF 86, and their eighth affirmative defense, they say the disclosures which are at issue here were adequate, and also that it's without scienter, and in the Abdo (phonetic) case which we cited, and the Twitter case which we cited, courts have found that, when you get to trial, you don't have to have -- it's not a formal defense of defense of counsel.

If you're going to say, in a case where intent is the main issue, scienter is the main issue, that "We acted in good faith because our lawyers approved the disclosure," that opens the door.  You can't have it both ways as a corporate defendant.  You can't say, "We checked with our lawyers, without allowing the other side the right to test that assertion."

THE COURT:  Just a moment.  I did not see the reference to the answer in your papers, so I did not look at that in advance, but is it your contention that the fifth affirmative defense and the eighth affirmative defense specifically reference lawyers, or do they just say, "We acted in good faith"?

MR. SAHAM:  Correct, your Honor.  They do not, and we're not contending -- they don't have an affirmative defense, defense of counsel, but both the <u>Abdo</u> case which we cited you --

THE COURT:  No, no, no.  I'm sorry.  I asked the wrong question.

MR. SAHAM:  Yes.  Sorry.

THE COURT:  My question was an "or," and you said, "Yes."  So I still don't know what the answer is.

MR. SAHAM:  No, no.  No, they do not assert advice of counsel specifically.

THE COURT:  No, I'm not asking about that.

MR. SAHAM:  Sorry.

THE COURT:  I get that they don't assert an advice of counsel defense.  When they say, "We acted in good faith," do they say, "We acted in good faith because we consulted counsel"?

MR. SAHAM:  No, they just --

THE COURT:  Any mention of counsel anywhere --

MR. SAHAM:  No, your Honor.

THE COURT:  -- in the affirmative defense?  Okay.

MR. SAHAM:  No.

THE COURT:  I just wanted -- and I'll check, but that's what I was trying to understand, and I understand the <u>Abdo</u> case, and the argument that you're making based on

16

that.

So, if I may, just to summarize, it would be unfair, misleading to a potential fact finder, in fact, if VMware were permitted to say, "We consulted counsel," leaving the impression that counsel approved, and the Plaintiff doesn't have any way to rebut that, or to test whether, in fact, counsel were adequately informed about the circumstances before approving.

So I understand that whole theory.  I'm just trying to figure out -- and I'm going to be asking VMware this question as well -- what they plan to argue, and what their position is in the case, because, if they utterly disavow any use of counsel to create the impression that consulting with counsel, you know, equals good faith or supports a good faith defense, well, we may have a different situation, even if they haven't asserted that explicitly.

So I'm going to find out what their plan is, but right now, if they -- let's just hypothetically say they're not going to touch the question of whether counsel was consulted for anything in this litigation.  Is it still Plaintiffs' view that there was an implied waiver before the SEC, and how does that work?

MR. SAHAM:  Absolutely, your Honor.  I'd go back to Judge Breyer in the Reyes case, and there's at least four circuit courts, not the Ninth Circuit.  They've never

weighed into it.  There is absolutely no selective waiver. Once an entity, a corporate entity or even an individual, goes to a government entity such as the SEC to attempt to exonerate themselves or mitigate liability, that is waiver of the privilege.  Doesn't matter what happens in another litigation.  They are going to assert it here, and that's another question, once they've done it.

THE COURT:  But that's true for express waiver. That's certainly true for express waiver.  Once the cat is out of the bag and you've disclosed the privileged communication or the work product material, it's out.  But implied waiver, a little bit different, and <u>Bittaker</u> is the most recent and most thorough discussion of implied waiver in the Ninth Circuit, and I'm not sure that it's so cut and dried in the Ninth Circuit's view on that point.

The reason I say that is if, in the SEC investigation -- let's just say there was a presentation to the SEC that could have been construed as an implied waiver, meaning "We're going to tell you, SEC, that we're all good because our counsel looked at this," and the SEC didn't press it, didn't ask for the underlying communications, whatever.  I'm not sure there's actually been a waiver in that situation --

MR. SAHAM:  Your Honor --

THE COURT:  -- if they didn't rely on it, right?

18

So now we're in this litigation, and the question is, is, you know, something that could have been construed as an implied waiver, because -- let me back up.

Many cases say, in an implied waiver situation, you're really putting it to the person who's the holder of the privilege, like, "If you go down this road, you will have to give up the goods," and then there's a choice, right?  So, if a VMware lawyer is never put to that choice, say, by the SEC, "If you're going to rely on this argument that your counsel preapproved everything, and you want us to take a look at that, you're going to have to show us all of that information" -- the SEC never put them to that choice.

I'm not sure the Ninth Circuit would find that there actually was an implied waiver, putting aside express waiver and all those e-mail communications in footnote 34 for the moment.  So that's something I don't think is really addressed in the cases that the parties cited to me.

MR. SAHAM:  Well, your Honor, I think it's much more of an express waiver than an implied waiver.  They went to the SEC.  They did produce these documents, leaving those aside.  They argued -- to mitigate their claim, they argued, "We showed" -- not only "We showed that the lawyers drafted the disclosure, the lawyers gave due consideration to the disclosure."  This is their words, not ours.  They cite the documents which had already been produced to the SEC for

support for that fact, and they said, "Look.  We acted in good faith.  You can't bring a scienter-based claim against us, because the lawyers approved it."  That's express as it gets.

They withheld another batch of documents, but what you have in the U.S. v. Sanmina case, which is another Ninth Circuit case, binding authority, once you waive, once you move forward and make that argument, it's not just a waiver for the four documents you put forward, it's waiver to the entire subject matter.

THE COURT:  But Sanmina is an express waiver case, so that's a little different, and I realize you're focusing on the express waiver now, even though I was trying to focus on implied waiver, but, okay.  I think I understand the point.

Let me ask about a couple of the other categories in your papers, which -- the second category deals with insider transactions.  I read the written submission at the page Bates ending 498, and I think it's a -- you quoted this passage with an ellipsis, but I think I can quote publicly the sentence that begins with "First, as the staff is aware."

Is that okay with VMware?  This at page ending 498. There are two sentences.

MS. O'CONNOR:  Yes, your Honor.

20

THE COURT:  Okay.  So what's stated there is: "First, as the staff is aware, all the trades at issue were executed within the applicable trading window and were cleared by VMware's legal team.  That pre-clearance was predicated on the company executives not having access to material nonpublic information at the time of the trades."

So VMware says, "Well, that's no different from saying we just followed our usual practice of consulting counsel before allowing officers to exercise options.  There is no actual substantive legal advice disclosed to the VMware or anybody else.

It's very much like U.S. v. White and, you know, Planet Aid, and some of the other cases that VMware are pointing to, where someone says, "We consulted counsel."  If you were to go further and say, "And counsel told me X, Y, and Z," well, that would be a waiver, but this is just an observation that "We used our usual process, ran it by counsel first."

So my question is, what legal advice is disclosed in that passage, which is the passage that Plaintiff relies on, and how is that a waiver?

MR. SAHAM:  Well, your Honor, I'd also look at

21

Bates number 574, which is the actual e-mail, and it's in the presentation.  They just duplicate a picture of it, and this would be an example.

THE COURT:  Is this something that you cited to me in your portion of the letter?

MR. SAHAM:  I believe we did, and I think that page, on page 28, is citing this pre-clearance, but, if you look at its --

THE COURT:  Let me just get to the place where you are, and I don't want you to quote something that's not allowed to be quoted.

MR. SAHAM:  Sure.  Sure.

THE COURT:  So let's just be careful.  So, yes, I do see -- I see this.

MR. SAHAM:  So the legal advice is that "You're pre-cleared to trade."  Now, in order to test the pre-clearance, you would need to know before -- I think, in the Abdo case, when you're relying on counsel to show your good faith, you would have to show four things:  that you made a complete disclosure to counsel before they pre-cleared; that you requested their advice; that you received the advice; and then you listened to it in good faith.

So the express waiver, and what I believe would come up at a trial in this case, and where they couldn't have it

both ways, is they want to say, "These transactions were all pre-cleared.  There were 10b5-1 plans, and counsel approved them.  Some of them, there weren't 10b5-1 plans, but, just focusing on the pre-clearance --

THE COURT:  But this e-mail doesn't actually say -- reveal any of the attorneys' thought processes.  It just says, "Done," like, "This is the outcome, pre-cleared," like, "Done."

