UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Magistrate Judge

LAMARTINA,                        )
                                  )
          Plaintiff,              )
                                  )
vs.                               )   Case No. C 20-02182-EJD
                                  )
VMWARE, INC., et al.,             )
                                  )
          Defendants.             )
_____)

                                      San Jose, California
                                      Tuesday, January 16, 2024

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
        RECORDING 10:00 - 10:51 = 51 MINUTES

APPEARANCES:

For Plaintiff:
                              Robbins Geller Rudman & Dowd,
                                LLP
                              655 West Broadway, Suite 1900
                              San Diego, California 92101
                         BY:  SCOTT H. SAHAM, ESQ.

For Defendants:
                              Debevoise & Plimpton, LLP
                              66 Hudson Boulevard
                              New York, New York 10001
                         BY:  MAEVE O'CONNOR, ESQ.
                              ELLIOT GREENFIELD, ESQ.

Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

*Echo Reporting, Inc.*

2

<u>Tuesday, January 16, 2024</u>                              <u>10:00 a.m.</u>

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling case 20-CV-02182-EJD, Lamartina versus VMware, Inc., et al., on for discovery hearing.

If the parties could state their appearances, please, beginning with Plaintiff's counsel.

MR. SAHAM (via Zoom):  Good morning.  Scott Saham for the Plaintiff.

THE COURT:  Good morning.

MS. O'CONNOR (via Zoom):  And good morning.  Maeve O'Connor for the Defendants.

THE COURT:  Good morning.

MS. O'CONNOR:  Good morning.

MR. GREENFIELD (via Zoom):  And Elliot Greenfield for Defendants also.  Thank you.

THE COURT:  Good morning.

This matter is a hearing on the discovery dispute that the parties filed at Docket 116 regarding the four documents produced by nonparty, Mr. Dockery (phonetic), that VMware has redacted on grounds that certain material is privileged. As you all know, I've reviewed the documents in camera, and I sent you some questions that I'd like addressed at this hearing, and that -- those were in Docket 126.  So,

hopefully you've had an opportunity to consider those questions.  I'd like to start with some -- some issues for VMware.

As I understand it, the four documents themselves are -- they're not communications seeking legal advice.  But, rather, VMware's position is that those documents or the redacted text in those documents summarizes or describes privileged communications previously exchanged between Mr. Dockery and in-house counsel.

Is that essentially correct?

MS. O'CONNOR:  That's generally correct, your Honor.  I think there may be some examples of communications with a lawyer in those documents that are arguably seeking advice or alerting the corporation to an issue on which it should get its legal advice from the lawyer who's being consulted.

THE COURT:  Right.  But that's -- it's only sort of his -- it's like Mr. Dockery's sort of reflecting on past communications.  He's not actually in those four emails or, whether to himself or others, seeking advice in the moment in those four emails, contemporaneously with those four emails.

Do you agree?

MS. O'CONNOR:  I -- I -- I mostly agree with that, that he's mostly saying that I -- this is the communication

4

I made to counsel previously.  I think there is one where he's saying, By the way, I didn't tell you about this inappropriate and concerning behavior by a particular executive that took place just recently and is laying out some behavior at Dockery 26, which I think is in that moment alerting the lawyer to the company to conduct that he thinks is concerning for the company and the company needs legal advice on.

THE COURT:  Okay.  And you referred to the page -- I'm -- by the way, for the sake of this hearing, we're only going to look at the redacted versions.  I think that's safe.  Those aren't confidential, and they're redacted.  So, I'm looking at the one that's -- the page that's labeled Doc 026, is that the page you're referring to, Ms. O'Connor?

MS. O'CONNOR:  Yes, it is, your Honor.

THE COURT:  Okay.  So, what's not clear to me -- and this -- this is really going -- diving into the first question I posed in my order is it's not clear to me that the communications, either the contemporaneous communications such as what's in Doc 026, or the summary of past communications, whether the purpose of those communications was for seeking legal advice.

So, you know, I'm mindful of the Upjohn standard and applies where communications are with counsel for -- on behalf of the corporation seeking legal advice or where

counsel is charged by the corporation with doing an investigation, but it's not clear to me from the papers or from the documents themselves that that's really what was happening.

So, that's really my first question, and I wonder if you could address that, Ms. O'Connor?

MS. O'CONNOR:  Sure.  Thank you, your Honor.  So, I think the way we need to think about it, because this is a corporation, is you have an employee of the corporation whose identified issues within the scope of his employment that he thinks are a concern and taking them through an internal channel to counsel for the corporation.  The -- I think the clear purpose for that is so that the counsel can then give legal advice to the corporation and advise the corporation on, you know, what are the implications of this information that's been communicated to counsel confidentially for that purpose.

