UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Magistrate Judge

LAMARTINA,                          )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )   Case No. C 20-02182-EJD
                                    )
VMWARE, INC., et al.,               )
                                    )
          Defendants.               )
_____)

                                        San Jose, California
                                        Tuesday, March 5, 2024

 TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
       RECORDING 9:56 - 11:25 = 1 HOUR AND 29 MINUTES

APPEARANCES:

For Plaintiff:
                                Robbins Geller Rudman & Dowd,
                                  LLP
                                655 West Broadway, Suite 1900
                                San Diego, California 92101
                           BY:  SCOTT H. SAHAM, ESQ.

For Defendants:
                                Debevoise & Plimpton, LLP
                                66 Hudson Boulevard
                                New York, New York 10001
                           BY:  MAEVE O'CONNOR, ESQ.
                                ELLIOT GREENFIELD, ESQ.

Transcribed by:                 Echo Reporting, Inc.
                                Contracted Court Reporter/
                                Transcriber
                                echoreporting@yahoo.com

*Echo Reporting, Inc.*

2

Tuesday, March 5, 2024                                  9:56 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling Case 20-CV-02182-EJD, Lamartina versus VMware, Inc., et al., motion to compel hearing.

If the parties could state their appearances, please, beginning with Plaintiff's counsel.

MR. SAHAM:  Good morning, your Honor.  Scott Saham for the Plaintiff.

THE COURT:  Good morning.

MS. O'CONNOR:  And good morning, your Honor. Maeve O'Connor and Elliot Greenfield for the Defendants.

THE COURT:  Good morning.

MR. GREENFIELD:  Good morning.

THE COURT:  All right.  So, this hearing concerns the motion to compel production of the 52 items on VMware's privilege log that the Plaintiff has identified and some other things in addition to that but principally that.

It is the Plaintiff's motion, and I will let you argue, but I wanted to highlight for both parties what my principal concern was, the, you know, questions that I -- I have from the briefing.  And the thing that -- the item that most intrigues me I guess is the express waiver argument regarding those documents, and by way of example, I'll refer

3

to Exhibit D where the -- the waiver appears to have occurred before the document was shared with the SEC.  In other words, otherwise privileged information in the case of Exhibit D appears to have been disclosed by the company to a third party, in this case PWC, and then in the SEC investigation, the company determined that that waiver had already occurred -- this is the argument anyway -- the waiver had already occurred and that the document was no longer privileged.  So, in that case, there is a waiver, but what is the implication of that for this dispute?  So, I'm -- I'm interested in that, and that gets into the question of the application of Federal Rule of Evidence 502(a), the fairness principles, concerns about selective disclosure, and all that.

Similarly, I'm interested in the express waiver question as it relates to preclearance review, and -- and there I'm -- I'm just really interested in the circumstances around the disclosure that the company made to the SEC.  We had a discussion at our last hearing about whether it was simply a -- as VMware described it, a process-oriented sort of results disclosure as opposed to an actual disclosure of legal advice, but I have some questions around what was actually disclosed and what the significance of that communication and all of the information and the presentation about preclearance that was shared to the SEC,

4

what the implications are of that.  So, those were the things that really caught my attention, and I share that with you so you can be sure to hit on those, but otherwise I'll -- I'll let you go ahead and make your argument, Mr. Saham.

MR. SAHAM:  Sure.  And I will specifically hit on the two topics you -- you are inquiring about, your Honor.

THE COURT:  Okay.

MR. SAHAM:  There was clearly express waiver.  We've got a bunch of emails, to use a technical term, but several emails that were exchanged internally between senior executives and in-house counsel during May and June of 2018, and then they were subsequently not -- from their initial creation, they were subsequently shared with PWC, and that was the first express waiver.

Then those same documents that had previously been -- privilege had been waived.  They are clearly privileged documents, and they're stamped privileged.  They're legal advice.  They were then subsequently also disclosed to the SEC, and they weren't just disclosed to the SEC.  They were used at pages 15 and 16 of the submission that your Honor has, which is Exhibit G I believe, to our motion that was also sent in the last time we were here by -- by Defendants to argue that not only PWC but also legal professionals approved the backlog disclosure.  And, of course, the

backlog disclosure is central to the litigation.

THE COURT:  Um-hmm.

MR. SAHAM:  And now we have -- clearly there's been an express waiver, and we're back -- I think that brings us full circle back to the arguments we addressed the first time we were here.

THE COURT:  Well, let -- let's not skip over the clearly there's been an express waiver.  That's the part I'm really interested in.

MR. SAHAM:  Okay.

THE COURT:  Because I'm not sure it's entirely clear there's been an express waiver or that there has been an express waiver in the way that you've described.  Let me put it that way.

So, I'll tell you like really nuts and bolts what I focused on.  So, when we were last here for a hearing on this issue, the Plaintiff pointed me to Footnote 34 of the document that's attached as Exhibit G to counsel's declaration.  So, Footnote 34 listed by Bates number a number of documents, and I recall the Plaintiff arguing that these documents were clearly privileged, had been relied on, and had been disclosed to the SEC.  But all of those documents were described in parentheticals as including people other than lawyers.  So, it was lawyers and, and sometimes just executives and others, not lawyers and.

So, I didn't have those in front of me, as you recall, and I was expecting that I would see those in this briefing. I think I've seen some of them. Maybe, maybe not. I can't tell exactly, but -- but it wasn't clear to me, and it is, I believe, the Plaintiff's burden to show that the material that has already been disclosed is or was privileged in the first instance, and just stamping it privileged is not sufficient. So -- so, that's point number one.

Of the exhibits that were highlighted in the briefing and attached to the Plaintiff's counsel's declaration, I looked at Exhibit A. I looked at Exhibit H, and I looked at Exhibit I. Nothing about those documents inherently just suggests that those are privileged. They are apparently proposed text for a 10 -- for a 10Q. So, yes, maybe counsel drafted it in the first instance. Counsel is copied on the communication, but it's forwarded to -- well, I don't know who -- I forget who Paula Delaney is, but it's forwarded to somebody, and it's meant to be a public disclosure. Counsel draft things all the time that are meant to be public. So, you know, maybe it was privileged. Maybe it wasn't at the time, but that's a -- that's a question mark I have.

Exhibit D seems different. That looks like an exchange between and among counsel and VMware executives for the purpose of seeking or providing legal advice on the language of the backlog disclosure. And that was -- that's the one

-- that's the communication which is explained more fulsomely I think in the opposition, was forwarded -- some versions of that was forwarded to PWC.  So, that's the one where I say, okay, I can see sort of on its face this is a privileged communication that was then forwarded to somebody outside the scope of the privilege.  There's a waiver, and that happened well before there was any SEC anything.

Okay.  So, that's what I'm trying to drill down on.  So, we can't just kind of gloss over clearly express waiver.  I mean, it really matters what are the documents, what was waived, and what are the circumstances in which the waiver occurred I think, because I think that I do need to do the 502(a) analysis and not just say anything related to backlog dis -- if -- if a document that mentions backlog disclosure was disclosed to a nonparty and would otherwise be privileged, thereby, everything that relates to backlog disclosure is automatically within the scope of the waiver, I don't think that's the law, unless you can establish that circumstance.  You have to do the fairness analysis.  So, that's -- that's my thinking.  So, I'm -- I -- I don't want you to gloss over --

MR. SAHAM:  Okay.

THE COURT:  -- the express waiver.

MR. SAHAM:  I'm with you, your Honor.

THE COURT:  I want you to focus on that for me.

8

MR. SAHAM:  Okay.

THE COURT:  Help me out with that.

MR. SAHAM:  I'm with you, and I -- I'm going to get to the fairness, but taking Exhibit D --

THE COURT:  Yeah.

MR. SAHAM:  -- you've got Mr. Chrysler asking for Mr. Norris's legal advice.

THE COURT:  I agree.

MR. SAHAM:  Please give me your thoughts.

THE COURT:  I agree.  I got you.  It's privileged.

MR. SAHAM:  Okay.  So, and then --

THE COURT:  Um-hmm.

MR. SAHAM:  So, these are each individual's emails, right, occurring in late May, early June.  Then at the end, one of the in-house counsel forwards them to PWC.

THE COURT:  Right.

MR. SAHAM:  And that's a waiver.

THE COURT:  Okay.

MR. SAHAM:  Each of those were individual legal communications that occurred.  Then there is a waiver that occurs back in 2018, the first waiver, when it is sent to PWC.

THE COURT:  Right.  Okay.

MR. SAHAM:  That's not a contemporaneous waiver. That's a subsequent.  There's legal communications over days

or weeks.

THE COURT:  Right.

MR. SAHAM:  And then they're sent to PWC, and then there's waiver.

THE COURT:  Okay.  I got you.  I --

MR. SAHAM:  Are we together there?

THE COURT:  I agree that --

MR. SAHAM:  Okay.

THE COURT:  -- looks like a waiver to me.  Are there any -- there's lots of other things attached and lots of other things that you talk about.  Are there any other things that you think are privileged communications that were waived by disclosure to a nonparty, a party outside -- I mean, I shouldn't way nonparty -- someone outside the privileged relationship?

MR. SAHAM:  Okay.  Here -- here's where I think the confusion -- and -- and it's part because we don't have the documents.  There's approximately 60 communications in May and --

THE COURT:  No, no, no, no.  No.  Sorry.  Sorry.  Let's not get into the documents you don't have.

MR. SAHAM:  Are you talking about the waiver?

THE COURT:  The ones that you say -- you -- you tell me there has already been a waiver in our last hearing, and it was all the stuff cited in Footnote 34.

MR. SAHAM:  Well, they're all related.  They're -- they're --

THE COURT:  I don't want to hear about the relationship yet.

MR. SAHAM:  Yes.  Okay.

THE COURT:  I want to find out what do you know was waived, actual waived, not scope of waiver implications production of all these kinds of things.  What was the actual waiver by disclosure to someone outside the privilege relationship or disclosure directly to the SEC?  Which documents?

MR. SAHAM:  Well, let's start with D and -- and 4 in Defendants' opposition.

THE COURT:  D, D and 4.  I got you.

MR. SAHAM:  Okay.

