# EXHIBIT G

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

## Before the
## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

_____ )

**In the Matter of:** )

                                         )      **HO-13879**

**VMware, Inc.** )

_____ )

## WRITTEN SUBMISSION ON BEHALF OF VMWARE, INC.

Andrew J. Ceresney, Esq.
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Kara Brockmeyer, Esq.
Mark D. Flinn, Esq.
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004

April 18, 2022

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

EXECUTIVE SUMMARY ..................................................................................................... 2

BACKGROUND ..................................................................................................................... 6

DISCUSSION .......................................................................................................................... 9

       I.      VMware's MPL Process Was Not Misleading ........................................................ 9

            A.     The MPL Process Is Entirely Permissible under GAAP ............................. 9

            B.     VMware's Backlog Disclosures Were Clear and Reasonable ................... 11

            C.     VMware's Finance and Legal Professionals, as Well as PwC, Reviewed and Approved the Company's Use of Backlog and Its Backlog Disclosure ..................................................................................... 15

            D.     VMware's Internal and External Statements Were Consistent .................. 20

            E.     Investors Understood the Backlog Process ................................................ 30

       II.     This Matter Is Unique and Distinguishable ........................................................... 34

CONCLUSION ...................................................................................................................... 38

i

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
LAMARTINA-VMW00000470

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

## INTRODUCTION

We make this submission to the Staff of the U.S. Securities and Exchange Commission (the "SEC" or "Commission") on behalf of VMware, Inc. ("VMware" or the "Company") in connection with the Staff's investigation of VMware's backlog and managed pipeline ("MPL") practices and disclosures.

On March 2, 2022, the Staff presented its preliminary assessment of its investigation to VMware, including its view that VMware failed to publicly disclose both the discretionary nature of its backlog and its use of backlog to manipulate the timing of revenue recognition.  The Staff asserted that backlog was used by the Company to meet its revenue guidance, and set out its view that backlog was material to making that guidance in every quarter during VMware's fiscal year ("FY") 2020.  The Staff also asserted that VMware's internal discussions related to backlog and its performance differed from its external statements, and that the Company misled analysts about the impact of backlog on its results.  The Staff described these perceived disclosure failures as potential violations of the antifraud provisions of the federal securities laws, as well as violations of the books and records, reporting, and internal controls provisions.

As explained below, we fundamentally disagree with the Staff's views and its characterizations of and inferences from the evidence.  However, VMware is interested in resolving this matter if we can agree on reasonable and mutually acceptable terms, and we are hopeful that we can agree on a set of facts that may form the basis for a resolution.

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    LAMARTINA-VMW00000471

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

## EXECUTIVE SUMMARY

As noted above, we disagree with the Staff's views on the Company's treatment and disclosure of backlog. VMware personnel acted in good faith, believing they had crafted disclosures that allowed investors and analysts to understand how the Company used backlog and its impact on results. Throughout the period at issue (FY 2020), VMware clearly disclosed both the amount of license and total backlog, and its discretionary nature. Indeed, the Company specifically stated that "backlog is managed based on multiple considerations, including product and geography."[1] Although the Staff has pointed to an earlier draft of this disclosure that used the word "discretion,"[2] the actual disclosure conveyed that the Company had discretion, and the Staff should not second guess the reasonable judgment of the Company's finance and legal professionals, particularly when the auditors *signed off on the very disclosure language at issue* following a review of multiple drafts*.*

At no time did VMware attempt to mislead investors or otherwise conceal the true state of its business. VMware's stock price exhibited a downward trend during the relevant time period while the Company met or exceeded its guidance, reflecting that the market was not misled by VMware's backlog practices. And analysts fully understood this performance and the relevance of backlog to VMware's results, including the license and total backlog figures that the Company disclosed each quarter. Accordingly, there is no basis for finding violations of the antifraud provisions, let alone a finding of scienter.

---

[1] VMware, Q1 FY 2019 Quarterly Report (Form 10-Q), at 30 (June 11, 2018) (Ex. 52).

[2] Email from Richard Puccio to Stephane Berthier (May 31, 2018, 19:14 EDT) (PwC_VMW_00020173-174) (Ex. 285).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000472

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

As an initial matter, we are pleased that the Staff has not expressed concerns related to VMware's accounting for backlog. VMware accounted for its backlog in accordance with Generally Accepted Accounting Principles ("GAAP") at all times, and there is no evidence in the record to support any accounting violations.

Nevertheless, we disagree with the Staff's presentation and findings related to VMware's backlog disclosure and its impact on investors.

*First*, VMware's backlog disclosures were clear and appropriate. VMware provided more disclosure about its backlog process – including language designed to convey the discretionary nature of the process – than what was required. Indeed, the SEC no longer presumptively requires backlog to be disclosed pursuant to Regulation S-K. Moreover, VMware enhanced its backlog disclosure as the backlog grew over time, ultimately adding language in the first quarter of FY 2019 stating that "backlog is managed based upon multiple considerations, including product and geography."[3] The plain meaning of this disclosure – which after all made clear that backlog was managed by the Company – conveyed that backlog was subject to the discretion of the Company and that the Company could decide when to recognize revenue based on factors such as product and geography.

*Second*, this disclosure was subject to extensive review and approval both within the Company and by VMware's external auditor, PwC, whose audit partner received the disclosure to review and responded that it "looks good."[4] Any testimony to the contrary cannot be credited

---

[3] VMware, Q1 FY 2019 Quarterly Report (Form 10-Q), at 30 (June 11, 2018) (Ex. 52).

[4] Email from Stephane Berthier to Kevan Krysler (June 5, 2018, 1:14 PM PDT) (PwC_VMW_00012328-331) (Ex. 292).

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY            LAMARTINA-VMW00000473

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

given the written record. Had PwC evidenced even the slightest concern about the disclosure, VMware would have revised it. In fact, the record reflects that when PwC suggested a wording change in the backlog disclosure, VMware immediately implemented it.

*Third*, VMware understood that analysts used its quarterly disclosures of license and total backlog to analyze the Company's performance. The analysts' comments and questions as reflected in earnings call transcripts and analyst reports indicate that they understood VMware's backlog process and understood how to account for backlog in analyzing the performance of the Company.

*Fourth*, while the Staff has suggested there was a disconnect between the Company's internal and external statements regarding performance, this unfairly cherry picks language from internal emails to paint a misleading picture. The Staff appears to have taken issue with certain colorful language that VMware sales employees used when they discussed backlog internally, such as referring to MPL in one instance as food in a "refrigerator"[5] or noting that the Company "burned"[6] MPL in a particular quarter. These terms that colorfully described the Company's use of backlog in informal celebratory emails were not inconsistent with the picture that VMware painted for external investors, since investors were always told how much backlog VMware had at the beginning and end of each quarter, thereby making it clear how much of the Company's revenue was attributable to license backlog. Importantly, VMware provides guidance on a quarterly basis and used backlog in setting its guidance each quarter. Thus, if the Company had

---

[5] Email from Sanjay Poonen to Maurizio Carli, et al. (May 5, 2018, 09:44 AM PDT) (VMW00074802-803). (Ex. 35).

[6] Email from Maurizio Carli to Dom Delfino, et al. (May 5, 2019, 11:32 AM PDT) (VMW00074976-977) (Ex. 163).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    LAMARTINA-VMW00000474

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

a significant amount of backlog that would be fully recognized as revenue going into the following quarter, it could set a more aggressive goal for itself.  Backlog was not a cookie jar reserve or a hidden asset; it was disclosed in the Company's filings each quarter, and license backlog (the component of backlog that had an immediate impact on revenue) was specifically called out during the Company's earnings calls.  In addition, the backlog fully converted into revenue in the first few days of each quarter and therefore had to be newly established later in the quarter.