MR. SAHAM:  Right, and we would say, in order for that to have any -- for them to be able to use that in a trial, we would be entitled to the rest of it.

THE COURT:  The rest of what?

MR. SAHAM:  Well, what they received in advance of giving the pre-clearance.

THE COURT:  I see.

MR. SAHAM:  Yes.

THE COURT:  Okay.  All right.  That's helpful. Let me then ask about the witness interview.

MR. SAHAM:  Certainly.

THE COURT:  Okay.  So the papers describe that a witness named Stephane Berthier -- am I saying that right?

MR. SAHAM:  I believe so.  He's the PWC partner.

THE COURT:  Okay.

MR. SAHAM:  Yes.

THE COURT:  So there was the interview was

23

conducted.  VMware says the interview was not a privileged communication, so it was not, you know, someone within the fold of privilege, talking to counsel, obviously, if it's someone who's with PWC, but then the memoranda or the notes, counsel's notes of that interview, are work product.

So I understand that the Plaintiffs' position is "Well, you've disclosed the content, or some of the content, of the interview.  Therefore, you must produce all the notes."  Is that a fair characterization of the Plaintiffs' position?

MR. SAHAM:  Yes, your Honor.

THE COURT:  Okay.

MR. SAHAM:  And it's not just that they disclosed it.  So there's a deposition transcript from the SEC where Mr. Berthier testified under oath that he was not aware of the discretionary nature of the backlog.  Now, we don't have --

THE COURT:  Wait.  And you have that deposition transcript?

MR. SAHAM:  We do, your Honor.

THE COURT:  Okay.

MR. SAHAM:  We didn't at the time we wrote the brief, but we do now.

THE COURT:  I see.  Okay.

MR. SAHAM:  And so what we had at the time -- we still don't have the SEC's presentation, but we have the

24

Defendants' presentation, which your Honor has as well, in response to the SEC presentation.

So apparently the SEC referenced that testimony where he said, "Well, PWC wasn't aware of it," and in order to rebut that, they -- and in order to mitigate their circumstances with the government, in order to exonerate themselves, they said, "Well, we're going to waiver our work product."  We interviewed this guy, and he said the opposite.

So here you have the clear situation where they go to the government to, you know, seek mitigation or exoneration. It doesn't work.  They end up paying -- maybe it did.  They end up paying an $8,000,000 penalty, and enter into a cease-and-desist order.

THE COURT:  Okay.  Yes.  Let me just pause there.

MR. SAHAM:  Sorry, your Honor.

THE COURT:  I'm trying to understand the circumstances of this interview.  So the interview was transcribed.  You called it a "deposition transcript," but are there two separate things?

MR. SAHAM:  Two separate things, your Honor.

THE COURT:  Okay.  So there's an interview, and then there's a deposition transcript?

MR. SAHAM:  Correct.

THE COURT:  And what's quoted?  So there's a --

25

MR. SAHAM:  The interview.

THE COURT:  The interview is quoted?

MR. SAHAM:  Yes.

THE COURT:  Okay.

MR. SAHAM:  The interview memoranda, where it was Debevoise interviewing a critical witness, the PWC partner, which they say contradicts --

THE COURT:  Okay.  So what you're after -- you have the deposition transcript now.  So what you're after -- back to my original question -- is counsel's interview notes?

MR. SAHAM:  For all the witnesses.

THE COURT:  Okay.  But just focusing on this person first, because, so far as I can tell from your papers, there hasn't been a disclosure to the SEC of any other witness' interview, excerpts of any other witness iv notes.

MR. SAHAM:  Well, that's where I get back to the Ninth Circuit and Judge Alsup and Judge Tigar.  I'm sorry, your Honor.

THE COURT:  Are there --

MR. SAHAM:  Saying that --

THE COURT:  Are there any witnesses, other witnesses, besides this person, whose testimony or statements made in interview to counsel were disclosed to

26

the SEC by VMware?

MR. SAHAM:  Just this one.

THE COURT:  Okay.

MR. SAHAM:  Our assertion is that waives the entire subject.

THE COURT:  Okay.  Let's get there --

MR. SAHAM:  Yes, your Honor.

THE COURT:  -- but I just really need you to focus on what I'm asking first --

MR. SAHAM:  I'm sorry, your Honor.

THE COURT:  -- because I'm trying to get to the bottom of what was going on.

MR. SAHAM:  That's the only one that was disclosed.

THE COURT:  Okay.  So, presumably, now that you have the deposition transcript, and you have in this litigation an opportunity to depose or interview Mr. Berthier himself, if you'd like, is that fair?  I mean, there's nothing preventing you from talking to him.

MR. SAHAM:  Well, I imagine he wouldn't talk to us, but there would be nothing to prevent us from deposing him.

THE COURT:   Sure.  Okay.  So you could take his deposition.  So, right now, the argument is not "Well, we have a need for this deposition testimony," which is one way

27

that you can get work product.  The argument really is "There's been a waiver of work product protection, and it must be produced"?

MR. SAHAM:  Correct.

THE COURT:  Okay.  All right.  And now tell me why you think the waiver extends -- this is a question you wanted to answer -- why the waiver extends beyond this witness to some number of other witnesses.

MR. SAHAM:  It's because the law in the Ninth Circuit, U.S. v. Sanmina, at least two District Courts, Judge Alsup in Marvell and in LendingClub, have held, based on U.S. v. Sanmina, that once you waive work product, once you've waived privilege, the waiver extends to the entire subject matter.  You can't selectively -- so, "We like this document.  We're going to show that one to the SEC, but we're going to hold these other ones back."

THE COURT:  Well, the rub in all of these cases is, how broadly do you define "the subject matter"?  That's always the issue.  I don't really have a lot of -- a lot to go on in your papers about how broadly "subject matter" should be defined in this case.  If my touchstone is what's been disclosed, which is a couple statements from Mr. Berthier which I found at the page you cited to me, I could narrowly define "subject matter," could probably -- what am I supposed to do here?

MR. SAHAM:  Well, your Honor, I looked at that in three bits.  We're always at an informational disadvantage, because we don't have the documents, but with respect to the backlog disclosure, we do have -- we do know that on May 31st, 2018, Craig Norris, in-house lawyer, circulated the first draft of the backlog disclosure, and we know, 12 days later, on June 11th, 2018, the backlog disclosure was publicly made in an SEC filing.

So we've got 12 days of communications, all with the subject line "Backlog Disclosure," and there's 46 of them. So we know in that instance, with respect to the backlog disclosure -- and we've attached that privilege log as Exhibit 2 to our letter -- we can very narrowly disclose the subject matter, the discussions between the lawyer, the chief accounting officer, and the CFO, about the backlog disclosure which was publicly made on June 11, 2018.

THE COURT:  Wait, wait, wait.  I'm confused now. So, if we're talking about work product disclosure, you're saying -- sorry, work product waiver -- you're saying work product waiver is then going to require disclosure of privileged material, in and of itself, as opposed to other work product material, which is how I understood your argument to be?

MR. SAHAM:  I'm sorry, your Honor.

THE COURT:  Because all of the things in Exhibit 2

29

are marked "Attorney-Client Communication," not "Work Product."

MR. SAHAM:  Your Honor, what we view -- and, again, I guess there's three -- so, when you're asking what relief we would be asking for, and you're asking how specific can you tailor it --

THE COURT:  No.  Okay.  So there are three buckets, right, backlog disclosure, insider transactions, witness interview, which is the only one for which work product is the issue.  So, work product, different analysis than attorney-client privilege.  So that's why I'm focusing on -- we're down to the point where you're saying, if I find a waiver of work product protection as to Mr. Berthier's interview, that waiver should extend to the entire subject matter.  What is the definition of "the entire subject matter" for purposes of work product waiver?

MR. SAHAM:  Your Honor, we would be willing to view that limited to the backlog disclosure, because that's what he's commenting on, and to the extent there's other interview memos, where they interviewed other witnesses about the backlog disclosure.