And, so, that's the way that we look at it.  The client is not Mr. Dockery seeking advice for Mr. Dockery.  He's an employee of the corporation, and he's speaking to the corporation's lawyer through I think an approved reporting channel for, you know, a concern like that that he's raising.  And the lawyer then is going to advise her client, which is the corporation and needs to get the information from Mr. Dockery to facilitate that.  So, that's the way we

6

think that this fits into the Upjohn and similar standards.

THE COURT:  So, do I have to conclude that that was the corporation's purpose, that was counsel's purpose? Does Mr. Dockery's subjective purpose matter?  Maybe that was not his purpose at all.  Maybe he was not speaking as an employee of the corporation.  He had utterly different intentions.  Maybe it was simply to -- to complain about his own alleged mistreatment.

And, so, whose -- whose purpose matters, and how do I know?  Because it's -- again, you could interpret the documents in the way that you described, but I don't have any evidentiary basis to do that.  I don't have anyone's declaration, which is at the end of this hearing, I'm going to ask you whether I need to actually consider this on a, you know, noticed motion basis because my expedited procedure doesn't, of course, allow you to ordinarily put in declarations or things like that.

So, that's -- that's the thing that none of the cases that anyone cited to me really addressed is how do I figure out what the purpose was without that kind of material?

MS. O'CONNOR:  Yeah.  So I think, your Honor, the way I would answer that is that, you know, you have to look at the documents, and we have a good-faith basis from looking at the documents to conclude that this is a reporting internally.  I don't think there's any other

reason to report internally to counsel if not to raise a concern to legal in the -- in the corporation as to which the corporation needs advice.

Mr. Dockery exists in that interaction only as an employee of the company. So, I don't think that his subjective view is -- is what's determinative here. If he's gone to counsel to raise his hand and say, I've observed something that I think is concerning and I need to let you know about it, counsel is like, Tell me, and the counsel's going to figure out what to do about it on behalf of the corporation.

So, it is -- I think the way we deal with it is we look at the -- the documents and we do our best. We don't have access to Mr. Dockery. But the Ninth Circuit has said that to the extent there are difficult questions, those ought to be resolved in favor of the privilege applying versus not.

Here we don't actually think this part of it, from our perspective, is difficult. But, obviously, if the Court has questions, that suggests otherwise. But we believe that it's the corporation's -- the corporation is the client, and that this is a reporting line created by the corporation for this purpose and that Mr. Dockery, as an employee within the scope of his employment, is making use of that to raise an issue, and it's the corporation's privilege that attaches.

THE COURT: Of course, in Upjohn, there was

8

already an ongoing investigation, and counsel was reaching out to employees specifically in aid of that investigation to gather facts.  That's not the situation here.  At least I can't tell that it is.

MS. O'CONNOR:  Well, I don't think the -- I don't think the investigation needs to be already ongoing.  If he's raised an issue to counsel and counsel then is deciding what to do with it, counsel's deciding, you know, Tell me about this.  I'm going to carry it forward.  I think that's all within the context of the corporation through its lawyers figuring out what to do with information that may or may not have legal implications that they then need to sort through.

THE COURT:  All right.  So, let -- let me ask you about the next item on my list of questions, which is this overlap.  I'm going to call it the overlap issue.  But, essentially, the documents reflect themselves -- Mr. Dockery at least reports that he commuted the same thing to both nonlawyers and lawyers.

So, that's a little bit more attenuated than, Here's my communication with a lawyer for purposes of seeking legal advice.  Now he's communicating with other people in the company for other purposes arguably.  Again, hard to tell just on the -- the basis of the information I have.

And, so, it -- it's somewhat troubling that the effect

of the redactions are that -- I'm just imagining how Mr. Dockery might be questioned in his deposition. You can't actually question him about things that are redacted that he told to somebody else who's a nonlawyer because of the way that the redaction is done.

So, and, you know, I -- I don't know if you have -- if you know exactly what document I'm talking about. I think I cited it in the order, the one that I think highlights this issue most precisely. But I'm wondering how -- what VMware's response is about that and how the Court should handle that issue.

MS. O'CONNOR: Yeah. So, it may be -- if I could take one step back here, your Honor, because I think I have a few responses. One is obviously I've laid out how we think the privilege attaches here, but we actually think that the impact of what we're trying to do here is very narrow. We're trying to protect the communications with counsel. The reason we're trying to do that is because, number one, they're privileged but, two, we do have a concern. Plaintiffs made the argument suggesting that we permitted this to be disclosed, and we have a concern if we don't take steps to protect it, we're going to face a fairness argument about a partial disclosure, a partial waiver. So, we're sort of in some ways defensively trying to protect that.