THE COURT:  Anything beyond that set?

MR. SAHAM:  Well, they disclose -- those I think are the most important ones.

THE COURT:  Okay.  Got you.

MR. SAHAM:  But they -- there's about eight emails that they gave to PWC and gave to the SEC, and those are the ones in Footnote 34 which contain these two and then several others.  These are the four that I think most clearly contain legal advice.

THE COURT:  Okay.  So, let's look at --

11

MR. SAHAM:  These two.

THE COURT:  Let's look --

MR. SAHAM:  D and 4.

THE COURT:  Okay.  So --

MR. SAHAM:  I think they might be --

THE COURT:  -- D --

MR. SAHAM:  -- parts of the same string.

THE COURT:  Yes.  So, we have D.  I have D.  And then I have --

MR. SAHAM:  Defendants' 4.

THE COURT:  -- Defendants' 4, Defendants' Exhibit 4.

MR. SAHAM:  And they may even be the same or part of the same string.

THE COURT:  I -- you know, that -- that's kind of the point of the opposition, I think that there were 10 documents or some multiple of documents that VMware had originally included on its privilege log to the SEC.  Then it discovered that the string had been disclosed to PWC.  And, so, it took those documents that had been on its SEC privilege log and gave them to the SEC because it concluded they were no longer privileged.  Okay.  So, we have that, however it's described as your Exhibit D or the collection that's Exhibit 4, whatever, that -- that set.  I have -- I have that set.  But I don't think those are the exhibits --

12

those are the emails, rather, that you were pointing me to in Exhibit G, Footnote 34 when we last met.

MR. SAHAM:  They are at least parts of the same string.  I think for the purposes of this discussions, if your Honor focuses on D and 4, that contains -- remember these are emails.  And when they're produced, there's one --

THE COURT:  Yeah.  No, I --

MR. SAHAM:  -- then there's two, then there's three.

THE COURT:  I get it.

MR. SAHAM:  So, they're -- they're different documents, but they contain the same information.

THE COURT:  Okay.  Let me just highlight an example.  I'm looking at Exhibit 4, and there's something that's Bates numbered PWCVMW00019851 to 862.  It's got some other exhibit number, and it's described as a May 2017 internal memorandum.  Where is that?

MR. SAHAM:  Wait.  I'm sorry.  Did you say you were in Exhibit 4 or --

THE COURT:  Exhibit G, Footnote 34.

MR. SAHAM:  Oh, okay, Footnote 34.  I'm sorry.

THE COURT:  I'm looking at the very first document that's cited there.  I don't see that in anybody's papers unless I missed it.  Where is it?  Because that was among the documents that you highlighted to me at our last

13

hearing, this is going to show waiver and reliance on privileged material before the SEC.  So, I'm just picking this as an example.  Is that in this material?

MR. SAHAM:  No, your Honor.  I think for -- to stipulate, for the purposes of this --

THE COURT:  Yeah.

MR. SAHAM:  -- argument, I think we can focus on 4 and D as --

THE COURT:  Okay.

MR. SAHAM:  -- being where the waiver --

THE COURT:  Okay.  All right.

MR. SAHAM:  Is that okay?

THE COURT:  All right.  That's helpful.

MR. SAHAM:  Okay.

THE COURT:  That narrows the things down.  Okay.

MR. SAHAM:  so, here's the situation.  I believe in Defendants' papers they don't say -- they want to say there was no privilege, so, therefore, that -- the documents weren't privileged.  But that's not accurate.  They were privileged clearly.  4 and D were privileged until they were produced to -- to PWC.  That was the waiver.

THE COURT:  Yes.

MR. SAHAM:  So, there's a waiver.  Now we have -- fortunately, we have binding case law, Ruhl (phonetic), Ritchie, Ninth Circuit cases that say when documents are

14

disclosed to an auditor and then subsequently disclosed, again, privileged documents are disclosed to the auditor on all fours.  Also the District Court in <u>Primera v. Blue Cross</u>, three on point on all fours cases, documents are waived initially when they go to the auditor, waived again when they go to the SEC.

Now, we didn't know the first time we were here that Defendants' position -- I believe Defendants' position -- there's maybe a little confusion in the briefing.  I thought they were saying the documents weren't privileged. What they were really saying is they were no longer privileged because they had been produced to PWC, and then they cite a couple of cases that I think support the Plaintiff, <u>Von Bulow</u> (phonetic) and <u>Dukes</u>, that talk about, well, an extrajudicial waiver doesn't get you the subject matter waiver  But once you get to the SEC and they submit and argue based on these same documents that legal counsel's approval takes you away from a securities law violation, you're square in the same place.  There maybe was an extrajudicial waiver, but then there's a subsequent judicial waiver.

THE COURT:  Okay.  So, let's pause on that point, and --

MR. SAHAM:  Sure.

THE COURT:  -- I'm -- I'm not sure that, for

example, U.S. v. Ruhl is supporting what you're saying, but we can get to that question.  But let's just go with the argument that, having decided that they had already waived privilege on -- I'm just going to call it the Exhibit -- Exhibit D document -- or documents -- VMware then proceeded to rely on those documents before the SEC as opposed to disclosing them because they were required to be disclosed per document request, and they could no longer assert privilege because it had already been waived.

Where is the -- if they're -- if Exhibit D is not cited in, say, Footnote 34, where is it relied upon in, say, Exhibit G, somewhere else?

MR. SAHAM:  The strings, that -- that's where I get to, your Honor.  It absolutely is in 34 in some form. It might not be all of Exhibit B.

THE COURT:  Okay.  So, tell me which --

MR. SAHAM:  -- but it's in there.  D and 4 are in Exhibit 34.

THE COURT:  Okay.

MR. SAHAM:  And they argue -- or, I'm sorry -- Footnote 34.

THE COURT:  How do I know?  Which -- so, just --

MR. SAHAM:  Okay.  I've --

THE COURT:  How do I --

MR. SAHAM:  I've got the Bates number.

16

THE COURT:  Yeah.  Is there a -- is there a way that I can tell?

MR. SAHAM:  And, honestly, the last time w were here, I brought the eight documents, and I was going to hand them up to you, that come from the footnote.

THE COURT:  Okay.

MR. SAHAM:  So, okay.  Let's go back to the -- the key document I think is -- and, again, I'm going to have to match it up by Bates number.

THE COURT:  Well, that's what I was trying to do.

MR. SAHAM:  Yes, but I -- I brought all those documents the first time when I was -- I didn't bring copies this time because I thought we were just going to rely on the ones that were submitted.  But Bates number -- and, again, I'm going to have to find it.  Yeah, here -- and, again -- okay.  Here we go, Judge.  So, this is simplest. They -- so, the last document cited in Exhibit -- in Footnote 34 is Exhibit 300, which is Defendants' 4, because that was SEC Exhibit 300.  It has a stamp on it.  So, that might be the simplest one, just --

THE COURT:  Oh, okay.  Let me --

MR. SAHAM:  -- to -- to go through.

THE COURT:  Let me look.  Let me look.

MR. SAHAM:  Okay.  Yeah.  So -- so, that -- I --

THE COURT:  I see.  Exhibit 300 in the upper right

17

corner --

MR. SAHAM:  Yes.

THE COURT:  -- of the document attached --

MR. SAHAM:  That's Defendants' Exhibit 4.

THE COURT:  -- as -- okay.  All right --

MR. SAHAM:  And this is I think the most complete string.  So --

THE COURT:  Okay.

MR. SAHAM:  And -- and it actually has the forwarding to PWC on -- on the -- so, the top email is June 5th.  It's forwarding Amy Fliegelman, who was the general counsel at VMware, forwarded it to looks like Burt Stevens, Steven Berthier (phonetic) --

THE COURT:  Um-hmm.

MR. SAHAM:  -- and June 5th.

THE COURT:  Okay.

MR. SAHAM:  And this has all the key emails contained within it.

THE COURT:  Okay.  So, let's -- let's say that it was not just a waiver to someone going outside the relationship but it was then a document used in --

MR. SAHAM:  Correct.

THE COURT:  -- the SEC investigation to support a point that VMware is arguing in its defense.

MR. SAHAM:  Correct.

18

THE COURT:  Then the question is what are the implications of that.  So, now, that's what I wanted to -- to get to because, you know, I saw your citations to Ninth Circuit law, and let's just take, for example, U.S. v. Ruhl, which is a complicated case somewhat -- somewhat complicated factually in how -- how it sort of -- the interests and who was advocating for what, but in -- but in this case, I believe that the Plaintiff is relying on the statement that appears at page 607 of the opinion where the Ninth Circuit writes:

"We begin with some basic premises.
First, there is no dispute that Broadcom had an existing attorney-client relationship with Irell and by electing to reveal the information gathered to Ernst and Young and later to various agencies of the United States, deliberately waived any corporate attorney-client privilege it held with respect to all matters at issue."

He put a lot of emphasis on the all matters at issue, but I read it as all matters at issue in this case, not all matters at issue relating to the general subject matter of stock option granting practices at Broadcom.  I don't think that -- I think you put too much emphasis on that in terms

19

of broad subject matter waiver.  I don't think the Court here was addressing the same problem that we all have in front of us.

So, I'd like to really understand like how you view the case law supporting a subject matter waiver that stems from Exhibit D/Exhibit 4 that extends to any communication on the privilege log about backlog disclosure.

MR. SAHAM:  Yes, your Honor.

THE COURT:  Um-hmm.

MR. SAHAM:  And there's about 4,000 emails that were produced in this case relating to backlog and backlog disclosure.  We're seeking 52.

THE COURT:  Okay.  The 52 that you're seeking in this window of time relating to --

MR. SAHAM:  Correct.

THE COURT:  -- backlog disclosure.

MR. SAHAM:  There --

THE COURT:  So, tell me how the case law supports that.

MR. SAHAM:  They all relate to this particular disclosure that was being drafted by Mr. Norris, Mr. Wingblatt (phonetic), Ms. Olli, Mr. Chrysler, Mr. Roe, in this very distinct period.  They're the -- the exhibits we listed on -- by chronological -- or by time --

20

THE COURT:  Um-hmm.