*Fifth*, VMware's financial disclosures and commentary during its public earnings calls clearly reflected the actual performance of the Company.  Following the first quarter FY 2020 earnings call, despite reporting results that met VMware's prior revenue and operating margin guidance and analyst expectations,  VMware's stock price declined more than 7%, reflecting that investors were disappointed with VMware's first quarter results (which included a $99 million decrease in license backlog from the fourth quarter of FY 2019) and VMware's license revenue guidance for the second quarter of FY 2020 (which took the level of backlog into account). Similarly, following the second quarter FY 2020 earnings call, despite again reporting results that met its prior revenue and operating margin guidance and analyst expectations, VMware's stock price declined by approximately 7%, showing that investors were not misled by VMware reporting results in line with guidance but instead  understood that VMware's license revenue growth was decelerating, as reflected both in VMware's complete second quarter results (which included a further $35 million decrease in license backlog from the first quarter of FY 2020) and VMware's license revenue guidance for the third quarter of FY 2020 and lowered license revenue guidance for the second half of the fiscal year (which took the level of backlog into account).

5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

*Finally*, while the Staff has suggested that statements made to analysts in response to their inquiries during the first quarter of FY 2020 were misleading, these responses actually reflect a disciplined approach of "sticking to the script" to ensure that VMware complied with Regulation FD.

## BACKGROUND

VMware was a closely held public company during the time period at issue. Approximately 81% of VMware's outstanding common stock was owned by its parent, and approximately 97% of the Company's float was held by institutional investors. As a result, nearly all of the Company's shareholders were sophisticated investors who understood the intricacies of VMware's business and the software industry in general.

As explained in VMware's public filings, the Company's backlog is "comprised of unfulfilled purchase orders or unfulfilled executed agreements received at the end of a given period . . . generally consisting of licenses, maintenance and services."[7] The term "unfulfilled" means that VMware had not delivered the underlying product or services to its customer, which is a key trigger for revenue recognition. During the relevant time period, VMware sold many different products and services, including software licenses, cloud-based subscription and software as a services ("SaaS") products, technical support services, and implementation and training services, among other offerings. Historically, VMware's core product sales were derived from software licenses, which it delivers to customers by providing electronic license keys that enable them to access the software after downloading it onto their infrastructure.

---

[7] VMware, Q1 FY 2019 Quarterly Report (Form 10-Q), at 30 (June 11, 2018) (Ex. 52).

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    LAMARTINA-VMW00000476

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

VMware sends or "ships" these keys to its customers via email, which is also referred to as "fulfillment."

Like most software companies, VMware's license business was heavily weighted toward sales at the end of its fiscal quarters. That is, the overwhelming majority of VMware's license orders were not placed until the final days of the quarter. This phenomenon, which numerous witnesses described in testimony as the "hockey stick" effect,[8] significantly reduced VMware's ability to anticipate what its financial results would be until the final day – or in some cases hours – of the quarter, when its sales volume ultimately settled. And the lack of visibility that resulted from the hockey stick effect made it difficult for VMware to not only prepare internal forecasts, but also allocate resources and make other decisions as part of managing its business. During FY 2018 and FY 2019, VMware experienced rapid growth as both its sales volume and the size of its individual orders increased. This growth exacerbated the hockey stick effect for VMware, further reducing the linearity of the Company's financial results.

VMware's MPL process helped reduce the hockey stick effect. In any given quarter, the Company's decision to utilize the MPL process would depend on how it was performing against its forecast.[9] VMware held regular meetings throughout the quarter to compare the Company's actual results against its forecast. Based on these meetings, the Company would decide whether to place a "hold" on its shipment of license keys for certain orders, which based on the relevant accounting rules, deferred the Company's recognition of revenue on those orders and created

---

[8] Contreras Tr. 92:10-21; Delaney Tr. 205:13-16; Krysler Tr. 72:10-25.

[9] Contreras Tr. 44:06-25; Delaney Tr. 68:14-25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                     LAMARTINA-VMW00000477

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

backlog.[10] VMware considered multiple factors when deciding whether to hold orders at the end of the quarter, including the product mix and geography of the orders and how those inputs tracked against the company's forecasted performance.[11] And importantly, VMware always shipped any license keys that were held at the end of a quarter immediately at the beginning of the following quarter. Put differently, VMware never held orders across more than one quarter. In that respect, backlog is not equivalent to a cookie jar of reserves; sales must be generated each quarter to establish backlog, and the level of those sales during the quarter will determine the Company's revenue levels as well as its backlog at the end of the quarter.

The MPL process was designed around VMware's license business, as license revenue would be recognized immediately upon fulfillment. The license business plateaued during FY 2020 when the Company began shifting to a SaaS model. This transition was a positive development for VMware because SaaS revenue, unlike license revenue, is required to be recognized ratably over the term of the subscription, thereby creating a steadier, more linear revenue stream that provides better long-term visibility. In many ways, the Company's transition to SaaS has helped neutralize the hockey stick effect that the MPL process was designed to address.

---

[10] Prior to the fourth quarter of FY 2018, VMware regularly offered product promotions to its customers, which under ASC 605 (the applicable revenue recognition standard at the time), enabled the Company to defer revenue recognition until the delivery of the promoted product. VMware used this process to manage the delivery of its orders and defer revenue recognition to a subsequent quarter. Like backlog and the MPL process, VMware fully disclosed its practice of offering promotions, as well as the total dollar value of its orders with product promotions as unearned revenue. *See., e.g.*, VMware, Q3 FY 2018 Quarterly Report (Form 10-Q), at 8 (Dec. 11, 2017) (Ex. 7).

[11] VMware issued forecasts for license and total revenue in advance of the following quarter. The forecasts took into account the level of backlog from the prior quarter and the Company's expectations for sales in the subsequent quarter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY LAMARTINA-VMW00000478

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

## DISCUSSION

### I.      VMware's MPL Process Was Not Misleading

The Staff's case against VMware is predicated on its theory that VMware's MPL process misled investors by "masking" the Company's financial performance, especially during FY 2020 as VMware began converting customers from its on-premise perpetual license model to its cloud-based SaaS subscription model.  This theory overlooks all of the proactive steps that VMware took to ensure that the MPL process was: (i) accounted for correctly; (ii) sufficiently disclosed and understood both internally and externally; and (iii) approved by the appropriate stakeholders.  These crucial facts cannot be ignored.  They show that VMware acted in good faith, reasonably relying on the relevant accounting standards, SEC rules, and experts both inside and outside the Company to ensure that its backlog practice and disclosures were appropriate.

### A.      The MPL Process Is Entirely Permissible under GAAP

VMware recognizes revenue in accordance with GAAP, as required by the company's Global Revenue Recognition policy.[12]  The current standard for revenue recognition is codified under Topic 606 ("ASC 606") of the Financial Accounting Standards Board ("FASB") Accounting Standards Codification, which VMware adopted on a full retrospective basis effective as of the first quarter of FY 2019.  ASC 606 requires that for software licenses, revenue recognition is triggered only upon the delivery or shipment of the license to the customer.[13]

---

[12] *See generally* VMware, Global Revenue Recognition Policy (June 21, 2017) (VMW00054042-123) (Ex. 4); VMware, Global Revenue Recognition Policy (May 1, 2019) (VMW00053971-4041) (Ex. 152).

[13] FASB ASC 606-10-25-23.

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000479

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

There is no GAAP standard that requires companies to deliver a software license to a customer at a certain point in time. As a result, it was entirely permissible under GAAP for VMware to defer delivery on orders as part of the MPL process, as long as the Company ensured that it did not recognize revenue on those orders per the requirements of ASC 606.