THE COURT:  So other work product materials, witness interviews related to the backlog disclosure. That's the subject matter?

MR. SAHAM:  Correct, your Honor.

30

THE COURT:  Okay.

MR. SAHAM:  Yes.

THE COURT:  And is there a log of such items, or is that part of another lurking dispute?

MR. SAHAM:  We're again at an informational disadvantage, because the only discovery we've really gotten so far is what was produced to the SEC.  We received a privilege log that they produced to the SEC.  We haven't gotten privilege logs in our case yet, so we don't have a privilege log listing interview notes.

THE COURT:  Got it.  Okay.  So you would need to have the work product materials log in order to make an assessment about, you know, which ones, right?  You'd need a log that would say, "We're asserting work product protection as to these witness interviews conducted by counsel and as to this subject matter"?

MR. SAHAM:  Right.  If they were going to assert that Berthier is the only person they interviewed, and there's not 30 other interviews -- we don't know how many others there were, nor the subject matter.  Only defense counsel knows that.

THE COURT:  Okay.  All right.  Thank you.  All right.  And then, finally -- and I'll let you also share with me any other arguments you'd like to make, but this is my list of questions.

So one thing I can't tell is if the Plaintiff is also challenging -- and maybe you've answered this -- you know, the underlying privilege log, or a failure to log documents from certain attorney custodians.  I'm looking at the arguments for the notes, footnote one, footnote three, your proposed resolution.  There aren't really arguments developed in the letter about "You didn't adequately log" or "You're refusing to log things that you should log."  Just where are we with that issue?

          MR. SAHAM:  Certainly, your Honor.  We tried to be narrow about the 46 documents.  What we have are these three lawyers, Norris, Olli, and Wainblat.  We said they should be custodians whose files should be electronically searched for discovery in our case.  Defense counsel said, "No.  They're lawyers.  It's all privileged.  We're not going to do it."  So we've never gotten to a privilege log or anything.  What we know is there's 46 documents with their names on it that were withheld from the SEC in that two-week period.

     We don't know if we searched the -- they used search terms to gather the documents that were produced from 13 custodians, that were produced to the SEC.  Olli, Norris, and Wainblat were not one of those custodians,  What we said is "You should apply those same search terms to those three custodians, even though they're lawyers, because we think there's been waiver," and then there would or wouldn't be a

32

privilege log, or your Honor's ruling, if there was waiver, would extend to their documents, or at least some of their documents, but we don't have a privilege log.  I'm giving you a long-winded answer.

THE COURT:  Okay.  But your footnote number one implies that there's no dispute that these custodians filed, the three lawyers, will be -- are relevant, and I thought I understood that they would be searched, but that they would be too burdensome to log all the materials, and so lawyers and all their communications would be privileged.

MR. SAHAM:  Defense counsel has basically refused to go through -- they say, "It's all privileged.  We're not" --

THE COURT:  So "Not going to search."  Okay. Well, I'll find out from them what their position is.

MR. SAHAM:  Yes.  And if I'm misquoting what I'm saying, they can correct me.

THE COURT:  Okay.

MR. SAHAM:  Yes.

THE COURT:  They'll tell me if that's -- okay. And so what, exactly, is Exhibit 2, if you could just tell me?

MR. SAHAM:  Certainly, your Honor.  So Exhibit 2 -- and, again, if your Honor wanted us to provide a short letter brief with the four e-mails they did produce -- but

33

what we know is Mr. Norris drafted the 10Q -- it's an SEC filing -- on May 31st.  He drafted the first crack at it, and he used the word "discretionary" in the first crack. Then there's a bunch of e-mails where that language, in his words, gets "watered down" by the executives.  Those were the e-mails that were actually produced.

Then we know, on June 11th, so 12 days later, they file publicly for the world a backlog disclosure that doesn't have the word "discretionary" in it, and what Exhibit 2 is, is the 46 documents that were on the SEC privilege log that are about that disclosure, as far as we can tell.

THE COURT:  Okay.

MR. SAHAM:  It's got the same people, the same name, and what we say is the production of those documents to -- both the three or four e-mails that stamped "Privileged" about that topic to both us and the SEC, as well as the arguments that were made to the SEC in the presentation, saying "Lawyers approved.  Based on their review of the disclosure, they approved.  We acted in good faith.  There's no scienter" -- that those things working together cause a waiver for those 46 documents on Exhibit 2.

THE COURT:  Okay.  And there may be others, but these are the ones that you know about, because this is the privilege log that you have?

MR. SAHAM:  Right, and it's narrowly construed.

34

We know there's 250 others from other time frames that appear to be about backlog, but we know that those 46 are in between the initial draft of the disclosure and the filing of the disclosure, and say, "Backlog disclosure" on them somewhere.

THE COURT:  Got it.  Okay.  All right.  Thank you for clarifying that.  All right.  Those were my questions.  I'm happy to hear from you if there's any matter that we haven't covered that you'd like to address in this argument.

MR. SAHAM:  Just very briefly, your Honor, and the Marvell case is in my mind because I argued it in front of Judge Alsup, and Judge Alsup said -- on circumstances far less favorable to the Plaintiff here, he said, as soon as the Defendant there, which was Marvell, went to the SEC and gained and advantage by making a presentation.  He said, in his words, "Waiver."

THE COURT:  Yes.  I've read the transcript.

MR. SAHAM:  What we have here is something far stronger for the Plaintiff, things we didn't have in front of Judge Alsup.  We have a presentation where we say the lawyers approved the disclosure.  We have at least five e-mails from lawyers which are clearly, when you look at them, the CFO seeking legal advice, the chief accounting officer seeking legal advice, and the lawyers providing that legal advice.

So we have the actual express waiver of the documents that were stamped "Privileged" being produced, and under those circumstances, the subject matter, construed narrowly, being that 12-day window, it would appear from our perspective that those documents -- there's been waiver as to those -- at least those 46 documents, and, at a minimum, I think the Court should look at them, and compare those 46 documents to the four or five that were stamped "Privileged" that were produced, to see if they're substantively the same.

THE COURT:  So basically you're asking the Court to review the documents cited in footnote 34 of the written submission with the 46 documents in Exhibit 2, which I should review in camera?

MR. SAHAM:  Well, your Honor, it's slightly different.  In 34, they reference examples of the ones they produced to the SEC.  There's at least two others that are even more compelling that weren't referenced --

THE COURT:  I see.

MR. SAHAM:  -- in Exhibit 34, but are the ones that I would quote to you in a letter, because they're clearly seeking legal advice, stamped "Privileged" right on them.

THE COURT:  Okay.

MR. SAHAM:  So these are the --

36

THE COURT:  So that's an express waiver argument.  Okay.

MR. SAHAM:  Yes.  There's two documents, in particular, I would show your Honor.

THE COURT:  Okay.  But otherwise the proposal is that I compare what you have that's been produced, and is contended to be not privileged, but, if privileged, clearly waived, because it's been disclosed, with the 46 documents in Exhibit 2?

MR. SAHAM:  Yes.

THE COURT:  That's --

MR. SAHAM:  And if you believe Defendants, and they inadvertently stamped "Privileged" and produced it, and think it's not a privileged document, even though it's three lawyers discussing with two accountants a disclosure -- but, if you believe Defendants, as they said in the letter to the SEC and as they said in their letter, that those are not privileged documents, they just gave them to the SEC because they were lawyers on them, but they weren't privileged, then I think you'd have to look at the other 46 documents and see if they're any different, because they're saying these three are not privileged.  Are the other 46 not privileged, either?

But, your Honor, I guess one step removed -- and I'm not sure if your Honor is willing to go there -- I think

37

there's been waiver, and you don't even need to look at the documents that are on the privilege log.  I just think they've -- by going to the government, by producing these documents to the government and us, that's an express waiver of the --

THE COURT:  But I haven't seen any of the documents that they produced.  That's the problem, is you say they've produced these documents, and they're clearly privileged, and, therefore, there's been an express waiver.  I can't tell.  So I'm looking at the two documents that I do have, and these are the arguments that VMware is presenting to the SEC.