10

But in the deposition, I think it's very clear from documents that have not been redacted that Mr. Dockery had a wide range of conversations.  Plaintiffs can ask, What were your concerns?  And they can, you know, see the issues that are identified in these emails.  What were your concerns?  You spoke to multiple people.  What did you say?  Pick someone who's not a lawyer.  What did you say to that person about it?  What did you observe they gave you a concern?  They get everything.  We're just trying to protect the communication with counsel, which is --

THE COURT:  No.  I understand that part, but in the particular document at issue, there are five people to whom the communication was made, and --

MS. O'CONNOR:  Yes.

THE COURT:  -- not all of them are lawyers.  But yet the whole thing is redacted.  So, I mean, we can handle the concern that you have about fairness or whatever by just my ordering that  it be so, that it doesn't -- it doesn't waive anything.  But one thought I had is why not redact the lawyers' names and just leave the nonlawyers and have the statement be, You made a statement to these people?  I mean, why is that not an adequate way to protect the privilege?

MS. O'CONNOR:  I guess our feeling was it -- look, I think -- I think this is a little bit of a tricky one.  I agree, your Honor.  I think our take was it's clear that

this is the content of the communication with counsel, and that communication is privileged.  It didn't go -- it's not like he's saying, And then I also communicated it to, you know, someone at the grocery store, right.  He's only talking to people within the company's privilege.  So, our feeling was that the fact that he repeated the same things to others doesn't deprivilege what he had said to counsel. So, we -- we felt like the correct landing spot on that one was redaction.  But, having said that, Plaintiffs can ask, What conversations did you have with these people at deposition?  And they can find out about the conversations that aren't with lawyers.

THE COURT:  And if Mr. Dockery doesn't exactly remember and needs his recollection refreshed by looking at an email that he wrote where he summarizes what he communicated with a particular manager, he can't do that, right?

MS. O'CONNOR:  Well, so, I think that there are multiple examples of documents that aren't redacted that touch on the same subject matter that are unredacted.  I can -- I can point the Court to some of them.  Portions of Dockery 70, 69, 65, 14, I think these documents all are unredacted versions of the same issues being described because in those contexts, there's no communication with counsel --

12

THE COURT: Um-hmm.

MS. O'CONNOR: -- at issue.

THE COURT: Is VMware taking the position that -- I'm going to look specifically at Docket -- Doc 014, which is the -- the page I -- I think I cited in my order. Is VMware taking the position that the communications occurred with counsel and noncounsel at the same time or with noncounsel only after having communicated with counsel and merely repeating things already said to counsel, to noncounsel? The document doesn't suggest that that's the case. The document refers to, in its redacted form, multiple times with various people the communication was had. So, it doesn't suggest a sequence. It doesn't suggest, I was merely repeating to nonlawyers what I'd already told the lawyers. I mean, that's -- is that an essential part of the argument that VMware is making about privilege is the order in which these communications occurred?

MS. O'CONNOR: I don't think it's an essential part of the question. I think this document in particular, you know, it's interesting because he -- he does start out by saying these were very discrete questions raised about, you know, redacted legal issues, and that is sort of the core of where he went to counsel. He seems to have gone primarily to counsel. So, I guess our feeling is not that

13

the order in which he did this matters, that Plaintiffs can inquire about what he raised with these other people.

There may also be facts, because we don't have access to Mr. Dockery, that could emerge in the deposition that could, you know, shed light on the picture of the privileged calls that are being made here.  That's another thing that could -- could happen, right.  But, so, I think we see this as, you know, kind of these core legal questions that he raised internally and that were just, you know.  So, we think that this -- the way to land on this one is that it's protected because it's primarily reflecting his conversations with lawyers and Plaintiffs can ask in deposition about the rest of it.

THE COURT:  Why do you say it's primarily -- I don't see on the face of the document why it's primarily reflecting communications with lawyers.  Were they -- what is the basis?

MS. O'CONNOR:  Well, I see the -- the first redaction is -- reflects conversations with four people, two of whom are lawyers, and then the second redaction reflects the conversation with two lawyers.

THE COURT:  Okay.  There are more lawyers than nonlawyers, but --

MS. O'CONNOR:  That's -- that was all I meant, your Honor.

14

THE COURT:  Oh, okay.  All right.  Finally, I would like to address this question of gen -- I'm going to call it generality versus detail, sort of high-level description versus what was the actual communication.  My overall impression of Doc 021 through 29 is that that document is over redacted, and a lot of the redactions appear to be of material that I would consider to be pretty high level, like the kind of thing that might actually show up in a privilege log -- a privilege log.  And some of the detail that is redacted also seems to be -- well, it was characterized earlier as, you know, a sort of separate category of material that counsel -- or that this employee was seeking to share with counsel for purposes of getting an investigation or legal advice for the corporation.  I question whether that's really the correct interpretation of this material, but talking about the high level versus detail level issue, I wonder how I should address that in this situation?