MR. SAHAM:  -- between I believe May 6th and -- and June 5th.  They all involve -- they're basically the same group of people emailing about exactly the same subject, and here's how we get into subject matter, matters of fairness, sword and shield.

They went to the SEC -- and our trial will be about this too.  They went to the SEC, and they said, Look, they spent all this time crafting this disclosure, and they only produced bits of the story, how they got to that disclosure.  And, in fairness, I mean -- and I think if you read Ritchie's description of subject matter, Primera, I mean, just the -- the quotations couldn't be more on point.  Because Primera has selectively disclosed some of the documents relating to this subject matter, it would be unfair not to require Primera to disclose the remainder, citing Wyle, yet a third Ninth Circuit case.

THE COURT:  But isn't --

MR. SAHAM:  Now, here --

THE COURT:  But can I just ask a question?

MR. SAHAM:  Yes.

THE COURT:  Isn't the unfairness analysis in all of those cases very context specific?  So, in this case, you know, I might be wondering or your presiding judge might be wondering what is it that has been selectively disclosed

21

that would be unfair if you didn't have the full story.  So, what -- what is your theory of -- of that?

MR. SAHAM:  Okay.  Scienter is an element of our claim.

THE COURT:  Right.

MR. SAHAM:  Intent.  Two individual Defendants, Mr. Gelsinger and Mr. Rowe, one of their defenses, there was the adequate -- two of their defenses.  There was the adequate disclosure, and we didn't act with scienter.  The basis of that is going to be legal professionals, accounting professionals spent a lot of time looking at this disclosure before it went into our SEC filings and all felt it was adequate.  Therefore, we didn't act with the intent to -- that -- that is required under the Securities laws to be found liable under 10(b) or 10(b)(5).

Now, here you have part of the story.  You have six emails with lawyers drafting and sending around red lines of a disclosure that gets changed.  It's substantially changed from the first draft to what actually goes in the SEC filings.  And to be -- for them to be able to say the disclosure was adequate, there was no scienter, without giving us the ability in discovery to look at the other documents in the same exact context, the drafting of this disclosure in May and June -- we're not talking about every backlog.  There's -- there's literally thousands and

thousands of backlog documents -- to look at those and see how they got from the disclosure they started with to the disclosure they utilized, which at least one lawyer referred to as watered down.

THE COURT:  Yeah, but you have that already.  So, what are you missing?

MR. SAHAM:  What -- what -- if those are the ones --

THE COURT:  Don't interrupt me.  What I'm -- what I'm trying to -- what I'm trying to understand is, you know, in our last hearing and in the opposition papers, the Defendant disavows any reliance on advice of counsel or even the suggestion that legal professionals were involved and tells me in the opposition that this is an evidentiary matter for motions in limine, not a discovery issue.  All right.

So, maybe they're right.  Maybe they're not right.  But what I'm really trying to focus on is in -- in certain cases, there's a sort of argument that the defendant or the privilege holder has disclosed favorable information.  So, there's a partial disclosure of privilege or a waiver of privilege that is self-serving, and what they're doing is in that selective disclosure depriving the other party of the benefit of contesting or rebutting or testing that self-serving disclosure of otherwise privileged information by

23

limiting -- by saying, you know, I'm -- I'm going to give you this but not this.

So, here I'm just trying to understand if you -- if it's -- if they're disavowing any of this reliance on counsel for any purpose kind of a thing, what is the Plaintiff missing from the story that you think makes this disclosure to the SEC unfair?

MR. SAHAM:  Well, your Honor, their -- their eighth -- or their fifth affirmative defense, VMware fully satisfied its disclosure obligations.  Their eight affirmative defense they didn't act with scienter.  If those eight documents, one of which does have some good language, granted, that we usually don't get, but if those are the eight they choose to give to PWC when PWC came knocking on the door, "We're uncomfortable with the disclosure," what are the other 52?  They may be -- you know, and maybe your Honor has to look at them to see how contextually they are related and we're open to that if your Honor wants to look at the 52 documents --

THE COURT:  Okay.

MR. SAHAM:  -- in camera, but I would have to guess, having been an assistant U.S. attorney for some number of years and doing this for some number of years when a corporate defendant chooses to give -- and, again, it's an express waiver.  Those are the ones they chose to give to

24

PWC and that was the first waiver, and maybe those -- they -- they stuck with only giving those to the SEC when they argued at page 15 and 16 there's full -- full approval by legal professionals, and I'm talking about at the written submission to the SE -- to the SEC.  That's what they used as their basis.  Although it had the watered down language, they used that to say, Look, the legal professionals spent a lot of time on this.  The accountants spent a lot of time on this, and they thought it was fine.  Therefore, we don't have a -- a willful violation of the Securities laws.  If those eight can support the argument that great lawyers Debevoise made to the SEC at page 15 and 16, I think I'm entitled to at least cross examine these lawyers with the other 52.  Maybe they're worse, but maybe they're better.  I would have to guess they're better, and maybe your Honor's got to be the arbiter of whether they relate to it and are something that it would be unfair for us to go not have when we go cross examine, you know, the -- the individual Defendants and the lawyers in this case.

THE COURT:  So, to what extent does your argument depend on the use of the Exhibit D, Exhibit 4 emails that had been previously disclosed to PWC in Footnote 34 to support the point that that footnote is cited to in Exhibit G?  Like, so, is it -- is your argument really relying on this is how you used it in front of a federal agency, not

just merely disclosing it to your auditor?  Like, what -- is -- is that an important --

MR. SAHAM:  It is, your Honor.

THE COURT:  -- thing?  Okay.

MR. SAHAM:  It's very important.  They cited Von Bulow, which is one of those famous cases from the Second Circuit --

THE COURT:  Um-hmm.

MR. SAHAM:  -- when they say like an extrajudicial disclosure doesn't lead to subject matter waiver, but the language is -- is quite interesting, your Honor, and I -- I think I should -- should probably read it to you.  It said -- and let me put on my glasses so I can read it -- not subsequently used by the client in a judicial proceeding to his adversary's prejudice.

So, essentially, they're saying, Oh, it's an extrajudicial waiver because it's with PWC, but the key there, it was not subsequently used in a judicial proceeding.  Here it has subsequently been used.  They used it with the SEC, and the language in the motion to dismiss --

THE COURT:  Um-hmm.

MR. SAHAM:  -- Judge Davila found that they were making similar arguments.

THE COURT:  Let me remind you it's Davila.

26

MR. SAHAM:  Davila.  I'm sorry.

THE COURT:  No, that's okay.  I just don't want you to be embarrassed in front of him.

MR. SAHAM:  Yeah.  I'm horrible with pronunciations.  But, so, it distinguishes Van Bulow.  It also distinguishes Dukes, which is the Walmart case where there was the article in the Wall Street Journal, and that language, again, in finding no subject matter says when it remains extrajudicial.

Here the waiver, which I think we all can agree occurred originally with PWC, it didn't remain extrajudicial.  If it stopped there, they might have had an argument, but then they went to the SEC --

THE COURT:  I see.  Okay.

MR. SAHAM:  -- and utilized these documents, and now we're in the sword and shield and fairness.  They absolutely already made the argument twice, once before the SEC, and I -- I implore your Honor -- I know you've already read it -- read page 15 and 16.  I mean, they're talking about --

THE COURT:  Yeah.  No, I -- I'm very familiar with it.

MR. SAHAM:  -- the advice of legal professionals.

THE COURT:  No, I -- I have that.  And we had that -- an extended discussion about that --

MR. SAHAM:  Yes.

THE COURT:  -- also at our last hearing.  Okay.  So, I -- I get that point, and thank you for elaborating on it .

Let's -- let me just ask another -- and this is really just to drill down on what your argument is.  Question, if I don't find that there has been an express waiver by virtue of these disclosures, in the first instance to PWC or in the first -- or in the second instance to the SEC, is the Plaintiff's position that I should still review these 52 documents in camera and, if so, what would the basis be?  Again, I'm not making this finding, but if I don't find an express waiver, why should I look at these in camera?

MR. SAHAM:  Your Honor, I think Samina (phonetic) is a good case, and we -- we cited it in both, another Ninth Circuit case.  So, again, you know, we're talking about binding authority.  Samina goes through both express waiver and implied waiver, and I think it really gets you to the same place because whether you're talking express waiver is producing a document and then you're talking about, Well, what's the extent of subject matter, you have to determine the fairness, and -- and that's really very similar to the inquiry of implied waiver.  You make an argument, and you have to determine they're using it as a sword and shield.  It's that fairness inquiry.  I mean, I think reading those

28

Ninth Circuit cases, Samina, Ritchie, Ruhl, Wyle, they all interject the same concept whether it's talking about implied waiver and then going into the fairness inquiry or even express waiver and then figuring out what the subject matter should be.  And I think it's clear, you know, so either way you looked at it, your Honor, whether you looked at it as an express waiver, which I think clearly there is, they've used these documents.  They've produced these documents to PWC and the SEC.  That's on its face an express waiver.  But then they also made these arguments based on those documents.

I would assert even if they didn't use those documents and you're just viewing it as an implied waiver, the fact that they made those arguments would compel the same result, that you should look at the documents in camera to determine in fairness whether Plaintiffs are being prejudiced by Defendants being able to make a particular argument without having access to cross examination.

THE COURT:  Okay.  So, I have to find either express waiver or implied waiver has already occurred before you are suggesting I look at the documents in camera, the 52 documents in camera?

MR. SAHAM:  Yeah.  And I -- your Honor, I think you don't need to look at them.  I think it's a --

THE COURT:  Okay.

MR. SAHAM:  -- clear case you would just ordered them --

THE COURT:  Yes.

MR. SAHAM:  -- produced, but obviously you're in charge, and you can decide --

THE COURT:  Yeah.  Okay.

MR. SAHAM:  -- whether you want to look at them.

THE COURT:  Okay.  That -- that's helpful.

I have a question about the preclearance category, and then I'll --

MR. SAHAM:  Sure.

THE COURT:  -- I'll let you argue whatever else you were planning to --

MR. SAHAM:  Certainly, your Honor.