VMware had a number of internal controls, policies, and procedures in place to ensure that it properly accounted for the impact of the MPL process, and the Company enhanced these controls as its backlog increased over time. In particular, the Company's internal controls over revenue recognition included a process to verify that all revenue recognition criteria were satisfied and properly documented for each revenue entry, including whether VMware's delivery of the underlying license occurred prior to quarter-end. VMware also had a process in place to ensure that the MPL "hold" was applied only to orders for which delivery or transfer of control had not occurred prior to quarter-end.[14] We understand that VMware's external auditors tested these controls on a regular basis. We also produced an extensive amount of documentation related to these controls in response to the Staff's request for evidence of fulfillment for orders in VMware's backlog at the end of the fourth quarter of 2019.[15]

VMware took comfort in knowing that the MPL process complied with GAAP and that the Company had extensive controls in place to ensure that its accounting was appropriate. For example, Kevan Krysler, VMware's Chief Accounting Office during the relevant time period, testified that he had "multiple conversations" to confirm that the MPL process was permissible under GAAP, including discussions with VMware's external auditors and a former colleague

---

[14] *See* OTC – Remaining Performance Obligation Process Narrative, VMware (Apr. 2019) (VMW00054144-49).

[15] *See* VMW00039047-67; VMW00091770-836.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000480

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

from KPMG who was one of the authors of ASC 606.[16]  It was entirely reasonable for VMware to rely on this accounting conclusion, especially given that the SEC itself has confirmed that stopping shipments to manage revenue recognition is not a GAAP violation, but that the amount of the backlog must be disclosed.  In a 2007 complaint filed against software company Mercury Interactive, the SEC wrote that "***While stopping shipments to manage the recognition of revenue is not necessarily a violation of GAAP***, companies are required to disclose '[t]he dollar amount of backlog orders believed to be firm, as of a recent date and as of a comparable date in the preceding fiscal year, together with an indication of the portion thereof not reasonably expected to be filled within the current fiscal year, and seasonal or other material aspects of the backlog.'"[17]  As described in more detail below, VMware not only met, but exceeded this disclosure requirement.

**B.      VMware's Backlog Disclosures Were Clear and Reasonable**

During the relevant time period, SEC Regulation S-K required issuers to disclose their backlog in the business section of their annual report on Form 10-K if the backlog was material.[18]  Specifically, issuers were required to disclose the "dollar amount of backlog orders believed to be firm, as of a recent date and as of a comparable date in the preceding fiscal year,

---

[16] Krysler Tr. 231:23-233:01.

[17] Complaint at 32, *SEC v. Mercury Interactive, LLC*, No. 07-2822 (N.D. Cal. May 31, 2007), available at https://www.sec.gov/litigation/complaints/2007/comp20136.pdf.

[18] In August 2020, the SEC adopted amendments to Regulation S-K that eliminated, among other items, this prescriptive backlog disclosure requirement.  In its release adopting the amendment, the SEC noted that companies may still need to address backlog when describing their business, but only if backlog is material to an understanding of the business. Modernization of Regulation S-K Items 101, 103, and 105, Exchange Act Rel. No. 33-10825 (Aug. 26, 2020), available at https://www.sec.gov/rules/final/2020/33-10825.pdf.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                              LAMARTINA-VMW00000481

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

together with an indication of the portion thereof not reasonably expected to be filled within the current fiscal year, and seasonal or other material aspects of the backlog."[19]

VMware first disclosed its backlog pursuant to Regulation S-K in the business section of the Company's 2016 annual report on Form 10-K.  In addition to including the dollar amount of the backlog, VMware also explained that "[b]acklog is comprised of unfulfilled orders against purchase orders or executed agreements received at the end of the period.  While we generally ship products immediately upon receipt of purchase orders or executed agreements from customers, we sometimes have orders with unshipped products."[20]  VMware subsequently enhanced its disclosures as the backlog grew over time, adding information that went beyond the requirements of Regulation S-K.  As a result of these enhancements, VMware's backlog disclosure is more robust than any comparable disclosures adopted by its peers – a point that VMware specifically considered and shared with the Company's external auditors as it was drafting the disclosure.[21]

In particular, VMware made the following enhancements to expand its backlog disclosures:

- Q1 FY 2018:  VMware added language to its risk factors to address risks related to the backlog, stating that "the timing of when sales orders are processed . . . can cause

---

[19] 17 C.F.R. § 229.101(c)(1)(viii) (2011).

[20] VMware, Annual Report (Form 10-K), at 8 (Feb. 24, 2017) (Ex. 288).

[21] *See* Email from Kevan Krysler to Kevin Healy (May 24, 2017, 7:07 PM PDT) (PwC_VMW_00019851-862) (attaching a memo summarizing VMware's "Assessment of Disclosure Considerations of Backlog in Q1 '18," which lists 10 peers that did not disclose backlog on a quarterly basis).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    LAMARTINA-VMW00000482

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.**

fluctuations in our backlog and impact our bookings and timing of revenue recognition."[22]

- <u>Q3 FY 2018</u>:  VMware began discussing its license backlog with investors during quarterly earnings calls, noting that license backlog was $90 million.[23]  VMware also disclosed both its license and total backlog in the management's discussion and analysis ("MD&A") section of its Form 10-Q for the first time, and continued to disclose both of these amounts on a quarterly basis going forward even though Regulation S-K only required companies to disclose total backlog.[24]

- <u>Q1 FY 2019</u>:  VMware added a paragraph to its quarterly backlog disclosure to specifically convey the discretionary aspect of the MPL process.  This new disclosure explained that backlog was "managed based on multiple considerations, including product and geography."[25]  This disclosure was carried forward in the MD&A section of the Company's subsequent Form 10-K and Form 10-Q filings, as well as the business section of its Form 10-K filings.

- <u>Q2 FY 2020</u>:  VMware began disclosing total backlog (as opposed to just license backlog) during its quarterly earnings calls.[26]

---

[22] VMware, Q1 FY 2018 Quarterly Report (Form 10-Q), at 41 (June 9, 2017) (Ex. 289).

[23] VMware, Q3 FY 2018 Earnings Call Tr. at 4 (Nov. 30, 2017).

[24] VMware, Q3 FY 2018 Quarterly Report (Form 10-Q), at 30 (Dec. 11, 2017) (Ex. 7).

[25] VMware, Q1 FY 2019 Quarterly Report (Form 10-Q), at 30 (June 11, 2018) (Ex. 52).

[26] VMware, Q2 FY 2020 Earnings Call Tr. at 5 (Aug. 22, 2019) (Ex. 228).

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                      LAMARTINA-VMW00000483

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

VMware made these enhancements in an effort to ensure that its backlog practice was transparent to investors, despite the Company's understanding that backlog was generally not a metric that its investors found to be meaningful.  The investors' lack of focus on backlog is reflected by the fact that they typically did not ask questions about it during earnings calls,[27] even during VMware's earnings call for the first quarter of FY 2020 when the Company clearly disclosed that license backlog had decreased from $147 million to $48 million.[28]  Additionally, in August 2020, the SEC itself recognized that backlog is not *per se* material to investors by removing backlog from the list of items that must be included in a company's Regulation S-K disclosure.[29]

At several points during its presentation, the Staff described VMware's use of backlog as an "unsustainable trend," presumably in reference to a separate provision of Regulation S-K, Item 303, which requires companies to disclose in the MD&A section of their filings "any known trends or uncertainties" that may have an unfavorable impact on the Company's revenues.[30]  Item 303 also requires issuers to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."[31]  Because

---

[27] *See*, *e.g.*, Rowe Tr. 188:19-189:01 ("I would present VMware's backlog in my prepared remarks, you know, going way back for this period and did not get - - I don't believe I had any question on the live call with it, and had very few questions on the topic.  So it was my understanding that investors and analysts were comfortable and aware of the topic.  I did not get a lot of questions on the topic.")

[28] VMware, Q1 FY 2020 Earnings Call Tr. at 5 (May 30, 2019) (Ex. 180).

[29] *Supra* n. 18.

[30] 17 C.F.R. § 229.303 (2012).