So I'm going to put you on the spot here and say you keep telling me they argued the lawyers approved, so I'm looking at the pages that you cited me, and, you know, the thing that comes the closest, I think, is at page -- the Bates ending 472, the third-from-the-bottom line of the first paragraph, and that's hardly -- well, I mean, that's --

MR. SAHAM:  Well, your Honor --

THE COURT:  -- not a really compelling, "and the lawyers approved, therefore," kind of a statement, if you know what I mean.

MR. SAHAM:  Well, your Honor, could you look at pages --

38

THE COURT:  So, yes, that's what I'm trying to say, what text --

MR. SAHAM:  I'm sorry.  That's the summary that they --

THE COURT:  Yes.  What text?

MR. SAHAM:  -- they write five pages about it later in the brief.

THE COURT:  I saw it.

MR. SAHAM:  You go to 485.  The heading is "VMware's Finance and Legal Professionals, as Well as PWC, Reviewed and Approved the Company's Use of Backlog."  And then, if you go to the third paragraph under that heading, they say that the legal professionals received numerous e-mails -- this is their words, not mine:

> "The record contains numerous e-mails,
> an internal memorandum, and other
> documents that reflect these
> individuals'" -- referring back to the
> prior sentence, "legal professionals" --
> "thoughtful consideration of the
> disclosure."

THE COURT:  Yes.  So, again, I think the thesis that VMware is arguing is that that sentence that you're referring to doesn't just refer to the professionals.  It refers to feedback from a number of internal and external

39

stakeholders, including multiple accounting, financial, and legal professionals, feedback from.  So, yes, the title of the section does says, "Reviewed and Approved" by people including legal professionals.  So I guess then we're back to the notion of "My lawyer reviewed it before I acted."

MR. SAHAM:  And drafted it, not just reviewed it, but drafted it.

THE COURT:  With the assistance of -- I mean, I read the whole thing.  So, I mean, you can't tell me that it was only lawyers, and that they're arguing that it's only lawyers.  They're saying there was a communication between the legal professionals and the accounting firm, back and forth, and ultimately they say they relied on the advice of their accounting firm.

That's the position they took in front of the SEC, at least as to the backlog issue, and so I'm going to find out what we're doing here, but, you know, it's not as strong as -- what I'm trying to say, it's not as dramatic a statement as you've presented it, in my reading.  So, if there's any other pages besides 485 to 490 and 472 that you're focusing on, I would just ask you to point that out to me.

MR. SAHAM:  Yes.  Not in the brief, your Honor.  I think, just to make this clear -- and I just don't think it's super complicated.  We're glad to submit a letter.  But

40

I think, if your Honor looked at, really, just one e-mail, you would be able to --

THE COURT:  It's really the e-mails.

MR. SAHAM:  It's so simple.  When you say, "Accountants," it's not PWC.  They're not even involved in the string.  It's the chief accounting officer, Mr. Krysler, going back and forth with in-house counsel.

THE COURT:  Okay.

MR. SAHAM:  You know, PWC, they say, ultimately approves it, but Mr. Berthier says he never heard anything about "discretionary."  So they couldn't be relying on PWC.  The only way they get to PWC is their interview memo.

THE COURT:  Okay.

MR. SAHAM:  So that's what I would say, your Honor.

THE COURT:  Okay.  I understand.  All right.  Thank you for clarifying that.  All right.

So now I'd like to hear from VMware.  I actually have some questions for you as well.  So I'm sure there's many things you would like to respond to that you've already heard, but if I could just share with you my questions.  So I just wanted to confirm that VMware has, in fact, produced to the Plaintiff all of the documents that VMware provided to the SEC during the investigation.  Is that right?

MS. O'CONNOR:  Yes, 100 percent, 75,000 pages.

41

THE COURT:  Okay.  And did VMware create --

MS. O'CONNOR:  Documents.

THE COURT:  -- a privilege log for those materials that were withheld from the SEC during the investigation?

MS. O'CONNOR:  Yes.

THE COURT:  Okay.  And that log has been provided to the Plaintiff?

MS. O'CONNOR:  That's correct.

THE COURT:  But there's been no additional supplemental privilege log provided for this litigation, You know, in response to the request for production you've received specifically in this litigation?

MS. O'CONNOR:  That's right.

THE COURT:  Okay.  And is that just, hasn't happened yet, or is there a position that VMware is taking that it's not going to produce such a privilege log?

MS. O'CONNOR:  VMware will certainly produce a privilege log.  We were not, I think, planning, or had not agreed to log Debevoise's internal materials, because that's just a logging burden, and this is the first we have heard of a desire for a log of interviews.  So this, again, is not something the parties have conferred about in advance, one of many things.

THE COURT:  And when you say, "Debevoise material," are the three lawyers, Norris, Olli, and

42

Wainblat -- are those Debevoise lawyers?

MS. O'CONNOR:  No, they're not.

THE COURT:  Those are in-house?

MS. O'CONNOR:  That's right.

THE COURT:  Okay.  So we're kind of jumping ahead a little bit, but I'm looking at footnote one.  Is VMware refusing to produce documents from those people's files, or to log privileged materials, or just "Everything is going to be privileged, so, therefore, we're not going to do any of those things"?  What is the position VMware is taking as to those three individuals?

MS. O'CONNOR:  So where that conversation is, your Honor, the Plaintiffs asked for those individuals to be added as custodians, and we said, "Look.  That's just going to be burdensome and duplicative, because they're going to intersect with other custodians' pulls already, but to go straight to a lawyer's files is just a really big burden."  You have to review them all for privilege, this and that.

There are also some direct pull matters where we're going -- we're not running search terms on custodians, but, rather, directly pulling documents, and they'll get additional documents from those custodians' files through that end, and so we don't feel that they've made the case that undertaking this burdensome process is necessary or appropriate here.

43

THE COURT:  Okay.  And that dispute, I realize, is not fully briefed.  I was just trying to get some color. And so it's not appropriate for me to decide that question at this time.  So thank you for addressing it so far.

So one thing I'm really curious about it -- and this is one thing that I think the Plaintiff is really focused on as well -- is, you know, what distinguishes the documents that VMware produced to the SEC from the documents that it did not and that it is withholding, so, for example, these 46?

So, you know, Plaintiff characterizes the documents that were produced as things that, you know, could fairly be construed as privileged communications which were nevertheless produced, and VMware, as I perceive, is sort of drawing a line between those things and what it's withheld before and is withholding now.  So what's the distinction, if you can?  And maybe it's not possible to generalize.

MS. O'CONNOR:  Well, I'm happy to generalize to the extent I can generalize.  I will say, if I may, one source of frustration for us is that Plaintiffs' submissions and our conversations never said, "We have an express waiver argument based on this set of documents."

This issue has not been teed up between the parties, which I think is not really a way to run a rodeo, when we're flying across the country for a privilege argument.  We did, you know, look at some of those documents, because we

44

thought perhaps they're referring to things cited in footnotes in the presentation, but they never told us that.

And so footnotes -- the footnotes that are referenced, 34, 35, these include non-privileged e-mails among VMware finance and accounting personnel, sometimes copying a lawyer but not reflecting legal advice.  So I think it's a principled and correct privilege call.

There are agendas and materials for disclosure committee meetings which reflect redactions where the SEC team withheld the privilege from the SEC but otherwise produced the document, and those are non-privileged, and there's one document that does contain discussion that may have initially been privileged, but was forwarded contemporaneously outside the privilege, and, therefore, had to be produced and was produced.

So those are the categories of documents that I can think of, and there is a little bit of an irony for being attacked for trying to draw a principled line on privilege and not simply call anything that copies a lawyer "privileged," but I think that that's the reality of the process that was followed, and the way that the decisions were made.

THE COURT:  Okay.  So, if the Court concludes that I can't really resolve this dispute without addressing what seems to be now the principal argument, which is express

45

waiver, based on these e-mail disclosures, without actually having some look at them, while, you know, letting the parties address that argument, is it VMware's position that it should have an opportunity to brief that?

What is the position on whether the Court should actually look at the four or six examples that the Plaintiff identifies as documents that have been produced that are clearly privileged, and whether I should compare them, do an in camera review of the 46 documents in Exhibit 2 or some subset of those?  Like, how does VMware propose the Court address this issue?