MS. O'CONNOR:  So, it's maybe a little hard in the abstract.  I think your Honor had called out the top of Doc 024.

THE COURT:  Um-hmm.

MS. O'CONNOR:  And that one I feel that it reveals more than just the topic.  So, the privilege log would -- would say, you know, communication with, you know, counsel

15

regarding -- and it would just name the topic without characterizing his views on the topic.

THE COURT:  Um-hmm.

MS. O'CONNOR:  So, I think this does go beyond what a privilege log would say.

THE COURT:  Okay.

MS. O'CONNOR:  There may be other examples, and there may be -- you know, there may be places where -- where we could have been more surgical.  We tried to kind of follow a line that I've tried to describe of, you know, focusing on protecting his communications with counsel, and I think, while I understand -- I think I understand where your Honor's coming from on it, I guess from the perspective of a corporation, it's -- it's almost hard to imagine for me what purpose an executive has for going to the general counsel with something they've observed other than to permit the general counsel to learn about and advise the corporation.

THE COURT:  Because this particular employee is complaining about his own -- his own treatment by the company and positing reasons why he was treated the way he was.

MS. O'CONNOR:  I think, though -- I understand that, but I think that happens later, right.  So, he's gone, and he's raised these issues, and I think that those

16

communications are privileged. He's now suggesting that that led to treatment of him that he thinks is unfair. So, but in -- in so doing that, he's referring back to the privileged communication, which I don't think loses its privileged status by virtue of having been repeated.

THE COURT: Um-hmm.

MS. O'CONNOR: At least that's -- that's how we would see it, that the -- the privileged character remains because he brought these issues up the ladder inside the corporation to be, you know, looked at. And, so, that -- that was a privileged communication. That remains a privileged communication. There's no claim here in the case such as a retaliation type claim that would result I think in exposure of those prior privileged communications simply because they're later raised in a different context.

THE COURT: Okay. That's helpful. Thank you.

So, just kind of circling back to one question I alluded to earlier in the argument, which is does VMware feel that it requires an opportunity to submit, for example, a declaration of counsel, the counsel involved in the communication with Mr. Dockery or counsels -- maybe it was more than one -- or anyone else in the company. Do you want an opportunity to produce this on a noticed motion?

MS. O'CONNOR: I think -- I think that might be helpful here. I think especially given the -- the nature of

the Court's questions that we're now hearing, I think it might be helpful to be able to flesh that out a bit more as to our position on these.

THE COURT:  Okay.  Thank you.

Let me turn to Mr. Saham, and I wanted to begin just by the observation that the sort of principle underlying Upjohn, of course, when you read that case is that there needs to be -- it encourages full and frank disclosure to counsel.  It's not Mr. Dockery's privilege, of course.  It's VMware's privilege, and he was at the time, you know, an executive of the company.  He wasn't someone who you wouldn't think would be in a position to report alleged misconduct to counsel on behalf of the company.

So, you know, it seems like the protection of the contents of his communication with in-house counsel and these four documents would be within the privilege if the overall purpose of those communications was to alert counsel to possible wrongdoing so it could be investigated or remediated or whatever the case may be.  And I know you don't have access to the material that has been redacted, but given the context that appears in the material that is not redacted, why shouldn't the Court conclude, as Ms. O'Connor argues, that these communications upon which Mr. Dockery's reflecting -- so, he's reflecting on his, you know, past communications that he had with counsel in these

18

current emails.  Why shouldn't I conclude that those are within the scope of the privilege?

MR. SAHAM:  Well, your Honor, as a step back, you asked at the beginning of the hearing is there a case directly on point about whose intent, and there is, and we cited it.  It's the Chevron case, and I'm just quoting from it.  It says:

"With respect to internal communications involving in-house counsel, Defendants" -- in that case it was Chevron -- "must make a clear showing" -- it's their burden -- "that the speaker made the communication for the purpose of obtaining or providing legal advice."

And that case cites the D.C. Circuit in In Re Sealed Case, which is 737 F.2d 94.  So, it clearly is Mr. Dockery's, as the speaker's intention.  There's absolutely nothing in these documents, any of the four documents -- first, three of them aren't even directed to lawyers -- that show that he's seeking legal advice.  He's not --

THE COURT:  Let me pause you there, Mr. Saham.  So, it doesn't matter that the actual emails as reflected in the privilege log are or are not directed to lawyers because what's being redacted, what's being claimed as within the

scope of the privilege is not the overall communication but Mr. Dockery's summary or description of prior communications that he had.  That's really what matters is the prior communication, his disclosure in these emails of prior communications.  So --

MR. SAHAM:  And the --

THE COURT:  And he's not permitted to waive the privilege on his own just because he feels like it, right.  So, he has to -- the question is is at the time he made those communications that he is summarizing or describing in these contemporaneous emails, were those communications privileged?