THE COURT:  -- to argue.  But, so, my understanding of the Plaintiff's argument is that the theory is that VMware has already disclosed its in-house counsel's legal opinion or advice that there was no improper insider trading by sharing that opinion and advice of the SEC in the form of this presentation about the preclearance result. Okay.

And what I wanted to know is that presentation includes not only that email that says this -- this has been precleared, but it includes lots of other information, you know, the timing of the trades and all those kinds of

30

things.  Does the Plaintiff already have all of the underlying factual information about the trades, what was publically disclosed, what the executive knew, what the timing of the trade was, when the trade occurred, all -- does it -- does the -- has that been produced as a sort of factual matter in discovery?

MR. SAHAM:  Well, your Honor, I'd love to give you a black and white answer.  Where we are in discovery right now, we've received that -- though it was obviously -- requests for production, we made all the document relating to the trades.

THE COURT:  Um-hmm.

MR. SAHAM:  Other than what's been withheld as privileged, certainly we have the plans, the 10(b)(5)(1) plans.  We have the transaction documents.  We haven't gotten to the point of deposing these people and potentially deposing the brokers who made the trades.  I think really what we're saying here -- and, again, I believe there's express waiver in two places in the same document that -- well, there's -- really, there's two presentations.  There's the preclearance.  And if you look simply at the last three Bates numbers 574, that's an example.

THE COURT:  I'm sorry.  Can you just give me an exhibit number that --

MR. SAHAM:  Okay.  This --

THE COURT:  -- so we can be clear.

MR. SAHAM:  I'm sorry.  I'm not sure this was an exhibit.

THE COURT:  Oh.

MR. SAHAM:  But it was a letter.  We -- we attached as an exhibit the written submission, but I don't believe we attached -- there were two presentations that Ms. O'Connor sent you on October 23rd.

THE COURT:  Right.  Okay.  So, you're referring -- I mean, I remember the -- and I do have the preclearance presentation, but are you referring right now to --

MR. SAHAM:  I'm referring to that letter she sent.

THE COURT:  Okay.  The -- the letter?

MR. SAHAM:  Yeah.

THE COURT:  Okay.

MR. SAHAM:  It's an October 23rd letter, and it attaches --

THE COURT:  Exhibit J --

MR. SAHAM:  -- both --

THE COURT:  -- is the Executive Trading Analysis. That's the document that we had.

MR. SAHAM:  Yeah.  That's -- that's --

THE COURT:  Is that what you're referring to?

MR. SAHAM:  Yes.  Yes.

THE COURT:  Okay.  So, I've got Exhibit J in front

32

of me.  And what was the --

MR. SAHAM:  Oh, it is Exhibit J.  I'm sorry.

THE COURT:  And what -- what number were you -- what Bates number were you --

MR. SAHAM:  574 are the last three.  That's just one example.  There are several of these.

THE COURT:  Right.  Yes.  Okay.

MR. SAHAM:  That's just an email from Mr. Wingblatt.  Again, he is an in-house counsel who's dealing with the disclosure, and he's also -- I'm not exactly sure who Mr. Turner is, but he's letting him know that Mr. Gelsinger is precleared.

And what we're saying is they've -- this is -- it's both, again, express waiver and implied waiver.  You've put forward an email saying he's precleared.  Therefore, he's not doing anything wrong when he makes the trade.  What was the basis --

THE COURT:  Um-hmm.

MR. SAHAM:  -- of the determination of preclearance.  And that could fall into two -- two broad categories, information about the trade but also information about the underlying issues in the case.  I mean, is there material, nonpublic information?  Did this lawyer consider what's at issue in our case, the backlog that they were using this -- I mean, and there's a difference in

characterization, but if we're correct and convince a jury that they were utilizing a slush fund to, you know, use cookie cutter reserves and smooth revenue and all that --

THE COURT:  Um-hmm.

MR. SAHAM:  -- was that considered in determining whether or not Mr. Gelsinger and Mr. Rowe were in possession of material nonpublic information.  We're entitled to examine Mr. Wingblatt and cross examine him with what he considered in making that determination that he's precleared.  It's not just the trading documents.  It's was he in possession, did they look at closely whether or not this was material nonpublic information and whether it was appropriate to trade at that point.

THE COURT:  Okay.  So, in your motion you say -- you -- you indicate that one of the things you're -- and I'm looking at page 10 of your motion.  This is why -- why I was focusing on this question is one of the things that you say is that you want to know what in-house counsel reviewed or considered in preapproving insider transactions in this case, including whether they met the requirements of the plans, as that bears on the scienter defenses.

MR. SAHAM:  Correct.

THE COURT:  Okay.  So, that's why I was focusing on have you asked for and are you getting the factual information that counsel relied on?  Maybe you haven't asked

34

for it in exactly the same way --

MR. SAHAM:  Well --

THE COURT:  -- that way, but I just wanted to know what the -- the state of play was.

MR. SAHAM:  Absolutely not.  We're not getting it because that's one of the items we're asking for is to make Mr. Norris, Mr. Wingblatt, and Ms. Olli, the people who made this determination, custodians.

THE COURT:  I see.

MR. SAHAM:  They say, no, it's too burdensome to make them custodians because everything they have is privileged, and that's --

THE COURT:  Okay.

MR. SAHAM:  -- why we're here fighting about it, because we don't think it's -- we think there's been waiver. We have absolutely not gotten --

THE COURT:  Okay.

MR. SAHAM:  -- what they have --

THE COURT:  All right.  I -- that's helpful. I understand now what -- what the structure of this argument is.  Okay.

MR. SAHAM:  And that's why one of the issues -- so, if you -- if you boil down into four categories what we're asking for in this motion to compel, it's, one, the 52 documents.  It's, two, you know, what was relied on for the

preclearance, but then it's also the last one, the documents, the custodial files and it may be that they're going to put all those documents on a log, but they won't even search these --

THE COURT:  No, I got -- I got that point.

MR. SAHAM:  Yes.

THE COURT:  Okay.  All right.  Anything else that you would particularly like to argue in support of the motion?  These were the things that were most top of mind for me that I raised with you, but I'm happy to hear any other argument.

MR. SAHAM:  No, your Honor.  I think that really does hit the highlights.  The only -- the only thing that's left is -- is sort of a fourth category which I would say is the -- the sort of least focused, but it's the -- we also do believe, and, again, this would be an implied waiver, that the use of the Berthier interview memo about backlog --

THE COURT:  Oh.

MR. SAHAM:  -- and so forth was a waiver of work product as to the other memo, really all the memos that deal with that subject matter.

THE COURT:  You know, I was reviewing the transcript last night from our last hearing, and I realized that there wasn't anything in my order that, you know, sort of tied this issue up in a little bow.  But where we left

36

off on this work product issue with this Berthier interview memo was I believe VMware had said, Okay.  Well, you know, apart from excising opinion work product, recognizing there was a waiver of some portion of that memo's factual work product in the quotation that's provided in Exhibit G, that it would be appropriate -- and I -- maybe Ms. O'Connor has some different take on it now, but that it would be appropriate to disclose the fact work product from that memo and only that memo and not every other memo, which -- for whatever they may be.  And I now understand from the briefing that there were two interviews of PWC people, Mr. Berthier and maybe someone else.  I don't know who, but the only disclosure that's been pointed out to the Court is the disclosure of something that person said, Mr. Berthier said, to a lawyer in one interview.

So, I don't know where things stand, but I thought we had reached a sort of agreement that that was an appropriate thing to do.  And I'll find out from VMware if they still think that's an appropriate thing to do or if I've misunderstood, but I don't see any basis for disclosing everybody's interview memo, whether they're PWC employees or not PWC employees or just -- just based on this quotation from Mr. Berthier's interview.  That's not consistent with the work product doctrine as far as I can tell.  And I don't think that there's been the kind of broad waiver that would,

37

you know, justify such a scope.

So, if you'd like to be heard on that point, I mean, your arguments were essentially the same in this briefing as they were before.  I didn't really see anything different.  So, you know, that's kind of where I ended up at the end of our last hearing.

MR. SAHAM:  Your Honor, and, again, I think we -- we are really in the same place.  I mean, we had a similar situation in front of Judge Alsup, and he interpreted subject matter waiver to be when you go to the SEC and say things that are positive from the memos that you've waived it as to the entire scope of the investigation, and I understand your Honor didn't really -- wasn't persuaded by Judge Alsup's reasoning there, but, I mean, you asked is there anything else.  That's the fourth category of information.

THE COURT:  Okay.

MR. SAHAM:  I don't want to reargue something --

THE COURT:  Okay.

MR. SAHAM:  -- that we've already lost, but --

THE COURT:  So --

MR. SAHAM:  -- I mean, we -- we disagree, and we believe there's been --

THE COURT:  Okay.

MR. SAHAM:  -- waiver as to all the memos.

38

THE COURT:  All memos, as to all -- as --

MR. SAHAM:  All of the memos.

THE COURT:  -- to all -- all interviews?

MR. SAHAM:  Yes.

THE COURT:  Okay.  All right.

MR. SAHAM:  So, I mean, just to just summarize just so it's crystal clear what we're asking for, we're really asking for four categories.  We're asking for the 52 documents, and if you want to order them produced, review them in camera, we're asking for all the memos.  We're asking for -- and then the last two categories I think relate to the -- to the preclearance and also the -- the backlog too, but we -- the documents were -- that were relied on and were reviewed by counsel in making their determination of preclearance, and that sort of wraps itself into, well, these three lawyers --

THE COURT:  Custodians.

MR. SAHAM:  -- Wingblatt, Olli, and --

THE COURT:  Um-hmm.

MR. SAHAM:  -- and Norris, are appropriate custodians, and that may give rise to another fight on what's on a privilege log as opposed to what's produced, depending on your Honor's ruling here and whether it would cover those items.  But, at a minimum, I think those documents have to be collected because we really don't have

a set of documents either on a log or produced as to what those lawyers relied on in making the preclearance determination which, of course, then relates to the backlog because that's the material nonpublic information we allege it was inappropriate to trade based on.