[31] *Id.*

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

VMware's discretionary backlog was fulfilled at the start of the following quarter and needed to be newly established through sales each quarter, it did not constitute a trend. But to the extent VMware's use of backlog was a "trend or uncertainty," the Company satisfied Item 303's requirements because it disclosed it both quantitatively and qualitatively in its MD&A, as explained above. VMware's backlog disclosure also included language stating that the Company did not view the backlog as "indicative of future sales or revenue," clearly tracking the requirements of the regulation.[32] And as explained below, VMware ensured that this disclosure was subject to extensive review and approval.

### C.    VMware's Finance and Legal Professionals, as Well as PwC, Reviewed and Approved the Company's Use of Backlog and Its Backlog Disclosure

VMware added language to its backlog disclosure in the first quarter of FY 2019 stating that "backlog is managed based upon multiple considerations, including product and geography."[33] The Staff seems to believe that the language of this disclosure is insufficient because it does not specifically include the word "discretion." We disagree.

To begin with, VMware's use of the word "managed" clearly discloses that the Company exercised discretion. How else could backlog be managed if not through decisions made by the Company? Investors clearly understood that VMware's delivery of license keys is what triggered revenue recognition, and that this delivery was within the Company's control. The implication of the disclosure is clear.

---

[32] VMware, Q1 FY 2019 Quarterly Report (Form 10-Q), at 30 (June 11, 2018) (Ex. 52).

[33] *Id.*

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000485

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

Further, as part of VMware's process for drafting the disclosure, the Company sought feedback from a number of internal and external stakeholders, including multiple accounting, financial, and legal professionals. The record contains numerous emails, an internal memorandum, and other documents that reflect these individuals' thoughtful consideration of the disclosure.[34] The backlog disclosure – including the initial version of the disclosure and all subsequent revisions – was also subject to review by the Company's Disclosure Committee, as reflected in the agendas and discussion items for the Disclosure Committee meetings that took place prior to the Company's earnings calls and SEC filings during the relevant time period.[35] This detailed vetting process demonstrates that VMware had a reasonable, good-faith basis for adopting its backlog disclosure.

VMware also sought feedback on the disclosure from its external auditor, PwC. We understand from the Staff's presentation that PwC has apparently disclaimed or minimized its involvement in the drafting and decision-making related to VMware's backlog disclosure. While it is true that the disclosure was ultimately VMware's responsibility, the record is clear that PwC received several drafts of the disclosure and provided comments and advice to VMware on its

---

[34] *See, e.g.*, *See, e.g.*, PwC_VMW_00019851-862 (Ex. 291.2) (May 2017 internal memorandum); VMW00098498 (March 2018 email between accounting personnel); VMW00493626 (May 2018 email between accounting and legal personnel); VMW00493623 (Ex. 265) (June 2018 email between accounting and legal personnel); VMW00051370 (Ex. 45) (June 2018 email between accounting personnel and VMware's Chief Financial Officer); PwC_VMW_000000028507-511 (Ex. 300) (June 2018 email between legal, accounting, and finance personnel).

[35] *See* VMW00495884-888 (Q4 2016 Disclosure Committee materials); VMW00495889-891 (Q1 FY 2018 Disclosure Committee materials); VMW00495907-910 (Q3 FY 2018 Disclosure Committee materials); VMW00495919-921 (Q1 FY 2019 Disclosure Committee materials); VMW00495924 (Q1 FY 2019 Disclosure Committee materials).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    LAMARTINA-VMW00000486

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

wording.  It was perfectly reasonable for VMware to rely on PwC's feedback, particularly given their knowledge of disclosures and internal processes adopted by similar companies.

As the Staff pointed out in its presentation, the Company initially drafted language for its backlog disclosure that specifically included the word "discretion."  This initial draft, which stated that VMware's backlog "depends on numerous factors, including the timing of delivery of license keys, which management may determine based on its discretion," was sent to PwC for its review.[36]  Krysler later circulated internally a revised draft of the disclosure in track changes that did not contain the term "discretion," and noted that the revisions were "based on further considerations of the disclosure as well as discussions I had throughout the day with our financial experts, PwC."[37]  Several hours later, Krysler forwarded this draft and the accompanying email to PwC's engagement partner, Stephane Berthier.[38]  VMware's General Counsel also followed up with Berthier the following week, noting that the Company "took [Berthier's] advice when reworking the wording" of its backlog disclosure, to which Berthier replied, "Feel free to [reach] out anytime.  I look forward [to] continuing working with you and the rest of the legal team."[39]  Later that day, Krysler sent Berthier the final draft of the disclosure – which included the language that ultimately appeared in VMware's filings indicating that backlog was "managed" – and Berthier replied that the disclosure

---

[36] Email from Richard Puccio to Stephane Berthier (May 31, 2018, 19:14 EDT) (PwC_VMW_00020170-174) (Ex. 285).

[37] Email from Kevan Krysler to Craig Norris, et al. (June 1, 2018, 2:35 PM PDT) (PwC_VMW_00012822-825) (Ex. 286).

[38] Email from Kevan Krysler to Stephane Berthier (June 1, 2018, 6:46 PM PDT) (PwC_VMW_00012822-825) (Ex. 286).

[39] Email from Stephane Berthier to Amy Fliegelman Olli (June 5, 2018, 17:47 EDT) (PwC_VMW_00028507-11) (Ex. 300).

17

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

"looks good."[40]  Proving that he read **and considered** the language, Berthier provided a single unrelated comment on the disclosure language,[41] which VMware incorporated into the disclosure when it filed its Form 10-Q on June 11, 2018, less than one week later.

At no time did PwC express any concerns about either the disclosure language or VMware's use of backlog to manage its business.  In fact, as VMware's auditor, PwC was required to discuss any such concerns with VMware under the relevant auditing standards.[42]  If PwC had done so, VMware would have revised the disclosure and its use of backlog.  And as described above, VMware took PwC's feedback into account when revising the disclosure, which was ultimately more extensive than other backlog disclosures within the software industry.

We understand from the Staff's presentation that PwC also apparently denied having any specific recollection or awareness that VMware's backlog included a large discretionary component. Unfortunately, the Staff declined to make the transcript of this testimony available to us, so we cannot tell exactly what was said.  To the extent, however, the PwC audit team claimed they did not understand that the majority of VMware's backlog was discretionary, such statements are simply not credible in light of the clear written record.

As VMware's external auditor, PwC had a professional obligation to understand VMware and its environment, including "the events, conditions, and company activities that might reasonably

---

[40] Email from Stephane Berthier to Kevan Krysler (June 5, 2018, 1:14 PM PDT) (PwC_VMW_00012328-331) (Ex. 292).

[41] *Id.*

[42] *See, e.g.*, PCAOB Auditing Standard No. 2710.05 ("If, while reading other information [in addition to audited financial statements and the independent auditor's report thereon,] the auditor becomes aware of information that he believes is a material misstatement of fact . . . he should discuss the matter with the client.").

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                     LAMARTINA-VMW00000488

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

be expected to have a significant effect on the risks of material misstatement."[43]  Given that VMware's backlog grew to nearly $450 million at the end of FY 2019, PwC could not have satisfied this obligation without understanding the nature of VMware's backlog.

And as noted above, PwC received the initial draft of VMware's backlog disclosure that specifically included the word "discretion."[44]  We understand that in connection with its revenue cutoff testing, PwC also received VMware's "Overall MPL Hold Report," which specifically identified the orders on MPL that were subject to a "threshold" or discretionary hold.  If PwC did not understand what the Company meant when it used the term "discretion" or "threshold hold," the audit team had an obligation to clarify that as part of their review process.