MS. O'CONNOR:  Well, thank you, your Honor.  I think that -- we have no idea what documents my colleague is referring to, apart from, you know, some reference to these footnotes.  So, if their argument is now an express waiver argument based on that, which is, I would say, not what was presented, then I think that we need to present that argument properly to the Court.

The request that the Court review the 46 documents on the privilege log is a little bit of, like, a "heads I win, tails you lose" position they're taking.  Like, if these documents are privileged, the Court has to review them.  If these documents aren't privileged, the Court also has to review them.  I don't think that makes a lot of sense to me, and I don't think it's a great use of judicial resources, if

46

the documents -- if the Court agrees are not privileged, and I think the company had, certainly, a good faith reason to think they were not, and was drawing a very careful line with the SEC, and was not waiving privilege.  So, if that, you know, position is upheld, then I don't see any reason to start reviewing everything else inside a privilege log.  I think that would reflect --

THE COURT:  Well, I wouldn't review everything.  I understand it's quite long.

MS. O'CONNOR:  Yes.

THE COURT:  But there's a particular claim as to this subset of the privilege log, that it is, from the Plaintiffs' perspective, indistinguishable from documents that have already been produced, covers the same time period, same subject matter, but VMware's position is, unless I find there's been a waiver already, express or implied, and I'm down to the question of "Okay.  How broad is that waiver," I should have no need to look at anything in camera.  Is that fair?

MS. O'CONNOR:  I think that's correct, your Honor. Obviously, whatever the Court finds helpful, we're not, you know, going to stand in the way of the process, but it feels like, you know, VMware drew careful lines.  Not every document that copies a lawyer is privileged.  I think that's very clear, although I appreciate my colleagues broad view

47

of things, and, you know, so we tried to be principled about that.

There's going to be other documents that reflect a lawyer giving advice and going back and forth more specifically.  Those were withheld, and I don't think that there's a need -- if the Court agrees that this set is not privileged, I don't think there's a need to then start delving into what else is there, based on Plaintiffs' desire to know what else is in there.  That's not really a basis for invading the privilege.

THE COURT:  Well, of course, I wouldn't share with them.  It would be an in camera submission, just me, but, you know, under federal rules, that's okay.  And I assume everybody agrees federal law applies here to attorney-client and work product issues here, right?  There's no --

MS. O'CONNOR:  Yes, your Honor.

THE COURT:  Okay.  Very good.

So let me turn to the point which I think is really kind of -- well, at least what I interpreted as the crux of the argument made in the papers, which is this concern that VMware has and will -- so has in the SEC investigation and will in this case -- point to the fact of counsel's review and approval of the backlog disclosure and the pre-clearance of trades, the so-called "insider transactions," to negate or rebut a showing of scienter or

48

to affirmatively show good faith.

Even if that's not explicitly called out, and it's not a full-blown "advice of counsel" defense, I do find Judge Hixson's discussion and observations in Abdo pretty compelling when it comes to, you know, the notion that you could make a suggestion to a fact finder that would be unfair and misleading if you weren't really prepared to go all the way and hit all of the elements on an "advice of counsel" defense.

So, you know, I'm really -- you know, the footnote response in VMware's portion of the discovery dispute letter was not particularly informative as to how things -- how you see things playing out in this case.  So, if we put aside what may have happened before the SEC and what positions were taken there for a moment, just want is the position that VMware is going to take in this case, or has taken in this case on that question of scienter and good faith?

MS. O'CONNOR:  Well, we are certainly not going to put the advice of counsel at issue, and we don't intend to do that in any way.  So I think, in my mind, there's a question in my mind whether the time to fully identify those parameters is today or is a motion in limine, when it's more concrete, but if the Court prepares to do it today, we're prepared to be bound by whatever the Court sees as necessary to not prejudice the Plaintiffs, and that's fundamentally

our position.

We do not intend to inject this issue into the case, and, you know, I would -- I think that, you know, Plaintiffs did reference a couple of in limine-stage decisions around this issue.

THE COURT:  Abdo was one of them, yes.

MS. O'CONNOR:  Yes, and my instinct is that that's probably the appropriate time to fully nail down what can and can't be argued, simply because -- you know, simply because it's -- you know, it's kind of hard, in the abstract, to draw lines without the full ability to think about, you know, whether there's something that could come up, but I think the fundamental thing I want to convey to the Court is that we are prepared to abide by whatever, you know, the Court feels is necessary at this stage and any stage, so that Plaintiffs aren't prejudiced by any suggestion of counsel approval.

THE COURT:  Okay.  Yes.  I mean, so, just to kind of flesh this out, I mean, you know, U.S. v. White, which you cited to me, is helpful in the sense of it distinguishes between an observation that a lawyer was in the room and whether substantive advice was relied on and used to establish a point, but it also makes the point, U.S. v. White makes the point, that you can't use the lawyer's presence or participation to mislead.

50

I mean, it's right there in the discussion of, you know, sort of the implied waiver doctrine and how it's supposed to work, and that was a criminal case, so, you know, there was -- you know, maybe there were some slightly different optics to what was going on there, but I think, again, returning to <u>Abdo</u>, that's very compelling to me.

So, you know, where to draw the line is -- I take your point.  It may be difficult for me to do at this stage, but it's ultimately going to come down to, if you get all the way to trial, or even summary judgment, and they haven't had an opportunity to take this discovery because I've prevented it, for example, well, you know, I doubt that it's going to get reopened.  It will just be, you know, a "No."  Right?

So I just wanted to be very clear.  Given that you have these affirmative defenses, apparently, in the answer, the fifth and the eighth affirmative defenses, which don't explicitly reference lawyers or advice of counsel, but are there, I'm not entirely sure what to do with that.  Is that some other -- what is the basis for those affirmative defenses, if you can share with me?

MS. O'CONNOR:  Well, one is we didn't act with scienter, and one is our disclosures were --

THE COURT:  In good faith?

MS. O'CONNOR:  -- were not misleading.  So, look. I mean, I think there's defenses we're going to need to

51

assert in the case to defend against elements of the case. One way to think about it is we didn't act -- we're not going to say we didn't act with scienter because our lawyers approved this, but I think there would be room to say we relied on PWC's sign-off, which is not legal, and Plaintiff has the PWC testimony from the SEC, which VMware itself didn't have until, you know, it was received in this proceeding, and they have the ability to take testimony, and to argue that the PWC witness, you know, was or was not fully informed, and that is or is not valid, but I think that's a type of argument we would have available, just to give an example off my head, that's not, I don't think, invading anything about what lawyers were saying or doing.

THE COURT:  Okay.  So now let's move to this question, which I think is -- well, at least it's more challenging for me.  Maybe it's not challenging, but I have some concern about it, which is the idea that there was an implied waiver before the SEC, not an express waiver -- put that aside for a moment -- but an implied waiver before the SEC, because of statements that VMware made in its presentation and its written submission, and I'm just going to focus on the insider transactions part, because that's the quoted language that I read earlier, but it could apply also to the statements that the Plaintiff was mentioning at pages 489 to 490 about "Legal professionals approved."

52

So, with the insider transaction statement, which is at page 489, does that not effectively communicate, "Our lawyers looked at each trade in question before it was made, determined that each officer was not in possession of material nonpublic information before the trade was made, and said, 'Okay'"?  Like, does that not -- does the statement that VMware wrote to the SEC not communicate exactly that sentiment?

MS. O'CONNOR:  Your Honor --

THE COURT:  I'm sorry.  Four eighty-nine of the written submission.

MS. O'CONNOR:  Four eighty-nine.

THE COURT:  Let me make sure I've got the --

MS. O'CONNOR:  I think it's not 489.  I did see it a few moments ago when we were talking, so I just --

THE COURT:  No, no.  I'm sorry.  I'm sorry.  You're right.  I have the wrong citation.  Four ninety-eight.  Excuse me.  Sorry.  Sorry about that.  Didn't mean to mislead you.  No.  Let's see.  Yes, bottom of 498.  So, yes, bottom of 498.