MR. SAHAM:  And you -- there would have to be some evidence that Mr. Dockery in the communications he's summarizing was primarily involved in seeking legal advice, and there's absolutely no evidence of that at all, and in --

THE COURT:  But the question -- but -- I'm sorry to interrupt again, but the question is not whether he was seeking legal advice for himself.  I accept the premise that as an executive for the company, he could be seeking legal advice on behalf of the company as an executive of the company.  Why not?

MR. SAHAM:  He could have been, but he wasn't.

THE COURT:  How do I know?

MR. SAHAM:  Well, there's no evidence of anything

20

in --

THE COURT:  So, you agree that there ought to be some opportunity for an evidentiary showing?

MR. SAHAM:  Well, the -- the showing would be his intent, not some lawyer at VMware who still works at VMware, whether they thought they were seeking legal advice.  But the emails that we're saying are not privileged here, we have to think about those, Judge.

First of all, I think you're 100 percent correct in Dockery 14, he told Paula Delaney on multiple instances and Anna Datu (phonetic) on multiple instances the redacted information.

If they wanted to redact something there, they could redact, and we could care less whether he's also told Amy Fliegelman or Morris Kreeman (phonetic), but we're 100 percent entitled to ask at his deposition, and to the extent someone doesn't remember something from five years ago, that he told Paula Delaney the things that are listed on page 14. There's nothing privileged about that.  That would be essentially saying if I made a confession to the police that I committed securities fraud and then I later in an email not even to my lawyer, to someone else, the CEO of the company, wrote, Well, I also confessed in addition to confessing to Delaney, I confessed to a lawyer, that that somehow would innoculate --

THE COURT:  That's not what Ms. O'Connor is saying.  She's saying there's some practical difficulty with this particular document and doing the redactions and agrees that you're entirely free in questioning Mr. Dockery about what he said to nonlawyers.

MR. SAHAM:  But what if he doesn't remember?

THE COURT:  Yes.  Okay.  The what if he doesn't remember is the practical problem that  we're trying -- that -- that she acknowledged exists here.  But it's not -- she's not taking the position -- VMware is not taking the position that somehow that sharing it also with lawyers means that it's privileged with respect to nonlawyers.  That's not the position that's being taken here.  So, I -- I don't want us to get distracted from that point.  There's a practical difficulty.  I sort of threw out there a -- a thought I had about how to deal with that.

Does -- does the Plaintiff have a thought about how to deal with that issue?

MR. SAHAM:  The -- the page 14 issue?

THE COURT:  Yes.

MR. SAHAM:  I agree 100 percent with your Honor you could redact the names of the lawyers and just say the content of what was shared with Anna Datu and Paula Delaney who are -- Delaney is a -- a senior finance executive.  I -- and we're entitled to ask, You told Ms. Delaney these three

22

things?  And, you know, it's different than what Ms. O'Connor's saying, Well, he might generally recall conversations, but here's a very specific list of things he said and we're entitled to that, at a minimum, even if there was some demonstration.  And then remember this is communications with in-house counsel.  So, the standard "the primary purpose" according to the Ninth Circuit has to be for the seeking of legal advice.  So, if the primary purpose was for something else, it's not privileged.  It's not -- it's not protected, and there's nothing in the record that suggests any of this from the perspective of Mr. Dockery, you take the last document, the one -- the only one that was addressed to counsel.  He's treating counsel as an adversary.

THE COURT:  Okay.  These -- these are all in the moment, okay, in the moment, although I -- I understand that VMware contends that the disclosures about another employee's behavior is not historical but is a communication made in the present time for the purpose of seeking legal advice, and that's the reason that that material is redacted.

Again, I am troubled by the idea that five years later, testimony about what the -- the speaker's subjective purpose was is dispositive, and maybe that's not what you're saying, but I don't -- I don't see anything in the Ninth Circuit

that really is on point with this issue, because the -- the whistleblower cases that the Plaintiff cites are about the communication being made in the context of retaliation against the whistleblower and for that purpose.  And, so, that's the purpose being -- you know, this is not that same situation.  So, I get the point about in the email that you describe, Mr. Dockery is treating the person he's communicating with as an adversary, yes.  So, that one may be trickier.  But in all of the others, where he's recounting prior past communications with counsel, there's no indication in the record that counsel was an adversary at that point.  He was making the communication as an employee of the company.  And, so, you know, I -- like I said, I don't think any of the case law that you've cited is really addressing this question, and certainly there's nothing in the Ninth Circuit that I could find or that you all cited that seems precisely on this point.  So, I'd be very interested in your thoughts on that issue, beyond _Chevron_.