THE COURT:  Okay.  And then you had some other item in there about your 30(b)(6) deposition which I'm just going to lay that to rest because I don't want to belabor it, but I already made my ruling about the 30(b)(6) deposition.  I'm not going to reconsider it.  If something new and interesting comes up that you didn't anticipate after I make this ruling and you think that there's good cause to reopen a deposition, you just proceed under whatever you have to show for good cause, just like any other deposition request.  I mean, that's -- that's just kind of --

MR. SAHAM:  No, no, we --

THE COURT:  -- the way I would --

MR. SAHAM:  -- accept that, and we're here, your Honor.  And that may be -- maybe the Court misunderstood what we were asking for.  We were -- we were certainly saying -- and obviously we could refile a motion subsequently.  We were saying based on the first hearing, I mean, implied waiver.  Now, we -- we've dealt with the express waiver.  There may be a further development of the

40

record not just from the 30(b)(6) deposition, but from all the depositions.

THE COURT:  Sure.  There may be.  And then you can seek relief --

MR. SAHAM:  Correct.

THE COURT:  -- if you feel that you need to redepose somebody you've already deposed.  But it would be under just the ordinary is there good cause under the Federal Rules to seek further deposition testimony or reopen someone's deposition.  That's all I'm saying.

MR. SAHAM:  Understood, your Honor.

THE COURT:  I'm not prejudging it.  I just didn't want to have it be sort of a situation where I was inviting duplicative effort by allowing you to postpone this resolution of this dispute.

MR. SAHAM:  Right, your Honor, and we weren't asking to reopen it.  What we were --

THE COURT:  Yeah.

MR. SAHAM:  -- saying is --

THE COURT:  Got it.  No, it's --

MR. SAHAM:  -- is that that -- and not just the 30(b)(6), but all the depositions in this case may create a record that --

THE COURT:  They may or they may not.

MR. SAHAM:  -- may cause you to revisit the

41

privilege log.

THE COURT:  Okay.  All right.  Thank you.

Let me hear from VMware.  And, you know, my -- my principal concern is, as I shared with Mr. Saham, about the express waiver and the implications of that.  So, maybe we could start there.

MS. O'CONNOR:  Sure, your Honor.  So, I think that, first of all, maybe just trying to orient and back up to those footnotes of 34 and 35, I think that one of those documents is this -- this series of emails that were forwarded to PWC.  The other documents there were not privileged documents.  They are nonprivileged emails among VMware accounting and finance personnel, sometimes copying lawyers but not legal advice reflected.  There's, you know, nonprivileged agendas or materials for disclosure committee meetings.  There's some privilege redactions in some of them, but there's no waiver.  There's emails with the auditors, again.  So, those are not privileged documents.  And I think the -- the basis for the argument here is the -- the document that was forwarded to PWC.

THE COURT:  Right.  Which is the last document listed in Footnote 34, correct?

MS. O'CONNOR:  That's right.

THE COURT:  Okay.

MS. O'CONNOR:  And that document we do believe was

42

waived at the time it was contemporaneously sent to PWC, within -- you know, the same day, within minutes of the final email exchange on the chain, it was sent off to PWC, you know, outside any judicial context.

And I think, to pick up on one of your Honor's other questions, I think that means that Rule 502 is not applicable to any, you know production of those materials to the SEC or citation of them because Rule 502 applies only where disclosure is made in a federal proceeding or to a federal office or agency and waives.  And the privilege was gone.  I think Mr. Saham suggested we waived again with the SEC and we waived again, but the privilege doesn't renew. The privilege was gone.  And you can see from the email correspondence with the SEC that there was kind of a very principled and careful effort to draw lines, and the SEC said "Is all this definitely privileged?"  And they said, Well, gee, we found -- you know, because this email chain forwarded to PWC, there's no basis to call that privilege any more.  And, so, the enclosed, you know, documents that were also exposed are not privileged.

So, I think that that was a very principled process based on discovery that contemporaneously before any investigation or anything was underway, the general counsel had forwarded a chain to PWC.

THE COURT:  But, yet, on that point, though,

43

nothing required VMware to rely on this document before the SEC, and yet it chose to do so.  So, I'm not entirely persuaded that having, you know, waived privilege beforehand -- and I'm not sure how long beforehand, maybe years beforehand, but waived privilege beforehand, the company, nevertheless, relied on privileged information, one could argue, in a document in support of a position it was taking before the SEC.  And even if 502(a) doesn't technically apply because the waiver occurred before -- so, not in the context of a federal agency but before you got to a federal agency -- we still have the discussion that I think Judge Corley focuses on in Dukes about, well, maybe the Ninth Circuit hasn't quite resolved this yet.  But the same kind of fairness analysis should also apply.  And I'm a little troubled by the idea that, you know, a company might say, Well, look, we want to rely on these things before a federal agency, but, hey, they're privileged.  So, why don't we just disclose them to a nonparty first?  So, then they're no longer privileged, and then we can take the position that they're not privileged when we share them with the federal agency.

That's not what you did here, and I'm not suggesting that is what you did, that it was a deliberate sort of prewaiver waiver.  But, nevertheless, the company is relying -- so, you know, it would be as if in Dukes, the statement

44

made to the newspaper for purposes of the article responding to the -- the press inquiry was then actually used in the litigation.  Now, it wasn't.  Judge Corley found that there was no reliance in the litigation, but here there's a waiver, and then you're -- you're using it.

So, I think it's a little different than the simple extrajudicial waiver context, you know, in the cases that you rely on.  So, I'd be interested in your thoughts on that point.

MS. O'CONNOR:  Yes.  Thank you.  I guess I have two reactions, and one is we cite it, but there's no reliance at all on the content of the advice, and I think that what is stated on the top of page 16 of Exhibit G is really pretty narrow, that the company sought feedback from internal and external stakeholders, and there was -- you know, there was discussion.

It doesn't say here's what happened, here's who approved it, here's what we're relying on that went down in those discussions, and I -- I don't think that is a waiver, and I think the company was very very clear with the SEC and careful that they were not asserting an advice of counsel defense.  And I don't think that this narrow citation is -- is reliance on the substance of the legal advice in any way. And I think the second point is all of --

THE COURT:  Can I ask you a question before --

MS. O'CONNOR:  Of course.

THE COURT:  -- we get to the second point?  I don't want you to lose your train of thought, but is -- in terms of waiver document, do you have to rely on specifically the substance of the legal advice or can you simply rely on a high level characterization of it and cite the legal advice that's included in a document in support of that high level proposition?  So, you see what I'm saying?  It's like you've disclosed the document to the SEC.  You've cited it in support of a point you're making at a higher level in your memorandum.  You don't have to quote the legal advice for there to be waiver and reliance.  That's not what you're suggesting, is it?

MS. O'CONNOR:  No.  But I think, your Honor, we -- that the company very expressly with the SEC was not relying on the advice of counsel defense and was not relying on the advice of counsel with regard to the backlog disclosure.  So, that was just like -- it was off the table.  They weren't doing that.

THE COURT:  But you were relying on the fact of counsel, among others, having considered the disclosure.  That seems apparent.

MR. SAHAM:  Yeah.  There's reference to the fact that there was review by counsel.

THE COURT:  Okay.

46

MR. SAHAM:  That is correct, and I don't think that under the law that reveals anything about the substance of the advice.  I think that would be apparent from a privilege log, that counsel reviewed it, and, you know, that gets disclosed in that -- in that setting automatically, you know, emails to, from re backlog disclosure.  So, you know, that -- that is what is, I think, not privileged.

THE COURT:  Okay.

MS. O'CONNOR:  And then when we come to this question of a broader waiver, all of it is rooted in notions of fairness.  Whether you call it implied waiver, whether you call it implied waiver.  Whether you call it subject matter waiver.  There's different ways of looking at it. 502 the same.  They all are asking whether in fairness to the other side something more needs to be disclosed, and here -- and the requirement for Plaintiffs is to show manifest prejudice in order to get implied waiver.

We submit that there's no prejudice.  There's no unfairness.  We recognize that Plaintiffs would like to see these documents, but that's not prejudice.  We are not relying on an advice of counsel defense in any regard in this case.  We're not relying on the SEC presentation. We're not relying on, you know, any aspect of this.

And we talked last time about the -- you know, what is the exact shape of that.  I think some of that might end up

being a motion in limine decision as to it's not privileged to say counsel reviewed it.  But could you say that to a jury?  Would that be misleading?  Would you have a motion in limine around that?  I think that's a -- that's a down-the-road question.

THE COURT:  Um-hmm.

MS. O'CONNOR:  But we just don't see any prejudice in a setting where we are absolutely not relying on that, and we don't see a case like that, and -- where -- where some type of fairness based disclosure is found to expose the privilege when there's really no -- there's no prejudice to them.  There's no -- and there's no basis to think that the earlier disclosure -- I appreciate that your Honor was not saying that, but the earlier disclosure to PWC, it certainly looks from the record like almost not thinking, oh, woops.  I'm deprivileging these, but rather --

THE COURT:  Yeah.  It's a woops.

MS. O'CONNOR:  It looks like a woops, exactly. And -- and I think that some of what's embedded in that woops, I think that my -- my colleague is probably happy to have.  So, these are not documents that the company is relying on to assert any substantive argument in this matter and did not rely on it in that regard with the SEC at all either.

THE COURT:  Okay.  So, if we could maybe shift our

48

focus a little bit to the preclearance issue, which I -- you know, I understand from Mr. Saham that the Plaintiff's theory is that the preclearance problem encompasses the backlog disclosure issue because the backlog disclosure issue was a material point that was, you know, that -- that implicates the preclearance.  So, they're somewhat related, but I'm -- I'm trying to think of them distinctly, at least for the moment.

So, when VMware takes the position that scienter's not present because the insider transactions at issue were executed pursuant to a trading plan, which I am assuming is something that VMware is going to argue, what exactly does that mean?  They were executed according to a trading plan. Does that implicate and subsume the whole preclearance process or is it something different than that?

MS. O'CONNOR:  So, that's something different, and that is a factual, not a legal point.  It means that the -- the -- and I -- if I'm not answering this right and I'm saying things that you know --

THE COURT:  No.  Go ahead.

MS. O'CONNOR:  -- please tell me.  But, you know, it means that the individual entered into what's called a 10(b)(5)(1) trading plan.  On the date when you enter into it, it says I'm going to sell 15,000 shares on this date. I'm going to sell 15,000 shares on this date, and it just

49

identifies the dates out into the future.