We also note that in March 2020, at the start of the investigation, we interviewed Berthier, who was quite clear that he understood the discretionary aspect of VMware's backlog.  Specifically, Berthier stated: "You could tell it was subjective – it was a decision by management to fulfill or not . . . The practice is management's discretion to choose to fulfill or not."  He also commented that VMware's backlog disclosure was "more making sure the reader could understand this is something that is under [VMware's] control, as opposed to imposed because it was 12:01 and not 11:59 . . . ."  Regarding the Company's disclosure, Berthier stated: "I felt like this was more than what other companies do . . . to the extent you include a disclosure that's not required.  A lot of companies stick with what's required.  It was clearly a conscious decision on their part to disclose more."

---

[43] *See* PCAOB Auditing Standard No. 2110.07-.17.

[44] Email from Richard Puccio to Stephane Berthier (May 31, 2018, 14:25 EDT) (PwC_VMW_00020170-174) (Ex. 285).

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                   LAMARTINA-VMW00000489

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

Given PwC's approval of the Company's disclosure language, we do not see a basis for fraud charges against the Company.

### D.   VMware's Internal and External Statements Were Consistent

The Staff has suggested that VMware's backlog practice was misleading because certain statements that VMware employees made internally were purportedly inconsistent with the Company's external statements during FY 2020.  But the Staff has simply cherry picked this language to portray a misleading picture.

The Staff focused on the following examples of internal statements within VMware, which it claimed were inconsistent with certain of the Company's external representations.  But as reflected in the chart below, the Staff simply overlooked a number of external representations that were entirely consistent with these internal statements.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000490

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

**Internal v. External Statements: Use of Backlog**

| Internal | External |
|---|---|
| • "Net net in order to make our number we had to burn a lot of MPL"[45]<br><br>• "[A] tough Q1, but thankful for MPL, we bought ourselves a bit of time"[46]<br><br>• Backlog had "positive impact of 16 pts" on reported Q1 license bookings growth[47]<br><br>• "[W]e dodged a bullet on having a weaker outcome, by having the managed pipeline you have all built-up save our day"[48]<br><br>• "Current [As-Reported] Model required substantial usage of prior 20Q1 MPL"[49] | • "We exited Q1 with $48 million of license backlog compared to $147 million at the end of Q4 FY '19."[50]<br><br>• "Our backlog related to licenses was $48 million, which we generally expect to deliver and recognize as revenue during the following quarter."[51]<br><br>• "We saw a positive impact to both revenue and unearned revenue in Q1 due to the benefits from our sales momentum exiting the fourth quarter."[52]<br><br>• "[W]e clearly benefited from the strength that we saw in the fourth quarter."[53] |

[45] Email from Maurizio Carli to Dom Delfino, et al. (May 5, 2019, 11:32 AM PDT) (VMW00074976-977) (Ex. 163).

[46] Email from Sanjay Poonen to Maurizio Carli, et al. (May 4, 2019, 09:57 AM PDT) (VMW00074588-589) (Ex. 161).

[47] Email from Richard Gu to Zane Rowe, et al. (May 25, 2019, 11:49 AM PDT) (VMW00095059) (Ex. 176).

[48] Email from Sanjay Poonen to Dom Delfino, et al. (May 31, 2019, 02:24 AM PDT) (VMW00422418) (Ex. 185).

[49] VMware, 20Q2 Bookings Forecast, Week 3 Forecast – update (May 23, 2019) (VMW00047766-779) (Ex. 174.1).

[50] VMware, Q1 FY 2020 Earnings Call Tr. at 5 (May 30, 2019) (Ex. 180).

[51] VMware, Q1 FY 2020 Quarterly Report (Form 10-Q), at 28 (June 10, 2019) (Ex. 195).

[52] VMware, Q1 FY 2020 Earnings Call Tr. at 4 (May 30, 2019) (Ex. 180).

[53] *Id.* at 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

LAMARTINA-VMW00000491

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.**

In particular, the Staff appears to have taken issue with email language stating that VMware "burned" MPL during the first quarter of FY 2020,[54] citing emails about VMware having to "burn" MPL "in order to make [its] number"[55] or that MPL "bought [VMware] a bit of time"[56] and helped the Company "dodge[] a bullet on having a weaker outcome."[57] These colorful statements were made by sales employees who focused primarily on VMware's internal bookings forecast, and not on the Company's revenues and other external financial performance measures. More importantly, the statements all convey the same basic point – that a portion of VMware's revenue during FY 2020 was derived from the backlog it had accumulated in the prior quarter and had not established in the current quarter. ***This point was not hidden from investors.*** Indeed, VMware's Chief Financial Officer ("CFO") explained during the Company's earnings call for the first quarter of FY 2020 that VMware had "clearly benefited from the strength that [it] saw in the fourth quarter" and had experienced "a positive impact to both revenue and unearned revenue in Q1 due to the benefits from [its] sales momentum exiting the fourth quarter."[58] Far from concealing the impact of backlog, these statements referenced the strength of the prior quarter in explaining the Company's performance in the first quarter of FY 2020.

---

[54] Email from Sanjay Poonen to Maurizio Carli, et al. (May 4, 2019, 09:57 AM PDT) (VMW00074588) (Ex. 161). Multiple witnesses testified that the term "burning" MPL described the practice of "using" or "consuming" backlog. Carli Tr. 70:12-13; Delaney Tr. 228:23-24; 236:06-08; Poonen Tr. 138:13-21.

[55] Email from Maurizio Carli to Dom Delfino, et al. (May 5, 2019, 11:32 AM PDT) (VMW00074976) (Ex. 163).

[56] Email from Sanjay Poonen to Maurizio Carli, et al. (May 4, 2019, 09:57 AM PDT) (VMW00074588) (Ex. 161).

[57] Email from Sanjay Poonen to Dom Delfino, et al. (May 31, 2019, 02:24 AM PDT) (VMW00422418) (Ex. 185).

[58] VMware, Q1 FY 2020 Earnings Call Tr. at 4-5, 8 (May 30, 2019) (Ex. 180).

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                      LAMARTINA-VMW00000492

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.**

Moreover, beginning with the third quarter of FY 2018, VMware explicitly defined backlog and highlighted both the beginning and ending amounts of license backlog in its quarterly disclosures in both SEC filings and on earnings calls.  VMware's investors could use these figures to easily calculate the amount of revenue that was attributable to backlog using simple subtraction:

*Prior License Backlog – Current License Backlog = Backlog Impact to Revenue*

And performing this calculation would also allow investors to easily calculate the impact that this revenue had on the Company's ability to meet its revenue guidance.

In fact, during the first quarter FY 2020 earnings call, VMware's CFO stated "We exited Q1 with $48 million of license backlog compared to $147 million at the end of Q4 FY '19."[59]  So while VMware's internal discussions referenced the fact that backlog helped VMware achieve its guidance, that was perfectly clear from the CFO's statements on the call.

The Staff has suggested that these disclosures were misleading because VMware only disclosed license backlog, and not total backlog, on its earnings calls prior to the second quarter of FY 2020.  But this view fails to appreciate the significance of license backlog and the manner in which it translates to revenue in comparison with other types of backlog.  As an initial matter, only a portion of VMware's backlog was discretionary.  For example, at the end of FY 2019, VMware's total backlog peaked at $449 million, but only $147 million of that balance (33%) was discretionary.[60]

_____

[59] *Id.* at 5.

[60] VMware, Quarterly Backlog Detail (Feb. 28, 2021) (VMW00465296) (Ex. 259).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                LAMARTINA-VMW00000493

Additionally, the license component of this discretionary backlog is the key portion that investors cared about because license backlog is the only component that translates immediately to revenue upon release from backlog. ASC 606 requires other components of total backlog, such as SaaS and subscription orders, to be recognized as revenue ratably over the term of the subscription, resulting in only a minor impact to revenue as these orders are released from backlog.[61] This difference in accounting treatment is why VMware's disclosures focused primarily on license backlog, rather than total backlog, to properly inform investors about the revenue impact of its backlog. And VMware clearly explained this fundamental distinction during its earnings calls, as discussed further below. Nor is there any shred of evidence that VMware failed to disclose total backlog in earnings calls in an attempt to mislead investors; indeed, this information would have been freely available to investors approximately one to two weeks later in the quarterly filings, and in any event would have had a small impact on revenue given that non-license backlog was typically not recognized as revenue in the following quarter.