Does that not effectively communicate what the lawyers' view was?  That's the first point.  So there are, you know, many points, first, second, and third, argued in this section, but the first point is -- four points.  The first point is "Lawyers pre-cleared," and not just "Lawyers

53

pre-cleared," but lawyers, like, did these things.

MS. O'CONNOR:  Well, your Honor, I think that -- I do think that it's a process-oriented statement, and there's an aspect of this that's compliance and an aspect that's legal.  If you look at the trading submission that was put into the SEC, they're citing e-mails to brokers that state as a factual matter, "This person has been pre-cleared to trade," but these are not -- I don't think there's any revealing of legal advice in that, and I do think that this statement, like all the other statements, were intended to be "There's a process in place, and the process was followed, prior to these trades being made."

I think that, you know, on the backlog topic, that we had been talking about, I think it's quite clear that what the company is talking about when it talks about "lawyers" is if you look on page 16, the last sentence of the first paragraph there, referring to a "detailed vetting process," and then, if you go to page 20, the conclusion of the extended PWC discussion refers to "Given PWC's approval of the disclosure language, we don't see a basis for fraud charges," and I think that that's the line that was walked through this submission, was that lawyers were referenced in connection with an effort to show the processes that existed and were followed, and with regard to PWC, there was a direct argument about approval, and the benefit of that

54

approval to the company.

THE COURT:  But there is the section heading at page 15, Bates number 485, subsection C, that Plaintiffs' counsel called out as being a pretty explicit statement about "Finance and Legal Professionals Reviewed and Approved."

MS. O'CONNOR:  Yes, and, your Honor, I obviously see those words there.  I think that the way I see that is a kind of inartful heading, because it doesn't match what's argued, and what's argued is that "Legal professionals and finance professionals reviewed," and then, as I just referenced on page 20, "and PWC approved," and that's what's actually argued.  I think that heading is a little bit of an inartful mishmash of those two points.

THE COURT:  Okay.  Well, thank you for your argument on that point.  I had wondered about the process.  I think you said, "Process-oriented statement."  I had wondered about that, but it's not really -- wasn't really briefed, so I didn't want to suggest that to you all, but that was something I was thinking about.

I think that makes this more challenging, because there are some things that lawyers do that are clearly just process things -- not just process things, but things that are expected to be done from a process perspective, and you would communicate the result of that process to any number

55

of people, internal and external, without disclosing some underlying privileged communication, and that happens all the time, I think, with public companies and SEC, like normal filings.  So I'm trying to figure out, you know, where does the line get crossed where that becomes a disclosure of legal advice?  And that's what I think is more challenging about this circumstance.

I did want to ask about something in the executive trading analysis, so I think VMware calls that the "presentation," and it's at page 569, and this is kind of going to this process notion that you just mentioned, Ms. O'Connor.  What am I looking at at -- it's slide five, Bates number 569?

MS. O'CONNOR:  This is an excerpt of the company's compliance procedures with regard to VMware's insider trading policy.

THE COURT:  Is that a privileged document?

MS. O'CONNOR:  No, it's not a privileged document.

THE COURT:  Okay.  I'd like to turn to the witness interview issue.  Okay.  So, as I understand it from the Plaintiff, there was an interview of Mr. -- how do I pronounce his name, "Berthier"?

MS. O'CONNOR:  I believe it's "Berthier."

THE COURT:  Berthier.  Mr. Berthier.  Then there was also a deposition, for which there is a transcript, and

the interview, not a privileged communication, but the contention is that counsel's notes are work product.  Is that correct?

            MS. O'CONNOR:  That's correct.

            THE COURT:  Okay.  So for what purpose was that interview conducted?  I assume Debevoise did the interview.

            MS. O'CONNOR:  Yes.

            THE COURT:  What was the purpose?

            MS. O'CONNOR:  I think it was for the purpose of gathering information.

            THE COURT:  For --

            MS. O'CONNOR:  In connection with the SEC investigation.

            THE COURT:  Okay.  So the investigation had already happened, or it was launched?  I'm drilling down on "in anticipation of litigation."

            MS. O'CONNOR:  Yes.  The SEC investigation was underway.

            THE COURT:  Okay.  All right.  And then --

            MS. O'CONNOR:  And my colleague just pointed out -- maybe this is helpful, your Honor.  On page 19 of the written submission --

            THE COURT:  Yes, I have the -- that was just where I was going.  This is where it's quoted.

            MS. O'CONNOR:  Yes.

57

THE COURT:  Yes.

MS. O'CONNOR:  It says, at the beginning of that paragraph that starts in the middle of the page, "We note that in March 2020, at the start of the investigation" --

THE COURT:  Got it.

MS. O'CONNOR:  -- "we interviewed."

THE COURT:  Okay.

MS. O'CONNOR:  So that's what -- the SEC investigation was underway.

THE COURT:  Got it.  That was the purpose.  Okay. So, you know, there's quote marks around the statements attributed to Mr. Berthier.  So let me just ask this question.  Like, what is the source of the quoted material? Is it written notes?  Is it an audio recording?  Is there a transcript?  Like, you know, something is being quoted.

MS. O'CONNOR:  It's attorney notes, your Honor.

THE COURT:  Okay.  And the attorney notes are effectively verbatim?

MS. O'CONNOR:  No, they're not effectively verbatim, but I think that there are parts of it that would be -- you know, it's mostly fact work product, and maybe just a little bit of opinion work product.

THE COURT:  Because it is presented, "Berthier" stated, quote, "Berthier stated," quote.  So it feels very verbatim in the way it's presented to the SEC, but it's not

58

necessarily verbatim?

MS. O'CONNOR:  Well, I guess, your Honor, maybe I should be careful.  I wasn't there.  I have looked at those notes, and I would have to ask the person who took them how verbatim they were.  They seemed to have been comfortable with those statements being fairly close, but I don't want to get out over my skis in answering that one.

THE COURT:  Sure.  Okay.  So I have had occasion to deal with this situation, as you all know, in the Rubalcava matter, not the same situation, but a disclosure of attorney notes, and, you know, it's difficult for me to see how this is not a disclosure, if the notes are work product, how this is not a partial disclosure, at least to the SEC, of attorney work product.  I mean, it seems really straightforward.  How could it not be?

So, if this is not attorney work product, and it's, you know, just an audio recording, okay.  Well, then, maybe the audio recording should be -- without any, you know, counsel impressions involved at all, should just be turned over.  But, if this comes out of attorney notes, and it's claimed to be work product, it has been disclosed, and I just don't see any way around that.

MS. O'CONNOR:  Yes, your Honor.  I think that where it kind of broke down was Plaintiffs said, "And, therefore, we need every single interview memo you ever

59

did," and we were like, "Wait.  What?"  And I think the case law is clear that, to the extent that there's a waiver, it doesn't go beyond what is disclosed, and so, obviously, certain statements have been disclosed.

We did offer to Plaintiff, and we're prepared to produce to Plaintiff, that set of notes.  There's, as I mentioned, a little bit of opinion work product that we would seek to redact from it, but the response was "No, we need every single interview memo," and we couldn't -- we weren't able to resolve the issue.

THE COURT:  Okay.  But as to Mr. Berthier and the attorney work product associated with that interview, is VMware prepared to produce notes of the entirety of the interview, perhaps excising opinion work product, if there is any, from fact work product?

MS. O'CONNOR:  Yes, your Honor.  I mean, I think, in another circumstance, I might say, "Look.  This is -- you know, waiver of work product only waives what is disclosed," but that's already -- Plaintiffs have that, and if it gets us through this, we don't mind providing the rest of those notes, subject to the redaction of opinion work product.

THE COURT:  Okay.  And then I don't really have a good sense of what is the extent of the possible scope of subject matter waiver that the Plaintiff is advocating, how many witnesses, anybody else interviewed about backlog

60

disclosure.  Since there's no log, what is the scope of what we're talking about here?

MS. O'CONNOR:  So maybe I can answer that in two ways, your Honor.  Obviously, there was a broader investigation.  I don't know offhand the number of witness interviews that exist.  Maybe it's approximately 20.  I don't exactly have that at my fingertips.

But here I think that the effort to turn this into a subject matter waiver is not supported by the law.  This was a -- this is a person outside of the company, PWC, who was, you know, spoken to about this disclosure, and what was stated to the SEC is "This person outside the company said the following thing."