MR. SAHAM:  Well, as far as the case law, I think certainly _Chevron_ makes the distinction of when you're dealing with in-house counsel.  There's -- there's a presumption when you're dealing with outside lawyers like a criminal -- an individual hiring a criminal lawyer that everything's privileged.  When you have in-house counsel, that presumption doesn't apply, and the burden of proof

24

shifts to the corporation to show that the primary purpose was seeking legal advice.

From a -- from a practical standpoint, though, your Honor, about resolving this whole issue short of briefing because we're -- we're going to take Mr. Dockery's deposition on February 1st, and the email that is most important to me is the one you're talking about, 13 and 14, because it goes to the CEO of the company, Mr. Gelsinger, and I think honestly, taking the Court's suggestion that you redact out the lawyers from page 14, number three and just put back in what was told Ms. Delaney and Ms. Datu, because really what I want is to show in advance of our class period in July 2018, that Dockery communicated to the CEO of the company, who's a Defendant, what it is exactly he communicated to Datu and Delaney.

With respect to those other issues about remembering things in the other three emails, maybe the record would be better for the Court to resolve after the deposition if there is a problem with him recalling because there are some other documents that could be helpful to refresh his recollection.  But, certainly, I want to take his deposition on February 1st, and I think I'm entitled completely under any reading of the law to ask him about what he told the CEO in number three, and I wouldn't ask him what he told Morris Kreeman or Amy Fliegelman Olli.  I would just ask him simply

25

-- I would need the information that was redacted, and the question would be, You told Mr. Gelsinger, the CEO of the company, that you told Ms. Delaney and Ms. Datu this several months earlier, and that would be key and I think would not require declarations or anything else because there can't be any question that we're entitled to ask Mr. Gelsinger questions about what Mr. Dockery had previously told Ms. Delaney and Ms. Datu.  And I think that could potentially take this whole -- if we get the -- that portion of the email, it could potentially remove us from even needing to come back.

THE COURT:  Okay.  Well, thank you for that suggestion.  Let me just get clarification.  You referred to the deposition of Mr. Dockery as taking place on February 1st.  I thought I saw something that said it was happening on the 25th, but it's now the 1st?

MR. SAHAM:  It's now February 1st.

THE COURT:  Okay.

MR. SAHAM:  Yeah.

THE COURT:  All right.  And, so, if I understand your proposal correctly, is with respect to Doc 014, delete counsel's names and restore the first -- not the first but the actual second redaction, the one that follows after the list of names on that page and leave the other redactions in place is what you are proposing?

26

MR. SAHAM:  Yeah, for that document, and then certainly on that last document, the longer one, if there are certain things that your Honor thinks should be unredacted, obviously less redactions are superior.  But I -- I think, you know, given that there's some other documents we could use and given the centrality of 13 and 14, which goes to Mr. Gelsinger, I think we probably could take the deposition, and unless he can't remember anything beyond that, maybe we would be done.  I mean, there's no guarantee, but I think there's a real likelihood that, you know, we wouldn't have to then brief this whole thing with declarations of counsel and declarations of Mr. Dockery if he's even willing to give it.  He's a nonparty.  We would have the record from his testimony of -- you know, from what either side wanted to ask him that would be helpful for your Honor to determine his intent, and I know maybe if it was briefed later and Ms. O'Connor wanted to put in a declaration from in-house lawyers, that she could do that, but the deposition on -- on February 1st is the only way we could get at, you know, Mr. Dockery's intent to the extent it's relevant, and I think it clearly is because we don't control him.  We can't get a declaration from him.  He's a former employee who, you know, is being compelled to testify.  He's not a volunteer.

THE COURT:  Yeah.  Okay.  Thank you for that

27

suggestion.  I don't want Mr. Dockery to have to testify twice because he's -- so -- so, my -- my plan was to make this decision before he -- he has his deposition, but given the dissatisfaction I have with the case law that's been presented to me or that I've been able to locate, I am worried about some of these things.  So, let me -- let me just go back briefly to VMware's counsel.

What do you think of the suggestion that Mr. Saham raises, which is if we make this adjustment to this one document, we can proceed with the deposition and possibly just not have any further proceedings on the remainder of the documents?

MS. O'CONNOR:  Well, look, I -- I think I -- I appreciate the effort to be constructive and find a solution.  I am concerned because there is a reality that just redacting the attorney's name doesn't protect the -- the privilege around a communication to an attorney around these issues, and I do think that I -- I understand Mr. Saham's concern about recollection, but the documents that I mentioned I think touch on all of these issues --

THE COURT:  Um-hmm.

MS. O'CONNOR:  -- that -- that are here and they're not rejected.  So, you know, Dockery 69 has unredacted language of communications with the then head of worldwide sales, all about managed pipeline and his views on

this.  So, there's -- there's a number of references to that.  There's references to, you know, other concerns about a particular executive's behavior.  So, I think a lot of it is -- is available for purposes of refreshing Mr. Dockery's recollection or otherwise in unredacted material that's here.  So, in that sense, I think the concern is maybe somewhat overblown about not being able to refresh him.