THE COURT:  Okay.

MS. O'CONNOR:  And then on those dates the trades are executed.  And it's a way of avoiding these types of arguments by just, you know --

THE COURT:  It's all set in stone in --

MS. O'CONNOR:  It's set in stone.

THE COURT:  -- advance without -- but -- okay.  But then how does the preclearance process integrate or not with that plan?  Because there still had to be preclearance?  Is the preclearance for purposes of adjust -- of saying, yep, I looked at the plan and your trade complies with the date set in the plan and the number of shares that you propose to trade?

MS. O'CONNOR:  Well --

THE COURT:  How does the preclearance process get involved here?

MS. O'CONNOR:  Yeah.  I think there's a compliance aspect of it and a -- probably a legal aspect of it.  In a 10(b)(5)(1) complex, I don't think that there's anything to it at all that may even apply, right.  It only applies for non 10(b)(5)(1).

THE COURT:  If you could speak into the microphone if your colleague's going to address something.

MS. O'CONNOR:  I apologize.

MR. GREENFIELD:  Sorry.  I was just going to say my understanding of it is that if -- if there's going to be a sale that's not part of the 10(b)(5)(1) plan, that's when you need to get preclearance.

THE COURT:  So, is that what occurred here where we have these emails that have been disclosed to the SEC, say, in Exhibit J to the Plaintiff's briefing where there is this preclearance email?

MR. GREENFIELD:  Yeah.  There's a -- a very small number of trades that were made outside of the 10(b)(5)(1) plan.

THE COURT:  Got it.  Okay.

MR. GREENFIELD:  And, so, they were precleared.

THE COURT:  All right.  Thank you.  I never practiced corporate law.  So, thank you for the education.

So, then that leads to my next question is, okay, so, will VMware rely on the fact of preclearance by in-house counsel to support its argument that no scienter occurred with respect to the insider trading?

MS. O'CONNOR:  No.  We will rely on the 10(b)(5)(1) plans and whatever other arguments can be made, but we're not relying on any advice of counsel.

THE COURT:  So, there won't be any evidence that you will rely on that says, And this trade was precleared?

MS. O'CONNOR:  That's correct.

51

THE COURT: Okay. So, this email -- just to put a real fine point on it, this email that shows up in Exhibit J at Bates number 574, ending 574, from Mr. Wingblatt to Mr. Turner, that's not a document that you're going to use?

MS. O'CONNOR: No. And this is, obviously, to be clear, not a privileged document either. But, no, we're not going to make that point if that point implies legal advice.

THE COURT: Okay. And then I asked Mr. Saham this question, which is Plaintiff is interested in what did the lawyers consider in making preclearance determinations. And, as a factual matter, has all of the material that the lawyers had and considered for that point, assuming it's relevant, has that been produced or will that be produced in the course of discovery or is that being withheld on privilege grounds or work product grounds or whatever?

MS. O'CONNOR: So, the lawyers are not custodians --

THE COURT: Um-hmm.

MS. O'CONNOR: -- of the mails at this -- at this point. And, so, if there's factual matter, I wouldn't think that factual matter is -- is privileged. There is, I guess taking this from another angle, discovery of what the individuals knew at a point in time as a factual matter will be discovered from the individuals who are custodians and who will be deposed.

THE COURT:  But -- but you're -- you're going to resist, if you're not already resisting, discovery of the lawyers who precleared.  What did you consider or what did you know at the time you made this preclearance determination that you'll contend is privileged information or work -- I don't know, I guess work product?  I'm not sure of work product, but not -- not apply, there was no anticipation of litigation?  I don't know what's going on with that, but let's assume it's a --

MS. O'CONNOR:  I would think so, your Honor.  It's a little bit abstract because the -- the lawyers have not been custodians, and that's just a burden point, and we can -- we can discuss that.

THE COURT:  Custodians or not.  Let's say their deposition gets noticed.

MS. O'CONNOR:  Yes.  And they're asked what factual information was provided to you on this issue.

THE COURT:  Yeah.  What did you consider in making the -- Mr. Wingblatt, what information did you consider before you precleared Mr. Gelsinger to do this trade, you know, in April of 2019?

MS. O'CONNOR:  Yeah.  I would think that that question is fine because it's -- and maybe I would -- maybe I would tweak it and, rather, what information did you know or there might be a little question of is consider embedding

53

the legal analysis versus what was sent to you or communicated to you.

THE COURT:  I see.

MS. O'CONNOR:  But that's like an around-the-edges issue that you could work through in a deposition with instruction.

THE COURT:  Okay.

MS. O'CONNOR:  But I don't see the facts as privileged.

THE COURT:  All right.  So, you know, on this -- on this issue, I -- I still come back to the question -- and I appreciate that this arises in the motion in limine context, but, you know, the -- the idea that there can be reliance either before the SEC or in this court, on involvement of counsel, not -- not advice of counsel but involvement of counsel in a way that could be prejudicial to the Plaintiff if they're not permitted to explore that, that -- that to me seems like the hardest issue for the Court to resolve, because right now, the -- the pleadings are what they are.  You're still in discovery, and, you know, I'm not -- I'm not sure that I can say, well, this will not be in evidence at trial.  This will not be something you argue or this will not be a document that you use at trial, and, therefore, you know, discovery is usually in anticipation of what might reasonably be expected to be at issue.

54

So, you know, I'm a little bit struggling with how to police that issue here.  And, you know, VMware has insisted that it's not going to rely on the fact of preclearance by a lawyer at all for any purpose.  And if that's really true, well, okay, that -- that really changes the dynamics.  I mean, I'd wonder if the Defense is going to rely on the fact of preclearance by a lawyer for some affirmative purpose, and maybe that would be interesting.  But, you know, I am troubled by -- I think Abdo -- and as you pointed out in your footnote, Abdo and Shenwick I think are the more -- you know, challenge the position that this discovery is off limits, but it really depends on what -- what the Defendant is going to argue.

MS. O'CONNOR:  Well -- so, if I can answer that in a few pieces I guess, your Honor.

THE COURT:  Sure.

MS. O'CONNOR:  One is -- and I think I said this last time we were here.  Fundamentally, I think that there are aspects of where you draw the line that are not fully resolved.  So, the Plaintiff cites Abdo and Shenwick.  Shenwick cites First Solar decision within the Ninth Circuit that goes the other way on this exact question of where you land on a motion in limine.  It's not this exact question, but it's a down-the-road question.

So, I do have some concern that we're going to get into

a deposition and it's going to be a lawyer witness and the lawyer witness will be asked, Did you review this?  And I don't think that's privileged.  That's a yes/no question that I think the lawyer can answer because it would be reflected on a privilege log.  So, the lawyer will answer that, and then we'll be back here on a waiver argument.  That's the concern that we're --

THE COURT:  I see.

MS. O'CONNOR:  -- sort of struggling with as to how we walk this line.  So, I think that there are questions where we can't legitimately instruct not to answer.  It's a different question whether we would affirmatively inject that in the case.  And, ultimately, as I think I said in November, our number one goal is we're not -- we're not relying on an advice of counsel defense.  We're not going to inject an issue in a way that creates a fairness issue for the Plaintiff, and we would be guided by the Court on that.  We're just not -- you know, some of these issues -- but if you look at, you know, Shenwick v. First Solar, I think you see that it's not maybe 100 percent clear.  We're not looking to be cute in depositions, but we do worry a little bit about the limits of where you can instruct not to answer and how Plaintiff may then say, aha, you're clearly going to use this in the following way.

We're not.  It's a deposition.  This is not a

56

privileged answer to a question.  I can't instruct, but we are not going to inject an issue in any way that has an implication that could be confusing to a jury or create a risk of unfairness.  That is our position and our goal. And, so, whatever is the best way to get there today if the Court has concerns about where this ends, we're happy to talk further about that or figure it out.

THE COURT:  Okay.

MS. O'CONNOR:  I do think that some of it does stand up in the motion in limine context.

THE COURT:  Um-hmm.

MS. O'CONNOR:  And gets resolved pretrial where it's very concrete.  For example, there could be a situation where Plaintiff injects something.  So, we don't intend to argue the SEC order didn't find X.  But there could be ways that the Plaintiff uses it where in fairness we ought to be able to either --

THE COURT:  I see.

MS. O'CONNOR:  -- require them to use it more fully or -- or correct, even though we're not going to inject it.  And, so, I'm a little worried about overlegislating today --

THE COURT:  Right.

MS. O'CONNOR:  -- the boundaries.

THE COURT:  I think that is a danger, and I'm not

57

sure that that's my role.  But -- but I am -- I am responsible for managing discovery here and deciding the issues that are presented.  And, so, what I think is the hardest question is this coming back to this express waiver issue, so, not merely the disclosure to PWC but the positions that VW -- VMware took before the SEC, because -- and, you know, whatever another law firm did is like not in your control, but whatever happened in that context, I think that creates a cat out of the bag situation.  So, whatever I conclude happened before the SEC as far as waiver is waiver for all purposes, even if you don't intend to use something in this case, you intend to take a narrower approach to defense.

So, what I'm -- what I'm really focusing on is this thing that we started our discussion about, which is how did -- how did the company use this PWC disclosed material.  If that's it and we're down to that one, you know, pile of emails, all -- you know, that string of emails, how was that used, and also interested in -- in the best authority that you think bears on this question.  And if I find that that was used, then the scope of the waiver.

That's -- that's really what I think is the nub of this dispute.  I think that's where we are right now.  So, you know, I have Plaintiff's favorite pile of cases they shared with me.

58

What -- what do you think is the most persuasive authority? I mean, you cited, you know, In Re Bulow and a number of District Court -- and I should point out that In Re Bulow from the Second Circuit, The Ninth Circuit has frequently cited In Re Bulow. So, it's a well cited, well recognized case in the Ninth Circuit, and we have a bunch of District Court cases as well, some within the Ninth Circuit, some would not.

What would you point the Court to in terms of the most persuasive authority for VMware's position on this point of express waiver, not express waiver, and scope of waiver, if there is a waiver as to this collection of email?

MS. O'CONNOR: Well, I think another persuasive one, your Honor, is the White case by then Judge Ginsburg.