The Staff also suggested that VMware employees' internal statements regarding the Company's transition to SaaS and its performance in the Americas region during the second quarter of FY 2020 were inconsistent with the Company's external messaging. For example, the Staff cited communications indicating that VMware used MPL "magic"[62] to "close the license gap"[63] that was created in part by the transition to SaaS. The Staff's focus on the term "magic" is completely misplaced. Multiple witnesses testified that this term was a reference to "hard

---

[61] FASB ASC 606-10-25-27.

[62] Email from Sanjay Poonen to Patrick Gelsinger, et al. (Aug. 3, 2019, 08:35 AM PDT) (VMW00038242) (Ex. 217).

[63] Text message from Paula Delaney to Maurizio Carli (Aug. 2, 2019, 21:29 PDT) (VMW00403260) (Ex. 211).

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

LAMARTINA-VMW00000494

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

work" or "working quite intensely to process all of the orders" and "finish the quarter."[64]  For example, VMware's quarterly close process requires coordination across several different systems, such as Oracle and Salesforce, that the Company has integrated through its acquisitions over the years.  There is no evidence that this term was used to describe anything nefarious or misleading.

Additionally, the Staff focused on the internal statements excerpted in the chart below, which it portrayed as misleading.  But these internal statements were entirely consistent with the Company's external representations.  VMware executives were transparent about the so-called "license gap," stating on its earnings call for the second quarter of FY 2020 that "The increasing momentum in [VMware's] hybrid cloud subscription and SaaS businesses, for which revenues [are] recognized over time [was] driving a slight change in [the Company's] license revenue mix."[65]  VMware executives made a number of similar statements on the Company's earnings calls throughout FY 2020, as reflected in the chart below.  Again, this chart makes clear that the Staff overlooked several external representations that were entirely consistent with the internal statements that it focused on during its presentation.

---

[64] Poonen Tr. 179:22-24; Gelsinger Tr. 167:04-11; 167:25-168:04.

[65] VMware, Q2 FY 2020 Earnings Call Tr. at 6 (Aug. 22, 2019) (Ex. 228).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000495

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

**Internal v. External Statements: Transition to SaaS**

| Internal | External |
|---|---|
| • Shift to SaaS "is now becoming a major structural issue we have to address"[66]<br><br>• "I don't want anyone to freak out . . . [but because of failing license yield], we may be able to 'hit' the All-in bookings Plan, but we will be very short on License"[67]<br><br>• SaaS effect on license "can only get worse" and "we have . . . to accept we have to message to the street"[68] | • "[W]ith the Perpetual product the license bookings will translate into revenue faster than the SaaS bookings will translate into SaaS revenue."[69]<br><br>• Our SaaS portfolio "drives a slight mix shift in revenue because . . . in the subscription or SaaS business, you tend to recognize that revenue over a period of time."[70]<br><br>• As "subscription and SaaS generally convert to revenue over a longer period of time . . . [w]e expect license revenue mix to be impacted."[71]<br><br>• "[I]t's simply that mix shift . . . you ultimately get that revenue, but it's just over a slightly longer period of time."[72]<br><br>• "[T]here's always a little bit of a headwind, especially as you're growing [SaaS] just because you essentially recognize the revenue slightly differently."[73]<br><br>• Our EUC business "had a remarkable shift to SaaS, which we're very pleased with. But as I pointed out in my prepared remarks, we get that revenue ratably."[74] |

---

[66] Email from Paula Delaney to Maurizio Carli (Aug. 2, 2019, 06:35 PM PDT) (VMW001023419-420) (Ex. 210).

[67] Email from Sal Contreras to Doreen Kleindienst, et al. (Aug. 2, 2019, 05:53 PM PDT) VMW00359127-128 (Ex. 165).

[68] Text message from Paula Delaney to Maurizio Carli (Aug. 2, 2019, 22:06-22:12 PDT) (VMW00403260) (Ex. 211).

[69] VMware, Q1 FY 2020 Earnings Call Tr. at 8 (May 30, 2019) (Ex. 180).

[70] VMware, Q2 FY 2020 Earnings Call Tr. at 8 (Aug. 22, 2019) (Ex. 228).

[71] *Id.* at 6.

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY   LAMARTINA-VMW00000496

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

These statements make clear that VMware viewed its transition to SaaS as a positive development.  Indeed, the Company was transparent on its earnings calls about the so-called "SaaS smile,"[75] or the impact that the transition to SaaS had on the Company's short term performance.  Although the Staff argued that the Company used the license backlog to mask the impact of this transition, the amount of the license backlog *and its decrease in the first quarter of FY 2020* were fully disclosed to investors.

Likewise, VMware's external statements regarding the Company's "rebuilding" and "reacceleration" of its Americas region during the second quarter of FY 2020 were entirely consistent with statements made in the prior quarter regarding "territory realignments and [organizational] adjustments" that the Company was making in the region.[76]  Indeed, the Company's stock price declined more than 7% after these prior statements.  VMware's internal discussions were also consistent with these public statements, and the Company's former head of sales testified extensively about his reorganization of the Americas and the short-term impact that had on the region.[77]  Again, the Staff has taken these various snippets from the record

---

[72] *Id.* at 8.

[73] VMware, Q3 FY 2020 Earnings Call Tr. at 12 (Nov. 26, 2019) (Ex. 248).

[74] VMware, Q4 FY 2020 Earnings Call Tr. at 9 (Feb. 27, 2020) (Ex. 254).

[75] VMware, Q3 FY 2021 Earnings Call Tr. at 30 (Nov. 25, 2020) ("[T]he fast-growing subscription and SaaS portion of the portfolio generate attractive margins when they're at scale . . . but many of them aren't yet . . . And this is part of the SaaS smile. We are excited about it. We're leaning into it . . . We're very comfortable with the smile that you alluded to with the long-term value that we're going to be getting out of our sub and SaaS portfolio.")

[76] VMware, Q1 FY 2020 Earnings Call Tr. at 9 (May 30, 2019) (Ex. 180).

[77] Carli Tr. 108:01-109:18 ("[W]e were creating 57 new territories . . . It's not something you do overnight . . . before they become fully productive takes time . . . we had for a couple [of] quarters [a] less productive sales force [in the Americas.]")

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY LAMARTINA-VMW00000497

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.**

without the proper context in an attempt to portray VMware's disclosures as misleading.  They clearly do not amount to fraud.

The same is true for certain statements made by VMware executives during the Company's earnings calls for the third and fourth quarters of FY 2020, which the Staff has suggested overemphasized the strength of the Company's business and its positive trajectory heading into FY 2021.  The Staff fails to appreciate that these statements were entirely consistent with the state of the VMware's business, which was undergoing a transition during FY 2020.  As explained above, VMware began shifting to a SaaS model during this time period, which was undeniably viewed as positive long-term development, but it simply could not occur overnight.  Statements indicating that the executives "[felt] good about [VMware's] pipeline" and were seeing "momentum" in its cloud products and the "ongoing strength of the business" were not overly optimistic – they simply reflected the reality of the transition.[78]

The Staff has also suggested that during the first quarter of FY 2020 VMware officers exercised stock options and sold VMware stock without Rule 10b5-1 plans while in possession of material nonpublic information ("MNPI") indicating a purported "slowdown" in the Company's business relative to expectations.  This is patently incorrect.

First, as the Staff is aware, all of the trades at issue were executed within the applicable trading window and were precleared by VMware's legal team.  That preclearance was predicated on the Company executives not having access to MNPI at the time of the trades.