I don't see how that leads to -- first of all, work product waiver is narrower.  It doesn't tend to be a subject matter waiver.  I really don't see how that leads to "Therefore, if Debevoise spoke to the chief accounting officer about that law, that's waived."  This is not -- we're not making a representation to the SEC about VMware. We're making a representation to the SEC about PWC.

THE COURT:  Yes.  I mean, I guess you could say, "Well, the scope of subject matter waiver is very narrow," meaning this person and, you know, this interview.  Was Mr. Berthier interviewed on more than one occasion or just one occasion?

61

MS. O'CONNOR:  I'm pausing, your Honor.  It's possible that there were kind of two close together.  I don't have that at my fingertips.

THE COURT:  I mean, I could see an argument, potentially, if there's a contention that PWC did or said "X," let's say, with regard to the backlog disclosure, recommended this, and we have more than one person from PWC who was interviewed, and they said inconsistent things, that that might be meaningful.

I take your point that if it's PWC, someone internal to the organization, you know, other people, that that might be getting outside the scope of an appropriate waiver, but I don't have anything that says, "These are the things that we're withholding based on work product.  So I'm wondering if it might be easier for me to resolve this dispute if I knew what else there was.

Is there any reason why VMware would not identify -- presuming there's a request for production out there -- identify what other interview memos are out there, so that I could make a determination about what is and what is not?

MS. O'CONNOR:  Well, I guess there could be an argument that the individuals interviewed is in itself work product, and maybe I would just need to discuss that with my client, and make sure that people, you know, figure out the comfort level that exists around that.

62

THE COURT:  I see.

MS. O'CONNOR:  You know, Plaintiff does have three transcripts of SEC testimony taken under oath of PWC witnesses.

THE COURT:  Okay.  So people other than Mr. --

MS. O'CONNOR:  Mr. Berthier and two others, and we just received those.  I haven't read them, but they exist. So, you know, I think --

THE COURT:  I mean, it seems to me -- let me just -- I'm sorry to interrupt you, but it seems to me like, in this case, PWC's communications with VMware are pretty critical to VMware's position, and, you know, Mr. Berthier as an example.

If his present recollection is different than the interview that he gave to counsel during the investigation, I would imagine that VMware is very interested in impeaching him with that prior statement, if it's inconsistent.  And so there will come a time, if the same thing happens with other PWC witnesses, that it will be necessary to disclose these things, because you will want to use them.  Do you see what I'm saying?

So I'm not sure if we're at that point now, but it seems that, at least with respect to Mr. Berthier's testimony, that the factual statements that were relied upon, and, presumably, will be relied upon by VMware, are

63

entirely discoverable.  So I'm not sure where we stand on the other folks.

MS. O'CONNOR:  Right.  Well, I guess the way I would think about it, your Honor, is I guess I just see zero prejudice to Plaintiff in this situation, where, you know, excerpts from one interview were disclosed.  We have offered to provide the rest of those notes.  Plaintiff has testimony under oath by the SEC, which VMware did not have at the time of putting together the written submission, because that's not the way it works with the SEC, so we weren't there, didn't know what had been said.

So Plaintiff has a very robust ability to conduct a -- he can decide whether it's a cross or what type of deposition he wants to take of anyone from PWC.  I guess I'm having a little trouble with the notion that we would get to any type of broader waiver beyond the specific notes that were disclosed of one interview, and I don't see any --

THE COURT:  Just based on the record before the Court right now, that's your argument?

MS. O'CONNOR:  That's right.

THE COURT:  Okay.

MS. O'CONNOR:  That's right, and I don't see any -- I just don't see any prejudice to Plaintiff that would justify any type of broader waiver here.

THE COURT:  Okay.  Thank you.  Is there anything

64

else that you would like to argue?  Those are my questions.

MS. O'CONNOR:  Well, your Honor, I appreciate your time this morning, and I think I have probably covered much of what I wanted to cover.  Let me just --

THE COURT:  Sure.

MS. O'CONNOR:  -- in the course of responding to the Court's question.  You know, I guess, you know, I do think that the argument that came through to us -- and my colleague can tell me I'm wrong, but the argument that came through to use from the papers submitted was very clearly an implied waiver argument, and implied waiver, of course, requires a showing that there would be -- it would be manifestly unfair to let the privilege stay in place, and on each of these topics, I just don't see how that showing has been made, especially on the backlog, with the representations that we've made about, you know, we're not going to rely on this.

We are not going to rely on the written submission, and Plaintiffs -- you know, it's just not injected into this case.  I just don't see any way Plaintiffs get past this unfairness showing that they would need to show for implied waiver.  That may be why they're doing what looks to us like a pretty big pivot to express waiver, and my colleague tell you that it's not a pivot, but it was -- you know, it feels that way to us, and that may be why, to get away from this

65

fairness issue.

We just don't see any prejudice to the Plaintiff in a situation where, you know, a well submission was made to the SEC that I think really does walk a careful line between process and substance, that no privilege -- the privilege was not waived.  The privilege was not selectively disclosed to the SEC, but, rather, we made a decision we're not going to waive.

There were redactions.  There was a privilege log with the staff.  Plaintiffs have, you know, 75,000 documents from the SEC production.  They have all kinds of testimony from SEC.  We're not putting this at issue.  I'm just not seeing how they would get to any unfairness, even if there an implied waiver, which, obviously, as your Honor understands, we dispute.

THE COURT:  Okay.  All right.  Thank you.

Let me go back to the Plaintiff, and I'm going to let you respond, but I do want to -- I am sensitive to this issue of, like, what was briefed and, like, kind of how it may have morphed, and, you know, I don't want to suggest that you have to -- how should I put it? -- you have to really defend that, that it didn't morph, because where I'm going with this is, if express waiver is really the issue here, I'm going to give the parties an opportunity to brief it, because I don't feel like I have the record to address

66

that.  I don't have the record to address it.  So, anyway, I just -- I wanted to say that before you got into your response.

MR. SAHAM:  Certainly, your Honor, and more briefing is fine, but on the top of page three -- and this is a quote from our letter, which they've had -- you know, they got it from us, and then they responded, and then -- you know, so they had it for quite some time -- that:

"Communications from VMware's in-house counsel that were produced to the SEC, including those stamped 'Privileged,' evidenced the backlog disclosure was drafted and revised by in-house counsel. Based on these communications, VMware had a reasonable good faith basis for adopting its backlog disclosure."

That's at the top paragraph of page three of our letter.  We have always made that argument.  We believe -- and your Honor, I think rightfully, asked for those submissions, because they used these documents, and they made arguments in those five pages in that section C, that exacerbated it.

THE COURT:  Right.

MR. SAHAM:  They went to the SEC and said, "Exonerate us, because counsel approved this."

THE COURT:  Well, this is why I asked the question of "Is it express waiver or is it implied waiver," because the case law is a lot about implied waiver and discussion about fairness, the fairness principle, which is an implied waiver concept, and then I have these cites here, and the cites are only to the presentation and the submission, and not to the underlying documents.  So that's why I asked for those.

So I think we've gotten to the point where I now understand that the Plaintiff is making both arguments, and perhaps principally an express waiver argument, but it's not fair, especially when we're talking about privilege, for me to deal with it on the record that I have right now.  It's not fair to either side, because I just have your characterization of a document that I don't see.  Right?

MR. SAHAM:  And to be fair, your Honor, when the Court asked for those two presentations, we were on a meet-and-confer with defense counsel, and we said, "Well, can we also submit the e-mails?"  And their response was "We're just going to send what the Court expressly asked for."

THE COURT:  Yes, which is appropriate.  You know, I mean, I hold people to my standing order.  I try to do these things expeditiously, but I will tell you that sometimes I find, when it's not like a -- when it's not just

68

a legal decision, on privilege questions in particular, that I often invite the parties to do regular noticed briefing, where you can submit your declarations, you can submit your underlying documents in just a regularly noticed motion, because privilege issues are often very challenging for me to decide just on the abbreviated, expedited discovery dispute resolution procedure that I like to use.  This may be one of those circumstances, now that I more fully understand what the parties are arguing about.