THE COURT:  Um-hmm.  Okay.  Thank you.

Let me just go back to Mr. Saham because I didn't know if I gave you an opportunity to argue all the things you wanted to argue about on the -- the questions I posed and anything else relating to this dispute.

MR. SAHAM:  Sure, your Honor.  And just going back, the centrality of 13 and 14 is it went to a defendant. Scienter is an element of our securities fraud claim, having a document that expressly contains the information about managed pipeline that was provided to Mr. Gelsinger before the start of our class period when he's an individual Defendant.  They are highly, as -- as your Honor knows from our other hearing, highly contesting his scienter.  That's one of their affirmative defenses.  This is a key document, and to suggest that because there's other documents that he wrote to himself, you know, get you to what he told Mr. Gelsinger, that's -- that's just not correct.

I think ultimately, when you look at -- and just sort

29

of to -- to generally address the issue, you know, under Ritchie, which is the Ninth Circuit case, and Upjohn, you have to have confidential communications between attorneys and clients which are made for the purpose of giving legal advice, and then when it's in-house counsel, the burden shifts that it has to be the primary purpose and the holder of the privilege has to meet that burden.  And here, even if we're talking about we have these four emails and nothing on their face is privileged but they're referring back to potentially another communication that maybe had some privilege in it, but we're not talking about deprivilegizing (sic) prior communications.  We're talking about these high-level emails, two of which he wrote to himself that are literally a paragraph long and then the two others that are redacted.  They really are akin, the information in these documents, I would suggest it's -- as your Honor's question suggested, really are about the level of information that would be found in a privilege log.  There's nothing recounted in these documents that is someone asking for legal advice, someone receiving legal advice, somebody recounting advice that I had obtained.

So, when the relief being sought is these documents, these high-level general documents being not redacted, we're not talking about deprivilegizing if there were other communications that, you know, the lawyer took notes of the

30

call or whatever.  We don't -- we don't have those.  We're not --

THE COURT:  I mean, this is -- look, I think the example of the emails that -- that Mr. Dockery wrote to himself, those are -- those are like notes to file.  It's a summary of a communication that he had.  It even has quotes with legal counsel.  So, I'm just -- I'm not persuaded that somehow it's like too high level and too attenuated to actually be capturing a privileged communication.  If it's a privileged communication, it's captured, and it's still a privileged communication that's summarized.  So, that's not a really persuasive argument to me.  There are some things that I think are pretty high level and really not disclosing anything, but those are not them.  Those actually have quote marks in them.

So, you know, I -- the thing that is most troublesome to me is that the -- I can imagine a scenario where there's a context where there's a structure in place for employees like Mr. Dockery to report suspected wrongdoing to counsel, and that's like a reporting channel and it's in place.  And, so, this is like just part of that.

I can also imagine a situation where he had no such purpose and there was no such structure, and he's just upset about something and maybe he has motives that are totally unrelated to seeking advice of counsel, and that's, I think,

31

a harder call. But at the same time, since I don't know and I can't tell from the documents, I think I need to give VMware an opportunity to put -- make an evidentiary showing that these are, in fact, the kinds of communications that fall under Upjohn, because I think that's the only framework that matters here. It's not does Mr. Dockery need legal advice for himself. It doesn't fit into that context. It fits into the Upjohn context. And the point about primary purpose has to do with the distinction between in-house counsel and outside counsel where in-house counsel can sometimes wear nonlegal hats and act in a business capacity. I don't really see that this dispute falls in that bucket either. This is about whether the purpose of the communication was for the purpose of seeking legal advice for the corporation or if that was the corporation's purpose in requiring employees or facilitating employees such as Mr. Dockery in making these communications. That's what I think is the issue.

I don't see that the parties really have a lot of case law on this point, this particular scenario, but I'd like to hear from you about what you think your best cases are. So, Mr. Saham, you said Chevron is your best case. I'd like to understand from VMware what's your best case, and then my -- my thought is maybe what we do is I can allow both sides -- although you say Mr. Dockery is not willing to provide a

32

declaration.  Okay.  Fine.  Maybe you have nothing to say.  But, certainly, VMware could have an opportunity to submit a declaration on behalf of the counsel involved in the communication and make their evidentiary showing, without having full-blown briefing, because I don't want to mess up your schedule.  So, that's another thought.  But, first of all, I'd like to get your best cases on this point.

So, Mr. Saham, anything other than Chevron?

MR. SAHAM:  Well, I would -- I would cite Chevron and then -- and then the language in Ritchie, which is the Ninth Circuit:

"Confidential communications

between attorneys and clients which are

made for the purpose of giving legal

advice."