THE COURT: Which we talked about last time, right?

MS. O'CONNOR: Exactly, which you spoke about last time, which I think is another very helpful one. And then the -- the Von Bulow case and the Dukes case I think are very helpful in dealing with the kind of narrow scope of, you know, waiver that results from an extrajudicial express waiver that does not get injected and does not prejudice anyone. I think White also really talks about -- and I can have a moment and find some others as well but really talks about mentioning the fact that lawyers were, you know, there

59

or looked at the document doesn't inject the advice.

THE COURT:  That's an implied waiver case, right.
So, U.S. v. White focuses on the implied waiver issue.  The
other two, Von Bulow and Dukes, focus on express waiver in
the context of --

MS. O'CONNOR:  Res.

THE COURT:  -- extrajudicial matters.

MS. O'CONNOR:  Yes, it did.  And -- and maybe I
lost the question as to which -- which --

THE COURT:  Yeah.  So, I mean, if I view --

MS. O'CONNOR:  -- you were more focused on.

THE COURT:  -- as Plaintiff is urging me to do,
the use of -- I'm going to call it Exhibit 4 and Footnote 34
to support the point in Exhibit G before the SEC, if that
use is, you know, an express waiver again of otherwise
privileged material -- so, reliance on advice of counsel to
make a point, that's really the issue.  You saying, Well --
well, that's not really reliance on the advice of counsel
contained in that document because the point that's being
made is just that lawyers considered it, as well as a bunch
of other people considered how to do this disclosure, it's
not actually relying on the actual advice that's disclosed
in that document, and yet the document is cited.  The SEC is
invited to look at it by virtue of this footnote.  And it
was produced, as it must have -- it had to have been

60

produced.  But it's relied on in a way beyond mere production.  It's cited, not highlighted, but cited.  So, you know, that's a -- that's a very like difficult line drawing problem for the Court.  But if -- if that's an express -- that's not -- that's not the same kind of implied waiver context that I think U.S. White addresses -- U.S. v. White addresses is all I'm saying.

MS. O'CONNOR:  So, I do think, though, that -- that -- well, I guess I come back to two things.  One is that I think it is used in a very narrow way and in a context where the intent not to waive and not to rely on the advice of counsel is very clear, and I think that's relevant to the analysis.  It was very clear we're not going here.

THE COURT:  Um-hmm.

MS. O'CONNOR:  This is cited as a process point.  The process, as I said, appears on a log.  And, so, for Plaintiffs to try to -- I feel like they're trying to sort of drive a truck through this -- this point and get to a -- a big waiver, but there's no -- they need to show manifest prejudice for an implied waiver, and I think there's none because in the SEC and here, reliance on the advice of counsel is off the table and is not something that's being injected or used.

THE COURT:  Um-hmm.  Okay.  All right.  Anything else that you'd like to argue?

61

MS. O'CONNOR:  Let me just take a quick look, your Honor, but --

THE COURT:  Sure.

MS. O'CONNOR:  -- I think we may have touched on the main points.

THE COURT:  There were some of these other issues about work product.  I would like to know what your final call is on work product, if I got your argument right or not, when you get to it.

MS. O'CONNOR:  Yes.  So, on that, thank you for raising it.  We weren't entirely clear where it landed.  We had offered the Berthier memo to Plaintiffs before the dispute ever got raised to the Court, and we are happy to produce it subject to redaction of very limited opinion work product.  We hadn't done it because we didn't want to walk into another waiver argument --

THE COURT:  I see.

MS. O'CONNOR:  -- without the Court's endorsement that that's the appropriate --

THE COURT:  I'm happy to order you to do it because I do think that's the appropriate result is to produce the fact work product from that Berthier interview memo because facts were disclosed, fact work product was disclosed to the SEC.  So, I think you should do that.  I will order you to do that in writing if you would like me to

do that, but I -- you don't need to wait for me.  I think that's the right thing.

MS. O'CONNOR:  Yes.  I consider myself ordered. So, thank you.

THE COURT:  Okay.

MS. O'CONNOR:  That helps.  And then maybe the only other point, on the -- on the custodians, the legal custodians, it's really -- it is, as I mentioned, it's just a burden argument because normally you don't end up producing lawyers' custodial files, especially where reliance on counsel advice is not being put forward, and it just is a lot of work to -- to analyze and log and make the privilege log.

Having said that, you know, obviously the -- the Court may have a different view, and that -- that can land where it lands.  I -- I will note that Plaintiffs in Footnote 11 of their reply brief put a narrow scope around what would be reviewed for those custodians, and I would submit that if we are to produce documents from those custodians, it should be limited to what Plaintiffs have asked for.  I have some concern that if they broadened it out, it will be 5,000 documents or 6,000 documents.  And based on these set of terms identified here, it's 1800.  It's still a burden, but it's not as much of a burden as it could be with the full set of search terms at issue as applied to other custodians.

63

THE COURT: So, you're getting that 1800 number by adding up 400, 613, 755, and 678?

MS. O'CONNOR: Yes.

THE COURT: Okay.

MS. O'CONNOR: That's right.

THE COURT: That seems like more than --

MS. O'CONNOR: Did I do the math wrong?

THE COURT: Maybe you left off the 678, because it looks like there -- there is manage pipe, manage pipeline, backlog, and MPL, and then another 678 unique documents respectively for the three lawyers.

MS. O'CONNOR: I see. So, you're right. It's like 2800.

THE COURT: Okay.

MS. O'CONNOR: So, which, again, the burden just went -- went up, and -- anyway, that was the -- that's just the basis for the argument that it's really --

THE COURT: A burdensome thing.

MS. O'CONNOR: Yes.

THE COURT: And -- and what time period does this hit report cover? Is it just this May to June 2018 time period or is it broader?

Mr. Saham, you probably know.

MR. SAHAM: I think the 52 documents are that small period. That's for the entire relevant period.

64

THE COURT:  The 52?  Wait.  Sorry.  Let me ask a better question.  I'm talking about your Footnote 11 where you have the argument about custodians in your reply brief.  This is what Ms. O'Connor --

MR. SAHAM:  I believe that's for the relevant period, which was agreed upon as -- for discovery, the 2800.

THE COURT:  Right.  What period of time is that?  That's broader than this -- just this narrow window.

MR. SAHAM:  Yes.  Yes.  I believe --

THE COURT:  Okay.

MR. SAHAM:  -- it's from -- and, again, don't quote me because it wasn't in dispute.  It's somewhere in 2018 through 2020, which was the scope of the --

THE COURT:  Right, right, right.  Okay.  So, I guess what I'm asking is if you did the same hit analysis but only for the May to June 2018 time period, would -- maybe that's already been done and that's what the 52 documents are, but if it hasn't been done, I would assume it's a much narrower scope of much -- many fewer hits.  But maybe the parties haven't done that yet.

Do you understand what I'm asking?

MR. SAHAM:  Yeah, and I could address that pretty quickly, because I just wanted to make a few points, and that was one of them.

THE COURT:  Okay.  Well, let me just see if Ms.

65

O'Connor is done yet, and -- because we're -- we're just trying to wrap up on the Defendants' side.

MS. O'CONNOR:  Just two more things, your Honor. On is on the request to review documents in camera, I continue not to quite understand this.  In camera review is appropriate where we cite this In Sight Global case.  The party seeking discovery established reasonable good-faith doubts about the propriety of the redactions made to the disputed documents.  I don't think we have any basis to question these at all, and there's a, you know, heads I win, tails you lose quality as I mentioned last time.  I -- I don't think that there's been any showing of a need for in camera review of a bunch of privileged documents in this matter.

One other point I guess I would just make in conclusion is that the White case and also I think the Bitticker (phonetic) case both make the point that there's a -- you know, there comes a point typically where a party says, Well, I consulted my lawyer and then if somebody asks, Well, what did the lawyer advise you, you still have the opportunity to say, I'm not -- I'm not telling you that, you know, or objection, privileged, and avoid the waiver.  And here I think that the SEC was told we're not waiving, we're not relying on this, and would have understood the parameters of the way in which this was cited because that

66

was very clear in the investigation, and this feels like a little bit of a -- of a got you based on what I think is very narrow and consistent with, for example, White and other cases that talk about the fact that you -- you know, attorneys were consulted or were in the process doesn't reveal the nature of the --

THE COURT:  Doesn't --

MS. O'CONNOR:  -- advice.

THE COURT:  No, I understand that point.  I will make -- make a note that In Sight Global, which was my case, reaches the result it does and recites the standard for in camera review under California law because California law applied, and California law does not allow in camera review apart from a showing unless there's consent.  So, I don't think that's where we are.

My view is that I can order in camera review if I think it's necessary.  I'm not sure it is necessary.  I don't know if we want to look at 52 documents in camera.  I've been invited to look at lots more documents in camera.  Always takes me a really long time in other cases.  So, I'm not a big fan of in camera review unless it's absolutely necessary.  So -- so, anyway, but I -- I take your point on that, that we don't just do it as a matter of course, even under federal law.  That's -- that's correct.

Okay.  Thank you for your follow-up comments on those

67

items.

Let me turn back to Mr. Saham.  You had something you wanted to say about the hits and --

MR. SAHAM:  Just -- just quickly a few points, your Honor.

THE COURT:  Okay.

MR. SAHAM:  I'll be very brief.  First off, it was the same law firm.  It was Debevoise before the SEC, not a different law firm.

THE COURT:  No.  Different law firm than here.

MR. SAHAM:  No, same law firm.

THE COURT:  Oh.

MR. SAHAM:  Same law firm.  Same law firm represented --

THE COURT:  Oh, oh, oh.  I --

MR. SAHAM:  -- VMware --

THE COURT:  -- see what you're saying.

MR. SAHAM:  -- before the SEC.

THE COURT:  Okay.  I --

MR. SAHAM:  Just wanted to make that clear.

THE COURT:  Okay.

MR. SAHAM:  It wasn't some other --

THE COURT:  Sorry.

MR. SAHAM:  -- law firm.  It was their --

THE COURT:  Okay.  Okay.

68

MR. SAHAM:  -- law firm.

THE COURT:  Okay.  Okay.