_____

[78] VMware, Q3 FY 2020 Earnings Call Tr. at 4-7 (Nov. 26, 2019) (Ex. 248).

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000498

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

Second, all of these trades took place more than two to four weeks prior to quarter-end, which was well before the Company had any meaningful insight into its financial results for the quarter due to the hockey stick phenomenon explained above.[79]  A finding that communications on the status of the Company's sales that early in the quarter were material would unsettle industry expectations regarding when information on quarterly sales becomes material.  Indeed, most companies close their trading window approximately two weeks before the end of the quarter, in recognition that information on the status of sales efforts prior to that time is not material.[80]  VMware's performance in the first quarter of FY 2020 provided no basis to distinguish it from most other companies.

Third, the information that the Staff has cited as "potential MNPI" consists of internal statements that the Staff has again cherry picked to support its theory.  For example, a number of these statements relate to VMware's use of backlog to meet its guidance, which was transparent based on the Company's external disclosures.  VMware also took backlog into account when setting its guidance, as explained more fully below, which further indicates that the executives' knowledge of this fact was not MNPI.

---

[79] In fact, this is the very reason that the Company routinely closed its trading window during the final two weeks of the quarter.

[80] Wayne R. Guay, Shawn Kim, and David Tsuri, *Determinants of Insider Trading Windows* at 1 (Feb. 24, 2022), available at https://ssrn.com/abstract=3844986 ("The typical trading window begins two-to-three trading days after the previous quarter's earnings release and ends approximately 2-3 weeks prior to the end of the next fiscal quarter.")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY      LAMARTINA-VMW00000499

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

Finally, the Staff's purported evidence of "potential MNPI" includes general sales and forecast presentations that were either consistent with the Company's external disclosures[81] or were simply unrelated to the Company's financial performance.[82]

### E.    Investors Understood the Backlog Process

VMware's investors and analysts understood VMware's backlog process and the impact that it had on the Company's revenue.  In fact, analyst reports from the first quarter of FY 2020 when the Company's backlog was decreasing make this clear.  For example, a Deutsche Bank analyst report noted: "The unbilled license backlog fell sharply to $48m from $147m in 4QF19, *implying that a good portion of 1QF20 product billings were actually 4QFY19 deals that got invoiced in 1QF20*."[83]  Similarly, a JP Morgan analyst wrote, "Billings grew an astonishing 25% y/y in consistent 606-to-606 terms (*or 20% if adjusted for a License Backlog drawdown*)."[84]  A William Blair analyst also performed an "adjusted billings" analysis of VMware's results for the second quarter of FY 2020, which incorporated his calculation of the Company's "O/B Backlog Change."[85]

---

[81] VMware, Q1 2020 March Forecast at 399 (VMW00099394-412) (Ex. 295.1) ("Current revenue forecast remains at guidance and latest consensus").

[82] For example, the Company's former head of sales explained that Ex. 131 was an internal tool used to determine where the sales organization should allocate resources.  He explained that this presentation was entirely unrelated to how the company would actually perform for the quarter.  Carli Tr. 169:15-171:09.

[83] Deutsche Bank Securities Inc., "First Signs of Macro Weakness," at 1 (May 31, 2019) (emphasis added).

[84] J.P. Morgan Chase & Co., "Good Q1: VMW Acknowledges Uncertainties in the Macro, but Bucks the Trend w/ Solid Billings Growth," at 1 (May 31, 2019) (emphasis added).

[85] William Blair & Co., "Solid Second-Quarter Results Upstaged by Dual Acquisitions of Pivotal and Carbon Black," at 2, 11 (Aug. 23, 2019).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    LAMARTINA-VMW00000500

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

These statements and analysis clearly indicate that the market understood the impact that backlog had on VMware's revenue during the first quarter of FY 2020.

The Staff appears to take issue with the fact that the Company prepared question-and-answer ("Q&A") responses on backlog which they did not use during VMware's earnings calls. But these briefing materials were quite extensive – more than 40 single spaced pages of potential questions on every conceivable topic, the vast majority of which (including the Q&A on backlog) were never used on the actual earnings calls.[86] As the Company's witnesses explained, the purpose of the draft Q&A for the earnings call briefing materials was simply to brainstorm every potential question that the Company's executives or Investor Relations personnel thought might be asked during the earnings call, so that they would be prepared to answer any question that might arise. As VMware's CFO testified, he "always wanted to be prepared and able to answer any question [based on] whatever information was out there" and while this was "a document with many, many questions and answers . . . that's not to say that [he] was anticipating [them all]."[87] Indeed, the transcripts of the earnings calls make it clear that backlog was not a topic of significant discussion during the Company's earnings calls. Analysts were much more interested in other aspects of the Company's business, including the Company's shift to a SaaS model.

The Staff also argued that VMware misled investors because it used backlog to meet its internal and external guidance. However, this fundamentally misapprehends how the Company used backlog. At the start of each quarter, VMware knew how much backlog it had, and it set its

---

[86] *See*, *e.g.*, VMware, Q1 FY 2020 Earnings Q&A (May 30, 2019) (Ex. 179).

[87] Rowe Tr. 232:02-05; 257:14-17.

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    LAMARTINA-VMW00000501

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

guidance taking that backlog into account. Indeed, the Company made this abundantly clear as early as the first time it disclosed backlog, stating during its earnings call for the third quarter of FY 2018 that its revenue guidance for the following quarter "takes into account our license backlog at the end of the [prior] quarter."[88]



**VMW Stock Price: Q3 FY 2018 – Q4 FY 2020**



The fluctuations in VMware's stock price during this period – which show a trend upward as license backlog grew and downward as it decreased – also show that investors were not misled by VMware's backlog practices, especially during FY 2020 when the reductions in license backlog were accompanied by significant declines in the Company's stock price, even though VMware had met its guidance. For example, the Company's stock price declined by more than 7% after the first quarter FY 2020 earnings call, reflecting investor disappointment

---

[88] VMware, Q3 FY 2018 Earnings Call Tr. at 4 (Nov. 30, 2017).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                      LAMARTINA-VMW00000502

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

with the first quarter results and second quarter license revenue guidance.  After this earnings call, a Deutsche Bank analyst reported that "several factors [pointed] to early/modest signs of pressure," including his observation that VMware's license revenue outperformance "was the skinniest in some time" and that "VMware reaffirmed but didn't raise its FY20 guide (it normally inches it up off a beat)."[89]  The analyst also noted that VMware's "backlog fell sharply" during the quarter, which he cited as another "key take" before "trimming [his] total and license revs estimates" for FY20.[90]

Likewise, VMware's stock price declined by approximately 7% after the second quarter FY 2020 earnings call, again reflecting investor disappointment with the second quarter results and license revenue guidance for both the third quarter and the full fiscal year, which was lower than management had previously guided.  After this earnings call, a Wedbush analyst noted that VMware "reported a solid quarter that featured growth in all 3 geographic categories with total revenue growing 12% y/y but will be overshadowed by the license revenue outlook for the remainder of the year/FY3Q20 which was —$50 million below the Street."[91]  The analyst also noted that VMware ended the quarter with "$13 million of license backlog vs. $48 million of license backlog at the end of [the prior] quarter."[92]  VMware's stock price declines after the first and second quarters of FY 2020 demonstrate the market's clear understanding that VMware's performance during this period was not as strong as it had been in the past, notwithstanding that the Company continued to meet its guidance.

---

[89] Deutsche Bank Securities Inc., "First Signs of Macro Weakness," at 1-2 (May 31, 2019).

[90] *Id.*

[91] Wedbush Securities, "Acquisitions of Pivotal & Carbon Black Headline a Solid 2Q; Positive for Cloud," at1 (Aug. 23, 2019).

[92] *Id.* at 3.