So we can talk about that, but let me just hear if you've got any other responses to arguments that your adversary made.

MR. SAHAM:  Certainly, your Honor.  I mean, avoiding going back to the documents themselves --

THE COURT:  Yes.  You don't have to repeat yourself, just anything -- yes.

MR. SAHAM:  -- the only thing I would add -- they went to the SEC.  They filed the submission.  The words were chosen very carefully.  They said that "Lawyers approved." They cited documents.  They cited interview memos.  Like, I mean, that's going a pretty long way.  They didn't say, "We know Mr. Berthier is lying," you know, or "We know what the SEC is saying Mr. Berthier said is incorrect."  They said, "We interviewed Mr. Berthier, you know, going back further in time when the events were fresher in his mind, and he

69

contradicts what you're saying, SEC."

THE COURT: Okay. That's the work product issue. I got it. Okay.

MR. SAHAM: Yes. But, your Honor, I understand you're separating the work product from -- but it's the point, and, again, maybe I'm --

THE COURT: But that undermines your argument, which is "PWC. We relied on PWC. PWC. That's why we have good faith. That's why we have no scienter, because PWC told us it was good." So that, like, undermines your point that "Legal counsel said it's good."

MR. SAHAM: It's two separate points completely. They make two separate points. They say, "Legal counsel approved it," and they say, "When Mr. Berthier says he didn't know about it, he's lying, he's wrong."

They're two totally separate points, but, in combination, they used both of those points to argue to the SEC that they shouldn't -- they didn't have scienter, they acted in good faith, and it's that going forward to the SEC to gain an advantage which causes a subject matter waiver. And, honestly, I understand why the Court would struggle with "Well, how broad is the subject matter waiver?" But it's those things together that constitute a waiver.

THE COURT: They did not rely on an "advice of counsel" defense, per se, in front of the SEC. Do you

70

agree?

MR. SAHAM:  Well, I think they went to the SEC and said, "Counsel approved."  I guess I disagree, your Honor. I think they went a lot closer to the SEC than -- they haven't done anything in our case other than provide their answer, because we haven't tried the case yet, or submitted witness lists or examined anybody, but they went to the SEC, your Honor, and they said -- it's in their heading -- "VMware's Finance and Legal Professionals Approved."

THE COURT:  Yes.  So, if the SEC understood them as relying on advice of counsel, do you agree that it didn't say, "Okay.  Then show me all that stuff.  Show me all the stuff"?

MR. SAHAM:  Well, they had already seen these two -- and, again, I'm getting back to these two e-mails.

THE COURT:  So you think it has to -- it all comes back to "There's the stuff," they already produced it?

MR. SAHAM:  Yes.  They already showed it to them.

THE COURT:  Okay.

MR. SAHAM:  I mean, it's so clearly -- it's advice from lawyers.

THE COURT:  Okay.  No, I'm just --

MR. SAHAM:  Yes.

THE COURT:  This is kind of where I think we're ending up, is that your implied waiver argument depends on

71

an express waiver in some ways, right, because, if your thesis is there was an implied waiver, at least, if not an express waiver, before the SEC, then that implied waiver means you're done, VMware, for this case, even if, in this case, you're not going to take a position that counsel's advice has any bearing at all on your affirmative defense or your scienter or good faith.

So you're saying, I think, it was already done at the time of the SEC investigation, there's no going back even if you take a different position in the case, which, by the way, I'm not sure is the law on implied waiver, clearly express waiver, but I'm not sure is the law on implied waiver, and I'd really like to know your best case for -- if you impliedly waive something, or suggest that you're doing that, in one forum, dispute, jurisdiction, but that forum doesn't say, "Well, as a consequence of that, show me everything," and you're saying they did do that, but "Show me evidence.  I'm not going to let you get away with that," then what happens when we come here?  Like, I don't know that any of your cases, anybody's cases, address that scenario.

MR. SAHAM:  Your Honor, where I think the law is slightly confused -- and I can understand your difficulty, because I have the same difficulty -- I believe there's two separate concepts that are both at work, and overlap.  If

72

there's an express or an implied waiver, then you'd have to ask, "What's the subject matter to which there was waiver?"

THE COURT:  Yes.

MR. SAHAM:  That's one issue that you could look at it, once there's been a waiver, that it goes beyond the particular item that was waived to cover the entire subject.

THE COURT:  Here's the point.  It's not just the subject matter that we were -- and I'm using U.S. v. White. It's not the only case that says this, but writing for the -- this is the D.C. circuit, writing for the Court.  The Court observes:

"The government acknowledged as much" -- meaning lack of substantive content in the disclosure -- "acknowledged as much when it admitted in oral argument that if GSA investigators had followed up White's undetailed assertion by asking what his attorneys had told him, White at that point still would have been able to claim his privilege and refuse to answer.  A contrary rule would ill serve the policies underlying the doctrine of implied waiver."

Meaning there's some point where someone says, "Attorney approved.  I'm not going to tell you what they

73

said, or how they approved, or what I told them, or anything like that.  Attorney approved."  And then someone says, "Okay.  Now I'll put you to the test.  What did your attorney say, and what did you tell your attorney before your attorney said that and approved it?"

SEC didn't ever get to that point, VMware argues.  So they put something out there.  SEC didn't drill down.  They've refused to disclose the privileged communications, and now here we are at, you know, federal court lawsuit.  Are we not in the same position that Justice Ginsburg, then Judge Ginsburg, was describing as the point at which you have an implied waiver or not?

It depends on how far the privilege holder goes in reliance, and that's what I'm worried about, is that here VMware didn't go as far as you're saying they went in the SEC investigation.  Now they're here telling me they're not going to go that far in this litigation, either.  They're not going to talk about counsel.  They're going to talk about PWC.  So I'm not sure I have any case law addressing that scenario.

MR. SAHAM:  We'll do our best to give you the case law, your Honor, and I think our briefing certainly would focus on these two e-mails.

THE COURT:  All right.  Well, let's talk about that issue, because, you know, while I don't like to create

74

more, you know, time, effort, and expense for anybody, I do feel like this is a serious issue that deserves -- you know, before I would find a waiver, I want to give the privilege holder an opportunity to feel like they've been fully heard and had an opportunity to brief it, and not be limited to 1,500 words, especially if they say, well, they didn't really appreciate the focus of your argument, and you haven't put before me on behalf of the Plaintiff the documents you think really are meaningful for the express waiver argument.

So I'd like to give you an opportunity to brief it.  I think you have a -- you don't have a discovery cutoff that's upon you.  It's not until June.  Is that right?

MS. O'CONNOR:  Correct.

THE COURT:  All right.  So I'm happy to just have you all talk about a briefing schedule.  You know, I can hear you, typically, on, you know, 35 days' notice.  I'm not scheduling things way out.

So we can get to it as promptly as you'd like, but I'd like to invite you to do it as a regularly noticed motion, and I will just -- I mean, I think what makes the most sense is, because these things seem to be wrapped up, express waiver and implied waiver, wrapped up in the present dispute, is I should just not rule on this submission, and allow you to fully brief it instead.

75

I hope that's okay with everyone.  If you want me to decide this one as it currently is, I can, but I think you may both be dissatisfied.  So I would rather have a fully briefed motion.

MS. O'CONNOR:  That's fine, your Honor.

MR. SAHAM:  That's fine with us, your Honor.

THE COURT:  Okay.  All right.  And then Plaintiff would go first, because it's your argument.  I think that's the appropriate thing to do.  There would be an opposition and a reply.  Okay?

MR. SAHAM:  And --

THE COURT:  So I'll let you confer about what you want to do in terms of schedule, and you can just go ahead and brief it.  You don't need approval for a hearing date. I mean, if I'm not available on your hearing date, I'll tell you, but does that make sense to everyone?  Okay.

All right.  Well, that's how we'll proceed, and I'll figure out what to say about this one, but I won't decide it in its current form.  Okay?  All right.  Thank you all very much.

MS. O'CONNOR:  Thank you, your Honor.

MR. SAHAM:  Thank you, your Honor.

THE CLERK:  Court is concluded.

(Proceedings concluded at 11:30 a.m.)

76

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Wednesday, November 15, 2023