And I just don't see, if you're looking at what Mr. Dockery was doing here, he's not asking for legal advice.  He is not receiving legal advice.  So, I would --

THE COURT:  But Ritchie is -- okay.  So, Ritchie is in the context whether this question doesn't arise, right?  This question doesn't arise about a corporation and individuals within the corporation.  So, it's -- it's not helpful in the same way.

MR. SAHAM:  I wasn't saying he was seeking legal advice on his own behalf.  I don't -- he's not seeking legal

advice for the corporation.

THE COURT:  Ritchie is not the same Upjohn context that I think is presented by this case.  Let me just put it a little bit differently.  But I have your -- your two favorite cases.  So, thank you for that.

Let me see from VMware what are your best cases for the Court?

MS. O'CONNOR:  So, your Honor, at the risk of being circular, I think that Upjohn is probably one of our strongest cases on this point.  There's also the case of Insight Global v. Beacon Hill Staffing, which is another case interpreting Upjohn and making clear that the key consideration is that the current or former employee of the corporate client has information of the corporation that the corporation's counsel need.

THE COURT:  You mean my own case?

MS. O'CONNOR:  Yes, that is your own case.

THE COURT:  Sounded familiar.  Okay.  I do like to --

(Simultaneous speaking.)

THE COURT:  Just a moment.  Anything else from VMware?

MS. O'CONNOR:  I think that those are probably the most helpful, you know, not to be circular with Upjohn, but I do think that that's the -- the framework, and I think

34

it's framework that supports where -- the positions that we've taken here.

THE COURT:  Okay.  And before I go back to Mr. Saham, because it sounds like he has something else to say, do you want to -- an opportunity to put in a declaration?  That was a question for VMware.  Does VMware want an opportunity to put in a declaration?

MS. O'CONNOR:  Oh, I'm sorry.  I thought that was a question for Mr. Saham.

THE COURT:  No.

MS. O'CONNOR:  Yes, your Honor, I think that would be helpful to us.

THE COURT:  Okay.  And how quickly could you do that?

MS. O'CONNOR:  I can certainly press to do it quickly given the -- the transition of who's still present, and I don't exactly know where people are is my only hesitation, but I would think, you know, it would be quick to do if we can reach people.  So, maybe I would ask for two weeks.  Is that doable or is that --

THE COURT:  I don't want to mess up your February 1st date.

MS. O'CONNOR:  Oh, okay.  Then let me see if I can -- let me see what I can do in one week.

THE COURT:  Okay.  I mean, this -- this is the

35

16th. So, I think I'd need it -- yeah, it would be great to have it, you know, a week to 10 days at the most.

MS. O'CONNOR: Okay.

THE COURT: So I can make a decision in time for you all to prepare for your deposition.

All right. So, that's -- that's my plan. I will pick a date I guess.

Okay. Back to the Plaintiff. There was something else you wanted --

MR. SAHAM: I'm sorry, your Honor. There is another really good opinion that I think is right on point from Judge Orrick, and it's the BioMarin Pharmaceutical case. It's not cited in the papers, but it's 2022 WL 17974487.

THE COURT: I'm sorry. Give me the Westlaw again, 1 -- what's the last -- the last digits?

MR. SAHAM: 4487 are the last four.

THE COURT: No, sorry. 2022 Westlaw?

MR. SAHAM: 17974487, and it's BioMarin Pharmaceutical.

THE COURT: Okay. And the Court I would point your Honor to, it's in a very similar context, and it says:

"But the Defendants do not make a
clear showing that the senders of the
emails were primarily requesting legal

36

advice.  This is particularly true of emails that were not sent by an attorney, did not generate a response from an attorney, and were not replying to an attorney."

So, you have emails very similar to ours, the ones we have here, and Judge Orrick found they were not privileged under the same analysis we have been discussing, and it's a very recent case.

THE COURT:  Okay.  Here's what I'm going to do.  I'm going to set a deadline of January 24th.  If it can't get done, you can let me know, but January 24th for the submission of a declaration in support.  So, giving VMware an opportunity to put in a declaration.  And, additionally, if the parties have case law that they would like me to look at that you haven't cited in your papers and you haven't mentioned to me here, you're welcome to put those citations also in by January 24th.  I don't want a whole bunch of more briefing.  So, just give me the citation, and I -- I can read.  I will read whatever you refer me to.  So, I'll give you an opportunity to do that.

So, I'll just issue a short order with those dates -- or with that date and those two items, and then my goal will be to get you a decision very promptly so that you have it in advance of Mr. Dockery's deposition on February 1st.

37

Okay.

MR. SAHAM:  Yes, your Honor.

THE COURT:  Okay.  Thank you all very much.  This matter's concluded.

(Proceedings adjourned at 10:51 a.m.)

38

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, January 23, 2024