MR. SAHAM:  And they didn't -- looking at pages 15 and 16, which I think your Honor has billed right down to what's most important.  It's not just considered.  I want to use the exact language they argued to the SEC.  VMware's finance and legal professionals, as well as PWC reviewed and approved the company's use of backlog and of backlog disclosure.

THE COURT:  Yeah.  We haven't --

MR. SAHAM:  It's not just they saw it.  They approved is what they're arguing.

THE COURT:  We had an extended discussion about this last time, right.  And it's collective everybody.  It doesn't parse out who reviewed, who approved.  It doesn't parse it out.  It's all like a pretty high level comment.  I get that.  It's the nature of the English language.  It's how it was argued.  Okay.

MR. SAHAM:  That was my point in --

THE COURT:  You know, it is what it is.  It says what it says, you know.

MR. SAHAM:  Well, I just wanted to correct the record.  It wasn't --

THE COURT:  Okay.

MR. SAHAM:  -- just considered.  It was approved.

69

Also, your Honor, this point of policing -- and I understand there's motions in limine and there's discovery, but we've already noticed Mr. Norris will likely notice additional lawyers.  And to suggest that we're going to be able to depose them about what was -- what they reviewed and -- and, again, this preclearance process, it's not just the preclearance.  So, there are certain trades that were pursuant to 10(b)(5)(1) plans, certain ones that weren't.

The -- the problem with the 10(b)(5)(1) plans is they were initiated after the scheme had started.  So, then you go back to was -- and this is the case law.  You have to look at, Well, what was in the possession of the lawyers and the executives at the time they set forward this 10(b)(5)(1) plan that would allow them to trade.  So, it's not just them now saying, Oh, we're not going to say preclearance.  They're absolutely going to argue, Oh, this 10(b)(5)(1) --

THE COURT:  Right.  But your argument --

MR. SAHAM:  -- plan exonerates us.

THE COURT:  -- on waiver is about the communication about preclearance.  That's cited in Exhibit J.  That's your waiver argument.  So, that's why I was focusing on preclearance.  So, you're saying, Ah, you waived because you said this guy's precleared and you disclosed that to whoever.

MR. SAHAM:  Well, however they're going to argue

70

it, your Honor.  They're going to argue that the -- and, again, getting back to the affirmative defenses that they haven't waived, that disclosure is appropriate, there's no scienter, I mean, the trading, whether it's pursuant to the preclearance, which is still part of it.  They -- there are multiple trades, suspicious trades that were made in addition to the 10(b)(5)(1) plan that were --

THE COURT:  Okay.  That's all fine and good.

MR. SAHAM:  Okay.

THE COURT:  But what I was really focusing on last time and this time is that if the Defendant is not going to say in part to support those defenses, Look, a lawyer looked at this, whether it's advice of counsel or just the fact of a lawyer looking at it, they're completely disavowing all of that and relying on all other facts not involving lawyers to support their defense, there's nothing in their affirmative defenses that necessarily requires them to rely on advice of counsel, the existence of counsel, the fact that counsel looked at something.  There's just your saying that because that's probably the usual thing that people do.  But it's not -- not necessarily required, is it?

MR. SAHAM:  Well, they've already done it to the SEC.

THE COURT:  Okay.  In this case.  I got the SEC point.

71

MR. SAHAM:  Yeah.

THE COURT:  And I --

MR. SAHAM:  But it is our case.  I mean, it's the SEC -- there's no selective waiver.  Once you've waived it --

THE COURT:  Your -- the SEC case is a separate proceeding from this litigation.  Like I said, the cat may have been out of the bag at the SEC --

MR. SAHAM:  Correct.

THE COURT:  -- and game over.  But if it's not and I have to focus on what is the behavior in this case in terms of the implied waiver argument, not express waiver, implied waiver argument, which has to do with litigation positions taken in the case, then I'm just trying to understand from the Plaintiff's perspective you seem to suggest like, Well, of course they're going to rely on lawyers.  And I'm -- I just -- I'm not sure that that's necessarily so.  And I'm -- I'm inviting you to tell me why it's necessarily so.

MR. SAHAM:  Before you even get there, at page 28 of Exhibit G, they already argued to the SEC first the staff is aware all of the trades at issue were executed within the applicable trading window and were precleared by VMware legal team.

THE COURT:  Got it.  I -- you --

72

MR. SAHAM:  There's no selective waiver.  Once they've waive it, it's waived.

THE COURT:  Got it.  Let's say --

MR. SAHAM:  Yeah.

THE COURT:  -- I disagree and we're focusing on this litigation.  I'm trying to separate the two things analytically, not because I think you're wrong but because I'm trying to separate them analytically.

Is there anything about the defenses in this case that necessarily will require VMware to rely on the existence, consideration, whatever, of -- of lawyers?

MR. SAHAM:  It's just the facts that are going to be at issue.  They say no scienter for two reasons.  One, there's been, you know, the -- there's been -- the -- the disclosures are adequate, which were drafted by lawyers.  So, that's going to necessitate an inquiry about the 52 documents and what exactly was relied on in crafting the disclosure.  Then the insider trades are at issue both pursuant to the 10(b)(5)(1) claim and not pursuant to the 10(b)(5)(1) plan.  The whole point of scienter based on a motive is that there was material nonpublic information that was utilized to make these trades at highly inflated prices.  And, to the extent there is a question about what was looked at and what was known and these lawyers are clearly the witnesses of who drafted the disclosure --

73

THE COURT: Okay. So, your -- your thesis is because the Plaintiff has the burden of proving scienter, you're going to need information about who drafted it, why, and what they relied on.

MR. SAHAM: Well, no. They -- they've already said they've -- they've -- unless they were going to completely eliminate and then -- this is <u>Shenwick</u>. They're interjecting issues into the case that relate to the lawyers. I mean, they -- the disclosures were drafted by lawyers. They say the -- VMware fully satisfied its disclosure obligations. How they would be able to prove --

THE COURT: No. You're --

MR. SAHAM: -- in evidence that affirmative defense without the people who drafted and approved the disclosures putting in evidence, that affirmative defense needs to be completely stricken. They can't just say, We're not going to rely on counsel. I mean, that is the basis --

THE COURT: Does the Plaintiff need to have this evidence to make its burden of proof? Do you need to be able to explore what the lawyers did and why to prove scienter?

MR. SAHAM: Oh, if they -- if they truly -- and, again, you're -- you're -- hypothetically. We're not going to be able to go back and do discovery when we're at trial and they put on a witness. Like, I thought it was fine.

74

They put on Mr. Gelsinger --

THE COURT:  It will be sorted out in motions in limine.  This issue is like front and center of --

MR. SAHAM:  We are not going to rely on the lawyers, but --

THE COURT:  Okay.

MR. SAHAM:  -- but there's nothing -- we need to depose the lawyers to take the discovery --

THE COURT:  Yeah.

MR. SAHAM:  -- so we'll be prepared.

THE COURT:  Yeah.

MR. SAHAM:  And you can't take someone's --

THE COURT:  I mean, had there been -- let me just like hypothesize.  Had there been no SEC investigation, no disclosure, no anything, they could -- they could stand on privilege, and you have to make do with whatever facts you develop.

MR. SAHAM:  Right.

THE COURT:  That's just the way it is.  The fact that the -- let me just put it very bluntly.  The fact that the -- that a lawyer drafted the disclosure document is neither here nor there, neither here nor there.  You would have to prove the disclosure was inadequate by means other than requiring the Defendant to waive privilege.

Let's forget SEC, forget any other waiver.  There's no

75

waiver.  They've just asserted a defense of no scienter. They -- you can't force them to waive privilege in that situation.  Do you agree?

MR. SAHAM:  I think the -- if you were going to focus on an affirmative defense, VMware fully satisfied its disclosure obligation.

THE COURT:  Okay.  Let's take that one. Nevertheless, no SEC investigation, no anything.  There's just lawsuit gets filed.  They haven't disclosed anything to PWC.  They haven't waived anything.  There's no argument that this has already happened.  You're just faced with that affirmative defense.  And they say we're not going to rely on anything having to do with the lawyer's involvement.

I don't think you could say you have to.  You have -- privilege is waived, therefore, implied waiver.  I don't think --

MR. SAHAM:  There'd be no underlying evidence for that affirmative defense but for what the lawyers --

THE COURT:  So, maybe they lose on their affirmative defense.  That's not a waiver of privilege.  So, I -- I'm just trying to like, you know, create a hypothetical where the issues are -- are simpler than what we have here, but I -- you know, I don't know.  This is a -- this is not simple.

Anyway, I -- I think I understand your point, that

76

there's already been a waiver.  So, we don't have to belabor this issue.  I got that.  Okay.

We've been going a really long time.  So, I think I need to conclude.  Is there anything that anyone desperately needs to say to me before we wrap up?

MR. SAHAM:  No.  Thank you for spending the time, your Honor.

THE COURT:  You're welcome.

MR. GREENFIELD:  Not desperate but just one quick point.

THE COURT:  Yes.

MR. GREENFIELD:  Just to answer your question, the hit report that's cited in Footnote 11 of their brief is something that we've produced.  So, I think I'm the one to talk about that.  That did go for the full like year-and-a-half, two-year period.  We have not done a hit report.  We have not been asked to do a hit report for the May to June period.

THE COURT:  Okay.

MR. GREENFIELD:  But we'd be happy to do that, and we can run that hit report, send it to Plaintiffs.  We can send it to you so you have an idea of the burden involved in doing that review if that would be helpful.

THE COURT:  Okay.  Well, thank you for that bit of information.  I will think about that.

77

MR. GREENFIELD:  Sure.

THE COURT:  All right.  I will issue a written order, but I'm not entirely sure exactly when I will get to it just because I'm in trial a lot this month and into the beginning of next, but I will try to get it to you promptly. I know you've been waiting a long time.

Thank you.

ALL:  Thank you, your Honor.

THE COURT:  This matter is concluded.

(Proceedings adjourned at 11:25 a.m.)

78

CERTIFICATE OF TRANSCRIBER


I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.


Echo Reporting, Inc., Transcriber

Tuesday, March 12, 2024

*Echo Reporting, Inc.*