33

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

The Staff has also suggested that VMware misled analysts by failing to provide information beyond what was included in the Company's public filings. In particular, the Staff referenced emails in which members of VMware's Investor Relations department were instructed to use "standard language"[93] or noted that their "script [was] working for now."[94] These emails do not show an attempt to mislead investors. Rather, they reflect the Company's disciplined approach to ensure that it complied with Regulation FD by not selectively disclosing details that may be considered MNPI.[95] This is yet another example of the Staff taking colorful language out of context to unfairly characterize the Company's actions and statements as misleading.

## II.    This Matter Is Unique and Distinguishable

As explained above, this is not an accounting fraud case. The crux of the matter is whether VMware's backlog disclosures were sufficient, and VMware firmly believes that they were. However, in the interest of exploring a potential resolution of the matter, we have considered what we believe to be the most comparable SEC enforcement actions within the last three years that involved disclosure failures. Those actions include the SEC's settled orders

---

[93] Email from Paul Ziots to Richard Gu (Sept. 10, 2019, 06:47 AM PDT) (VMW00457509-510) (Ex. 230).

[94] Email from Paul Ziots to Richard Gu, et al. (May 31, 2019, 07:20 EDT) (VMW00025072-73) (Ex. 191).

[95] In the Regulation FD adopting release, the SEC expressly stated its expectation "that most issuers will use appropriate disclosure policies as a safeguard against selective disclosure." Final Rule: Selective Disclosure and Insider Trading, Exchange Act Rel. No. 34-43154, 65 Fed. Reg. 51,716 51,724 (Aug. 15, 2000), available at https://www.sec.gov/rules/final/33-7881.htm.

34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

LAMARTINA-VMW00000504

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

against Marvell Technology Group, Ltd. ("Marvell"), Diageo plc ("Diageo"), HP, Inc. ("HP"), and Under Armour, Inc. ("Under Armour").

*Marvell*:[96] On September 16, 2019, Marvell agreed to settle SEC charges that it violated the antifraud provisions of the securities laws by failing to disclose its practice of accelerating, or "pulling in," sales scheduled for future quarters into current quarters to close the gap between its actual and forecasted revenues. According to the SEC order, the semiconductor company pulled in revenues across three quarters without disclosing the impact of that practice on its revenues. The SEC also found that Marvell's senior management ignored concerns raised by employees regarding the company's use of pull-ins, and that management concealed their use of pull-ins from the company's disclosure committee, board of directors, and independent auditor by deleting references to pull-ins from board and committee materials. As part of the settlement, Marvell agreed to a $5.5 million civil penalty and to violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 thereunder. No individuals were charged.

*Diageo*:[97] On February 19, 2020, London-based alcohol producer Diageo agreed to settle SEC charges that it violated the antifraud provisions by failing to disclose its practice of shipping unneeded products to its distributors. In particular, the SEC's order found that in 2014 and 2015, Diageo's North American subsidiary pressured certain distributors to buy products in excess of market demand in an effort to help Diageo meet performance targets in the face of declining

---

[96] *In the Matter of Marvell Technology Group, Ltd.*, Exchange Act Rel. No. 86971 (Sept. 16, 2019), available at https://www.sec.gov/litigation/admin/2019/33-10684.pdf.

[97] *In the Matter of Diageo plc*, Exchange Act Rel. No. 88234 (Feb. 19, 2020), available at https://www.sec.gov/litigation/admin/2020/33-10756.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

LAMARTINA-VMW00000505

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

demand for spirits. Diageo agreed to a $5 million penalty and to violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20 thereunder. No individuals were charged.

*HP*:[98] On September 30, 2020, HP agreed to settle SEC charges that it violated the antifraud provisions by failing to disclose its practice of using pull-ins. The SEC found that regional managers from HP's print supplies business used various incentives to pull in sales at quarter-end, including by extending substantial discounts to channel partners that agreed to place orders earlier than planned. Additionally, sales managers in HP's Asia Pacific and Japan region extended steep discounts to resellers who they knew would sell HP supplies outside of their region, in violation of HP policy and distributor agreements. As a result of these disclosure violations, the SEC found that HP failed to maintain sufficient disclosure controls and procedures, as evidenced by the fact that HP's principal financial officers and principal executive officers did not learn about its pull-in practices until "quarters after the actual conduct had taken place." HP agreed to a $6 million penalty and to violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, 13a-15, and 12b-20 thereunder. No individuals were charged.

*Under Armour*:[99] On May 3, 2021, Under Armour agreed to settle SEC charges that it violated the antifraud provisions by failing to disclose its practice of using pull-ins. The SEC found that Under Armour's senior management directed sales personnel to reach out to

---

[98] *In the Matter of HP, Inc.*, Exchange Act Rel. No. 90060 (Sept. 30, 2020), available at https://www.sec.gov/litigation/admin/2020/33-10868.pdf.

[99] *In the Matter of Under Armour, Inc.*, Exchange Act Rel. No. 91741 (May 3, 2021), available at https://www.sec.gov/litigation/admin/2021/33-10940.pdf.

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                LAMARTINA-VMW00000506

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

customers and offer sales incentives such as price discounts and extended payment terms so they would take delivery of products earlier than originally scheduled. In addition to not disclosing its pull-ins, the SEC found that Under Armour made misleading statements on earnings calls by attributing its ability to meet analyst earnings estimates to growth in various product lines, which the company inaccurately said remained intact. Under Armour agreed to a $9 million penalty and to violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, 13a-12, and 12b-20 thereunder. No individuals were charged.

Although these are the closest actions we could find, they are significantly distinguishable from this matter in several respects. First, none of the companies in these actions had any existing disclosures in place related to the conduct at issue, as opposed to the clear disclosure of the backlog practice and levels in this matter. Second, most of these cases involved pull-ins, which are meaningfully different from VMware's MPL process. In particular, when a company engages in pull-ins, the amount of the pull-in is typically not transparent to investors. This is very different from VMware, where the Company's beginning and ending backlog figures were clearly disclosed each quarter, and investors could (and did) use those figures to perform their own analysis of the Company. Third, many of the comparable cases involved other egregious conduct, such as channel stuffing, widespread control failures, or efforts to conceal the practices at issue. There is absolutely no evidence of such conduct in this matter. Instead, VMware's use of backlog was open and shared with the Company's external auditors, as well as investors.

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                          LAMARTINA-VMW00000507

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.**

<u>**CONCLUSION**</u>

This matter is unlike any action the SEC has pursued.  The Staff's case against VMware is based entirely on a practice that was permissible under GAAP and clearly explained in a disclosure that: (i) exceeded the requirements of Regulation S-K; (ii) exceeded peer disclosures; (iii) was enhanced as the practice grew over time; (iv) was vetted by internal and external professionals, including the Company's auditors; and (v) was understood by analysts who followed the Company.  Based on these facts, there is no basis to support violations of the antifraud provisions, let alone a finding of scienter.

VMware has undertaken extensive efforts to cooperate with the Staff's investigation for the past two years, including by making an initial presentation that outlined the issues in this matter, which have not changed.  VMware also responded to the Staff's questions and requests quickly, and made both current and former employees available for testimony, including one former employee who resides outside the United States.  We appreciate this opportunity to explain our view of the matter and to continue engaging with the Staff to explore a potential resolution.  We believe that any penalty in this matter should be proportional to the penalties in the four actions summarized above, taking into account VMware's level of disclosure and the Company's cooperation with the Staff.  We also believe that any violations should align with these matters.  We are hopeful that this submission will lead the Staff to agree to a reasonable resolution that appropriately reflects the unique facts and circumstances of this matter.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                            LAMARTINA-VMW00000508

FOIA CONFIDENTIAL TREATMENT REQUESTED BY VMWARE, INC.

Dated:  April 18, 2022                    Respectfully submitted,

Andrew J. Ceresney, Esq.
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

Kara Brockmeyer, Esq.
Mark D. Flinn, Esq.
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
(212) 383-8000

39

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    LAMARTINA-VMW00000509